### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 18-61550-CIV-ALTMAN/Hunt

**SHENZHEN KINWONG ELECTRONIC CO., LTD.**, *et al.*,

      *Plaintiffs*,

*v.*

**RISHI KUKREJA**, *et al.*,

      *Defendants.*

_____/

### OMNIBUS ORDER

      The Plaintiffs—Shenzhen Kinwong Electronic Co., Ltd., and Kinwong Electronic (Hong Kong) Ltd.—manufacture Printed Circuit Boards ("PCBs"). The Defendants—Rishi Kukreja; Kinwong LLC; and Circuitronix LLC—are in the business of distributing PCBs. The parties—once business partners—have chased each other in and out of courtrooms these past few years. In this case, they challenge one another's claims to the KINWONG mark. After protracted—and, sometimes, acrimonious—litigation, the Defendants moved to dismiss the Plaintiffs' trademark claims. The Plaintiffs, in turn, moved to dismiss Count IV of the Defendants' Amended Counterclaim.[1] And both sides filed cross-motions for summary judgment. This Order follows.

---

[1] While the Defendants' Amended Counterclaim [ECF No. 280] makes them Counter-Claimants/Counter-Plaintiffs too, we'll refer to them as "the Defendants" for simplicity's sake. For similar reasons, we'll use the term "the Plaintiffs" instead of Counter-Defendants.

## THE FACTS

### I.     The Parties

Shenzhen Kinwong Electronic Co., Ltd. ("Shenzhen Kinwong"), one of the Plaintiffs, manufactures PCBs—devices used to connect electronic components in all but the simplest of electronic machines—in China and sells them around the world. *See* Joint Statement of Undisputed Facts ("JSUF") [ECF No. 183] ¶¶ 1–2; Plaintiffs' Statement of Material Facts ("Plaintiffs' SMF") [ECF No. 185] ¶ 1.[2] Shenzhen Kinwong has owned the Chinese trademark registration for the KINWONG mark since 1999. *See* 1999 Kinwong Trademark Registration Certificate [ECF No. 186-9]. That same year, Shenzhen Kinwong—using its trademarks—began selling its PCBs to clients in the United States. *See* Deposition of Kent Wang ("Wang Depo.") [ECF No. 186-6] at 34:21–24 ("So we started to use our [KINWONG] trademarks since 1999, with Emerson in U.S. to do business."). And, since at least 2003, Shenzhen Kinwong has advertised its products on a globally accessible website, www.kinwong.com. *See* Plaintiffs' SMF ¶ 3.[3] The other Plaintiff—Kinwong Electronic (Hong Kong) Ltd. ("Kinwong HK")—is a subsidiary of Shenzhen Kinwong. *See* Defendants' Statement of Material Facts ("Defendants' SMF") [ECF No. 180] ¶ 22.

---

[2] Before 2013, Shenzhen Kinwong went by the name "Kinwong Electronics (Shenzhen) Co., Ltd." *See* Hansen Zhang Declaration re: Hong Kong Trademark Application ("Zhang Decl.") [ECF No. 180-7] at 3 ("The predecessor of the applicant was Kinwong Electronics (Shenzhen) Co. Ltd. . . . On June 16, 2013, the applicant changed the name of the company to 'Shenzhen Kinwong Electronics Co., Ltd.'"). Some of the exhibits in this case thus refer variously to "Shenzhen Kinwong Electronic Co., Ltd.," *see, e.g., id.* at 2–3; "Kinwong Electronics (Shenzhen) Co.," *see, e.g., id.*; and "Kinwong Electronic (Shenzhen) Co. Ltd.," *see, e.g.*, Draft 2005 Manufacturer's Agreement [ECF No. 186-25] at 3. The parties treat these all as variations on the name of a single entity—the Plaintiff, Shenzhen Kinwong. *See, e.g.*, JSUF ¶¶ 2, 8, 24; Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' MSJ") [ECF No. 182] at 2–26; Defendants' Motion for Summary Judgment ("Defendants' MSJ") [ECF No. 179] at 2–28. We'll do the same.

[3] *See also* 2019 Deposition of Rishi Kukreja ("2019 Kukreja Depo.") [ECF No. 186-11] at 125:25–126:2 ("A: There was a Kinwong.com website [when we started to do business with Shenzhen Kinwong in 2005], and I believe that that website at the time was in Chinese. Q: Okay. Anyone in the world could access Kinwong.com website, right? A: I believe in Chinese, yes.").

The Defendants—Circuitronix LLC ("CTX") and Kinwong LLC—are both Florida-based companies founded and owned by Rishi Kukreja (another Defendant) in 2002 and 2013, respectively. JSUF ¶¶ 3–5, 18, 23. Neither CTX nor Kinwong LLC has ever manufactured PCBs. JSUF ¶¶ 5, 23. Since its founding in 2013, Kinwong LLC has functioned as a holding company—with Kukreja as its sole owner. *Id.* ¶¶ 19, 23. Kinwong LLC has *never* sold any products—not PCBs or anything else. *Id.* ¶ 23. Meanwhile, CTX sells PCBs, but it does not manufacture them. *Id.* ¶¶ 5–6. CTX makes its money by acting as a middleman, purchasing PCBs from Chinese manufacturers—like Shenzhen Kinwong— and reselling them to end customers who use them in their products. *See* Plaintiffs' SMF ¶ 9; Defendants' Objections to Plaintiffs' SMF ("Defendants' Objections") [ECF No. 215] ¶ 9 ("Admitted[.]"). So, CTX and Shenzhen Kinwong would seem to be a perfect match—one manufactures a product that the other distributes.

## II.     The Course of Business

In 2005, these seemingly complementary companies connected after Kukreja—CTX's founder and owner—asked an intermediary to introduce him to some Chinese PCB manufacturers. *See* Plaintiffs' SMF ¶ 10; Defendants' Objections ¶ 10 ("Admitted[.]"). In April of that same year, Kukreja met Shenzhen Kinwong's COO and partial owner, Mafio Shum. *See* Plaintiffs' SMF ¶¶ 10– 11; Defendants' Objections ¶¶ 10–11 ("Admitted[.]"). Shortly after their meeting, Kukreja emailed Shum. *See* Plaintiffs' SMF ¶ 11; Defendants' Objections ¶ 11 ("Admitted[.]"). Kukreja—referring to Shenzhen Kinwong as "Kinwong"—wrote: "[I]t is my hope that we can build a strong relationship with Kinwong in the future. Keeping that in mind I would like to bring the following opportunity to Kinwong." Email from Rishi Kukreja to Mafio Shum (Apr. 27, 2005 11:47 AM) [ECF Nos. 186-23, 187-12][4] at 4. The opportunity consisted of a purchase order for 50,000 estimated annual units of each

---

[4] The parties have filed dozens of documents under seal. When citing sealed documents, therefore, we'll give the docket entry numbers for *both* the public and the sealed versions of those exhibits.

of six different products manufactured by Shenzhen Kinwong. *Id.*; Plaintiffs' SMF ¶ 11; Defendants' Objections ¶ 11 ("Admitted[.]"). Notably, Kukreja wrote to Shum at his Kinwong email address: mafio@kinwong.com.[5] *See* Emails re: CTX's Proposal to Capital Profit/Kinwong [ECF Nos. 186-23, 187-12] at 2–5.

Early on, the relationship between Shenzhen Kinwong and a company called Capital Profit confused Kukreja. Trying to resolve this perceived discrepancy, he emailed James Cheung, an intermediary, to ask: "Does Mafio [Shum] work directly for Kinwong or is he from another agency company (What is Capital-Profit)? I would like to work directly with the factories as much as possible." Emails re: Capital Profit/Kinwong [ECF Nos. 186-24, 187-13] at 2; Plaintiffs' SMF ¶ 12; Defendants' Objections ¶ 12 ("Admitted[.]"). In his reply, the intermediary copied Shum and explained that "Mafio is the President and owner of Kinwong Electronics (Shenzhen) Co., Ltd. The registered name in HK call [sic] 'Capital Profit Development Ltd.' It is a common thing like Olympic, Tatchun or other[ ] PCB board shops." *Id.* at 2; Plaintiffs' SMF ¶ 13. The Defendants do not dispute that Kukreja understood this clarification. *See* Plaintiffs' SMF ¶ 13; Defendants' Objections ¶ 13 ("Admitted[.]"). At the time, Capital Profit—which is not a party here—owned 100% of the shares in Shenzhen Kinwong. *See* JSUF ¶¶ 6–8.

Within a month, Kukreja (through CTX) and Shum (acting on behalf of Capital Profit) signed a Manufacturer's Agreement, formalizing what they hoped would be a symbiotic relationship. *See Id.* When Kukreja sent the agreement to Shum for his signature, he wrote: "I look forward to building a strong relationship with *Kinwong* in the near future." Email from Rishi Kukreja to Mafio Shum (May 4, 2005 3:15 AM) [ECF No. 186-25] at 2 (emphasis added) (attaching the Draft 2005 Manufacturer's Agreement). In the draft version Kukreja emailed to Shum on May 4, 2005, the agreement stipulated

---

[5] In other words, years before Kukreja formed Kinwong LLC—years before Kukreja applied to register the KINWONG mark in the United States—he was soliciting business from a company with the very same name. *See* JSUF ¶¶ 18–20.

that it was "by and between circuitronix, llc . . . and Kinwong Electronic (Shenzhen) Co. Ltd. (Manufacturer)." Draft 2005 Manufacturer's Agreement [ECF No. 186-25] at 3. And it identified Shenzhen Kinwong as "having its principal place of business at Rm 502, 5/f, Block B, Veristrong Industrial Center, 36 Au Pui Wan Street, Fo Tan, HongKong." *Id.* The parties later revised the agreement—replacing "Shenzhen Kinwong" with "Capital Profit"—after Shum asked that, "since factory 'Kinwong Electronic (Shenzhen) Co., Ltd.' is 100% held by 'Capital Profit Development Ltd.' with the same director Mafio Shum, and owing to the foreign exchange, tax reason, etc., kindly amend the P.O. by using Capital Profit Development Ltd. instead of Kinwong." Email from Mafio Shum to Rishi Kukreja re: Draft Agreement [ECF Nos. 186-29, 187-16] at 2; *see also* Plaintiffs' SMF ¶ 17; Defendants' Objections ¶ 17 ("Admitted[.]").

The executed, final version was "by and between circuitronix, llc . . . and Capital Profit Development Ltd. (Manufacturer) having its principal place of business at Rm 502, 5/f, Block B, Veristrong Industrial Center, 36 Au Pui Wan Street, Fo Tan, HongKong." 2005 Signed Manufacturer's Agreement [ECF No. 186-26] at 2. Capital Profit's address was thus the same as Shenzhen Kinwong's. *Id.*; *see also* Draft 2005 Manufacturer's Agreement [ECF No. 186-25] at 3. Even though the executed agreement named only CTX and Capital Profit as contracting parties, everyone involved in the negotiations knew that Capital Profit was synonymous with Shenzhen Kinwong. *See, e.g.*, Email from Mafio Shum to Rishi Kukreja (May 5, 2005 4:41 AM) [ECF Nos. 186-29, 187-16] at 2 (explaining to Kukreja that "'Kinwong Electronic (Shenzhen) Co., Ltd.' is 100% held by 'Capital Profit Development Ltd.' with the same director Mr. Mafio Shum," but that Capital Profit would be party to the agreement due to "foreign exchange" and "tax reason[s]"). It's undisputed, in other words, that CTX was buying PCBs from Shenzhen Kinwong through Capital Profit. *See* 2019 Kukreja Depo. at 33:7–10, 62:22–63:1 ("Q. Starting in 2005 Circuitronix had PCBs manufactured by Kinwong in Shenzhen, China,

right? A. That is correct. . . . [T]he products that were being manufactured under the manufacturer's agreement were PCBs manufactured by Kinwong[.]").

From the beginning, in fact, CTX operated as if Capital Profit and Shenzhen Kinwong were one and the same. CTX employees referred to the new manufacturer as "Kinwong." Emails re: Kimball Electronics [ECF Nos. 186-30, 187-17] at 2 (email between CTX employees representing that they had "submitted a completed questionnaire to Kimball based on Kinwong"). Employees used the name "Kinwong" when they asked Kukreja questions. *Id.* (email from CTX employee asking Kukreja whether to use the name "Kinwong"). And Kukreja did the same. *Id.* (email from Kukreja telling employee to use the name "Kinwong"); Email from Rishi Kukreja to Daisy Ko re: Intellisense (Apr. 6, 2006 9:16 PM) [ECF Nos. 186-32, 187-19] at 2 (email from Kukreja asking CTX employee to "PLEASE PLACE ORDER ON CAPITAL PROFIT/KINWONG"). When Kukreja sent a purchase order that identified Capital Profit as the vendor, he asked the recipient: "PLEASE RELEASE THIS PO ON KINWONG." Email from Rishi Kukreja re: Purchase Order (June 12, 2005 10:34 PM) [ECF Nos. 186-31, 187-18] at 2–3. Even associates outside CTX referred to Capital Profit as "Kinwong" in their conversations with CTX employees. *See* Emails re: CTX's Profile [ECF No. 186-47] at 2–3 (external email introducing client to "Joe Yeo of Circuitronix [who] represents Kinwong a board house in China"). Indeed, the certifications Shenzhen Kinwong provided to CTX— and which CTX, in turn, sent its clients—made clear that the two companies were connected. For instance:

 

# CERTIFICATE OF REGISTRATION
## Quality Management System

Certificate No: **FM 98319**

| Location | Registered Activities |
|---|---|
| Kinwong Electronic (Shenzhen) Co., Ltd.<br>No. 166 Shuiku Road,Tiegang Village<br>Xixiang Town, Bao An<br>Shenzhen<br>Guangdong Province 518102<br>P. R. China<br>景旺电子（深圳）有限公司<br>中国广东省深圳市宝安区西乡镇铁岗村水库路 166 号<br>邮编： 518102 | The manufacture of printed circuit boards.<br>印刷电路板的制造. |
| Capital Profit Development Limited.<br>Rm. 502 Blk B 5/F. | Purchasing activity support to the site.<br>为生产地点提供采购支持. |

*See* BSI Certificate of Registration [ECF No. 186-47] at 69.

The 2005 Manufacturer's Agreement granted CTX an exclusive relationship with Capital Profit—but *only* as to those customers (1) whom CTX *introduced* to Capital Profit and (2) who submitted a purchase order within 12 months of the introduction. *See* 2005 Signed Manufacturer's Agreement at 2 (stating that the "Manufacturer grants circuitronix the *exclusive* right to promote and sell to all customers/accounts *introduced* by [C]ircuitronix" and that CTX would "handle the account exclusively for a period of 12 (twelve) months" (emphasis added)). In other words, CTX had the "exclusive right to promote and sell" products from Capital Profit (and, in turn, Shenzhen Kinwong), but CTX maintained that exclusive right *only* with respect to those clients *it* had introduced. *Id.* CTX thus only enjoyed exclusivity when it came to its own customers. *Id.* By contrast, Capital Profit (and Shenzhen Kinwong) were free to sell their products to *anyone*—so long as those customers hadn't been introduced by CTX. *Id.* The Agreement limited itself—geographically—to the Americas, including the United States. *Id.*; JSUF ¶ 15.

One year after signing the Manufacturer's Agreement—on May 3, 2006—Capital Profit changed its name to Kinwong Group Limited ("Kinwong Group"). JSUF ¶ 9. A Shenzhen Kinwong employee notified CTX of the formal name change and noted that "the accounts and addresses [are] unchanged." Email re: Capital Profit Name Change (June 12, 2006 2:46 PM) [ECF Nos. 186-33, 187-20] at 2. The Shenzhen Kinwong employee attached a note from Capital Profit asking that, beginning June 9, 2006, clients use the new name—Kinwong Group Limited—for remittances. *Id.* at 3–4, 7. The email also included a Certificate of Name Change from the Hong Kong Registrar of Companies. *Id.* A CTX employee forwarded this announcement, along with the accompanying documents, to Kukreja. *Id.* at 2. In light of that name change, Kinwong Group (formerly Capital Profit) continued to do business with CTX under the auspices of the Manufacturer's Agreement. *See* Defendants' Objections ¶¶ 19–20.

CTX employees reminded coworkers to refer to the company they were doing business with as "Kinwong," not "Capital Profit." *See, e.g.*, Email from Juan Castano to Andrew Barnett *et al.* (Jan. 11, 2007 5:00 PM) [ECF Nos. 186-34, 187-21] at 2 (email from CTX employee explaining that "Kinwong used to be Capital Profit Development (CPD). Only use Kinwong now"). CTX employees handled the relationship between Kinwong Group and Shenzhen Kinwong just as they had in the days of Capital Profit—by treating the two companies as one and the same. *See, e.g., id.*; Emails re: Kimball Electronics [ECF Nos. 186-30, 187-17] at 2 (emails from CTX employees, including Kukreja, treating Capital Profit and Shenzhen Kinwong as synonymous). Kinwong Group (standing in the same position as Capital Profit) owned 100% of the shares in Shenzhen Kinwong. *See* JSUF ¶ 8; *see generally* Email re: Capital Profit Name Change (June 12, 2006 2:46 PM) [ECF Nos. 186-33, 187-20]. Several years later, in 2011, Shenzhen Kinwong's structure changed. Kinwong Group sold 100% of its shares in Shenzhen Kinwong to Shenzhen Kinwong—thus consolidating ownership in the manufacturer itself. *See* Defendants' SMF ¶ 21; Plaintiffs' Counterstatement of Material Facts [ECF

No. 212].[6] That same year, an employee of Shenzhen Kinwong informed clients—including Kukreja—that "Kinwong Group Limited will be changed into Kinwong Electronic (Hong Kong) Limited." Email from Cherry He to Rishi Kukreja (June 9, 2011 10:59 PM) [ECF Nos. 186-77, 187-53] at 2. In other words, Shenzhen Kinwong was telling its clients to stop addressing purchase orders to Kinwong Group. *See id.* at 4 (explaining that, after June 1, 2011, Kinwong Group would no longer be receiving purchase orders). Instead, Shenzhen Kinwong instructed customers to submit orders to Kinwong Electronic (Hong Kong) Limited ("Kinwong HK"). *See id.* (asking clients to address orders to Kinwong HK). As before, the company's bank information remained the same. *See id.* at 2 ("Just only company name change, the bank information are the same as before."). This time, though, Kinwong HK was a wholly owned subsidiary, rather than the owner, of Shenzhen Kinwong. *See* Defendants' SMF ¶ 22; *see also* Zhang Decl. at 3 (explaining that Shenzhen Kinwong "established [the] wholly-owned subsidiary 'Kinwong Electronics (Hong Kong) Co., Ltd.' in the Hong Kong Special Administrative Region" in order "to conduct sales outside the domestic market"). Today, then,

---

[6] The Defendants concede that this transfer of rights occurred. Indeed, in their statement of material facts, they cite (without disputation) the following portion of the deposition testimony of Shenzhen Kinwong employee (and corporate representative) Cherry He:

> Q: What do you know about the relationship between Kinwong Group and Kinwong Electronic (Hong Kong) regarding the rights under these agreements? Tell me.
>
> A: The shareholders of Kinwong Group did sell shares to Shenzhen Kinwong. And then Hong Kong Kinwong is the subsidiary of Shenzhen Kinwong.
>
> Q: So is the Kinwong Group still in existence?
>
> A: The company still exists.
>
> Q: Okay. But it sold shares to Shenzhen Kinwong?
>
> A: Yes.

Defendants' SMF, Exhibit A: Composite of Shenzhen Kinwong Corporate Representative Cherry He's Deposition [ECF No. 180-1] at 20–21.

Kinwong Group operates as a separate company in Hong Kong. *See* JSUF ¶¶ 9, 13; Plaintiffs' SMF ¶¶ 19–20.

Throughout the parties' working relationship, CTX conducted sales and marketing for Shenzhen Kinwong through agreements it signed with *both* Capital Profit *and* Kinwong Group. *See* 2005 Signed Manufacturer's Agreement (with Capital Profit); 2010 Settlement Agreement [ECF No. 186-38] at 2 (with Kinwong Group).[7] So, for instance, CTX brought customer representatives to personally audit Shenzhen Kinwong's factory in China. *See* JSUF ¶ 16. CTX also used Shenzhen Kinwong's materials—complete with Shenzhen Kinwong's name, address, and financial information—in its (CTX's) presentations to potential U.S. customers. *See* Plaintiffs' SMF ¶ 28; *see also* Email from Rishi Kukreja to Margaret Johnson (Jan. 24, 2006 6:42 PM) [ECF No. 186-2] at 2 (email from Kukreja to a U.S. client forwarding, at the client's request, a presentation containing information on Shenzhen Kinwong's factory).[8] But here's the rub: throughout the thousands of emails the parties exchanged over the course of their lengthy relationship, the Defendants (Kukreja and CTX) consistently referred to the company they were doing business with—whatever name appeared on the purchase orders—as "Kinwong." Plaintiffs' SMF ¶ 24. And Kukreja admitted as much in his 2019 deposition:

> Q: How many e-mails would you say are in Circuitronix records that reference Kinwong; thousands?
>
> A: I do not have—thousands, yes.

---

[7] In 2010, CTX and Kinwong Group settled a dispute regarding each party's compliance with the 2005 Manufacturer's Agreement. *See* 2010 Settlement Agreement [ECF No. 186-38] at 2. The parties stipulated that the Manufacturer's Agreement remained in full force and effect to the extent that it did not conflict with the Settlement Agreement. *Id.* at 5.

[8] *See also* CTX Quality Presentation [ECF No. 186-2] at 9–48 (slides depicting certifications, test reports, and memberships for Shenzhen Kinwong and Capital Profit); 2019 Deposition of Animesh Dutta ("Dutta Depo.") [ECF No. 186-5] at 67:10–20 ("Q: If you turn to [slide] 3, it says historic milestones. And you see at the bottom it says: 1993 company established. Right? A: Right. Q: That's Kinwong's information, not Circuitronix, correct? A: Yes. Q: Circuitronix wasn't established until 2002? A: Right."); *see generally* Kinwong Presentation [ECF Nos. 186-14, 187-5].

Q: And all of that is in reference to the PCBs you were manufacturing in China at the Kinwong factory? . . .

A: All those e-mails are—that is correct.

2019 Kukreja Depo. at 102:24–103:8.

The parties spend quite a bit of time quibbling about who set the quality for the PCBs. *Compare* Defendants' SMF ¶ 10 ("[CTX] set the quality of the PCBs that it ordered from Capital Profit."), *with* Plaintiffs' Counterstatement of Material Facts ¶ 10 ("Disputed. . . . Kinwong performed its own quality control review and issued 'Certificates of Conformity' for the products it manufactured."). Both sides probably have a point. On the one hand, the Plaintiffs were actually manufacturing the PCBs, and they've produced several "certificates of conformance," which indicate that *they* were the ones conducting quality control over the PCBs before shipment. *See* Plaintiffs' SMF ¶ 47 (collecting certificates). On the other hand, the Manufacturer's Agreement suggests that, "[i]f [the] MANUFACTURER fails to adhere to quality standards and delivery schedule as per the Purchase Order terms, circuitronix reserves the right of procurement elsewhere." *See* 2005 Signed Manufacturer's Agreement ¶ 7.4. And Cherry He, Shenzhen Kinwong's corporate representative, testified that CTX engaged in at least some quality control over Shenzhen Kinwong's products:

Q. Did samples have to be sent to CTX for approval to make sure that they met the specification requirements?

A. Yes, we have sent samples to CTX, and then CTX would sell to the end clients.

Q. And if CTX found a problem with the product, would they come back to you and have you fix it before they sent it to the client?

A. CTX had staff members in mainland China. Before the products are shipped, they would come over and inspect the products.

Q. Would they then approve for shipment once they have inspected?

A. Yes.

Q. And if there was a problem, they would tell you what the problem was and you would work together to fix the problem before the goods were shipped?

11

A. Usually, that is the case; but I'm not the only person that would be involved. They would very often come to our factory, and sometimes they would have direct communication with the quality personnel.

Deposition of Cherry He ("He Depo.") [ECF No. 186-124] at 60:10–61:11. In other words, *both* CTX and Shenzhen Kinwong had quality-control teams, and both appear to have played a role in ensuring the quality of Shenzhen Kinwong's PCBs.

As the working relationship progressed, disputes arose regarding pricing, factory visits, information sharing, and Shenzhen Kinwong's right to sell its PCBs directly to certain clients. *See* 2010 Settlement Agreement at 2–4; *see generally Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 1:17-CIV-22462-AHS.[9] In 2010, CTX and Kinwong Group signed a Settlement Agreement. *See generally* 2010 Settlement Agreement. The settlement included (1) a $314,572.69 payment from CTX to Kinwong Group, *id.* at 2; (2) limits on Kinwong Group's right to increase the price of its manufactured goods, *id.* at 2–4; and (3) an extension of CTX's period of exclusivity for certain customers it had introduced to Kinwong Group,[10] *id.* at 4. While the Settlement Agreement included a section titled "Pricing, Lead-Time, Quality Standards and Payment Terms," specifications concerning "quality" or "standards" appeared nowhere in the document. *See generally id.* The Settlement Agreement also acknowledged that, in 2005, the companies had signed an agreement under which "Circuitronix [wa]s to perform global sales and marketing for Kinwong, on an exclusive basis, for certain customers[,]" *id.* at 2—making clear that Kinwong Group had succeeded Capital Profit in this

---

[9] In that lawsuit, filed in 2017 before Judge Ursula Ungaro, CTX sued Shenzhen Kinwong and Kinwong HK for breach of contract, alleging (among other things) that the Kinwong entities had violated certain pricing conditions, impermissibly altered credit terms, and "us[ed] CTX's confidential business information to steal CTX's customers and circumvent CTX." Second Amended Complaint, *Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 1:17-CIV-22462-AHS (S.D. Fla. Feb. 13, 2018), ECF No. 48. After a trial before Judge Patricia A. Seitz, the jury found for CTX and awarded compensatory damages. The case was later reassigned to Judge Anuraag H. Singhal for all further proceedings.

[10] Schedule A of the Settlement Agreement identifies these customers as: Lear Corporation, Kimball Electronics, TRW, and GE Industrial and Consumer. *See* 2010 Settlement Agreement at 8.

business endeavor. The 2005 Manufacturing Agreement remained in effect so long as it "d[id] not conflict with the terms of this [Settlement] Agreement." *Id.* at 5.

***

To recap, then: When CTX (a U.S. company) wanted to become a distributor for Shenzhen Kinwong (located in mainland China), CTX signed an agreement with Capital Profit—a Hong Kong entity that *both* owned Shenzhen Kinwong *and* facilitated its sales. Capital Profit then changed its name to Kinwong Group, but the relationship remained the same—principally because Kinwong Group still owned Shenzhen Kinwong. As if that weren't convoluted enough, Kinwong Group—formerly known as Capital Profit—then sold its ownership shares in Shenzhen Kinwong back to Shenzhen Kinwong. And, at around the same time, the Hong Kong facility CTX had initially dealt with—first as Capital Profit, then as Kinwong Group—became Kinwong HK, a subsidiary of Shenzhen Kinwong.

### III.    The Marks

Since 1994, Shenzhen Kinwong has certified its PCBs through Underwriters Laboratories ("UL"). *See* Plaintiffs' SMF ¶ 29; 2005 Shenzhen Kinwong Management Manual ("Shenzhen Kinwong Manual") [ECF No. 186-47] at 13 (stating that "Kinwong" received a "[q]ualified UL certification in 1994"); *see also* UL File E158063 [ECF Nos. 186-52, 187-32] at 4–5 (noting that UL issued the certification in 1994). UL is an international organization that develops safety standards for, and conducts product testing of (among many things), PCBs. *See* 2003 UL Certification [ECF Nos. 186-52, 187-32] at 7. With this first certification, UL assigned the applicant (Capital Profit) a file number (E158063)—just as it did with its other clients. *See* Email from Wenwu Jiang to Rishi Kukreja (Jan. 18, 2010 4:54 PM) [ECF Nos. 186-52, 187-32] at 2 (informing Kukreja that "[t]he document we provided customer has a UL file number E158063, per record enclosed, the name of the company listed is Capital Profit"). Like the other companies that registered with UL, *see* UL File E158063 at 4–5 (listing

13

other companies' abbreviations),[11] Shenzhen Kinwong registered a UL code—the letters "CP" for Capital Profit. *See* Plaintiffs' SMF ¶ 29; *see* UL File E158063 at 7 (explaining that "CP" denotes "KINWONG ELECTRONIC (SHENZHEN) CO LTD"). This "CP" code appeared on just about every PCB that Shenzhen Kinwong manufactured. *See* He Depo. at 144:4–18 (discussing exceptions where "the board is very, very small, like a toothpick").

By 2005, Shenzhen Kinwong had linked the UL code "CP" and the trademark ⊕ to its own name as well. *See* E243951 UL Card [ECF No. 186-47] at 69.[12] And there's no doubt that Kukreja (and CTX) understood these codes and symbols as referring to Shenzhen Kinwong. In a presentation Kukreja *himself* gave to clients in 2006, *see* Email from Rishi Kukreja to Margaret Johnson (Jan. 24, 2006 6:42 PM) [ECF No. 186-2] at 2, CTX included a slide of Shenzhen Kinwong's UL certification, which identified the manufacturer's UL code as "CP." Here's the slide:

---

[11] Some UL codes clearly stand for the companies' names—"GE: General Electric," for example, and "P: Panasonic"—whereas others are less obvious, such as "HU: Zhejiang Huazheng" and "G: Grace Electron." UL File E158063 at 4.

[12] This document also appears in an email that a CTX employee sent to Kukreja in 2010. *See* Email from Wenwu Jiang to Rishi Kukreja (Jan. 18, 2010 4:54 PM) [ECF Nos. 186-52, 187-32] at 2, 8. That email identified the UL file numbers for Capital Profit and Shenzhen Kinwong. *See id.*



*See* CTX Quality Presentation [ECF No. 186-2] at 48.

While CTX and Shenzhen Kinwong worked closely together, they were clear on who made the PCBs and who distributed them: in 2008, for example, when CTX employees sent parts made by Shenzhen Kinwong to clients, they used shipping labels that identified CTX as the "supplier" and "Kinwong" as the manufacturer. Here's what those labels looked like:



*See* 2008 Shipping Labels [ECF Nos. 212-2, 217-1] at 7.

In 2009, Shenzhen Kinwong hired another company (Electrotek) to act as its North American sales representative. *See* Electrotek Agreement [ECF No. 186-104] at 1. Its agreement with Electrotek stipulated that "the name 'Kinwong' and the logo type used by Kinwong are service marks and trademarks belonging solely to Kinwong." *Id.* at 2–3. Under this arrangement, Shenzhen Kinwong's sales were made under the KINWONG mark, its circuit boards were stamped with *its* UL code ("CP"), and all packaging, shipping labels, invoices, and bills of lading were imprinted with the "Kinwong" name. *See* Plaintiffs' SMF ¶¶ 47, 53; Defendants' Objections ¶¶ 47, 53 (disputing only the separate question of who was conducting quality control, but not objecting to this point). After this agreement was in place, Shenzhen Kinwong began advertising its parts in English-language trade publications. *See* Magazine Advertisements [ECF No. 186-108]. And, by 2013, Shenzhen Kinwong was one of the world's largest PCB manufacturers, with more than $300 million in annual sales. *See* Plaintiffs' SMF ¶ 55; Defendants' Objections ¶ 55 ("Admitted[.]"); *see also* Zhang Decl. at 3–5; Printed Circuit Design Article [ECF Nos. 186-107, 187-75] at 6, 9 (ranking Shenzhen Kinwong as the world's 48th-largest PCB manufacturer).

### IV.     The Birth of Kinwong LLC

On January 18, 2013—while conducting business with Shenzhen Kinwong—Kukreja formed Kinwong LLC, a Florida limited liability company. JSUF ¶¶ 18–19. Kukreja was the new company's principal and sole owner. *Id.* Kinwong LLC thus became the world's *fourth* "Kinwong" company— but the only one owned by the Defendants. One year later—and while Kukreja was still doing business with Shenzhen Kinwong—Kinwong LLC filed an application with the U.S. Patent and Trademark Office ("USPTO") for the "KINWONG" mark in the circuit-board category. *Id.* ¶ 20; *see also* Kinwong LLC USPTO Application for the KINWONG Mark ("Kinwong LLC USPTO App.") [ECF No. 186-111] at 21. The USPTO published the Kinwong LLC application "for opposition" in July 2014. *See* JSUF ¶¶ 21–22; *see also* Kinwong LLC USPTO App. at 10 (indicating that the application was "published for opposition" on "07/01/2014").

The USPTO asked Kinwong LLC for more information. In his response—a January 2015 supplement to the Kinwong LLC application—Kukreja swore, under penalty of perjury, that "[t]he mark KINWONG has been used on our website – kinwongllc.com to promote the printed circuit board business." Kinwong LLC USPTO App. at 30–31. At the time, the website kinwongllc.com had been in use for only a month. *See* Dutta Depo. at 136:5–9 ("Q: So it's right that when you submitted the response to office action on January 19, 2015, the website Kinwong, LLC had been live for roughly a month or less, correct? A: Correct.").

In his February 2015 supplements to the USPTO application, Kukreja declared—again, under penalty of perjury—that Kinwong LLC "first used" the mark "at least as early as 12/11/2014, and first used in commerce at least as early as 12/11/2014, and is now in use in such commerce." Kinwong LLC USPTO App. at 21. As proof of Kinwong LLC's use of the KINWONG mark in commerce, Kukreja submitted the following photographs of boxes bearing the label "Kinwong, LLC":






*See* Kinwong LLC USPTO App. at 25–29 (indicating that Kukreja submitted these files on Feb. 10, 2015).[13]

---

[13] *See also* Dutta Depo. at 142:1–7 ("Q: You submitted these photographs at the direction of Mr. Kukreja, correct? A: I don't remember. Q: Did you submit these photographs of your own accord? Was it your idea to submit the photographs? A: I would have taken Mr. Kukreja's input on it."); Email from Rishi Kukreja to Animesh Dutta (Feb. 9, 2015 12:36 PM) [ECF Nos. 186-117, 187-81] at 2 (email from Kukreja regarding the trademark application, telling CTX employee Dutta: "I hope you're tracking closely"); *id.* (email from Dutta replying, "Yes. Will be submitting additional proof (as discussed with you) by tomorrow – 2/10/2015"); Email from Animesh Dutta to Rishi Kukreja (Feb. 18, 2015 10:38 AM) [ECF Nos. 186-118, 187-82] at 2–6 (attaching photos submitted to USPTO and informing Kukreja that they "were uploaded on 2/10/2015 as proof of use in promoting Kinwong, LLC's commercial interests").

Unbeknownst to the USPTO, the labels on these boxes had been ordered on February 5, 2015 and picked up on February 9, 2015—*just* the day before Kukreja submitted the photographs to the USPTO. *See* Fastsigns Invoice [ECF No. 186-119]; 2020 Continued Deposition of Rishi Kukreja ("2020 Kukreja Depo.") [ECF No. 186-10] at 387:5–15 ("Q: [This] is an invoice that was produced to us from Fast Signs, an invoice dated February 9 of 2015, which is the date of response to office action with the photographs, the Kinwong, LLC boxes were submitted to the U.S. Patent and Trademark Office? A: Yes. Q: Is this the invoice reflecting the purchase of vinyl labels with the Kinwong, LLC logo on it? A: It seems to be."). The USPTO granted Kinwong LLC's trademark application on May 12, 2015. *See* JSUF ¶¶ 21–22. And, despite Kukreja's claim to the USPTO, Kinwong LLC has *never* sold any product directly. *Id.* ¶ 23 ("Kinwong, LLC is a holding company and has never sold product directly.").

## PROCEDURAL HISTORY

The Plaintiffs—Shenzhen Kinwong and Kinwong HK—filed this lawsuit on July 9, 2018. *See generally* Docket. A lot's happened since. After the Plaintiffs submitted the now-operative Amended Complaint [ECF No. 63], the Defendants moved to dismiss, *see* Motion to Dismiss Amended Complaint ("Defendants' MTD") [ECF No. 73], and we held a hearing, at which the lawyers presented their oral arguments, *see* 6/25/2019 Hr'g. Tr. [ECF No. 94]. But, before we could rule on the MTD, the parties moved to stay the case. *See* Unopposed Motion to Stay [ECF No. 155]. With the parties' consent, on January 8, 2020, we closed the case, denied the MTD as moot, and granted the Plaintiffs' Unopposed Motion to Stay. *See* Order Granting Joint Motion to Stay Deadlines [ECF No. 160]. While the case was closed, the Defendants filed their answer to the Amended Complaint, which included a counterclaim and a jury trial demand. *See* Defendants' Answer and First Counterclaim [ECF No. 163]. The Plaintiffs responded with a motion to dismiss of their own. *See* Plaintiffs' Motion to Dismiss Counterclaim [ECF No. 170].

About a month later, after the parties' settlement discussions had faltered, we reopened the case. *See* Order Reopening Case [ECF No. 177]. That same day, the Defendants filed their motion for summary judgment, *see* Defendants' MSJ [ECF No. 179]—to which (with our permission) they appended an addendum that readopted and reasserted the arguments they'd advanced in their original MTD—and the Plaintiffs, in turn, filed their motion for partial summary judgment, *see* Plaintiffs' MSJ [ECF No. 182]. These motions became ripe just as the COVID-19 pandemic swept across the country.

In July 2020, we granted the Plaintiffs' motion to dismiss the Defendants' counterclaim. *See* Order Granting Plaintiffs' Motion to Dismiss [ECF No. 269]. After the Defendants filed their Amended Counterclaim [ECF No. 280], the Plaintiffs moved to dismiss Count IV (tortious interference with business relationships), *see* Plaintiffs' Motion to Dismiss Count IV of Amended Counterclaim ("Plaintiffs' MTD") [ECF No. 288]. In November 2020, we held a hearing on the parties' respective motions to dismiss and for summary judgment. *See* Minute Entry [ECF No. 330]. Shortly after that hearing, we issued a partial ruling—granting in part the Defendants' MTD, dismissing Counts V and VI of the Amended Complaint, and denying the Defendants' Motion to Strike. *See* Order [ECF No. 331]. This Order resolves everything else.

## THE LAW

### I. Motion to Dismiss

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

To meet this "plausibility standard," a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545).

On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). Unsupported factual allegations and legal conclusions, however, receive no such deference. *See Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). A complaint's "well-pled allegations must 'nudge the claims across the line from conceivable to plausible.'" *Hays v. Page Perry, LLC*, 627 F. App'x 892, 896 (11th Cir. 2015) (cleaned up) (quoting *Twombly*, 550 U.S. at 555, 570).

## II.      Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *Id.*

At summary judgment, the moving party bears the initial burden of "showing the absence of a genuine issue as to any material fact." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997); *see also Celotex* Corp. *v. Catrett*, 477 U.S. 317, 323 (1986) ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."). Once the moving party satisfies its initial burden, the burden then shifts to the non-moving party to "come forward with specific facts showing there is a genuine issue for trial." *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The Court, in ruling on a motion for summary judgment, "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3); *see also Green v. Northport*, 599 F. App'x 894, 895 (11th Cir. 2015) ("The district court could consider the record as a whole to determine the undisputed facts on summary judgment."). In any event, on summary judgment, the Court must "review the facts and all reasonable inferences in the light most favorable to the non-moving party." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).

In sum, if there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013). On the other hand, the Court must grant summary judgment if a party "has failed to make a sufficient showing on an essential element of her case." *Celotex*, 477 U.S. at 323; *see also Lima v. Fla. Dep't of Children & Families*, 627 F. App'x 782, 785–86 (11th Cir. 2015) ("If no reasonable jury could return a verdict in favor of the nonmoving party, there is no genuine issue of material fact and summary judgment will be granted." (quoting *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir.1994))).

ANALYSIS

## I.     The Defendants' Motion to Dismiss

The Defendants have moved to dismiss the Plaintiffs' trademark claims (Counts I–IV). *See* Defendants' MTD; Defendants' MSJ at 24–27 (reasserting the arguments the Defendants had advanced in the original MTD). In essence, the Defendants say that the Plaintiffs' trademark claims constitute compulsory counterclaims to the prior breach-of-contract action, which was tried before Judge Seitz in mid-2019. And (the Defendants continue), since the Plaintiffs didn't assert those claims in the prior litigation, they've waived them. *See* Defendants' MSJ at 24–26 ("Plaintiffs' failure to raise the issues in this case in the Circuitronix case operates as a waiver of the subject claims.").

A party "must state as a counterclaim" any claim that (1) "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and (2) "does not require adding another party over whom the court cannot acquire jurisdiction." FED. R. CIV. P. 13(a)(1). In deciding whether a counterclaim is compulsory, we must determine whether "the same operative facts serve as the basis of both claims or the core of facts upon which the claim rests activates additional legal rights, otherwise dormant, in the defendant." *Republic Health Corp. v. Lifemark Hosps. of Fla., Inc.*, 755 F.2d 1453, 1455 (11th Cir. 1985) (quoting *Plant v. Blazer Fin. Servs., Inc.*, 598 F.2d 1357, 1361 (5th Cir. 1979)). Courts refer to this as the "logical relationship" test. *Id.*; *see also Revere Copper & Brass Inc. v. Aetna Cas. & Sur. Co.*, 462 F.2d 709, 714 (5th Cir. 1970) ("We have indicated that a counterclaim is compulsory if it bears a 'logical relationship' to an opposing party's claim."); *John Alden Life Ins. Co. v. Cavendes*, 591 F. Supp. 362, 365 (S.D. Fla. 1984) ("To determine whether multiple claims arise from the same 'transaction or occurrence' and are therefore compulsory under Rule 13(a), this Circuit has adopted the 'logical relationship' test." (citing *Revere Copper & Brass*, 426 F.2d at 715)). "Only claims that do not arise from common operative facts are not logically related." *Montgomery Ward Dev. Corp. v. Juster*, 932 F.2d 1378, 1381 (11th Cir. 1991).

The central question we must answer here, then, is whether Shenzhen Kinwong and Kinwong HK's trademark claims arise from the same operative facts that were before the jury in the 2017 contract litigation. Generally, however, "[t]he issues of fact and law surrounding contract claims are not largely the same as those surrounding trademark infringement." *Feed Mgmt. Sys., Inc. v. Brill*, 518 F. Supp. 2d 1094, 1097 (D. Minn. 2007). And that's certainly true here. The "operative facts" in our case concern the Defendants' alleged misuse of the KINWONG mark, whereas the prior litigation turned on allegations that the Plaintiffs had violated their contracts with CTX by selling PCBs directly to CTX's U.S. customers. *Compare* Plaintiffs' Amended Complaint ¶ 1 (alleging that the Defendants have sought to "'hijack,' capitalize on, and benefit from the substantial goodwill and reputation that Plaintiffs have built over a decade in their KINWONG mark"), *with* Second Amended Complaint, *Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 17-22462, (S.D. Fla. July 9, 2018), ECF No. 48 (seeking relief against Shenzhen Kinwong and Kinwong HK for "using CTX's confidential business information to steal CTX's customers and circumvent CTX"). And the question of whether the Defendants (in our case) coopted the Plaintiffs' KINWONG mark has very little to do with whether the Plaintiffs, for example, violated pricing agreements, altered credit terms, or circumvented a non-compete by "stealing" CTX's customers.

As proof that the trademark claims are "indelibly enmeshed" with the contract case, the Defendants point to the Plaintiffs' request for information on an assignment-of-claims agreement—between CTX and two affiliates—that (in part) formed the basis of CTX's 2017 lawsuit. *See* Defendants' MSJ at 22. But the Defendants contradict themselves on the very same page when they argue that (in their view) this case is "so" related to the 2017 case because the "Plaintiffs filed a subpoena on Defendants' corporate counsel [during the course of this litigation] seeking information regarding the assignment of claims which formed the basis of the Contract Case, *a document wholly*

*irrelevant to this action.*" *Id.* (emphasis added). In other words, the only real example of overlap the Defendants have identified is—in their view—"wholly irrelevant" to this case.

Unsurprisingly, in denying the Defendants' request for a protective order on this assignment-of-claims dispute, Magistrate Judge Patrick M. Hunt noted that "this is . . . a different case, with *at least* somewhat different facts and posture." Omnibus Order [ECF No. 140] at 5 (emphasis added). He's right. The 2017 case was about the alleged breach of specific contract provisions. This case is about trademark infringement—a claim that doesn't rely on *any* breach of contract. Indeed, the crucial evidence in the two cases is totally different: as the Plaintiffs explain—in a point the Defendants never dispute—only 7 of the more than 130 exhibits the Plaintiffs filed in support of their MSJ in this case (less than 5%) were ever even produced during the discovery phase of the contract case. *See* Plaintiffs' Response to the Defendants' MSJ [ECF No. 211] at 22; Defendants' Reply in Support of their MSJ ("Defendants' MSJ Reply") [ECF No. 223] at 10–11 (not disputing this point). And, while the Defendants harp on the relevance of the Manufacturer's and Settlement Agreements to both cases, they never cite to any provision of those contracts that's relevant in *both* actions. *See generally* Defendants' MSJ; Defendants' MSJ Reply. Nor do they explain how the facts that gave rise to *this* case bear any meaningful connection to the facts from which the *prior* case arose. *See generally* Defendants' MSJ at 20–23.

The Defendants' reliance on *Flanigan & Associates. Inc. v. Allstate Insurance Co.*, 2013 WL 12158127 (M.D. Fla., Mar. 26, 2013), is neither here nor there. *See* Defendants' MSJ at 25; *see also* Defendants' MTD at 12–13. In *Flanigan*, the plaintiff alleged that the defendant (Allstate) had breached two separate exclusive-agency agreements. *See Flanigan*, 2013 WL 12158127, at *1. Over the plaintiff's objection, the district court allowed Allstate to amend its answer to add counterclaims relating to the plaintiff's allegedly unauthorized use of Allstate's trademarks. *See id.* at *1–3. Allstate's trademark counterclaims were compulsory, the court said—but only because both parties' claims were, in

essence, breach-of-contract claims. *See id.* at \*2 ("Defendant's counterclaims arise from the same operative facts as [p]laintiff's breach of contract claim because both involve alleged violations of the [exclusive-agency] Agreements."). Both *Flanigan* agreements had stipulated that the plaintiff would "cease and desist from any and all use of [Allstate] Company servicemarks and tradenames" after the exclusive relationship ended. *Id.* at \*2 n.3. As the district court explained: "Plaintiff claims Defendant breached the agreements by failing to make termination payments. In turn, Defendant asserts that Plaintiff breached by allegedly continuing to use Defendant's trademarks and other conduct." *Id.* at \*2. The court therefore concluded: "As both Plaintiff's and Defendant's causes of action depend on the [exclusive-agency] Agreements, there is a logical relationship among the claims." *Id.*

The *Flanigan* contracts, unlike ours, specifically addressed the plaintiff's post-termination rights in (and use of) the defendant's trademarks; they, in fact, directed the plaintiff, upon dissolution of the parties' agreements, to "immediately cease and desist from any and all use of [defendant] Company servicemarks and tradenames." *Id.* at \*2 n.3. No such language appears anywhere in our contracts. *See generally* 2005 Signed Manufacturer's Agreement; 2010 Settlement Agreement. *Flanigan*, in short, cannot guide us here.

Attempting to marshal additional support, the Defendants point to *Alexsam, Inc. v. WildCard Systems*, 2015 WL 13688558 (S.D. Fla. Nov. 20, 2015) (Bloom, J.). *See* Defendants' MSJ at 25. But that case is also different. There, the district court determined that the defendant's patent-invalidity counterclaim was compulsory because the disputed "[s]ettlement [a]greement itself contemplate[d] a basis for negating the [a]greement, providing that the [a]greement would terminate should a court find the Licensed Patents invalid or unenforceable." *Alexsam*, 2015 WL 13688558, at \*5. As in *Flanigan*, then, the contract and trademark claims were entwined: in *Flanigan*, the trademark infringement *was* a breach of the contract (and vice versa), whereas in *Alexsam* the agreement *itself* terminated upon a finding that the patents in question were invalid.

Unlike the Defendants' cases, the Plaintiffs' trademark claims in our case do *not* arise from the parties' prior agreements. Indeed, the Defendants' principal position at oral argument was that they had *signed no contract* with the Plaintiffs. *See* 11/12/2020 Hr'g Tr. [ECF No. 335] at 43:8–19 (arguing that "we don't have a document, we don't have a transfer, we don't have an assignment" between Capital Profit and Shenzhen Kinwong). According to the Defendants, in other words, their contracts were with Capital Profit and Kinwong Group—neither of whom assigned their rights to the Plaintiffs and neither of whom is a party here. Having staked out this position, the Defendants cannot now argue that the Plaintiffs' trademark-infringement claims arose from the prior breach-of-contract case because, in their view, there *never* was any contract with the Plaintiffs.[14]

Even putting the contracts aside, though, the fact is that our case just doesn't arise from the same set of operative *facts* that animated the 2017 breach-of-contract litigation. In that case, as we've seen, CTX was suing Shenzhen Kinwong and Kinwong HK for breach of contract and unjust enrichment. *See* Second Amended Complaint ¶¶ 62–93, *Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 17-22462 (S.D. Fla. July 9, 2018), ECF No. 48. The gravamen of that litigation, then, was CTX's allegation that Shenzhen Kinwong and Kinwong HK had violated the terms of the Settlement Agreement's non-compete by going behind CTX's back and signing side deals with CTX's customers. *Id.* ¶¶ 3, 55, 60. In our case, by contrast, Shenzhen Kinwong and Kinwong HK are suing CTX, Kinwong LLC, and Kukreja for violating the Plaintiffs' trademark rights. *See generally* Plaintiffs'

---

[14] For similar reasons, we find unpersuasive the Defendants' reliance on two out-of-circuit, district court cases. *See* Defendants' MSJ at 25–26 (citing *Keith A. Keisser Ins. Agency, Inc. v. Nationwide Mut. Ins. Co.*, 246 F. Supp. 2d 833, 835 (N.D. Ohio 2003) (concluding that the plaintiffs' claims—including trademark infringement under Ohio common law—were compulsory counterclaims to the prior state-court action because "[a]t the core of both sets of claims is the contention that the other party breached one or more of their *contractual* obligations to the other" (emphasis added)), and *M&G Partners LLP v. K7 Design Grp. Inc.*, 2018 WL 2431853, at *4–6 (E.D. Wis. May 30, 2018) (holding, in part, that the plaintiff's claim for trademark infringement was a compulsory counterclaim to an earlier-filed breach-of-contract claim by the defendant (against the same plaintiff) in New York federal court because the two actions "both fundamentally depend on what occurred in connection with the [same] Walmart deal")).

Amended Complaint. As part of *this* lawsuit, the Plaintiffs allege that they owned the KINWONG mark long before "Kukreja, Rishi, DBA KINWONG, LLC" registered that same name with the USPTO. *See id.* ¶ 31. As this simple summation makes plain, our case has nothing to do with the parties' non-compete agreements (or the decision by Shenzhen Kinwong and Kinwong HK to engage CTX's customers) and everything to do with a question the jury was never presented with—and on which it was never asked to opine—in the 2017 litigation: who owns the KINWONG mark?[15]

Since the two cases arise from different facts, we have little difficulty concluding that the Plaintiffs' claims weren't compulsory counterclaims to the 2017 litigation. And, for this commonsense proposition, authority abounds. *See, e.g.*, *Grendene USA, Inc. v. Brady*, 2015 WL 1499229, at *3 (S.D. Cal. Apr. 1, 2015) ("[T]he 'essential facts' of the [defendants'] causes of action in the Trademark Action differ from those of [the plaintiff's] breach of contract cause of action. The Trademark Action involves facts dealing with the alleged infringement."); *Vanderveer Grp., Inc. v. Petruny*, 1994 WL 242589, at *4 (E.D. Pa. June 3, 1994) (finding that "the asserted breach of contract claim is not a compulsory counterclaim" because the "counterclaim does not involve claims of . . . trademark infringement . . . , which [is] the heart of [the suit]"); *Radisson Hotels Int'l, Inc. v. Amelia Invs., Inc.*, 1992 WL 167051, at *4 (M.D. Fla. July 6, 1992) (finding that a claim based on an "interpretation of certain contract provisions" was not a compulsory counterclaim in a Lanham Act action "based upon alleged infringing use of [plaintiff's] trademarks, trade names, and service marks without its consent by defendants").

The Defendants' MTD is, therefore, **DENIED**.

## II.    The Plaintiffs' Motion to Dismiss

---

[15] For this reason, too, the Defendants' dependance on *Flanigan* and *Alexsam* is misplaced. In those cases, after all, both the underlying and the subsequent actions revolved around the same basic question: did the one party infringe the other's trademark rights? Since the answer to that question necessarily resolved the breach-of-contract issue, the cases were factually the same and the trademark counterclaims were compulsory.

The Plaintiffs have moved to dismiss Count IV of the Defendants' Amended Counterclaim, which alleges that the Plaintiffs tortiously interfered with a business relationship. *See* Plaintiffs' MTD at 1–8. "Under Florida law, '[t]he elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)). The Plaintiffs' MTD attacks only the third element of Count IV—that is, whether the interference was unjustified. *See* Plaintiffs' MTD at 7.

"The third element, intentional and unjustified interference with a business relationship, requires the plaintiff to allege that 'the defendant acted without justification.'" *Duty Free Ams.*, 797 F.3d at 1280 (quoting *Sec. Title Guar. Corp. of Balt. v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. 2d DCA 1989)). Crucially, in assessing whether a party's interference was unjustified, "Florida recognizes a 'privilege of interference.'" *Id.* (quoting *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 657–58 (Fla. 4th DCA 1980)). This privilege of interference embodies the fundamental principle that a competitor can go after business for itself: "[t]here can be no claim for tortious interference with a business relationship where the action complained of is undertaken to safeguard or promote one's financial or economic interest." *Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) (quoting *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 293 (Fla. 3d DCA 2007)). In our case, the Defendants base their interference claim on the allegation that the Plaintiffs stole the Defendants' customers for themselves. *See, e.g.*, Amended Counterclaim ¶ 27 (alleging that the Plaintiffs "contact[ed] Circuitronix customers and solicit[ed] concealed sales in

breach of the exclusivity provision of the Settlement Agreement"). On the Defendants' own allegations, then, the privilege plainly applies.[16]

To be fair, that doesn't end our analysis. That's because this privilege to compete is "qualified." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001). In particular, the privilege can be overcome in two circumstances. *First*, a party can overcome the competition privilege by proving that "the defendant's motive was *purely* malicious." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (emphasis added). *Second*, a tortious-interference claim can survive the privilege "if improper methods were used." *Id.*; *see also Duty Free Ams.*, 797 F.3d at 1280 (noting that interference is privileged "unless the [claimant] alleges a purely malicious motive divorced from any legitimate competitive economic interest" or "adequately alleges improper methods" (cleaned up)). The idea (of course) is that, while companies may freely compete for business, that competition becomes tortious when it's grounded in an improper purpose or method.

By the Defendants' own allegations, neither exception to the competition privilege applies here. *First*, the Defendants haven't plausibly alleged a "purely malicious motive." Quite the opposite: As we've said, they've claimed that the Plaintiffs "contact[ed] Circuitronix customers" and "solicit[ed] . . . sales" for themselves. Amended Counterclaim ¶ 27. The unmistakable import of these assertions is that the Plaintiffs had a competitive economic interest in doing business with the Defendants' customers, and that the Plaintiffs "disparaged Circuitronix" in the hopes of arrogating that business to themselves. *Id.* ¶¶ 79, 83–84. It's simply implausible to believe, in other words, that the Plaintiffs' *sole* motive was to maliciously harm the Defendants. *Cf. Concierge Servs., Inc. v. Flagler Holdings VI Beta Inc.*, 2021 WL 3934225, at *4 (S.D. Fla. May 27, 2021) (Graham, J.) (dismissing a tortious-interference

---

[16] Unsurprisingly, the Defendants never contest this point. *See generally* Defendants' Response to Plaintiffs' MTD [ECF No. 294] (analyzing the "the privilege of competition" without ever suggesting that the Plaintiffs *weren't* competing for business).

claim where the plaintiff "alleged no facts indicating the sole basis for Defendant's [actions] was malice").[17]

The Eleventh Circuit's decision in *Duty Free Americas* is dispositive on this issue. There, the plaintiff—an operator of duty-free stores—lost several bids for retail space at various American airports. *Duty Free Ams.*, 797 F.3d at 1257–61. The operator sued Estée Lauder, contending that Estée Lauder tortiously interfered with prospective business relationships, in part, by "inducing" the operator's competitors to make misrepresentations about the operator to airport authorities. *Id.* at 1281–82. The Eleventh Circuit affirmed the district court's order granting Estée Lauder's motion to dismiss, reasoning that the operator "d[id] not allege that any of its competitors took action for the sole purpose of interfering with [the operator's] prospective relationships with airport authorities." *Id.* "[T]here [were] simply no facts from which [the Eleventh Circuit could] infer that the statements were made [by the competitors] out of any motivation other than the hope of winning the airport contract." *Id.* Our case is just the same. According to the Defendants, the Plaintiffs tried to steal one of their clients by criticizing the Defendants' business practices. But, like the defendant in *Duty Free Americas*, the Plaintiffs didn't besmirch the Defendants "solely for the purpose of harming" their interests. *See Duty Free Ams.*, 797 F.3d at 1282. They did it to secure business for themselves. That's sufficient to dispose of the Defendants' "pure malice" contentions here.

*Second*, the Defendants fare no better on the "improper methods" prong. As an initial matter, in their response to the Plaintiffs' MTD, the Defendants never even *mention* this second test—much less contend that they've satisfied it. They've thus waived any such argument they could've made. *See,*

---

[17] *See also, e.g., Ernie*, 260 F.3d at 1294 n.9 (affirming summary judgment on a tortious-interference claim because "[a]ppellants have failed to show that [a]ppellee's sole basis for disapproving the transaction was malicious"); *Mattocks v. Black Ent. Television LLC*, 43 F. Supp. 3d 1311, 1319 (S.D. Fla. 2014) (Cohn, J.) (granting summary judgment on a tortious-interference claim where the defendant had "financial motives" for its actions and "no record evidence shows that [the defendant acted] for purely malicious reasons").

*e.g.*, *Gunder's*, 422 F. App'x at 822 (affirming the district court's dismissal of a tortious-interference claim because, among other reasons, the plaintiff "failed to raise its 'improper means' argument in response to [the defendant's] Rule 12(b)(6) motion"); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived."); *Cont'l Tech. Servs., Inc. v. Rockwell Int'l Corp.*, 927 F.2d 1198, 1199 (11th Cir. 1991) ("An argument not made is waived . . . .").

But, even if the Defendants *had* asserted an improper-methods claim, that contention would've failed. "[I]mproper methods" include "physical violence, misrepresentations, illegal conduct, [and] threats of illegal conduct." *Duty Free Ams.*, 797 F.3d at 1280 n.9 (cleaned up). In our case, the only (potentially) improper method we can think of—though the Defendants never mention it—is the claim that the Plaintiffs made misrepresentations in pursuing the Defendants' customers. In their counterclaim, the Defendants allege the following:

> 79. Early on in 2015, Plaintiffs beg[a]n to contact customers of Circuitronix and began to make disparaging remarks regarding the company, its work practices and its rights. One employee and corporate representative of both Counter-Defendant entities, Joe Fu, has been documented stating in a March of 2015 e-mail that Mr. Kukreja is a "fuxking guy" and that the Counter-Defendants do not own the Kinwong mark in the US. He specifically expressed in his email that "[n]ow is the time to extinguish him."

> 80. Novita Technologies ("Novita"), was a customer of Circuitronix in 2017.

> …

> 83. In November of 2017, Rishi Kukreja had a meeting with an employee of Novita, Laura Adams, who told him that representatives of Counter-Defendants had approached Novita, that they were aware of Novita's business relationship with Circuitronix, and were making numerous disparaging statements about Circuitronix on an ongoing basis.

> 84. In 2018, representatives of Counter-Defendant corporations continued to have meetings and discussions with representatives of Novita at which they disparaged Circuitronix regarding its services, quality and packaging of goods, in an effort to harm Circuitronix's reputation and induce Novita to cease its business relationship with

Circuitronix. This unlawful disparagement and interference continued until at least May 1, 2018.

85. In particular, as late as April and May of 2018, Mike Tucker, an employee of Counter-Defendant corporations communicated with Don Williams, of Novita, and discussed alleged problems with Circuitronix in meeting deadlines, packaging and timeliness.

…

88. Circuitronix reasonably believes that Counter-Defendants made false and derogatory representations to Circuitronix's customers, as set forth above, with the intent of interfering in Circuitronix's business relationships with these clients and by these actions caused actual damages through lost business.

Amended Counterclaim ¶¶ 79, 80, 83–85, 88.

The problem is that, while the Defendants allege that "[CTX] reasonably believes that [Kinwong] made false and derogatory representations to [CTX's] customers, as set forth above," the Defendants' conclusory accusation of "falsity" is entirely untethered from any particular statement, fact, or customer. In other words, while the Defendants point to "false and derogatory representations . . . as set out above," they *never* explain which of those statements, if any, were false. What's worse, the Defendants allege *only* that CTX "reasonably believes" certain statements to be false—not that any statements were, *in fact*, false. The Defendants, then, never contend that any statement was *actually* false, never identify *which* statement they "reasonably believe[ ]" to be false, and never explain *how* any of those statements were, in fact, false. For all these reasons, the Defendants' "bare and wholly conclusory statements"—after years of discovery across multiple lawsuits and following an opportunity to amend—fall far short of stating a plausible claim for relief. *Duty Free Ams.*, 797 F.3d at 1281; *see also Miller v. Ascom Holding AG*, 2019 WL 6910157, at *2 (M.D. Fla. Dec. 19, 2019) (Barber, J.) (dismissing a tortious-interference claim because the plaintiff alleged, "in conclusory fashion, that [the defendant] 'intentionally misrepresented facts and circumstances' to encourage the decedent to accelerate his benefits, but she does not identify with any sufficient detail the nature of these misrepresentations").

Against all this, the Defendants offer one response: that "[w]hether or not their conduct is justified is a matter for an affirmative defense and is not ripe for a motion to dismiss." Defendants' Response to Plaintiffs' MTD at 8. But the Eleventh Circuit has explicitly noted that this is an open question under Florida law: "The first issue we confront in determining whether [the defendant's] actions are protected by the privilege of competition is which party bears the burden of persuasion. The answer is far from clear." *Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc.*, 262 F.3d 1152, 1158 (11th Cir. 2001). In recognizing this open question, though, the Eleventh Circuit observed that, according to some commentators, "placing the burden on the defendant to show justification for his actions requires too little of the plaintiff because the major issue in the controversy—justification for the defendant's conduct—is left to be resolved on the affirmative defense of privilege." *Id.* (cleaned up). And that seems exactly right: if all a plaintiff needed to allege was a knowing interference with a business relationship, any advertisement—going (as it necessarily would) after a competitor's customers—would state a claim. That can't be the law—and, fortunately, it isn't.

But, even if the Defendants *were* right that the competition privilege is an affirmative defense, that wouldn't change our result here for two reasons. *One*, in *Duty Free Americas* (which post-dated *Austral*) the Eleventh Circuit affirmed the district court's finding, on a motion to dismiss, that the competitors' statements, made in the context of a competitive bidding process, were privileged. 797 F.3d at 1280–82. In doing so, the court was pellucid: "when plaintiffs have failed to adequately allege improper methods, we have followed the Florida courts and dismissed these claims." *Id.* at 1280–81. And that's precisely what happened here. The Defendants, in their counterclaim, never alleged improper methods. As in *Duty Free Americas*, then, dismissal is appropriate. *Two*, "under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed if an affirmative defense . . . appears on the face of the complaint." *Okpala v. Drew*, 248 F. App'x 72, 73 (11th Cir. 2007). Here, for all the reasons we've

outlined, the Plaintiffs' privilege to interfere appears squarely on the face of the Defendants' counterclaim. So, the Defendants lose *even* on their view of the law.

Because the Defendants have failed to plead a necessary element of their claim, the Plaintiffs' Motion to Dismiss Count IV of the Amended Counterclaim is **GRANTED**.

### III.    Cross-Motions for Summary Judgment

The Plaintiffs have moved for summary judgment on their claims for trademark infringement and cancellation (Counts I–IV), *see* Plaintiffs' MSJ at 15–23, and the Defendants, for their part, have moved for summary judgment on the Plaintiffs' trademark claims, *see* Defendants' MSJ at 15–24. The Defendants also ask for summary judgment on *some* of their own counterclaims—specifically, Count I (federal trademark infringement and counterfeiting); Count III (common law trademark infringement); Count VI (denial of the Plaintiffs' trademark application because of fraud on the USPTO); and Count VII (a declaration that the Plaintiffs have no legal right to register trademark application No. 79/212,641). *See id.* at 6–14. The Defendants don't, however, move for summary judgment on their other three counterclaims, which are: Count II (federal unfair competition); Count IV (tortious interference, which we've now dismissed); and Count V (denial of the Plaintiffs' trademark application because of priority of use). *See generally id.*

### A.    Trademark Infringement

The Plaintiffs' trademark claim—that they are the senior users[18] of the KINWONG mark and that the Defendants' trademark registration for that mark should be cancelled—simply isn't close.

To prevail on a trademark-infringement claim, "a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two."

---

[18] "Senior user" status—also known as the party with "senior rights"—"designates the first party to use the mark anywhere in the United States." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:1 (5th ed. 2021). The "junior user," on the other hand, is "the second party to use the mark, even though the junior user may be the first in time in a given territory." *Id.*

*Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130–31 (11th Cir. 2018) (quoting *Tana v. Dantanna's*, 611 F.3d 767, 773 (11th Cir. 2010)). The second element isn't in dispute: the parties agree that their simultaneous use of the KINWONG mark is likely to confuse consumers. *See* Defendants' MSJ at 8 ("Evaluation of this case in light of these [seven] factors proves that Plaintiffs' activities create a likelihood of confusion."); Plaintiffs' MSJ at 16–17 (contending that the Defendants "have adopted a mark that is the same or confusingly similar to Kinwong's" (cleaned up)). So, only the first element— who has rights in the KINWONG mark—is in dispute.

Trademark rights turn on priority of use. As the Eleventh Circuit has explained, "[r]ights in a trademark are determined by the date of the mark's first use in commerce. The party who first uses a mark in commerce is said to have priority over other users." *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080–81 (11th Cir. 2016) (quoting *Hana Fin., Inc. v. Hana Bank*, 574 U.S. 418, 419 (2015)); *see also Vital Pharms., Inc. v. Monster Energy Co.*, 472 F. Supp. 3d 1237, 1261 (S.D. Fla. 2020) (Altman, J.) (same). At the same time, priority of use is territorial—which is to say that a party's first use of a mark *outside* the United States doesn't establish any trademark rights *within* the United States. 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:5 (5th ed. 2021) (hereinafter "MCCARTHY ON TRADEMARKS") ("The concept of territoriality is basic to trademark law. Rights accrue in each nation only by use or fame of the mark in that nation."); *see also Cotton Ginny, Ltd. v. Cotton Gin, Inc.*, 691 F. Supp. 1347, 1352 (S.D. Fla. 1988) (Marcus, J.) ("[A] trademark is acquired only within those markets where the mark has been used and its meaning become known.").

When a trademark's first use occurs in the context of a manufacturer-distributor relationship, the question becomes whether the first use should be attributed to the manufacturer or to the distributor.[19] In resolving disputes "between a manufacturer and distributor, courts will look first to

---

[19] Although the Eleventh Circuit hasn't squarely addressed this question, courts around the country— as we'll explain—have analyzed the trademark issue in the context of a manufacturer-distributor dispute in more or less the same way.

any agreement between the parties regarding trademark rights." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1220 (9th Cir. 1996); *see also Premier Dental Prods. Co. v. Darby Dental Supply Co., Inc.*, 794 F.2d 850, 854 (3d Cir. 1986) ("The ownership of a trademark as between a manufacturer and an exclusive distributor is largely determined by the parties' agreement."); 2 MCCARTHY ON TRADEMARKS § 16:48 ("In manufacturer-dealer disputes, the courts presume that contractual provisions as to trademark ownership are determinative.").

But, "[i]n the absence of a written agreement," courts will "presum[e] that a foreign manufacturer owns the trademarks of its products." *Rigoni USA, Inc. v. Rigoni di Asiago USA, LLC*, 2009 WL 10667806, at *10 (S.D. Fla. Jan. 14, 2009) (Jordan, J.); *see also Covertech Fabricating, Inc. v. TVM Bldg. Prod., Inc.*, 855 F.3d 163, 171 (3d Cir. 2017) ("[W]here initial ownership between a manufacturer and its exclusive distributor is at issue and no contract exists, the manufacturer is the presumptive trademark owner[.]"); *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 882 (7th Cir. 1997) ("[T]rademark law creates a presumption that, in the absence of an assignment of trademark rights, a foreign manufacturer retains all rights to a trademark even after licensing the use of the trademark to an exclusive U.S. distributor."); *Sengoku*, 96 F.3d at 1220 ("But in the absence of an agreement between the parties, the manufacturer is presumed to own the trademark."); *Select Exp. Corp. v. Richeson*, 2011 WL 13135114, at *6 (S.D. Fla. May 5, 2011) (Dimitrouleas, J.) ("As between a foreign manufacturer and a U.S. distributor of trademarked goods, all U.S. rights in the mark generally remain with the manufacturer absent an agreement to the contrary." (cleaned up)).

This presumption is irrebuttable in the case of *non-exclusive* distributors. The Southern District of New York, for instance, has applied "the presumption that the manufacturer has superior rights to the trademark," while noting that the distributor "cannot rebut this presumption unless it is an *exclusive* distributor." *Excell Consumer Prod. Ltd. v. Smart Candle LLC*, 2013 WL 4828581, at *22 (S.D.N.Y. Sept. 10, 2013) (emphasis added); *see also Rogers v. Ercona Camera Corp.*, 277 F.2d 94, 101 (D.C. Cir. 1960)

("Nor do we perceive how ownership of the mark can otherwise be attributed to [the distributor], since it was found by the District Court not to be the exclusive distributor of [the] products."). As McCarthy has put it: "If there is more than one American distributor, no one of them is the 'exclusive' distributor and no one of them is the American 'owner' of the trademark. Ownership remains in the foreign manufacturer." 5 MCCARTHY ON TRADEMARKS § 29:8. This principle is sound: Where multiple distributors sell a single manufacturer's products under a common trademark, consumers don't understand that mark as representing any one distributor over another. Instead, the mark represents the one common link: the manufacturer.

Even where the distributor is *exclusive*, that distributor faces something of an uphill battle in establishing trademark ownership over the manufacturer. To assess whether an exclusive distributor has rebutted the presumption that ownership lies with the manufacturer, courts have widely adopted a six-part test.

> The six factors that should be considered are: (1) which party invented or created the mark; (2) which party first affixed the mark to goods sold; (3) which party's name appeared on packaging and promotional materials in conjunction with the mark; (4) which party exercised control over the nature and quality of goods on which the mark appeared; (5) to which party did customers look as standing behind the goods, *e.g.*, which party received complaints for defects and made appropriate replacement or refund; and (6) which party paid for advertising and promotion of the trademarked product.

*Covertech*, 855 F.3d at 171 (cleaned up) (noting the test's "general acceptance" and collecting cases); *see also TMT*, 124 F.3d at 884 n.4 (same); *Sengoku*, 96 F.3d at 1220 (same); *Uveritech, Inc. v. Amax Lighting, Inc.*, 115 U.S.P.Q.2d 1242 (T.T.A.B. 2015) (same).[20]

---

[20] Callmann points to a similar set of considerations:

> Courts may consider (1) which party invented and first affixed the mark onto the product; (2) which party's name appeared with the trademark; (3) which party maintained the quality and uniformity of the product; and (4) with which party the public identified the product and to whom purchasers made complaints. The court may also consider which party possesses the goodwill associated with the product, or which party the public believes stands behind the product. Other relevant factors

Ultimately, this analytical framework makes a good bit of sense. In focusing on whether the manufacturer and distributor have (contractually) sorted out the trademark-ownership issue themselves, whether the distributor is exclusive in the disputed region, and how consumers understand the mark, the framework "balance[es] two policy factors." 2 MCCARTHY ON TRADEMARKS § 16:48. The first is a "[c]ontractual [e]xpectation" policy, which recognizes that the parties' "legitimate expectations should be honored." *Id.* The second is a "[c]ustomer [p]erception" policy that aims to protect the way in which "customers perceive the mark" to prevent confusion. *Id.*

As we'll explain below, in applying these principles, ownership of the KINWONG mark plainly rests with the Plaintiffs. Indeed, the Defendants fail at every turn: *First*, the Plaintiffs used their trademark in the United States long before they signed the Manufacturer's Agreement with CTX, and this simple—and dispositive—fact is not subject to genuine dispute. *Second*, even if the Plaintiffs *hadn't* used the mark in the United States before their relationship with CTX and Kukreja commenced, the Manufacturer's Agreement required CTX to "conduct all of its business in its own name"—suggesting that the parties understood that CTX's use of the KINWONG mark would be attributed to the Plaintiffs. *Third*, even if the parties' agreement *didn't* settle the matter, the evidence unambiguously shows that the Plaintiffs' relationship with the Defendants was *non-exclusive*. Thus, the irrebuttable presumption that ownership goes to the manufacturer—Shenzhen Kinwong—applies. *Fourth*, even if CTX *had* served as the Plaintiffs' exclusive American distributor, the Defendants' claim would fail for yet another reason: the Defendants haven't come close to rebutting the presumption that the manufacturer owns the trademark. We'll address each of these points below.

---

include which party paid for the advertising and what each party represents to others about the source or origin of the product.

4 CALLMANN ON UNFAIR COMP., TR. & MONO. § 17A:6 (4th ed. updated June 2021).

1.   *The Plaintiffs Used the KINWONG Mark First*

The evidence overwhelmingly shows that the Plaintiffs used the KINWONG mark in the United States first—long before any of the Defendants arrived on the scene. To start with, CTX wasn't formed until 2002 and didn't begin selling PCBs under the KINWONG name until 2005— when it entered into the Manufacturer's Agreement with Capital Profit. *See* JSUF ¶¶ 3, 6; Defendants' Objections ¶ 12 (claiming that "Circuitronix began developing the KINWONG brand in 2005"). Shenzhen Kinwong, meanwhile, has manufactured and sold its PCBs under the KINWONG mark since 1993. *See* Wang Depo. at 58:23–25 ("[W]e start[ed] to use these trademark of Kin[]wong in 1993, ever since the company was established[.]"). In 1999, the Chinese government issued Shenzhen Kinwong a trademark for the KINWONG mark—a trademark that remains active today. *See* 1999 Kinwong Trademark Registration Certificate.

Later that year, Shenzhen Kinwong sold PCBs under the KINWONG mark to its first U.S. customer, Emerson Network Power. *See* Wang Depo. at 34:21–22 ("So we started to use our trademarks since 1999, with Emerson in U.S. to do business."); Deposition of Shaobai Liu ("Liu Depo.") [ECF No. 186-7] ("Emerson is a US company. Beginning from 1999, Kinwong started supplying products to Emerson. At that time, Emerson was our number one biggest client."); Email from Wenwu Jiang to Rishi Kukreja (Nov. 14, 2005 7:34 AM) [ECF No. 187-4] ("Emerson has long time ([a]round 10 years) partnership with Kinwong"); CTX Quality Presentation at 26 (CTX's own presentation listing "Emerson" as one of Shenzhen Kinwong's "[m]ajor [c]ustomers"). In other words, Shenzhen Kinwong had a major U.S.-based customer three years *before* CTX was even formed.[21]

_____

[21]    The Defendants dispute the import of Shenzhen Kinwong's sales to Emerson in two ways, neither of which creates a genuine issue of material fact. *See* Defendants' Objections ¶ 4. *First*, the Defendants point to testimony that Shenzhen Kinwong's direct sales were to Emerson China, a subsidiary of Emerson U.S. *Id.* It's true that Shenzhen Kinwong did business with Emerson U.S. through a Chinese subsidiary. But the Defendants have pointed to *no* law for their position that doing

In addition to its Emerson sales, Shenzhen Kinwong also signed a deal in 2002 with Mingyu Enterprise Co., Ltd.—under the terms of which Mingyu would serve as Shenzhen Kinwong's U.S. sales agent. As Shaobai Liu—Shenzhen Kinwong's CEO and majority shareholder—explained, in the early 2000s, "we at Kinwong thought that if we wanted to expand our business, we had to sell to overseas markets." Liu Depo. at 19:6–8. At the time, however, Shenzhen Kinwong "did not have the resources to sell to markets such as Europe and US." *Id.* at 19:8–9. So, Shenzhen Kinwong's shareholders signed Mingyu up to serve as a "US distributor for Kinwong." *Id.* at 40:9–15. Mingyu "had a team and office or offices in the United States" and sold "Kinwong products to the United States." *Id.* at 19:6–19, 46:17–24; *see also* Wang Depo. at 35:21–36:2 ("We sold PCB to the U.S. market through Mingyu to, like, GM, Ford and Chrysler. At that time, the Kinwong's trademark that belonged to Shenzhen Kinwong and Mingyu just helps us to sell our products."). Indeed, CTX's own documents recognize that Mingyu's "[e]nd [c]ustomer[s]" included GM, Ford, and Chrysler. *See* CTX Quality Presentation at 26; *see also* CTX Supplier Contract Report [ECF Nos. 186-4, 187-2] ("Current customers include Mingyu . . . supplier to Ford, GM and Chrysler[.]").[22]

---

business with an American company through its foreign subsidiary is insufficient to support a company's use in the United States. *Second*, the Defendants complain that "no evidence of sales and shipment (purchase order, invoice, shipping papers) of branded product to U.S. for Emerson has been provided in discovery." *Id.* It's undisputed, however, that the Plaintiffs *couldn't* produce those records because their Enterprise Resource Planning system was updated in early 2005. *See* Plaintiffs' Reply to Defendants' Objections [ECF No. 222] ¶ 4. In any event, the Defendants, after years of discovery across multiple lawsuits, have produced *no* evidence—no testimony, declarations, or documents (from Emerson or anyone else)—to refute the Plaintiffs' assertion that Shenzhen Kinwong did business with Emerson U.S.

The Plaintiffs, in short, have come forward with admissible evidence—in the form of sworn deposition testimony—for their position that Shenzhen Kinwong sold PCBs to Emerson U.S. for years before CTX even existed. And the Defendants have adduced no evidence for their view that this deposition testimony was either false or mistaken. To the contrary, they've limited their objection to carping about the Plaintiff's failure to support the deposition testimony with *other* kinds of evidence (documents, pictures, etc.). But, to survive summary judgment, "[t]he non-movant . . . must do more than simply show that there is some metaphysical doubt as to the material facts. It must come forward with some affirmative evidence to support its claim." *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333, 1342 (S.D. Fla. 2021) (Altman, J.) (cleaned up).

[22]    The Defendants' attempts to create a genuine dispute of material fact over Shenzhen

And there's more. As early as 2004, Shenzhen Kinwong made sales through Yi Fung—a Hong

Kong distributor—to a U.S. customer, Neosong USA, and shipped its PCBs to Neosong in Chicago,

Illinois. *See* Wang Depo. at 34:24–25 ("[In] 2004 we did via [Yi Fung] sell PCB to customers of the

U.S., which is called [Neosong.]"). The record includes documents Shenzhen Kinwong sent to

Neosong—such as invoices, purchase orders, and packing lists—bearing the Kinwong name and logo.

*See* Email from Neosong USA to emmy@kinwong.com (Aug. 1, 2007 11:26 AM) [ECF Nos. 186-15,

187-6] (attaching a purchase order from Neosong USA to "Kinwong Electronic (shenzhen) Co.,

Ltd."); Email from Neosong USA to emmy@kinwong.com (Oct. 29, 2007 11:41 AM) [ECF Nos. 186-

---

Kinwong's relationship with Mingyu likewise fall short.

    *First*, the Defendants complain that "[n]o sales records have been produced showing sales by or to Mingyu" and that "[n]o evidence of product branded with the KINWONG mark and sold to the U.S. through Mingyu has been provided." Defendants' Objections ¶ 5. But (again) the Defendants don't get to pick and choose the kinds of evidence the Plaintiffs will rely on. The Plaintiffs have offered unrebutted (and sworn) deposition testimony for the proposition that this Mingyu relationship existed. And the Defendants' *own* documents *corroborate* the Plaintiffs' testimony. On the other hand, the Defendants have presented no testimony—from Mingyu or anyone else—to rebut any of the Plaintiffs' claims. As we've said, a party cannot survive summary judgment by simply proclaiming "I object" to the movant's well-supported factual assertions. He must, rather, come forward with *evidence* that raises a genuine dispute of material fact. *See A&E Adventures*, 529 F. Supp. 3d at 1342 ("The non-movant, however, must do more than simply show that there is some metaphysical doubt as to the material facts. It must come forward with some affirmative evidence to support its claim." (cleaned up)). Without any such evidence here, the Defendants' unsupported disputations ring hollow.

    *Second*, the Defendants reiterate that "[t]o the extent that Mingyu is a Hong Kong company and sales took place they would have occurred in Hong Kong." Defendants' Objections ¶ 5. But the Defendants *never* explain why the Plaintiffs' decision to use an intermediary is legally relevant. Nor could they. As we explain below, in our global economy, it's not uncommon for businesses to use distributors to access foreign markets. Recognizing this reality, our trademark law allows a manufacturer to avail itself of its distributors' U.S. business.

    *Third*, the Defendants argue that "GM, Ford, Chrysler do not buy boards directly from factories and only do so through intermediate companies called EMS Companies (Electronic Manufacturing Services). These companies would identify any boards with the EMS company and not the factory." Defendants' Objections ¶ 6 (cleaned up). The Defendants, however, provide *no* citation—let alone evidence—for their claim that GM, Ford, and Chrysler didn't identify the PCBs with their manufacturer (Shenzhen Kinwong). They've thus violated the "fundamental rule that each of [the party's] statements of fact must be pegged to record evidence via pinpoint citation[.]" *Trisura Specialty Ins. Co. v. Kanpai, Inc.*, 2021 WL 4902508, at *5 (S.D. Fla. Oct. 21, 2021) (Altman, J.) (cleaned up).

16, 187-7] (attaching an invoice and packing list, both of which are prominently labeled with the name "KINWONG ELECTRONIC (SHENZHEN) CO., [] LTD.").[23]

Beyond Shenzhen Kinwong's pre-2005 sales to customers in the United States—which, recall, were under the KINWONG name[24]—courts in our Circuit have found that a company's use of its mark on a website, while not dispositive, supports a finding of use in commerce. *See Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1196 (11th Cir. 2001) (finding use in commerce partly because the seller "made the [product] available . . . to numerous end-users via the Internet" and because the product "was posted . . . bearing [its] mark on a site accessible to anyone who had access to the Internet"); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 165 F. Supp. 3d 1256, 1264 (S.D. Fla. 2016) (Bloom, J.) (noting that one factor going towards ownership of a mark is whether "distribution of the mark was widespread because the mark was accessible to anyone with access to the Internet" (cleaned

---

[23]    The Defendants quibble with the Plaintiffs' Neosong evidence in three ways—all unavailing.
    *First*, the Defendants complain that "[t]he earliest communications of any sort with an entity called Neosong that Plaintiffs provided in evidence, are emails dated 2007[.]" Defendants' Objections ¶ 7. That's false. The Plaintiffs produced a draft contract between Shenzhen Kinwong and Neosong dating all the way back to 2002. *See* Contract [ECF Nos. 186-130, 339]. In any event, as we've shown, the unambiguous deposition testimony of Kent Wang (Shenzhen Kinwong's vice president of sales and marketing) indicates that the relationship dates back *at least* to 2004. And, again, the Defendants have offered no evidence to rebut this proposition.
    *Second*, the Defendants contend that "[a]ll sales were made to Yi Fung a Hong Kong based trading company in Hong Kong." Defendants' Objections ¶ 7. Again, however, the Defendants never explain why a foreign company loses its trademark rights when it uses a foreign distributor to sell its products to an American business. And—as we explain below—it doesn't.
    *Third*, the Defendants argue that "[t]he packing lists do not display the KINWONG trademark but only show the corporate name." *Id.* Much more on this below (*see infra* note 32). Suffice it to say here, though, that the Plaintiffs *have* prominently used the KINWONG mark—separate and apart from their consistent use of Shenzhen Kinwong's corporate name. *See, e.g.*, Email from Neosong USA to emmy@kinwong.com (Oct. 29, 2007 11:41 AM) [ECF Nos. 186-16, 187-7] (attaching an invoice and packing list, both of which feature the KINWONG mark in prominent letters alongside the Kinwong logo).

[24]    *See, e.g.*, He Depo. at 145:12–20 ("Q. Okay. And it's your intention to continue engaging in sales using the Kinwong name into the future unless stopped by the Court? A. . . . [W]hat I'm trying to say is, this is the standard practice all along for us. All along we have been selling Kinwong's products into the US market. And beginning from the year 1999, we have been selling to US companies. Until today.").

up)). Here, Shenzhen Kinwong has featured its mark on its website, www.kinwong.com, since 2003. Plaintiffs' SMF ¶ 3 (providing a link to a snapshot of the www.kinwong.com website as it appeared in December 2003); *see also* 2019 Kukreja Depo. at 125:25–126:2 (agreeing that "[t]here was a Kinwong.com website [in 2005]" and that "[a]nyone in the world could access Kinwong.com website").[25]

Ultimately, the Eleventh Circuit has explained that, in assessing whether a party's "use [was] sufficiently public to identify or distinguish the marked goods," evidence of sales is "highly persuasive." *Planetary Motion*, 261 F.3d at 1195 (cleaned up). The court has also noted that a party may establish "use in commerce even in the absence of sales" under a "totality of the circumstances approach." *Id.* In saying so, the court said that a company's promotional efforts over the internet can be probative of use in commerce. *Id.* at 1195–96. Use of a mark "need not have gained wide public recognition," but it must be more than "de minimis." *Id.* at 1196. On the facts before us, we think that Shenzhen Kinwong's substantial sales to U.S. customers—along with the presence of its globally-accessible website—is much more than "de minimis" and establishes its first use as a matter of law.

---

[25] The Defendants offer two objections to the website's relevance—both meritless. *First*, they say that, in 2003, the website was in Chinese, not English. *See* Defendants' Objections ¶ 3. But we've reviewed the link the Plaintiffs provided—the authenticity of which the Defendants never contest, *see generally id.*—and found that the website gave users the option of proceeding in *either* Chinese *or* English. *See* Plaintiffs' SMF ¶ 3 (providing a link, through "the Wayback Machine," to the website www.kinwong.com as it appeared in 2003). In any event, the Defendants don't deny that there are many Chinese speakers living in the United States—some of whom, it goes without saying, might be interested in importing PCBs. *Second*, claiming that Shenzhen Kinwong didn't sell *directly* to U.S. customers, the Defendants maintain that the website couldn't have been viewed by U.S. businesses. *See* Defendants' Objections ¶ 3. As we've explained, however—*q.v.*, our discussion of Shenzhen Kinwong's substantial business with Electrotek, Mingyu, Neosong, GE, GM, and others—Shenzhen Kinwong *did* sell to U.S. customers. And, again, whether these U.S. sales were direct or indirect couldn't make the least bit of difference, since a U.S. customer (like Mingyu) would have powerful incentives to conduct due diligence on the company that was manufacturing the PCBs it (Mingyu) would be importing for sale in the United States. And among the things a company like Mingyu might do in the course of its diligence would be—we should think—to peruse the manufacturer's website. The Defendants' unsupported musings, in other words, about whether U.S. customers did—or didn't—rely on Shenzhen Kinwong's website are precisely the kinds of untethered speculation that aren't sufficient to withstand summary judgment.

Courts have widely reached this same conclusion when presented with similar facts. *See, e.g.*, *Richeson*, 2011 WL 13135114, at *6 (finding first use at summary judgment where the trademark owner had "been selling its manufactured goods in the United States since [before the other side]," "made substantial sales to customers located therein," and "advertised its products in a membership directory published . . . in the United States"); *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 348–50 (D. Conn. 2018) (finding that a party, at summary judgment, failed to "raise[] a genuine issue of fact as to [the plaintiff's] priority in the . . . mark" because the "product was on the market prior to [the defendant's] engagement as exclusive distributor").

2.  *The Manufacturer's Agreement Prohibited the Defendants from Operating Under the Plaintiffs' Mark*

Even if CTX had been the first to use the KINWONG mark in the United States,[26] that use would still inure to the Plaintiffs' benefit. As we've said, "[t]he ownership of a trademark as between a manufacturer and [its] distributor is largely determined by the parties' agreement." *Premier Dental*, 794 F.2d at 854. Here, the Manufacturer's Agreement couldn't be clearer that "circuitronix shall conduct all of its business in its own name." 2005 Signed Manufacturer's Agreement. In other words, the Agreement—by its pain language—required CTX to do business as CTX, *not* as Kinwong. *Cf.* A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 56 (2012) ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). And this provision makes sense. By 2005, after all, Shenzhen Kinwong had already been using the KINWONG mark for over twenty years and had registered its mark in China more than five years earlier. *See* 1999 Kinwong Trademark Registration Certificate; Wang Depo. at 58:23–

---

[26] How did the Defendants acquire this first use? Well, according to Mr. Kukreja, "CTX acquired the common-law rights to the KINWONG mark in 2005, when it began putting KINWONG labels on the PCBs it purchased from [Capital Profit] and resold to U.S. customers under the MA." Plaintiffs' SMF ¶ 77; Defendants' Objections ¶ 77 (not disputing this point); *see also* Defendants' Response to Plaintiffs' MSJ [ECF No. 213] at 8 ("Starting in 2005, Circuitronix was the first entity to control the use of the name KINWONG as a trademark in the U.S. on product which was manufactured pursuant to its specifications and subject to its quality approval.").

59:1 ("[W]e start to use these trademark of [KINWONG] in 1993, ever since the company was established and then in 1998, we registered the trademark in China."). It would've been eminently reasonable for the Plaintiffs to reserve any goodwill they'd garnered in that mark for themselves.

This Agreement between the parties—for CTX to conduct business under its own name rather than under the Plaintiffs' KINWONG trademark—is "determinative." 2 MCCARTHY ON TRADEMARKS § 16:48; *see also, e.g.*, *TMT*, 124 F.3d at 884 n.4 (finding no need to resort to some "nebulous balancing test" where "the distribution agreement . . . explicitly provided that [the distributor] was 'required to display the trademark and instructions *supplied* by [the manufacturer]'"); *Country Fare LLC v. Lucerne Farms*, 2011 WL 2222315, at *7 (D. Conn. June 7, 2011) (finding that the plaintiff "had clear rightful ownership to the 'Mainely Mulch' trademark" because the parties' "agreement includes clear references to Mainely Mulch as a [plaintiff] product" in that the agreement mentions the "[plaintiff's] product called 'Mainely Mulch'").[27]

In response to all this, the Defendants offer *only* a single argument:

> Plaintiffs claim that Circuitronix agreed to "conduct all of its business in its own name" (i.e., as CTX and not as Kinwong)." This is false. Neither Plaintiffs nor the word Kinwong appears anywhere in the Manufacturer's Agreement. Circuitronix agreed not to do business as the entity Capital Profit in 2005 and 2006. Circuitronix never did business as Capital Profit Development, Ltd.

*See* Defendants' Response to Plaintiffs' MSJ [ECF No. 213] at 6 (cleaned up). In advancing this argument, the Defendants both miss the point and (improperly) try to rewrite the unambiguous terms of their contract. What they miss is that it's *irrelevant* whether the word "Kinwong" appears in the

---

[27] Even if this contractual provision weren't dispositive, it would still weigh heavily against the Defendants. In saying so, we're not contradicting anything we said in denying the Defendants' MTD, *see supra* Section I, because (as we explained there) this provision of the Manufacturer's Agreement— the one that required CTX to do business under its own name—has nothing to do with the contractual provisions that were at issue in the prior litigation (provisions dealing with pricing and non-competes, etc.). And the evidence CTX adduced at that prior trial—evidence that our Plaintiffs had breached the Manufacturer's Agreement by, among other things, selling directly to CTX's customers—has no connection to the evidence in our case (evidence that the Plaintiffs had been using the KINWONG mark for years before CTX came into the picture, etc.).

Manufacturer's Agreement. The contract expressly says that CTX will "conduct all of its business in its own name." 2005 Signed Manufacturer's Agreement ¶ 1. CTX thus agreed *not* to do business in Kinwong's name.

And the Defendants' efforts to *rewrite* their own contract unsurprisingly fail. Recall the careful wording of their argument: "Circuitronix agreed not to do business as the entity Capital Profit in 2005 and 2006," and "Circuitronix never did business as Capital Profit." Defendants' Response to Plaintiffs' MSJ at 6. But the contract *never* says that CTX "agree[s] not to do business as the entity Capital Profit." It stipulates, rather, that CTX will "conduct all of its business in its own name" (*i.e.*, as CTX). *See* 2005 Signed Manufacturer's Agreement ¶ 1. Because "Kinwong" is not CTX's "own name," the Agreement plainly prohibited CTX from operating as Kinwong. And that's really the end of that—because "we cannot" rewrite the parties' contract. *In re Checking Acct. Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1256 (11th Cir. 2012) ("It is a fundamental principle of contract law that it is improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous." (cleaned up)).[28]

### 3. *The Manufacturer's Agreement was Not Exclusive*

Even if the parties hadn't, through their Manufacturer's Agreement, unambiguously reserved the KINWONG mark for the Plaintiffs, courts—in the absence of any agreement—still "presum[e] that a foreign manufacturer owns the trademarks of its products." *Rigoni*, 2009 WL 10667806, at *10. And that presumption in favor of the manufacturer is *irrebuttable* where that manufacturer's relationship with its distributors is *not* exclusive. *See, e.g.*, *Excell*, 2013 WL 4828581, at *22 (recognizing that the distributor "cannot rebut this presumption [in favor of the manufacturer] unless it is an

---

[28] It goes without saying that, by not raising them, the Defendants have waived any other arguments they could've made on this issue (but didn't). *See Case v. Eslinger*, 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

*exclusive* distributor" (emphasis added)); *Rogers*, 277 F.2d at 101 ("Nor do we perceive how ownership of the mark can otherwise be attributed to [the distributor], since it was found by the District Court not to be the exclusive distributor of [the] products.").

As a preliminary matter, we think it's clear that Shenzhen Kinwong served as CTX's manufacturer. *See* JSUF ¶ 2 ("Shenzhen Kinwong . . . is a Chinese PCB manufacturer."). Kukreja, in fact, conceded this point over and over again at his deposition. *See, e.g.*, 2019 Kukreja Depo. at 33:7–10 ("Q. Starting in 2005 Circuitronix had PCBs manufactured by Kinwong in Shenzhen, China, right? A. That is correct."); *id.* at 49:6–51:3 ("[T]hey were the manufacturer of printed circuit boards."); *id.* at 62:22–63:1 ("[T]he products that were being manufactured under the manufacturer's agreement were PCBs manufactured by Kinwong[.]"). Nor could he have said otherwise. The *Manufacturer's Agreement* specifically defined Capital Profit as the "Manufacturer" and noted that the "MANUFACTURER, and/or its affiliates, is engaged in the manufacture of Printed Circuit Boards." 2005 Signed Manufacturer's Agreement at 1. At the time, Capital Profit owned 100% of Shenzhen Kinwong. *See* JSUF ¶ 8.

But that's just the beginning. The Manufacturer's Agreement also made plain that CTX was serving as Shenzhen Kinwong's distributor. CTX, after all, "does not directly manufacture PCBs." *Id.* ¶ 5. Rather, as Kukreja testified, CTX's "primary business is distributing printed circuit boards." 2019 Kukreja Depo. at 26:3–4. It's undisputed, in other words, that CTX "is a distribution business that buys PCBs from Chinese manufacturers and resells them to end customers." Plaintiffs' SMF ¶ 9; Defendants' Objections ¶ 9 ("Admitted[.]"). And, through its Agreement with Capital Profit, CTX agreed to do exactly that: to "diligently solicit and promote sales of Product." 2005 Signed Manufacturer's Agreement ¶ 5.1. The term "Product" in the Agreement included any manufacturing "services provided by MANUFACTURER or any associated entities"—which (obviously) would include PCBs manufactured by Shenzhen Kinwong. *Id.* ¶ 2. In short, the evidence that the parties

entered into a manufacturer-distributor relationship is overwhelming.[29] In this respect, the shipping labels CTX itself applied to the PCB shipments say it all:



*See* 2008 Shipping Labels at 7.

And the parties' relationship was indisputably non-exclusive. *First*, the Defendants have conceded that their relationship with Shenzhen Kinwong (through Capital Profit) was not exclusive. *See* Plaintiffs' SMF ¶ 23 ("The MA only granted CTX exclusivity to the customers it introduced; Kinwong could sell to all other customers directly or indirectly, including in the U.S."); Defendants' Objections ¶ 23 ("It is admitted that the MA only granted Circuitronix exclusivity to customers it

---

[29] *See also, e.g.*, Second Amended Complaint ¶¶ 2, 25, *Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 1:17-CIV-22462-AHS (S.D. Fla. Feb. 13, 2018), ECF No. 48 ("CTX entered into contracts with [Shenzhen Kinwong] concerning the manufacture, distribution and sale of printed circuit boards ('PCBs') and related electronic and industrial components. . . . Pursuant to the Manufacturer's Agreement, CTX agreed to perform global sales and marketing for Kinwong[.]"); 2010 Settlement Agreement ("On or about May 4, 2005, Circuitronix and Kinwong entered into that certain Manufacturer's Agreement . . . , pursuant to which Circuitronix is to perform global sales and marketing for Kinwong[.]"); 2019 Kukreja Depo. at 62:1–8 ("Q. Right. So Circuitronix agreed to perform global sales and marketing for Capital Profit and its PCB products for certain customers . . . ; is that right? . . . A. The agreement reads what it reads."); Dutta Depo. at 21:10–15 ("[W]ould it be fair to say that Circuitronix buys PCBs from a manufacturer, adds value through quality control, handling, shipping logistics, and then resells them to end customers? A. Yes.").

introduced[.]"). CTX thus *never* had exclusive rights to sell Shenzhen Kinwong's products in the United States. *Cf.* S.D. FLA. L.R. 56.1(c) ("All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts[.]"); *Lewis v. Sch. Bd. of Palm Beach Cnty.*, 850 F. App'x 674, 677 (11th Cir. 2021) ("If a fact in one party's statement is not controverted by the other party's statement, the court may deem that fact admitted if it finds that the fact is supported by properly cited record evidence.").

*Second*, as a matter of contractual interpretation, the Manufacturer's Agreement was plainly non-exclusive. The *only* provision in the contract that discusses exclusivity prohibits Capital Profit from circumventing CTX by selling directly to customers CTX had introduced. *See* 2005 Signed Manufacturer's Agreement ¶ 1 (giving CTX "the exclusive right to promote and sell its products to all customers/accounts introduced by [CTX]"). But the Agreement *never* gave CTX the exclusive right to sell Shenzhen Kinwong's products in the United States. *See generally id.* In fact, it expressly recognized that Capital Profit "may directly sell its Product"—which, again, included Shenzhen Kinwong's PCBs—"to certain of its customers within the [United States]" so long as Capital Profit agreed not to "enter into any contract with the customers/accounts of circuitronix to promote and/or solicit orders for the sale of Product." *Id.* ¶ 2. And—to his credit—Kukreja agreed to this plain reading of the Agreement at his deposition:

> Q. That's right. And the products that were being manufactured under the manufacturer's agreement were PCBs manufactured by Kinwong?
>
> A. That is correct.
>
> Q. And the territory of the manufacturer's agreement was the United States, Canada, Mexico and South America; is that right?
>
> A. So in this agreement, yes, but -- yes. When this agreement was signed, yes.
>
> Q. And this agreement acknowledged that the manufacturer could still sell its PCBs in that territory, right, as long as it wasn't to Circuitronix exclusive customers?
>
> A. It acknowledged that Capital Profit could sell their PCBs in this territory.

2019 Kukreja Depo. at 62:22–63:16; *see also* Dutta Depo. at 47:2–9 ("Q. So Circuitronix had exclusivity as to the customers that it brought to the manufacturer, right? A. Yes. Q. But other than those customers, the manufacturer could directly sell its product to other customers in the territory? A. Correct.").

*Third*, there's no genuine dispute that the parties' relationship was non-exclusive *in practice*. From 2005 through the filing of the summary-judgment motions, Shenzhen Kinwong had made over $100 million in sales, under the KINWONG trademark, to dozens of U.S. customers. *See* Shenzhen Kinwong Sales Spreadsheet [ECF Nos. 186-78, 187-54] (breaking the sales down by customer and by year); Deposition of Hansen Zhang [ECF Nos. 186-79, 187-55] at 52:2–53:11 (testifying that Shenzhen Kinwong had done "[d]efinitely more" than $100 million in sales to U.S. customers "using Kinwong's trademark"). Take Hella Electronic Corporation, for example—one of Shenzhen Kinwong's U.S. customers. The Plaintiffs have filed an email from a Hella employee to cindy@kinwong.com, soliciting a "quot[e]" for certain Kinwong PCBs. *See* Email from Hella Electronic Corp. to cindy@kinwong.com (Aug. 6, 2007 7:55 PM) [ECF Nos. 186-83, 187-57]. And Hella's head of logistics testified that "[t]he Kinwong name appears on the labels that are actually affixed to the box" the PCBs are shipped in. Deposition of Jeremy Smith ("Smith Depo.") [ECF No. 186-80].

Shenzhen Kinwong also entered into a "Kinwong North American Sales Representative Agreement" with Wisconsin-based Electrotek Corp. in 2009. *See* Electrotek Agreement. Through that agreement, Shenzhen Kinwong engaged Electrotek to serve "as an independent sales representative to offer, promote and sell in the name of Kinwong." *Id.* In fact, the former president of Electrotek, John Johnson, explained that the purpose of this agreement was for Electrotek to "function as Kinwong USA." Deposition of John Johnson ("Johnson Depo.") [ECF No. 186-50] at 32:15–22. The point was to solidify Shenzhen Kinwong's "footprint in the US" and to provide "support" for Shenzhen Kinwong's U.S. customers, including Honeywell—a major U.S. company that used

Kinwong PCBs to manufacture (among other things) smoke detectors, and which, as of the time Electrotek signed the Electrotek Agreement, had awarded Kinwong "top vendor" awards for "excellent quality." *Id.* at 35:22–36:5, 42:11–20.

In acting as Shenzhen Kinwong's sales representative, Electrotek agreed to "preserve the good will that is presently associated with the name and reputation of [Shenzhen Kinwong]." Electrotek Agreement ¶ 2. To that end, Electrotek "acknowledge[d] and agree[d] the name 'Kinwong' and the Logotype used by Kinwong are service marks and trademarks belonging solely to [Shenzhen Kinwong]." *Id.* ¶ 3. And, by all accounts, Electrotek was successful in promoting the "Kinwong" brand. Johnson, for instance, testified that customers would "reach out to [him] specifically asking for *Kinwong* products." Johnson Depo. at 45:18–20 (emphasis added). And he gave several examples of this: "Electronic Theater Controls in Madison," he said, "specifically wanted to have Kinwong products because they had a specialty printed circuit board[.]" *Id.* at 45:21–46:3. The upshot is that, since 2009, Shenzhen Kinwong has *both* sold over $20 million in PCBs to Electrotek *and* shipped PCBs *directly* to Electrotek's U.S. customers. *See* Plaintiffs' SMF ¶ 53; Defendants' Objections ¶ 53 (disputing only the irrelevant point of whether, in some cases, "quality control was in the hands of Plaintiffs"). Notably, the shipment invoices, packing lists, and certificates of conformance for these deliveries often (if not always) depicted Shenzhen Kinwong's name, stamp, logo, and UL file number. *See* Plaintiffs' SMF ¶ 53; Defendants' Objections ¶ 53 (disputing only the separate question of quality control).

Under the weight of this evidence, the Defendants offer two arguments—both unpersuasive.

*First*, the Defendants appear to claim that CTX *wasn't* Shenzhen Kinwong's distributor. *See* Defendants' Response to Plaintiffs' MSJ at 16–17 (contending that the Plaintiffs "characterize the Manufacturer's Agreement as a distributor agreement, which it is not, in order to claim the presumption that the manufacturer owned the trademark"). This argument is both factually and legally flawed. It's factually flawed because, as we've said, the record is clear that Shenzhen Kinwong

manufactured the PCBs and that CTX—which doesn't manufacture anything at all—marketed and sold those PCBs (as an intermediary) to customers in the United States. *See, e.g.*, 2008 Shipping Labels at 7 (CTX's own labels identifying "Circuitronix" as the supplier and "Kinwong" as the manufacturer). That's precisely what a distributor does. *See Distributor*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/distributor (last visited Dec. 8, 2021) (defining "distributor" as "one that markets a commodity").

The Defendants' argument is also legally flawed because we don't care, from a doctrinal perspective, whether CTX fits into the Defendants' secret definition of "distributor." After all, it's undisputed that, "[p]ursuant to the Manufacturer's Agreement, Capital Profit, through its factories, would manufacture PCBs pursuant to [CTX's] specifications for sale by [CTX] to customers in the United States." Decl. of Rishi Kukreja [ECF No. 73-1] ¶ 8; *see also* Defendants' Objections ¶¶ 72, 77 (acknowledging that CTX "purchased PCBs from Capital Profit" and "sold unbranded PCBs manufactured at the Shenzhen factory under [the] KINWONG trademark").

Courts routinely apply the manufacturer-distributor test to this sort of arrangement. *See, e.g.*, *Covertech*, 855 F.3d at 168 (applying the test where "Covertech sold its rFOIL products directly to TVM for resale to customers in the United States at a markup"); *Sengoku*, 96 F.3d at 1218–19 (applying the test where "Sengoku sold the heaters to an independent trading company, Zenith & Co., who then sold them to RMC," who (in turn) "handled all of the marketing and advertising for the heaters, and arranged for all of the retailer purchases of the heaters"); *Prod. Source Int'l, LLC v. Nahshin*, 112 F. Supp. 3d 383, 389 (E.D. Va. 2015) (applying the test where "P. Service . . . sold NIC OUT filters to . . . [SAS], and SAS, in turn, sold those NIC OUT filters to customers in the United States"); *Richeson*, 2011 WL 13135114, at *2 (treating a company as a distributor where it "began importing into and reselling goods manufactured by TIPL in the United States").[30]

---

[30] It's worth noting, too, that the label "distributor" isn't some magic potion. *Tactica Int'l, Inc. v. Atl.*

*Second*, the Defendants insist that "[i]t was Defendants who controlled quality of the products, setting specifications, inspecting samples and controlling all customer visits to the factory." Defendants' Response to Plaintiffs' MSJ at 16. Who cares? *That* inquiry (which side engaged in quality control) is irrelevant at this stage of the case—when we're trying to determine whether a company served as a *non-exclusive* distributor. That factor *can be* relevant, to be sure, in different circumstances—as, for instance, when an *exclusive* distributor tries to rebut the presumption that the manufacturer owns the mark. Even there, however—as we're about to see—quality control is only one of *six* factors that courts consider in assessing whether the distributor has rebutted the presumption in favor of the manufacturer. *See, e.g.*, *Covertech*, 855 F.3d at 171 (noting that one of the six relevant factors is "which party exercised control over the nature and quality of goods on which the mark appeared" (cleaned up)); 2 MCCARTHY ON TRADEMARKS § 16:48 (same).

### 4.   *The Defendants Failed to Rebut the Presumption in Favor of the Manufacturer*

But here's the point: even if (1) Shenzhen Kinwong *hadn't* used its KINWONG mark in the United States long before 2005 (it had), (2) the Manufacturer's Agreement *didn't* require CTX to do business in its own name (it did), and (3) CTX *wasn't* a non-exclusive distributor for Shenzhen Kinwong (it was), the Defendants would *still* fail to rebut the presumption that the Plaintiffs owned

---

*Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 600 (S.D.N.Y. 2001) (recognizing that "the factors used in determining the question of ownership of the . . . marks are the same whether or not Tactica is given the title of 'distributor'"). One treatise, for example, applies the same test to sales agents. 4 CALLMANN ON UNFAIR COMP., TR. & MONO. § 17A:7 (4th ed. updated June 2021) ("But in sales agency cases, a difficult question can arise as to who rightfully owns the trademark, the sales agent or the manufacturer of the product. In the absence of any agreement between the parties, the manufacturer usually owns the mark."). McCarthy also discusses—and applies the same framework to—relationships between manufacturers and "*dealers*." 2 MCCARTHY ON TRADEMARKS § 16:48–49. A "dealer," in McCarthy's usage, is "a person who makes a business of buying and selling goods especially without altering their condition." *Dealer*, MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY, https://unabridged.merriam-webster.com/unabridged/dealer (last visited Dec. 8, 2021). If that sounds familiar, it's probably because that's exactly what CTX did in our case.

the trademark they featured on their products. As we've suggested, in deciding whether a distributor

has overcome that presumption, we weigh six factors:

> (1) which party invented or created the mark; (2) which party first affixed the mark to goods sold; (3) which party's name appeared on packaging and promotional materials in conjunction with the mark; (4) which party exercised control over the nature and quality of goods on which the mark appeared; (5) to which party did customers look as standing behind the goods, *e.g.*, which party received complaints for defects and made appropriate replacement or refund; and (6) which party paid for advertising and promotion of the trademarked product.

*Covertech*, 855 F.3d at 171 (cleaned up); *TMT*, 124 F.3d at 884 n.4 (same); *Sengoku*, 96 F.3d at 1220

(same); *Uveritech*, 115 U.S.P.Q.2d at *9 (same); 2 MCCARTHY ON TRADEMARKS § 16:48 (same). As we'll

explain, we think that these factors lean decisively towards the Plaintiffs—and that no reasonable jury

could find otherwise.[31]

    *First*, it's undisputed that Shenzhen Kinwong created the KINWONG mark. *See* 2019 Kukreja

Depo. at 218:5–10 ("Q. You did not come up with the name Kinwong, right? A. I have never claimed

that I claim up with the name Kinwong. Q. Do you know who did? A. I -- Mr. Shum may have."); *see*

*also* Shenzhen Kinwong Business License [ECF No. 186-1] (noting that "Kinwong Electronic

(Shenzhen) Co., Ltd." was formed in 1993); 1999 Kinwong Trademark Registration Certificate

(Shenzhen Kinwong's KINWONG trademark registration from 1999); JSUF ¶ 3 (noting that CTX

was not formed until 2002). This factor, then, plainly favors the Plaintiffs.

    *Second*, to the extent the next factor—which party first affixed the mark to the PCBs—helps

anyone, it helps Shenzhen Kinwong. Although it appears that neither side applied the full KINWONG

mark to the physical PCBs themselves (devices that can, at times, be toothpick-sized), the record

indicates that, by 2004, Shenzhen Kinwong had linked its UL code "CP" to its corporate name:

---

[31] The Defendants never even *cite* this controlling legal standard, much less explain how they've met it. They've thus waived any such argument. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed waived."). In any event, as we explain in the text, the Defendants lose on the merits—waiver or no waiver.

Kinwong Electronic (Shenzhen) Co. Ltd. *See* E243951 UL Card [ECF No. 186-47] at 69. And there appears to be no dispute that nearly "[e]very PCB [Shenzhen Kinwong] sold to U.S. customers is marked with [Shenzhen Kinwong's] UL code." Plaintiffs' MSJ at 8. The Defendants contend only that the "CP" code was used for "several factories in addition to" Shenzhen Kinwong. Defendants' Response to Plaintiffs' MSJ at 13. That may be so, but—even still—the only marking on the PCBs themselves would lead customers back to Capital Profit (or Shenzhen Kinwong). There's certainly no evidence that any of these PCBs—however coded or construed—would have led any customer to the Defendants. And the Defendants never argue otherwise. *See generally* Defendants' Response to Plaintiffs' MSJ at 13.

But, beyond the codes on the PCBs themselves, the unrebutted evidence indicates that, from the very beginning, the Plaintiffs affixed the KINWONG mark to their packaging and shipping documents. For example, Cherry He—Shenzhen Kinwong's corporate representative—explained that "[t]here would also be some logos on the boxes," that, "[o]n our document, you would also find Kinwong's logos," and that "[a]ccompanying documents, inspection documents, and packaging documents, they would all contain Kinwong's logo." He Depo. at 130:21–25, 140:23–141:7. Her deposition testimony on this point was unwavering:

> Q. Do your sale of products bearing the word "Kinwong" on the box or documentation continue today in the United States?
>
> A. Yes. That has been the practice all along.

*Id.* at 145:8–11. Nor do we rely on Shenzhen Kinwong alone for this proposition. Electrotek's CFO likewise testified that Shenzhen Kinwong's logo was featured on the certificates of compliance that accompanied each Shenzhen Kinwong shipment. *See* Deposition of Mike Swerdlow [ECF No. 186-94] at 34:7–35:9; *see also, e.g.*, Smith Depo. at 43:13–45:12 (testifying, as Hella's head of logistics, that the "Kinwong logo" appeared on its invoices). Indeed, the Plaintiffs have filed examples of the

KINWONG mark as it appeared on its customers' boxes, shipping labels, certificates of compliance, and invoices. Here are some of those:




*See* Picture of Kinwong Box [ECF Nos. 186-89, 187-62]; Picture of Kinwong Box [ECF Nos. 186-90, 187-63].

*See* Composite Exhibit of Shipping Labels [ECF No. 186-92].





*See* Electrotek Certification of Conformity [ECF Nos. 186-97, 187-67]; Hella Certification of Conformity [ECF No. 186-101].



景旺企業集團有限公司
KINWONG GROUP LIMITED

**INVOICE**

TO：Behr Hella Thermocontrol Inc
Inc 50660 Century Ct.
Wixom, MI 48393
USA

DATE:  21-Jun-10
INVOICE NO:  SI06514-10

Sender:  Kinwong Group Limited
Address:  Rm 502,5/F,BlockB,Veristrong Ind.Centre.36Au Pui Wan Street,Fo Tan,Hongkong

Case 0:18-cv-61550-RKA   Document 187-72 *SEALED*   Entered on FLSD Docket 02/19/2020
Page 2 of 2

景 旺 電 子 （香 港 ）有 限 公 司
KINWONG ELECTRONIC (HONG KONG) LIMITED

**INVOICE**

Bill To:  ICAPE USA, LLC
700E Firmin Street， suite 104 Kokomo, IN 46902 USA

Date :  02-03-2015
Cust NO. :  029F
Invoice NO. :  HK15030034



*See* Behr Hella Invoice Header [ECF Nos. 186-98, 187-68] at 9; ICAPE USA, LLC Invoice [ECF Nos. 186-103, 187-72]; Electrotek Quotation Header [ECF Nos. 186-96, 187-66] at 10.[32]

    *Third*, it was often the Plaintiffs' names—and never any of the Defendants'—that appeared on packaging and promotional materials *together with* the mark. In fact, on several of the items we just pictured, Shenzhen Kinwong or Kinwong HK's corporate names (or their www.kinwong.com website) appeared alongside the KINWONG mark. *See, e.g.*, Picture of Kinwong Box [ECF Nos. 186-89, 187-62]; Composite Exhibit of Shipping Labels [ECF No. 186-92]; Hella Certification of Conformity [ECF No. 186-101]; ICAPE USA, LLC Invoice [ECF Nos. 186-103, 187-72]; Electrotek Quotation Header [ECF Nos. 186-96, 187-66] at 10. CTX would also share with its U.S. customers

---

[32] In passing, the Defendants suggest that the Plaintiffs "conflate their corporate name with the use of the word Kinwong as a trademark in U.S. commerce." Defendants' Response to Plaintiffs' MSJ at 7. But there are three problems with this argument. *First*, the Defendants have provided absolutely no authority for their view on this issue, so they've probably waived any argument they might've had. *See Hamilton*, 680 F.3d at 1319 ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *cf. MY. P.I.I. LLC v. H&R Marine Eng'g, Inc.*, 2021 WL 2414135, at *8 (S.D. Fla. June 14, 2021) (Altman, J.) ("But these two ingredients—smart law clerks and a penchant for hard work—do not oblige us [courts] to do the lawyers' jobs as well as our own."). *Second*, as all the pictures we've just shown make pellucid, the Plaintiffs did much more than simply use their corporate name; they repeatedly and consistently used KINWONG *as a mark* in commerce. *Third*, if the Defendants hadn't left their research to us, they would've found that (1) there's nothing intrinsically wrong with using *part* of one's corporate name as a mark and (2) what the Plaintiffs did here is all that's required to establish trademark use in commerce. *See, e.g.*, *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1348 (E.D.N.Y. 1994) ("Of course, a company may properly use a company name as both a trade name and service mark."); *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 846 F. Supp. 2d 1063, 1075 (N.D. Cal. 2012) (finding sufficient use of a trademark where "'SunEarth' is depicted in distinctively larger, more stylized and bolder characters than the remainder of the document and, as such, appears to have a greater impact upon potential purchasers than simply conveying the corporate name"); 1 MCCARTHY ON TRADEMARKS § 9:14 ("If a word, even though a part of the company name, is used so as to create an impression separate and apart from the company name, this tends to show a proper trade or service mark usage and the term can be registered.").

"Kinwong presentations"—often at the customers' request—that featured Kinwong's name, logo, factory photographs and address, financial information, customer lists, and quality certifications. Those presentations indelibly linked Shenzhen Kinwong (not any of the Defendants) with *both* the KINWONG mark *and* the Shenzhen Kinwong factory. Take a look:



*See* Email from Wenwu Jiang to Animesh Dutta (Aug. 24, 2005 7:30 PM) [ECF Nos. 186-14, 187-5] (attaching a Shenzhen Kinwong presentation to give to GE). In short, we think this factor—which the Defendants never really address—rolls the Plaintiffs' way.

    *Fourth*, on the question of which party exercised control over the nature and quality of the PCBs, we think it's a much closer call. On the one hand, the Plaintiffs were the ones who actually manufactured the PCBs, and they have produced several "certificates of conformance," indicating that *they* were the ones who conducted quality-control review of the PCBs before shipment. *See* Plaintiffs' SMF ¶ 47 (collecting certificates). On the other hand, the Manufacturer's Agreement suggests that, "[i]f [the] MANUFACTURER fails to adhere to quality standards and delivery schedule as per the

Purchase Order terms, circuitronix reserves the right of procurement elsewhere." 2005 Signed Manufacturer's Agreement; *see also* He Depo. at 60:10–61:11 (explaining that CTX would review "samples," "inspect" products before shipping, and "approve for shipment once they have inspected").

In other words, as much as the Defendants pound on their quality-control efforts, it appears that *both* sides played a vital role in ensuring the quality of Shenzhen Kinwong's PCBs. Indeed, CTX's vice president of engineering and quality, Wenwu Jiang, conceded as much at his deposition: "The final [inspection] report, there are two process. One process is Kinwong do the inspection themselves. They will send certain documents to Circuitronix. Circuitronix will review and verify if everything is correct or not." Deposition of Wenwu Jiang [ECF No. 180-1] at 159:18–24. Shenzhen Kinwong and CTX thus worked *together* (as a team) to secure the quality they were after. In the end, then, this factor is probably a tie, but we'll give the Defendants the benefit of the doubt and simply assume that it leans in their favor. As we'll see, this generosity won't save them here.[33]

*Fifth*, the evidence confirms that customers looked to the Plaintiffs as standing behind the PCBs. In fact, some of CTX's *own* customers insisted that CTX *only* sell them PCBs manufactured by Shenzhen Kinwong. In one email, for example, a General Electric employee explained to CTX that GE would accept PCBs only from Shenzhen Kinwong: "Its [sic] our understanding that the Siga 11 boards are manufactured by Kinwong Electronics. So Kinwong is the approved supplier. This board can not [sic] be moved to another Manufacturer without the permission and approval of UTC Fire &

---

[33] CTX also claims that it set the "specifications" for the Plaintiffs' PCBs. *See, e.g.*, Defendants' Response to Plaintiffs' MSJ at 16. Its citations to He's deposition, however, provide no support for this proposition. It appears, instead, that *the customers* set the specifications in their purchase orders. *See* 2015 Signed Manufacturer's Agreement ¶ 7.4 (noting that "quality standards" would be set "per the Purchase Order terms"); *see also* He Depo. at 60:10–14 ("Q. Did CTX send you the quality specifications that had to be met for a specific order? . . . A. There would be some specification descriptions in relation to PCB on the POs from CTX."). Even if CTX did set the specifications, though, that finding would have no impact on our analysis, since we've already decided to weigh this quality-control factor in the Defendants' favor.

Security." Email from Barton Shull to Michael Craven (Aug. 9, 2010 2:41 PM) [ECF Nos. 186-69, 187-45]; *see also* Deposition of Michael Craven ("Craven Depo.") [ECF No. 186-21] at 143:20–23 ("Q. Okay. And GE was insisting that CTX not use any manufacturer other than Kinwong without GE's approval, right? A. That is correct.").

Other CTX customers from the United States, like Lear Corporation (a Michigan-based company), included Kinwong's name and address in their internal systems and in their purchase orders to CTX—further demonstrating that they knew precisely which entity stood behind the PCBs. *See, e.g.*, Lear Purchase Orders [ECF No. 66] at 3, 9, 20, 22, 23, 25 (Lear purchase orders listing "kinwong electronic (shenzhen) co." as the "supplier shipping point"); Craven Depo. at 111:19–23 ("Q. And the supplier is saved in Lear's system as Kinwong Electronic Shenzhen. Do you see that? A. I see it says that in this particular document, yes."). Lear's global director of purchasing explained that he knew exactly *who* stood behind the PCBs Lear was buying (and it wasn't the Defendants): "Lear Corporation has purchased [PCBs] from [CTX] that were manufactured in China by [Shenzhen Kinwong] ('Kinwong'). Lear specifically audited Kinwong's factories and approved Kinwong as an authorized manufacturer of PCBs before purchasing these PCBs[.]" Decl. of Steven R. Cooke [ECF No. 186-120] ¶ 2.

Similarly, Electrotek's representative testified that "several" customers would *only* purchase PCBs that came from the Shenzhen Kinwong factory. The relevant exchange from the Electrotek deposition went like this:

> Q. So after auditing and approving Kinwong, when they received the products, they would know they were from Kinwong?
>
> A. Right. Yeah. We also had several customers that restricted product only to Kinwong. Acuity Brand Lighting, Grayhill, Plexus were three that were that way.
>
> Q. What do you mean they would restrict it to Kinwong?
>
> A. They were the only suppliers that we were permitted to use over there.

Johnson Depo. at 27:2–22; *see also, e.g.*, Email from Mike Craven to Rishi Kukreja (Mar. 7, 2017 6:52 PM) [ECF Nos. 212-14, 217-6] (explaining that a CTX customer (1) "called to discuss a concern that boards were being built at Benlida when he had certifications on hand for Kinwong" and (2) "emphasized that we cannot change sources on a whim since fire related products have a high degree of regulation").

In light of all this, CTX's business manager, Animesh Dutta, candidly testified that "*the U.S. customers to whom Circuitronix sold Kinwong parts knew that Kinwong was the factory they were coming from.*" Dutta Depo. at 53:21–25 (emphasis added). And, in their prior breach-of-contract case, CTX affirmatively alleged that, "[w]hen CTX marketed the Products for the Manufacturer's Agreement to its customers, the Products were associated with Kinwong Shenz[h]en's globally-recognized brand 'Kinwong.'" Second Amended Complaint ¶ 32, *Circuitronix, LLC v. Shenzhen Kinwong Electronic Co., Ltd. et al.*, No. 1:17-CIV-22462-AHS (S.D. Fla. Feb. 13, 2018), ECF No. 48. These admissions, by themselves, are probably dispositive. In combination with all the corroborating evidence in the record, our conclusion—that, in the customers' eyes, Shenzhen Kinwong stood behind the PCBs—is simply inescapable.

We'd be remiss if we didn't pause for a moment to point out the gaping hole in the Defendants' position. At this late stage of our case, the Defendants have failed to point to a single piece of evidence supporting their claim that "U.S. Kinwong and its predecessor in interest, Circuitronix, solely developed a trademark in U.S. commerce that represented to the consumer the quality that they controlled in developing the products which they solely branded." Defendants' Response to Plaintiffs' MSJ at 7 (failing to provide a single citation for this proposition); *see also id.* at 16 (claiming that, "[w]hen the consumer purchased a KINWONG board in the U.S. from Circuitronix, it was relying on *Circuitronix's quality and reputation*"—without citing any evidence in support of this assertion). And we can't just ignore this evidentiary lacuna because, from the beginning, it's been *the Defendants'* position

that "[t]he decisive question is not who manufactured the article sold under a given trademark, but which business or article is symbolized by it." *Id.* at 7 (quoting *Premier Dental*, 794 F.2d at 854).

*Sixth*, the final prong—which party paid for advertising and promotion of the trademarked product—likewise militates in the Plaintiffs' favor. The Plaintiffs, after all, have shown that *they* paid to promote and market their PCBs through their deal with Electrotek (which, for all practical purposes, functioned as "Kinwong USA"). In fact, by the terms of that deal, Shenzhen Kinwong agreed to pay Electrotek $4,000 a month—or nearly $50,000 each year—to serve as its sales representative in the United States. *See* Electrotek Agreement ¶ 8. Shenzhen Kinwong also advertised its brand on its global website, *see* Plaintiffs' SMF ¶ 3 (providing a link to Shenzhen Kinwong's website, www.kinwong.com, as it appeared in 2003); in industry publications, *see* Components [ECF Nos. 186-129];[34] and at international trade shows, *see* 2019 Kukreja Depo. at 264:6–23. The Defendants, by contrast, haven't pointed us to *any* advertising expenditures. *See generally* Defendants' Response to Plaintiffs' MSJ. This last factor, in sum, isn't close.

To recap, then: five factors weigh strongly in the Plaintiffs' favor and one (charitably assessed) tilts towards the Defendants. On these facts—and with the Defendants having failed to meaningfully engage with the controlling legal standard—no reasonable jury could find for the Defendants. And so, even if we needed to reach the rebuttable presumption (we don't), we'd still conclude that (1) the Plaintiffs own the KINWONG mark—a mark they'd been using for years before CTX came into existence, and (2) the Plaintiffs are entitled to summary judgment on their trademark-infringement claim.

Courts around the country haven't hesitated to grant summary judgment *even* in much closer cases. *See, e.g., Nahshin*, 112 F. Supp. 3d at 397 (granting summary judgment for the manufacturer—even though the evidence was "inconclusive" as to which party maintained the quality of the goods

---

[34] *See also* Global Sources [ECF Nos. 186-106, 187-74].

and which party the public identified with the product—because the other factors weighed in the manufacturer's favor); *Hernandez v. Sandoval*, 2014 WL 12580049, at *7 (C.D. Cal. Apr. 3, 2014) (granting summary judgment for the manufacturer where, although the distributor "claim[ed] that the public associates boots bearing the [trademark] with [the distributor], [the distributor] submits no evidence on this factor beyond a bare assertion in his own declaration"). The same result should follow here.

### 5. *The Defendants' Other Arguments Fail*

Trying to parry this conclusion, the Defendants raise three additional arguments—all meritless.

*First*, the Defendants point to the uncontroversial fact that they, not the Plaintiffs, own the KINWONG mark in the United States. *See* Defendants' Response to Plaintiffs' MSJ at 16–17 (arguing that trademark registration "is prima facie evidence of the validity of the registration, of the registrant's ownership of the mark" (quoting *Goya Foods, Inc. v. Tropicana Prods., Inc.*, 846 F.2d 848, 854 (2d Cir. 1988)). But "[o]wnership . . . is a product of use, not registration." *Richeson*, 2011 WL 13135114, at *6 (quoting *Aini v. Sun Taiyang Co., LTD.*, 964 F. Supp. 762, 773 (S.D.N.Y. 1997)); *see also Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1023 (11th Cir. 1989) ("Thus, a registered mark has prima facie validity but is subject to another's bona fide use of the same or similar mark under the common law."); *Union Nat'l Bank of Texas, Laredo, Tex. v. Union Nat'l Bank of Texas, Austin, Tex.*, 909 F.2d 839, 842 (5th Cir. 1990) ("Ownership of trademarks is established by use, not by registration.").

The Defendants are right that "[f]ederal registration of a mark generally creates a presumption that the registrant is the owner of the mark." *Rigoni*, 2009 WL 10667806, at *10; *see also* 15 U.S.C. § 1057(b) ("A certificate of registration of a mark . . . shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce[.]"). "This presumption is rebutted,

however, where there is evidence that the registrant did not own the mark at the time of registration. Proof of prior ownership, therefore, trumps registration." *Rigoni*, 2009 WL 10667806, at *10. And that's exactly what's happened here: the Plaintiffs have established (beyond dispute) that Shenzhen Kinwong used the mark first and that any use by CTX was Shenzhen Kinwong's as a matter of law. Because no jury could find otherwise, the presumption in favor of the U.S. registrant has been rebutted, and the Plaintiffs are entitled to summary judgment.

*Second*, the Defendants try to cut a hole in the chain that links Capital Profit, Kinwong Group, Shenzhen Kinwong, and Kinwong HK. *See* 11/12/2020 Hr'g Tr. at 43:8–19 (arguing that "we don't have a document, we don't have a transfer, we don't have an assignment" between Capital Profit and Shenzhen Kinwong); Defendants' Response to Plaintiffs' MSJ at 11, 15 (contending that, "without an assignment of rights from Capital Profit, [Shenzhen Kinwong] had no rights outside of China"). As the Defendants point out, CTX signed the Manufacturer's Agreement with Capital Profit (later renamed Kinwong Group). *Id.* at 9. Because of this (the Defendants say), the Plaintiffs failed to show that Shenzhen Kinwong—the main Plaintiff here—succeeded to the rights of those separate entities under the contract. *Id.* at 11, 15. And, taking an unexplained leap, the Defendants suggest that, without this link, the Plaintiffs cannot establish that they're entitled to Capital Profit's use of the KINWONG mark in the United States—through CTX or otherwise. *Id.* at 20.

But these questions about the link (if any) between Shenzhen Kinwong and Capital Profit (later renamed Kinwong Group)—*viz.*, whether Capital Profit assigned its contractual rights to Shenzhen Kinwong—are really beside the point. For starters, this isn't a contract case; it's a trademark action. Because the Plaintiffs—Shenzhen Kinwong and Kinwong HK—aren't asserting a breach of the Manufacturer's Agreement, it's mostly irrelevant whether Capital Profit ever assigned its rights under that Agreement to the Plaintiffs. There can be no dispute, for instance, that Shenzhen Kinwong has used the KINWONG mark for decades, that it manufactured PCBs for CTX, and that it has

standing to assert its rights to that mark. *See, e.g.*, Shenzhen Kinwong Business License (noting that "Kinwong Electronic (Shenzhen) Co., Ltd." was formed in 1993); 1999 Kinwong Trademark Registration Certificate (Shenzhen Kinwong's KINWONG trademark registration from 1999); 2019 Kukreja Depo. at 33:7–10 ("Q. Starting in 2005 Circuitronix had PCBs manufactured by Kinwong in Shenzhen, China, right? A. That is correct.").

In fairness, although the Defendants never clearly say so, they may be making a slightly different point. Maybe their contention is that Shenzhen Kinwong cannot claim any use of the KINWONG mark because it made sales only *indirectly* to the United States—through Capital Profit. This position—that Shenzhen Kinwong can't reap the benefits of "indirect" use in the United States—appeared to be how the Defendants framed this position at oral argument. As their lawyer explained at the time:

> All that we're suggesting is that unlike in the situation with the trident mark in the [*Richeson*] case or with the case cited therein, which also covers much of the same issue, in those cases, you had a distributor with a *direct*, not an *indirect* relationship with [the distributor], who then brought in the products and used their trademark, their catalogs, their branded product to claim a trademark that he never had a right to. This [case] is very different.

11/12/2020 Hr'g Tr. at 56:1–10 (emphasis added); *see also* Defendants' Response to Plaintiffs' MSJ at 9 (attempting to distinguish *Richeson* on the ground that "Shenzhen Kinwong has never sold product overseas directly," and its "sales had to take place in Hong Kong through, first a separate entity, Capital Profit, and after 2011, through its wholly owned subsidiary, Kinwong Electronic Hong Kong").

This argument fails for two reasons: *one*, the products in *Richeson* did pass through an intermediary; and *two*, in any event, the outcome in *Richeson* didn't turn on this direct-versus-indirect-sales distinction. In *Richeson*, the distributor—accused of trademark infringement—had purchased trademarked products through its own intermediary from the manufacturer. *See* 2011 WL 13135114, at *7 (noting that "[the distributor] was purchasing TRIDENT-branded goods from [the distributor's affiliate], not from [the manufacturer] directly"). In our case, of course, the parties are reversed: the

manufacturer (Shenzhen Kinwong) sold its trademarked products through its intermediary (Capital Profit) to the distributor (CTX). But this distinction doesn't really matter much since the analysis in *Richeson didn't* hinge on the presence of an intermediary. It was thus unsurprising that, when we pressed the Defendants at oral argument to provide *some* support for their position, counsel couldn't conjure even a *single* case that relied on this direct-versus-indirect-sales distinction. Here's that exchange:

> THE COURT: [Shenzhen Kinwong] found CTX to do that job [of selling product in the United States]. It finds an intermediary called Schmapital Schmofits, unrelated to Shenzhen completely. No ownership interest, no affiliation, nothing. There's a Chinese law that prevents it from selling directly into the United States, so it uses Schmapital Schmofits to do the job. Does that mean the fact that -- the formalistic fact that there's an intermediary, does that mean that they're not actually selling goods to the United States?

> MR. ESPINOSA: Your Honor, if CTX travels to Hong Kong, buys the goods in Hong Kong, there was a sale in Hong Kong. If the Hong Kong entity travels to the U.S. and sells the goods in the U.S., there was a sale in the U.S. It is that precise and that fine in determining trademark rights.

> THE COURT: What case says that the situs of where the sale occurred is the relevant situs for purposes of deciding this question?

> MR. ESPINOSA: Your Honor, I can't pull a case right now.

> THE COURT: I don't think there's any such case, because that wouldn't make any sense. That would totally interfere with the way business is actually done in the global marketplace. People sell products all over the world, sometimes through intermediaries, and they get to the United States intentionally, not by accident.

11/12/2020 Hr'g Tr. at 49:1–25; *see also, e.g.*, *Sengoku*, 96 F.3d at 1218 (applying the manufacturer-distributor paradigm to a trademark dispute between Sengoku (who manufactured heaters) and RMC (who arranged for retailer purchases), even though "Sengoku sold the heaters to an independent trading company, Zenith & Co., who then sold them to RMC").

*Third*, the Defendants launch a final Hail Mary—the "equitable doctrine of estoppel by laches." Defendants' Response to Plaintiffs' MSJ at 18–19. A defendant "must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against

whom the claim is asserted." *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). "The burden of establishing laches as an affirmative defense is on the Defendants." *Buccellati Holding Italia SPA v. Laura Buccellati, LLC*, 5 F. Supp. 3d 1368, 1374 (S.D. Fla. 2014) (Moore, J.); *see also Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1516 (11th Cir. 1984) (same). The Defendants' laches defense fails for two main reasons.

*One*, the Defendants haven't shown that the Plaintiffs delayed in asserting their trademark rights. "[B]ecause the Lanham Act does not contain a statute of limitations, the period for analogous state law claims is to be used as a touchstone for laches," which "in Florida is four years." *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1546 (11th Cir. 1986). In our case, the Defendants claim that the Plaintiffs were on constructive notice of Kinwong LLC's trademark registration in August 2014 and that they had actual knowledge of its registration by March 2015. *See* Defendants' Response to Plaintiffs' MSJ at 18. But the Plaintiffs filed this action in July 2018—well *before* the four-year "touchstone" had lapsed. Even taking the Defendants at their word, therefore, there's just no delay here.

*Two*, the Defendants haven't met their burden of showing that they've suffered *any* prejudice. In their brief, the Defendants say they've been prejudiced in three ways: (1) "the delay since the destruction of Mafio Shum's e-mails, sometime in 2013"; (2) "the loss of business"; and (3) "the costs of this litigation." *Id.* at 18–19. None of these survive even the slightest scrutiny. For the first, if Shum's emails have been missing since 2013, then they'd necessarily have been missing for this litigation— whether the Plaintiffs filed this case in 2015 or 2018. For the second, the Defendants don't even explain what business they've lost—much less do they provide *any* evidence to corroborate that assertion. For the third, the Defendants haven't offered a shred of evidence for their claim that they would've avoided the costs of this lawsuit if they'd only learned about the Plaintiffs' trademark claim sooner. Indeed, the Defendants conceded as much at argument:

> THE COURT: But wait, I just want to know, is there any testimony or evidence for the proposition that -- as I understand your detrimental reliance argument, it has to do

> with what your strategy would have been in the contract case. Is there any evidence for that proposition, other than your legal argument here today?
>
> MR. ESPINOSA: Your Honor, I don't think that anybody was asked: Would you have filed a declaratory judgment action if you had known about this? That has never been asked.

*See* 11/12/2020 Hr'g Tr. at 93:19–94:2. And that's a problem here because we're at summary judgment now, and—after months of discovery—a lawyer's arguments alone won't do the trick. "[T]o defeat summary judgment [a party] must offer *evidence* from which a jury could reasonably believe [its] arguments." *Mack v. Metro. Life Ins. Co.*, 246 F. App'x 594, 598 (11th Cir. 2007). Because there's no such evidence here, the Defendants haven't done enough to avoid summary judgment.[35]

### 6. One Final Thing

We've thought of one additional procedural quirk that we'll address *sua sponte*. In their answer, the Defendants raised twelve affirmative defenses (only *one* of which is laches). *See* Defendants' Answer and First Counterclaim at 9–13. In their summary-judgment papers, however, neither party addresses any of these other eleven affirmative defenses. One might justifiably wonder, then, whether these neglected, free-floating affirmative defenses might preclude us from granting summary judgment in the Plaintiffs' favor. They don't.

In *Johnson v. Bd. of Regents of University of Georgia*, 263 F.3d 1234 (11th Cir. 2001) (Marcus, J.), the Eleventh Circuit addressed a strikingly similar issue. The plaintiff in that case challenged the University of Georgia's affirmative-action program. *Id.* at 1237. In the district court, UGA and certain

---

[35] We also find pretty compelling, by the way, the Defendants' admission that, "[o]nce the litigations started and the parties stopped doing business, [the] Defendants temporarily stopped using the mark with the intent of restarting use." Defendants' MSJ at 17. This concession appears to cut straight to the reasonableness of any delay *and* to whether the Defendants have suffered prejudice. That's because it's probably reasonable to take one's time to file a trademark suit if the opposing side has halted its infringing use. And it's hard to see how the Defendants were prejudiced by the Plaintiffs' delay given that they'd already stopped using the mark by the time the lawsuit was filed. This isn't a case, in other words, in which the defendant has presented evidence of "its investment in the public's awareness of the trademarked brand" throughout the period of delay. *Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC*, 7 F.4th 989, 1010 (11th Cir. 2021).

intervenors—opposing the plaintiff's summary-judgment motion—attempted to defend the school's policy by meeting UGA's "burden" of showing (1) that "student body diversity [is] a compelling interest" and (2) that UGA's "policy is narrowly tailored to serve that interest." *Id.* at 1242. When the case came up on appeal, though, the intervenors—for the first time—argued that some *other* compelling interest justified the affirmative-action policy. Specifically, the intervenors contended that "UGA's favorable treatment of African-American applicants is necessary, still, to ameliorate the vestiges of UGA's past intentional discrimination against African-Americans." *Id.* at 1264.

The Eleventh Circuit rejected this new argument out of hand, reasoning that the intervenors "did not advance it in any meaningful way at the time of summary judgment." *Id.* Trying to salvage their claim, the intervenors contended (1) that "no party sought summary judgment disposition of this issue"—*i.e.*, whether redressing past discrimination justified UGA's policy—and (2) that, as a result, an "important defense remained for resolution at trial after the district court resolved the summary judgment motions." *Id.* In ruling against the intervenors, the appellate court noted that "the Plaintiffs moved for final summary judgment, not merely partial summary judgment on the issue of whether the policy could be justified in the name of student body diversity." *Id.* Because the plaintiff hadn't narrowed its summary-judgment motion to the sub-issue of student diversity, it "became incumbent upon the [party opposing summary judgment] to respond by, at the very least, raising in their opposition papers any and all arguments or defenses they felt precluded judgment in Plaintiffs' favor." *Id.* The court was *clear* that the intervenors "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." *Id.*

Notably, in saying so, the *Johnson* Court relied heavily on—and cited favorably to—a District of Delaware case, which Judge Marcus summarized as holding that the "burden is on [the] defendant to adduce evidence supporting affirmative defense, not upon [the] movant to negate its existence." *Id.*

71

(citing *Harper v. Del. Valley Broads., Inc.*, 743 F. Supp. 1076, 1090 (D. Del. 1990), *aff'd*, 932 F.2d 959 (3d Cir. 1991)). And that Delaware case is on all fours with ours. There, the defendants' answers "raise[d] at least two affirmative defenses . . . which were not addressed by either party in [their] motions for summary judgment." *Harper*, 743 F. Supp. at 1090. The court *sua sponte* addressed "whether the fact that these affirmative defenses have been preserved in the pleadings prevents the court from disposing of the case on summary judgment." *Id.* In answering that question, the court determined that, "[i]n addition to supporting their [own] cross-motion [for summary judgment], . . . defendants were seeking to defeat plaintiff's summary judgment motion." *Id.* It was, the court said, "in *that* context that defendants should have come forward with evidence to support their affirmative defenses." *Id.* (emphasis added).

We think that *Johnson* and *Harper* are dispositive here. As in *Johnson*, our Plaintiffs moved for summary judgment on their trademark-infringement and trademark-cancellation claims. And, like the intervenors in *Johnson*, our Defendants failed to raise a defense—on which they bear the burden of proof—that would've precluded summary judgment. Like the intervenors in *Johnson*, therefore, our Defendants "cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions." *Johnson*, 263 F.3d at 1264.

There are, it's true, two differences between our case and *Johnson*—but neither justifies a different result here.

The first is that *Johnson* dealt with "arguments or defenses" the intervenors didn't raise, whereas our case involves *affirmative* defenses. For three reasons, we think this is a difference without any significance. *One*, Judge Marcus was clear in *Johnson* to say that, when presented with a motion for summary judgment, the non-movant must "rais[e] in [its] opposition papers *any and all* arguments or defenses [it] felt precluded judgment[.]" *Id.* (emphasis added). We read *Johnson*, in other words, as

requiring exactly what it said: that, to avoid summary judgment, a non-movant must advance "any and all arguments or defenses"—including, of course, affirmative defenses. *See Price v. Time, Inc.*, 416 F.3d 1327, 1336 (11th Cir. 2005) ("The United States Supreme Court and this Court have recognized on many occasions that the word 'any' is a powerful and broad word, and that it does not mean 'some' or 'all but a few,' but instead means 'all.'"). *Two*, as we've explained, *Johnson* relied heavily on—and cited approvingly to—*Harper*, which (as here) *did* involve a non-movant who failed to advance an *affirmative* defense in response to a properly-filed motion for summary judgment. *Three*, the defense the intervenors failed to raise in *Johnson* functioned, in practice, like an affirmative defense. *Johnson*, remember, was a race-discrimination case governed by the burden-shifting paradigm that's derived from the Supreme Court's decision in *United States v. Carolene Products Co.*, 304 U.S. 144, 153 n.4 (1938). Under that framework, "[t]he proponent of [a racial] classification bears the burden of proving that its consideration of race is narrowly tailored to serve a compelling governmental interest." *Johnson*, 263 F.3d at 1244. In failing to make this showing in response to the summary-judgment motion, then, the intervenors in *Johnson* were remiss in much the same way as our Defendants were—*i.e.*, they didn't assert a defense on which *they* bore the burden.

The second distinction between our case and *Johnson* is that *Johnson* resolved a motion for *final* judgment, whereas we're here addressing the Plaintiffs' motion for *partial* summary judgment. But Judge Marcus was very careful in *Johnson* to point out that "the Plaintiffs moved for final summary judgment, not merely partial summary judgment on the issue of whether the policy could be justified in the name of student body diversity." *Id.* at 1264. Note, here, Judge Marcus's critical decision *not* to deploy a second comma after the phrase "partial summary judgment." For our purposes, that decision can only mean one thing: *Johnson* didn't turn on the difference between final and partial summary judgment—a distinction that would've made little sense; rather, *Johnson* hinged on the fact that the plaintiffs had moved for judgment on *the very claim* that (in the intervenors' view) the newly-raised

defense would've "precluded[.]" *Id.* The same is true here. The Plaintiffs have moved for partial summary judgment on the liability aspect of their trademark-infringement claim. The Defendants thus had an obligation to assert any arguments or defenses—including affirmative defenses—that (in their view) would've "precluded" the entry of *that* judgment.

A simple example will illustrate this commonsense point. Imagine a tort plaintiff who moves for summary judgment on liability *only*. Imagine, too, that—in its answer—the defendant had asserted the affirmative defense of "failure to mitigate"—alleging, in effect, that the plaintiff's *damages* (but not his liability) should be reduced. Since the plaintiff hasn't moved for summary judgment on the issue of damages, *Johnson* (obviously) wouldn't require the defendant to advance its mitigation defense in response to the plaintiff's motion. That's because the two positions are orthogonal to each other—or, to use *Johnson*'s phraseology, the defense doesn't "preclude[ ]" the judgment the plaintiff is seeking. In our case, by contrast—as in *Johnson*—the Plaintiffs have filed a motion for summary judgment on liability, *and* the Defendants failed to advance certain affirmative defenses that could've "precluded" summary judgment on liability. *Johnson* thus did oblige the Defendants to raise those affirmative defenses in their response.

Moving beyond *Johnson*, our issue is identical to *Harper*'s. Here, as in *Harper*, neither side moved for summary judgment on the Defendants' *affirmative* defenses. And, like the *Harper* Court, we conclude that—given this failure—the Defendants have abandoned any right they might've had to rely on those never-raised defenses. If the Defendants believed that the evidence supported an affirmative defense that would've precluded the Plaintiffs' claims, they should've raised that defense in their response. Instead, the Defendants asserted *only* laches—an affirmative defense that's plainly inapplicable here—and never argued that any of their other affirmative defenses precluded summary judgment. As in *Johnson* and *Harper*, then, summary judgment is appropriate.

In similar circumstances, courts around the country have (for the most part) come out the

same way. *See, e.g., Diversey Lever, Inc. v. Ecolab, Inc.*, 191 F.3d 1350, 1352 (Fed. Cir. 1999) ("And we believe the trial court correctly held that [the defendant's] failure to raise its affirmative defense of estoppel in opposition to [the plaintiff's] summary judgment motion constituted an abandonment of the defense."); *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 478 (D.C. Cir. 1993) ("As a general rule, though, the failure to raise an affirmative defense in opposition to a motion for summary judgment constitutes an abandonment of the defense."); *Residential Funding Co. v. Terrace Mortg. Co.*, 850 F. Supp. 2d 961, 965 (D. Minn. 2012) ("A summary judgment on the issue of liability encompasses all affirmative defenses and implicitly challenges the non-movant to establish a basis for finding that the defenses are both applicable and supported by sufficient facts." (cleaned up)), *aff'd*, 725 F.3d 910 (8th Cir. 2013); *Pantry, Inc. v. Stop-N-Go Foods, Inc.*, 796 F. Supp. 1164, 1167 (S.D. Ind. 1992) ("Just as a plaintiff need not disprove an affirmative defense in the plaintiff's initial portion of presenting evidence at trial, a plaintiff/movant need not anticipate and raise the non-movant's affirmative defenses.").

And we agree: it's not our role to advance affirmative defenses the Defendants themselves appear to have abandoned. Having elected not to address those defenses, in other words, the Defendants cannot expect us to do it for them.[36]

### B.      Cancellation of the KINWONG Mark

"[T]he Lanham Act permits a district court to direct the cancellation of a trademark registration when that registration has been determined to be 'invalid' or when the mark has been 'abandoned.'" *Monster Energy*, 472 F. Supp. 3d at 1269; *see also* 15 U.S.C. § 1119 ("[I]n any action involving a registered mark the court may . . . order the cancelation of registrations, in whole or in part[.]"). "[A] plaintiff's prior use of a confusingly similar mark is grounds for cancellation of [a]

---

[36] The Defendants' MSJ requires a finding that the Defendants have superior rights to the KINWONG mark. *See* Defendants' MSJ at 6–24. Because we've found that *the Plaintiffs* own the KINWONG mark, the Defendants' MSJ is **DENIED**.

registrant's mark." *Mystique, Inc. v. 138 Int'l, Inc.*, 601 F. Supp. 2d 1320, 1323 (S.D. Fla. 2009), *aff'd*, 375 F. App'x 997 (11th Cir. 2010). In the Eleventh Circuit's words:

> In order to cancel a registration under [the Lanham Act] in this case, [the plaintiff] must prove: (1) that the registered mark resembles [the plaintiff's] mark, (2) that [the plaintiff] acquired trade identity rights in the mark before the registrant used the mark, and (3) that the registered mark is likely to cause confusion when used in connection with the [products sold by the] registrant.

*Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1559 (11th Cir. 1991).

In our case, the first and third prongs are not in dispute: both sides agree, in other words, that the marks resemble one another and that the other's use of the mark is likely to cause confusion. The Defendants' only argument, as we've seen, is that they (and not the Plaintiffs) own the KINWONG mark. Having rejected that contention, we now also order the cancellation of the Defendants' KINWONG registration.

## C.    Fraud on the USPTO

Both parties have moved for summary judgment on their claims that the opposing party committed fraud on the USPTO. *See* Plaintiffs' MSJ at 1; Defendants' MSJ at 23. But, since we've disposed of the Defendants' MSJ, only the Plaintiffs' MSJ on this question remains.

"Fraud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008). "The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark." *Richeson*, 2011 WL 13135114, at *7 (quoting *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 242 (S.D.N.Y. 2010)); *see also Angel Flight*, 522 F.3d at 1210 ("Purposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark."). "The party seeking to cancel a mark bears the burden of proving the alleged fraud by clear and convincing evidence." *Id.* at 1209.

To support their fraud claim, the Plaintiffs rely exclusively on *Richeson*. *See* Plaintiffs' MSJ at 17–20. Although *Richeson* (it's true) found—at summary judgment—that a party had defrauded the USPTO, the party committing the fraud in *that* case "did not file a Statement of Material Facts disputing [the other side's] Statement of Facts" and didn't even "address the issue of [its] alleged fraud on the USPTO in its Response in Opposition." *Richeson*, 2011 WL 13135114, at *1, *9. Here, by contrast, the Defendants vigorously dispute the facts underlying the Plaintiffs' fraud-on-the-USPTO claim, *and* they've addressed each of the Plaintiffs' arguments in their response. *See generally* Defendants' Objections; Defendants' Response to Plaintiffs' MSJ at 17–18. These disputes raise genuine issues of material fact as to whether the Plaintiffs have proven fraud—a fact-intensive inquiry—by clear and convincing evidence.

For example, the Plaintiffs argue that Kukreja committed fraud when he "swore under oath to the USPTO that he knew of no other company with rights to the KINWONG mark in the U.S." Plaintiffs' MSJ at 9. But there's at least an open question as to whether Kukreja *knew* that the Plaintiffs had rights to the KINWONG mark in the United States. As we've seen, the answer to this question turns on a rather complicated legal analysis—one that's taken us some 78 pages to unpack. And the Plaintiffs—in moving for summary judgment—never really claim (or prove) that Kukreja *purposely* or *knowingly* made false statements to the USPTO. On the sparse briefing before us, then, we think the best course is to reserve this issue for the fact-finder at trial.

\*\*\*

Having carefully reviewed the briefing, the record, and the governing law, we hereby **ORDER AND ADJUDGE** as follows:

1. The Plaintiffs' Motion to Dismiss Count IV of the Defendants' Amended Counterclaim [ECF No. 288] is **GRANTED**. Count IV is **DISMISSED with prejudice**.

2. The Plaintiffs' Partial Motion for Summary Judgment [ECF No. 182] is **GRANTED in part and DENIED in part**. Summary Judgment is **GRANTED** as to the Plaintiffs' claims for federal and common law trademark infringement and cancellation (Counts I, II, and IV) and **DENIED** as to the Plaintiffs' claims that the Defendants defrauded the USPTO (Count III).

3. The Defendants' Motion to Dismiss [ECF No. 179] is **DENIED**, except as to that part of the Defendants' motion that sought dismissal of Counts V and VI, because we've already entered an order dismissing those counts with prejudice, *see* Order [ECF No. 331].

4. The Defendants' Motion for Summary Judgment [ECF No. 179] is **DENIED**.

5. The Defendants' KINWONG trademark, Registration No. 4,736,271, is **CANCELLED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this **8th** day of **December** 2021.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record