## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:18-CV-61550-ALTMAN/HUNT

SHENZHEN KINWONG ELECTRONIC
CO., LTD., a Chinese Limited Company,
and KINWONG ELECTRONIC (HONG
KONG) LIMITED, a Hong Kong Limited
Company,

      Plaintiff,

v.

RISHI KUKREJA, an Individual;
KINWONG, LLC, a Florida
Limited Liability Company; and
CIRCUITRONIX, LLC, a Florida Limited
Liability Company,

      Defendants.

_____/

### JOINT PRETRIAL STIPULATION FOR APRIL 2023 TRIAL

Pursuant to the Court's Amended Scheduling Order dated August 18, 2022 [D.E. 398], and

Rule 16.1(e) of the Local Rules of the United States District Court for the Southern District of

Florida, Plaintiffs, Shenzhen Kinwong Electronic Co., Ltd. ("Shenzhen Kinwong") and Kinwong

Electronic (Hong Kong) Co., Ltd. ("Kinwong HK") (collectively, "Kinwong" or "Plaintiffs"), and

Defendants Kinwong LLC, Circuitronix, LLC ("CTX"); and Rishi Kukreja ("Kukreja")

(Kinwong, LLC, CTX and Kukreja, collectively, "Defendants"), respectfully submit their Joint

Pretrial Stipulation in advance of the bench trial set during the Court's two-week trial calendar

commencing April 24, 2023.

I.      **SHORT CONCISE STATEMENT OF THE CASE BY EACH PARTY.**

     A.  **Kinwong's Statement of the Case**

This is a case about an American distributor, CTX, and its principal, Kukreja, hijacking the trademark of a foreign manufacturer, Kinwong, and then lying under oath to the United States Patent and Trademark Office ("USPTO") that the distributor knew of no one else with rights to the mark—despite having resold the manufacturer's products in the U.S. for nearly a decade.  The case is also about Defendants engaging in significant, illegal counterfeiting of KINWONG-branded products and otherwise passing products off as having been manufactured at Kinwong when, in fact, they were manufactured by cheaper and lower quality factories in China.

Kinwong has been manufacturing and selling printed circuit boards ("PCBs") worldwide under the KINWONG mark—its name—since 1993.  Defendant CTX, owned and controlled by Kukreja, is a PCB distributor.  Beginning in 2005, CTX bought PCBs from Kinwong and resold them in the U.S. under the KINWONG mark.  CTX signed a "Manufacturer's Agreement" with Kinwong in 2005—modified by a 2010 "Settlement Agreement" and a 2013 "Revised Schedule A"—"pursuant to which [CTX agreed] to perform global sales and marketing *for Kinwong.*"  Far from granting CTX any rights in the KINWONG mark, the contracts mandated that CTX "conduct all of its business in its own name" (*i.e.*, as CTX and *not* as Kinwong) while selling Plaintiffs' PCBs in the U.S.  CTX's distributorship relationship with Kinwong was non-exclusive such that Kinwong could continue to sell its own products in the U.S.  CTX and Kukreja have acknowledged that, under this contractual arrangement, they marketed and sold PCBs in the U.S. under Plaintiffs' already "*globally-recognized brand 'Kinwong.'*"

Many of CTX's customers had approved Kinwong as the sole manufacturer from which CTX could source the PCBs it resold to those customers.  When CTX's relationship with Kinwong

deteriorated around 2012-2013, and Kinwong announced its intention to terminate its contracts with CTX, Kukreja came up with a scheme to try to gain some leverage over Kinwong—and provide him with a way to continue selling counterfeited KINWONG PCBs to CTX's customers after his relationship with Kinwong ended.  In January 2013, Kukreja formed Defendant Kinwong, LLC, without ever notifying Kinwong that he had done so.  Kukreja then used Kinwong, LLC as the vehicle through which he would hijack the rights to the KINWONG trademark in the U.S.

While still doing business with Kinwong, Kukreja "DBA KINWONG, LLC" filed his fraudulent application to register the KINWONG mark, applying for registration with the USPTO on January 21, 2014.  Despite distributing Plaintiffs' PCBs in the U.S. for nearly a decade through CTX, Kukreja omitted any reference to either Plaintiffs or CTX in his U.S. trademark application before the USPTO.  Instead, Kukreja swore under oath that his first use of the KINWONG mark was *in December 2014* through the shell company he created behind Kinwong's back—Kinwong, LLC—and that he knew of no one else with rights to use the mark.

When the USPTO asked him for proof of use, he referred to a website he had created for Kinwong, LLC in December 2014 (www.kinwongllc.com)—based on Kinwong's website (www.kinwong.com) and using photographs of Kinwong's PCBs—and submitted it to the USPTO, again without mentioning his long-standing relationship with Kinwong.  When the USPTO asked for proof of commercial use, Kukreja could have provided samples of invoices, quotations, packing lists, shipping labels or other similar documents from his years of dealing with Kinwong, but did not.  Instead, Kukreja had a handful of "KINWONG LLC" labels printed at a local "Fastsigns" store and staged a photoshoot of three cardboard boxes with those newly-fabricated labels affixed to the side.  Kukreja then submitted those photos to the USPTO as purported proof of his use of the KINWONG mark in commerce "for supplying circuit boards,"

without informing the USPTO that Kinwong, LLC, in fact, never sold a single PCB. He submitted no records to the USPTO that these KINWONG, LLC-labeled boxes were ever shipped, and he has produced none in this case.

Meanwhile, CTX and Kukreja began sourcing PCBs from other Chinese manufacturers that had not been approved by their customers—such as Jiangmen Benlida Printed Circuit Co. ("Benlida")—and passing them off as if they came from Kinwong, the only manufacturer approved by those customers. Defendants carried out this counterfeiting scheme overtly—including by shipping PCBs with a Kinwong ("KW-SZ") logo printed on them (a reference to the Kinwong factory in Shenzhen, China), despite those PCBs being made by Benlida in Jiangmen, China—but also through elaborate deceptions such as creating "fake" manufacturing records during customer audits, "hiding" PCBs so that customers would not discover them during audits, and outright lying to customers about the origin of the PCBs.

Once Plaintiffs discovered Kukreja's fraudulent registration and counterfeiting scheme and filed this lawsuit, Defendants came up with a story that is diametrically opposed to what they told the USPTO. Defendants claimed that CTX acquired common law rights to the KINWONG trademark in the U.S. in 2005—simply by virtue of re-selling the PCBs CTX was having manufactured at Kinwong pursuant to the terms of the parties' contracts—and then assigned the mark to Kinwong, LLC for registration. Not only is this story inconsistent with Kukreja's sworn oath to the USPTO, it is also legally untenable, as this Court conclusively found in its ruling on summary judgment. *See* Omnibus Order [D.E. 341] at 35-75 ("The Plaintiffs' trademark claim— that they are the senior users of the KINWONG mark and that the Defendants' trademark registration for that mark should be cancelled—simply isn't close.") (internal footnote omitted).

In the Omnibus Order, dated December 9, 2021, this Court resoundingly determined on summary judgment (and on Kinwong's motion to dismiss Count IV of Defendants' Amended Counterclaim) that (i) Kinwong was the rightful owner of the KINWONG mark in the U.S. based on the overwhelming evidence of its prior use; (ii) Defendants infringed the mark; (iii) Defendants' registration of the mark should be cancelled; and (iv) every one of Defendants' counterclaims should be rejected.  [D.E. 341, 345].  In light of these sweeping rulings in Kinwong's favor, all that remains for the bench trial set during the Court's two week trial calendar commencing April 24, 2023 are the following limited issues: (1) Kinwong's claim that Defendants committed a fraud on the USPTO (Count III), [D.E. 63] ¶¶ 62-73; (2) the extent of Defendants' false designation of origin, trademark infringement, and unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count I), and trademark infringement and unfair competition under Florida common law (Count IV), by counterfeiting Kinwong PCBs and otherwise passing them off as coming from Kinwong when, in fact, they were manufactured elsewhere, [D.E. 63] ¶¶ 36-40, 48-53, 78-81; and (3) the amounts, if any, to be awarded Kinwong, including a determination that this is an "exceptional case" entitling Kinwong to recover its reasonable attorneys' fees under the Lanham Act, 15 U.S.C. §1117(a).[1]

---

[1] If the Court ultimately finds this to be an "exceptional case" entitling Kinwong to recover its reasonable attorneys' fees, Kinwong would then file a motion to determine the amount of fees to be awarded in accordance with S.D.Fla.L.R. 7.3.  Kinwong would also seek to recover its costs pursuant to 15 U.S.C. § 1117 and 28 U.S.C. § 1920.  Given its resounding win on summary judgment on the question of, among other things, ownership of the mark, and the Court rejecting all of the frivolous defenses and positions asserted by Defendants throughout this litigation, Kinwong believes this Court already has enough to find this to be an "exceptional case."

B.  **Defendants' Statement of the Case**

This case is about an American company, CTX, that was repeatedly misled and taken advantage of by its former Chinese business partners, particularly following the untimely death of the original Chinese owner and chief executive, Mr. Mafio Shum.

CTX is a Florida company founded by Mr. Rishi Kukreja, a naturalized US citizen and electrical engineer.  In 2005, Mr. Kukreja's company, CTX, entered into a Manufacturer's Agreement for the manufacture and sale of printed circuit boards, with Capital Profit, a Hong Kong corporation owned and controlled by Mr. Shum.

At the time the Manufacturer's Agreement was signed, in 2005, the corporation that later became known as Shenzhen Kinwong[2] was a wholly-owned subsidiary of Mr. Shum's Capital Profit.  In addition to being the owner of Shenzhen Kinwong (through Capital Profit), Mr. Shum was also its top executive, formally holding the position of COO until his untimely death in 2013.

At the time CTX and Capital Profit came together to form the Manufacturer's Agreement in 2005, Mr. Shum and his colleagues stated that Capital Profit directly or indirectly owned or operated multiple PCB factories in mainland China, including the "Kinwong factory" operated by Capital Profit's Shenzhen Kinwong subsidiary.

The Manufacturer's Agreement called for Capital Profit and its affiliates to manufacture PCBs in accordance with design specification provided by CTX, and for CTX to diligently solicit and promote sales of the PCBs in the contractually defined "Territory", including the United States of America.  Further, Capital Profit granted CTX the "the exclusive right to promote and sell its products to all customers / accounts introduced by [CTX]," and the contract prohibited Capital

---

[2] Shenzhen Kinwong has operated under different names over the years, such as Kinwong Electronics (Shenzhen), and Jingwang.  The current iteration has only been in use since 2013.

Profit from directly or indirectly entering into "any contract" with "customers / account" of CTX. Capital Profit also expressly recognized that CTX "is expending substantial monies on advertising, marketing, technology, and in the development of potential customers /accounts."

Around the time the Manufacturer's Agreement was signed, Mr. Shum and his colleagues indicated that the reason a partnership with CTX was appealing was because Capital Profit and its affiliates had no business in the United States, and saw the relationship with CTX as an opportunity to expand sales beyond Southeast Asia and into the lucrative American market.

At the time, Mr. Shum insisted that CTX's contract be with Capital Profit, and not with Shenzhen Kinwong. He also insisted that purchase orders from CTX be addressed to Capital Profit rather than Shenzhen Kinwong. Even so, almost from the outset, Mr. Kukreja and others at CTX began colloquially referring to Mr. Shum's entire organization as "Kinwong", the name of the primary manufacturing facility in China.

During their conversations in 2005, Mr. Kukreja inquired with Mr. Shum about using the name "Kinwong" to market PCBs in the United States. Mr. Shum told Mr. Kukreja that Capital Profit and its affiliates had never used the name "Kinwong" to market or sell products in the United States, and had no plans or intentions of doing so. Mr. Kukreja expressed an interest in adopting the "Kinwong" name to market PCBs and Mr. Shum agreed that he should do so.

Immediately, beginning in 2005, CTX began using the "Kinwong" name to market and sell its PCBs supplied by Capital Profit. For more than a decade following, CTX continued to use the "Kinwong" name openly in US commerce. CTX's use of the "Kinwong" name occurred with the express recognition and approval of Mr. Shum and his companies. Mr. Shum and his companies were fully aware of CTX's use and expansion of the "Kinwong" mark, as the parties were in regular communication about CTX's efforts to market and expand the PCB business.

For the next 13 years, neither Capital Profit (renamed Kinwong Group in 2006), nor Shenzhen Kinwong or any of its affiliates, objected to CTX's adoption or use of the Kinwong trademark in the United States.  CTX entered into new agreements with Kinwong Group (formerly Capital Profit) in 2010 and 2013, and in spite of certain disagreements that arose in the course of business, Kinwong Group never raised any objections or disagreements regarding CTX's adoption of the "Kinwong" mark in the US market.

Prior to Shum's illness, and eventual death in 2013, to the greatest extent possible, both organizations tried to cultivate an impression in the market and in the mind of customers that Kinwong and Circuitronix were one and the same.  Mr. Shum and Mr. Kukreja's companies worked together to ensure that in the United States market, "Kinwong" was synonymous with CTX.  For example, during in person factory audits with US customer, the Shenzhen Kinwong factory was presented to customers as the "Circuitronix – Kinwong" factory, with large signs bearing the "Circuitronix" name displayed on the front of the factory building, as well as in the reception and conference areas of the factory.  Mr. Shum also suggested to customers and third-parties that "Kinwong" and CTX were under common ownership or control.

After years of working to develop recognition of the "Kinwong" mark in the US, Mr. Kukreja formed a separate holding company to own the rights to the "Kinwong" trademark, Kinwong LLC, on January 19, 2013.  A year later, on January 21, 2014, Mr. Kukreja, without the assistance of counsel, filed an application to register the trademark KINWONG with the United States Patent and Trademark Office ("USPTO") in international class 9 for "circuit boards."  At the time that he filed this application Mr. Kukreja was not aware that Plaintiffs had made any prior use of the mark in U.S. commerce or that they made any claim to superior legal rights to the mark KINWONG in the United States.

Unfortunately, Mr. Shum's health began failing, and around the same time his organization began to undergo major changes in corporate structure and ownership.  In 2011, Kinwong Group (formerly Capital Profit) sold all of its shares to Shenzhen Kinwong.  Shenzhen Kinwong then formed a new Hong Kong subsidiary, Kinwong Electronic (Hong Kong) Limited ("Kinwong HK").  As Mr. Shum's health continued to deteriorate, his former organization increasingly came under the direction and control of new owners and executives, who had no prior relationship with Mr. Kukreja or CTX, such as such as Kent Wang, Hansen Zhang, Shaobai Liu, and his son, Ray Liu.  As Mr. Shum's health worsened, and he began transitioning management to the restructured organization's new leadership, the relationship between CTX and Shenzhen Kinwong also worsened.

Unbeknownst to CTX, Shenzhen Kinwong and Kinwong HK began systematically breaching the exclusivity provisions of the parties' contract in an effort to cut CTX out of the business and steal millions of dollars' worth of valuable business CTX had worked for years to develop.  Shenzhen Kinwong further breached the fiduciary duty provisions of the contract by stealing thousands of electronic files from CTX, that included CTX's intellectual property and sensitive commercial information.  CTX ultimately filed suit in 2017 and prevailed in a federal jury trial that resulted in a judgment against Shenzhen Kinwong for over $1 million.

During that trial, the jury was presented with extensive evidence of Shenzhen Kinwong's misconduct and dishonesty. In particular, the jury saw evidence that Shenzhen Kinwong engaged in undisclosed sales with CTX's exclusive customers, in violation of the contract, and kept all of the money for itself. The jury also saw evidence that Shenzhen Kinwong secretly attempted to do additional business with each of nine exclusive CTX customers over a period of several years.

Critically, the evidence showed that Shenzhen Kinwong engaged in an extensive pattern of deception in order to cover up its breaches of contract. Among other things, the evidence showed that Shenzhen Kinwong repeatedly lied to CTX about its activities and conspired to mislead CTX by altering documents, removing customer names and information from drawings, engineering reports, and internal records. The evidence also showed that Shenzhen Kinwong conspired to alter manufacturing logos – called UL logos – that are affixed to printed circuit boards they produce, in order to prevent CTX from discovering Shenzhen Kinwong's unlawful conduct. Additional evidence showed that Shenzhen Kinwong intentionally and deliberately caused manufacturing delays and built defective parts in order to undermine CTX's position in the market. Finally, the evidence showed that a high-ranking Shenzhen Kinwong executive, Vicky Liu, who reports directly to Shenzhen Kinwong's current CEO, Shaobai Liu, stole more than 8000 electronic files from CTX, containing sensitive proprietary and technical data, and placed those files on Shenzhen Kinwong's computer systems.

One of Shenzhen Kinwong's major aims during this period, was to conceal the "Kinwong" name in relationship to any unlawful business it was conducting in violation of its contract with CTX, in order to keep CTX from discovering the scheme and filing suit.

Meanwhile, Shenzhen Kinwong deleted or destroyed all of Mr. Shum's electronic files and emails shortly after his death in late 2013, and disposed of the computers that he used.  Also, despite being aware of Kinwong LLC's trademark registration no later than August, 2015, Shenzhen Kinwong never communicated any objection or asserted any claim to ownership of the "Kinwong" mark in the United States until this lawsuit was filed in July, 2018.

Accordingly, the evidence will show that Mr. Kukreja registered the Kinwong mark in good faith, on the honest belief that CTX, and by assignment, Kinwong, LLC, made first use of

the mark in the United States in 2005, and owned the senior rights to the mark. Although the Court has determined that Shenzhen Kinwong owns a superior right to the mark, the question of trademark ownership in this case turns on a complex legal analysis that required the Court's mastery of federal trademark law, and many pages of careful consideration to properly unpack and adjudicate. As the Court correctly recognized, it is certainly possible that a layman could have had a different view of the situation, in good faith, based on these facts and circumstances. Moreover, the evidence Shenzhen Kinwong relies upon to establish its first use of the mark, and nearly all of the other evidence relied upon to establish its rights, was not disclosed to Mr. Kukreja prior to filing the registration.

Shenzhen Kinwong's remaining allegations in this case, that Mr. Kukreja used CTX and Kinwong LLC to "perpetrate an unlawful scheme to counterfeit KINWONG products and resell those counterfeit products under the KINWONG mark to unsuspecting customers," is simply not supported by any credible evidence and is contrary to the voluminous evidentiary record in this case. Without evidence, Shenzhen Kinwong claims that this imaginary counterfeiting "scheme" included a variety of "elaborate deceptions" including falsification of production records, "doctoring" of financial records, having underlings "pose" as Kinwong employees, and even setting up a phony Kinwong factory in Shenzhen, which they describe as a "Potemkin village." To date, no witness has ever testified to having any personal knowledge of any of these allegations.

Millions of pages of documents have been produced in this case. In addition, Shenzhen Kinwong has sought or taken discovery from customers and third-parties including Lear, Kimball, Hella, Elektrotek, and more. Shenzhen Kinwong has deposed or subpoenaed current and former CTX employees, and had the opportunity to take discovery from other manufacturers and suppliers of CTX, in addition to many other sources, to develop evidence of this so-called counterfeiting

scheme.  Not one of these parties has ever provided a shred of evidence or testimony of any kind supporting the fictitious allegations.

In addition, Shenzhen Kinwong extends its false counterfeiting allegations to business transactions between non-party foreign companies, such as Circuitronix Hong Kong, which had no contact with or impact on U.S. commerce.  Data regarding these foreign purchases and sales were produced in discovery, despite Plaintiffs' prior agreement that discovery of irrelevant foreign transactions would not be conducted.  Nevertheless, Shenzhen Kinwong now relies almost entirely on foreign transactions, conducted under foreign law, by non-parties, following foreign business practices, to support its bogus claims.

The non-party, non-U.S. transaction documents, although they were produced in discovery, are not relevant to this action.  The Lanham Act simply does not extend territorially to cover 1) foreign non-parties; 2) in relation to foreign activity that had no substantial effects in the United States and that did not ship through the United States; and 3) where exercising jurisdiction would interfere with the sovereignty of another nation.  In this case the bulk of the information relied upon by Plaintiff involves Circuitronix Hong Kong and foreign customers.  These transactions have no impact on United States commerce and did not transit through the United States.  For that reason alone, these transactions, documents, and the claims related to them should be excluded.

Shenzhen Kinwong comes before the Court and makes unsubstantiated claims of infringement, counterfeiting and fraud on the USPTO against Defendants.  Moreover, they waste the Court's time trying allegations that are not contrary to the evidence.  The Court should find no damages for Counts 1 and 4 of Plaintiffs' Amended Complaint since Defendants never made any infringing or counterfeit sales of KINWONG branded products.  Furthermore, the Court should deny Count 3 of the Amended Complaint since Plaintiffs cannot show by clear and convincing

evidence that Defendants knew or had reason to know that Plaintiffs had or even claimed any rights to the trademark in the United States.  The Plaintiffs' own actions in provoking this litigation and the conduct of the case dictate against a finding that this is an "exceptional case."

## II.    THE BASIS OF FEDERAL JURISDICTION.

This Court's jurisdiction arises under 28 U.S.C. §§ 1331, 1332, 1338, and 1367(a).  The parties agree that this Court has subject matter jurisdiction over this lawsuit and personal jurisdiction over Defendants.

## III.    THE PLEADINGS RAISING THE ISSUES.

1.    Kinwong's Amended Complaint [D.E. 63]; and

2.    Defendants' Answer and Affirmative Defenses to Plaintiffs' Amended Complaint. [D.E. 163].

3.    The parties note that, due to an apparent oversight, the Court never issued a ruling dismissing Counts V, VI, and VII of Defendants' First Amended Counterclaim.  [D.E. 280]. Plaintiffs in fact moved for partial summary judgment as to all of Defendants' trademark-based counterclaims.  [D.E. 182]  This Court granted that motion.  [D.E. 341] at 77-78; [D.E. 345] (granting the motion as to Counts I, II and III but not as to Counts V, VI and VII).  Because Counts V, VI and VII all presume the existence of the trademark registration of the KINWONG mark filed by Kinwong, LLC—which was cancelled based on Plaintiffs' prior use of that mark in the United States pursuant to this Court's Omnibus Order—the parties agree that Plaintiffs' Motion for Partial Summary Judgment should also be granted as to Counts V, VI and VII of Defendants' First Amended Counterclaim (with Defendants reserving any rights they may have to appeal the dismissal of those counterclaims and this Court's rulings on summary judgment).

## IV.  LIST OF ALL UNDISPOSED MOTIONS OR OTHER MATTERS REQUIRING ACTION BY THE COURT.

1.  The granting of partial summary judgment as to Counts V, VI and VII of Defendants' Amended Counterclaim as noted in Section III(3) above.

2.  Plaintiffs believe the Court needs to address whether the undisputed facts set forth in this Court's ruling on summary judgment require proof at trial.  *See* Section V below. Defendants disagree.

3.  Both sides have raised objections to exhibits on the other side's exhibit list.

4.  Both sides have raised objections to certain of the other side's deposition designations.

## V.  A CONCISE STATEMENT OF UNCONTESTED FACTS WHICH REQUIRE NO PROOF AT TRIAL, WITH RESERVATIONS, IF ANY.

Plaintiffs are of the view that, in light of the Court's ruling on summary judgment, [D.E. 341], there is no genuine factual dispute as to the facts set forth in Plaintiffs' **Appendix A** attached hereto to this Joint Pretrial Stipulation and thus those facts require no proof at trial.  Defendants disagree.  The parties stipulate to the following uncontested facts.

1.  Printed Circuit Boards ("PCBs") are devices used to connect electronic components.

2.  Shenzhen Kinwong Electronic Co., Ltd. ("Shenzhen Kinwong") is a Chinese PCB manufacturer.

3.  Circuitronix, LLC ("CTX") is a Florida limited liability company founded in October 2002.

4.  Rishi Kukreja is the sole owner and CEO of CTX.

5.  CTX does not directly manufacture PCBs.

6.      In 2005, CTX entered into a Manufacturer's Agreement with Capital Profit Development Ltd. ("Capital Profit"), for the manufacturing of PCBs.

7.      Capital Profit is a Hong Kong company that was established on November 12, 1992.

8.      At the time the Manufacturer's Agreement was signed, Capital Profit was the 100% owner of the shares of Shenzhen Kinwong.

9.   Capital Profit changed its name to Kinwong Group Limited ("Kinwong Group") on May 3, 2006.

10.     Mafio Shum was the COO of Shenzhen Kinwong until his death in 2013.

11.     On June 1, 2010, CTX entered into a Settlement Agreement with Kinwong Group.

12.     Kinwong Electronic (Hong Kong) Limited ("Kinwong HK") was established on February 24, 2011.

13.     Kinwong Group remains in operation as a separate company in Hong Kong.

14.     Neither CTX nor Mr. Kukreja have ever owned any part of Shenzhen Kinwong or Kinwong HK.

15.     The Territory defined in the Manufacturer's Agreement included the United States.

16.     CTX brought customer representatives to personally audit factories in China, including Shenzhen Kinwong's factory.

17.     On January 18, 2017, Kinwong HK sent Mr. Kukreja a proposed new commission-based agreement for CTX.

18.     Kinwong, LLC is a Florida limited liability company formed by Mr. Kukreja on January 18, 2013.

19.     Mr. Kukreja is the sole owner and principal of Kinwong, LLC.

20.     On January 21, 2014, Mr. Kukreja filed an application for registration of the trademark KINWONG through Kinwong, LLC with the United States Patent and Trademark Office ("USPTO") (the "Kinwong LLC TM Application").

21.     The Kinwong LLC TM Application was published for opposition on July 1, 2014.

22.     Kinwong, LLC was granted the KINWONG trademark on May 12, 2015 (the "Kinwong LLC Registration").

23.     Kinwong LLC is a holding company and has never sold product directly.

24.     Shenzhen Kinwong has never received licensing fees from third parties for use of the KINWONG mark.

## VI.     A STATEMENT, IN REASONABLE DETAIL, OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED AT TRIAL.

1.     Whether Plaintiffs have proven by clear and convincing evidence that Kukreja, through Kinwong, LLC,[3] knowingly, and with the purposeful intent to mislead, made false, material representations of fact to the USPTO in connection with the application to register the KINWONG mark.

2.     Whether Plaintiffs have proven by a preponderance of the evidence that Defendants, perpetrated "an unlawful scheme to counterfeit KINWONG products and resell those counterfeit products under the KINWONG mark to unsuspecting customers" as alleged in paragraphs 36-42 of the Amended Complaint or "engaged in an elaborate, willful scheme to pass off Circuit Board Products that were not manufactured at Shenzhen Kinwong as if they were manufactured at Shenzhen Kinwong," as alleged in Count I of the Amended Complaint, or "engaged in a willful scheme to counterfeit KINWONG products, resell those counterfeit goods

---

[3] Defendants disagree that this should read "through Kinwong, LLC."

to Plaintiffs' actual and potential customers, and conceal their counterfeiting through fraud, forgery, and deception," as alleged in Count IV of the Amended Complaint ("Alleged Counterfeiting").

3.      The amount of profits to be awarded to Plaintiffs, if any, that are attributable to the Alleged Counterfeiting.

4.      Whether Plaintiffs have proven by a preponderance of the evidence that Kukreja is individually liable for any acts of Alleged Counterfeiting by CTX Shenzhen and CTX HK on the basis of agency or alter-ego liability, or that CTX is liable for any acts of Alleged Counterfeiting by CTX Shenzhen and CTX HK on the basis of agency liability.

5.      Defendants contend that another issue of fact that remains to be litigated at trial is whether evidence of third party transactions occurring outside the United States are admissible in the case.  Plaintiffs disagree.

## VII.   A CONCISE STATEMENT OF ISSUES OF LAW ON WHICH THERE IS AGREEMENT.

1.      "Fraud occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008); *see also Sovereign Military Hospitaller Order of Saint John of Jerusalem of Rhodes & of Malta v. Florida Priory of Knights Hospitallers of Sovereign Order of Saint John of Jerusalem, Knights of Malta, Ecumenical Order*, 702 F.3d 1279, 1289 (11th Cir. 2012) ("An applicant commits fraud when he 'knowingly makes false, material representations of fact in connection with an application for a registered mark.'").

2.      The elements of fraud in trademark registration are as follows: (1) "[t]he challenged statement was a *false* representation regarding a *material* fact. (2) The person making the representation *knew* that the representation was false ('scienter'). (3) An *intent to deceive* the

17

USPTO. (4) Reasonable *reliance* on the misrepresentation. (5) *Damage* proximately resulting from such reliance." *Church Girls, LLC v. Rodgers*, No. 2:18-CV-14232, 2018 WL 5923436, at *2 (S.D. Fla. Nov. 13, 2018) (quoting 6 McCarthy on Trademarks and Unfair Competition § 36:61).

3.      The party seeking cancellation must also demonstrate that the trademark applicant had "a purpose or intent to deceive the PTO in the application for the mark." *Sovereign Military,* 702 F.3d at 1289 (citing *In re Bose Corp.*, 580 F.3d 1240, 1243-45 (Fed. Cir. 2009); *Angel Flight*, 522 F.3d at 1210-11 (affirming cancellation on the basis of the applicant's purposeful failure to disclose a superior user of the mark).

4.      "'The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark.'" *Select Export Corp. v. Richeson*, No. 10-CV-80526, 2011 WL 13135114, at *7 (S.D. Fla. May 5, 2011) (quoting *City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 242 (S.D.N.Y. 2010)); *see also Angel Flight*, 522 F.3d at 1210 ("Purposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark.").

5.      The required oath in a trademark registration application "does not require an applicant to disclose all other persons who may be using the mark; it only requires an applicant to disclose those persons who the applicant believes possesses the *legal right* to use the mark." *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-61490-CIV, 2011 WL 2174012, at *13 (S.D. Fla. June 2, 2011) (emphasis in original); *see also Church Girls*, 2018 WL 5923436, at *2 ("applicant has no duty to investigate and disclose to the PTO all other possible users of the same or similar mark").

6.      The party seeking cancellation of the mark "bears the burden of proving the alleged fraud by clear and convincing evidence." *Angel Flight*, 522 F.3d at 1209.

7.      "[A]ny doubt must be resolved against the charging party." *Sovereign Military Hospitaller,* 702 F.3d  at 1289 (11th Cir. 2012) (quoting *Bose*, 580 F.3d at 1243).

8.      The Lanham Act provides for recovery upon establishing a violation of 15 U.S.C. § 1125(a), including disgorgement of defendants' profits.  15 U.S.C. § 1117(a).

9.      To recover remedies for trademark infringement under 15 U.S.C. § 1125(a), "a plaintiff must show (1) that it had trademark rights in the mark or name at issue and (2) that the other party had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130-31 (11th Cir. 2018).

10.      Similarly, to recover remedies for false designation of origin and unfair competition under 15 U.S.C. § 1125(a), a plaintiff must show that the defendant used a mark "or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion . . . or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person."   15 U.S.C. § 1125(a)(1)(A); *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir. 1984).

11.      "The analysis under the Lanham Act for trademark infringement also applies to claims of 1) trademark infringement and 2) unfair competition under Florida common law." *GLD, LLC v. Gold Presidents, LLC*, No. 20-CV-21617, 2021 WL 3110012, at *5 (S.D. Fla. July 22, 2021).

12.      "In order to establish the amount of profits to be disgorged [under 15 U.S.C. §
1117(a)], a plaintiff must establish the infringer's gross sales of the product; it is then up to the
defendant to refute that amount, and/or to proffer costs that should be deducted from the gross
sales." *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010).

## VIII.   A CONCISE STATEMENT OF ISSUES OF LAW WHICH REMAIN FOR DETERMINATION BY THE COURT.

1.      Whether this case constitutes an "exceptional case" entitling Plaintiffs or
Defendants to recover their reasonable attorneys' fees under 15 U.S.C. § 1117(a).

2.      Plaintiffs also believe the following is an issue of law for determination by the
Court:  Whether recovery based on disgorgement of Defendants' profits is inadequate based on
Defendants' withholding of Court-ordered financial documents and information, entitling
Kinwong to additional equitable recovery in the Court's discretion under 15 U.S.C. § 1117(a).  *See
Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1183 (11th Cir. 1994).  Defendants disagree
since there was full production and disclosure as evidenced by the lack of any challenge in the
record to the adequacy of the court order production.

3.      Plaintiffs contend the granting of Plaintiffs' Motion for Partial Summary Judgment
as to Counts V, VI and VII of Defendants' Amended Counterclaim as described more fully in
Section III(3) above.

4.      Defendants contend that another issue of law remaining for the Court is whether
the Court has subject matter jurisdiction to consider evidence of foreign transactions between
nonparty foreign entities where the Eleventh Circuit has determined that jurisdiction only lies
where: "1) Defendant is a United States corporation; 2) the foreign activity had substantial effects
in the United States; and 3) exercising jurisdiction would not interfere with the sovereignty of
another nation."  *International Café, S.A.L., v. Hard Rock Café International (U.S.A.), Inc*., 252

F.3d 1274 (2001). While Defendants contend that there was no counterfeiting scheme, the reliance on documents involving foreign transactions governed by foreign law and involving foreign parties creates a great deal of confusion and attempts to create an illusion of counterfeiting where none exists. The fact that the separately owned foreign affiliates may have collaborated on business deals with Circuitronix on occasion is not relevant since, as the Eleventh Circuit held that financial gain alone, are insufficient to establish the "substantial effects" required by *Bulova. Id.*, at 1278-79. *Id.* With regard to evidence of Circuitronix HK transactions, Defendants contend that none of these factors are met. *Vanity Fair Mills, Inc. v. T. Eaton Co.,* 234 F.2d 633, 642–43 (2d Cir. 1956) ("the absence of one of the above factors might well be determinative and that the absence of two is certainly fatal."); *See also Café International SAL v. Hard Rock Café International,* 252 F.3d 1274 (11th Cir. 2001) (acts of foreign subsidiary did not create extraterritorial jurisdiction). In *Baccus Worldwide Llc, V. Baccus Global, Llc,* 21-81401-CIV, 2022 WL 18583806, at *2 (S.D. Fla. Feb. 15, 2022), a West Palm Beach company sued another West Palm Beach company over its direction of use of a trademark in Europe. Although moneys were received in the US the Court found that absent substantial impact on US commerce, to the extent that the foreign use infringed foreign rights the court lacked jurisdiction. Defendants do not believe that this issue of subject matter jurisdiction over the foreign transactions has been decided by the Court. Plaintiffs disagree and are of the view that the sales do not constitute extraterritorial sales, as they are between CTX a U.S. company, and U.S. customers: Lear, Kimball, and Flextronics. To the extent that Defendants argue that the sales do not constitute U.S. commerce because some were made to companies which Plaintiffs contend are foreign subsidiaries or related companies of these U.S. companies, Plaintiffs contend that the Court has already rejected that argument. Omnibus Order at 40 n.21 ("Defendants point to testimony that Shenzhen Kinwong's direct sales were to Emerson

China, a subsidiary of Emerson U.S. It's true that Shenzhen Kinwong did business with Emerson U.S. through a Chinese subsidiary. But the Defendants have pointed to no law for their position that doing business with an American company through its foreign subsidiary is insufficient to support a company's use in the United States." (citation omitted)).   Plaintiffs contend that is the law of the case, and Defendants still can cite no law supporting the argument that a U.S. company's sales to the overseas subsidiary of a U.S. company constitute extraterritorial sales.   Even if Defendants were correct that sales to the overseas affiliate of a U.S. company constitute extraterritorial sales, Plaintiffs contend that the Court would have jurisdiction over those sales for multiple reasons.   Plaintiffs contend that at least some of Defendants' counterfeit products sold overseas made it back to the United States, both CTX and Kukreja are U.S. citizens, and Kukreja orchestrated the counterfeiting scheme from CTX's offices in Florida.   *See Levi Strauss & Co. v. Sunrise International Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (applying the Lanham Act extraterritorially where "the evidence suggests that some of the counterfeiting jeans were shipped through the United States on their way to Europe"); *Babbit Elecs., Inc.*, 38 F.3d at 1180 (applying the Lanham Act extraterritorially where U.S. persons were "the controlling force behind all of Babbit's sales of unauthorized Cobra products in South America, and have personally orchestrated such activities from Babbit's corporate office in Florida").   And finally, Plaintiffs contend that there is clear evidence of U.S. customer confusion resulting from Defendants' counterfeiting scheme.   *See, e.g.*, *Kroma Makeup EU, Ltd. v. Boldface Licensing ± Branding, Inc.*, No. 6:14-CV-1551, 2015 WL 1708757, at *10 (M.D. Fla. Apr. 15, 2015) ("[W]here the defendant's foreign conduct creates confusion among American consumers, there is little doubt about a substantial effect on U.S. commerce.").

5.      Defendants contend another issue of law is whether Plaintiff's damages, if any, are barred or reduced by the doctrines of unclean hands (*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1355 (11ᵗʰ Cir. 1983)), laches (statute of limitations) (*Kason Indus., Inc. v. Component Hardware Group, Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997); *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1517 (11th Cir. 1984), or estoppel (*Coach House Restaurant v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551 (11ᵗʰ Cir. 1991)).  Plaintiffs disagree that any of these defenses apply under the facts and circumstances of this case. Plaintiffs contend that the Court disposed of the laches defense on summary judgment (Defendants never pled a statute of limitations defense), [D.E. 341] at 68-70, and the Court found that Defendants abandoned their other defenses by not raising them on summary judgment.  *Id.* at 70-75.

## IX.    EACH PARTY'S NUMBERED LIST OF TRIAL EXHIBITS, OTHER THAN IMPEACHMENT EXHIBITS, WITH OBJECTIONS, IF ANY, TO EACH EXHIBIT.

1.      Plaintiffs' Exhibit List, with objections raised by Defendants, is attached as Exhibit A.

2.      Defendants' Exhibit List, with objections raised by Plaintiffs, is attached as Exhibit B.

## X.     EACH PARTY'S NUMBERED LIST OF TRIAL WITNESSES, WITH THEIR ADDRESSES.

1.   Plaintiffs' Trial Witness List is attached as Exhibit C.

2.   Defendants' Trial Witness List is attached as Exhibit D.

## XI.    ESTIMATED TRIAL TIME

Plaintiffs estimate that 6 to 8 days will be necessary to try this action.

Defendants estimate that 12 to 15 days will be necessary to try this action.

## XII.   ESTIMATE OF ATTORNEYS' FEES TO PREVAILING PARTY

Plaintiffs estimate that the prevailing party attorneys' fees and costs through trial will be approximately $4 to $4.5 million.

Defendants estimate that the prevailing party attorneys' fees and costs through trial will be approximately $2.6 million.

Respectfully submitted,

By: */s/ Mark A. Salky*
**GREENBERG TRAURIG, P.A.**
Mark A. Salky
Fla. Bar No. 058221
salkym@gtlaw.com
James E. Gillenwater
Fla. Bar No. 1013518
gillenwaterj@gtlaw.com
Emiley F. Pagrabs
Fla. Bar No. 1030834
pagrabse@gtlaw.com
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

*Attorneys for Plaintiffs Shenzhen Kinwong Electronic Co., Ltd. and Kinwong Electronic (Hong Kong) Limited*

By: */s/ Jorge Espinosa*
**GRAY|ROBINSON, P.A.**
Jorge Espinosa
Fla. Bar No. 779032
jorge.espinosa@gray-robinson.com
Francesca Russo
Fla. Bar No. 174912
francesca.russo@gray-robinson.com
333 S.E. 2nd Ave., Suite 3200
Miami, FL 33131
Tel: 305-416-6880
Fax: 305-416-6887

*and*

**CHAUNCEY COLE, PA**
Chauncey D. Cole IV, Esq.
Fla. Bar No. 102184
chauncey.cole@coletrial.com
9100 South Dadeland Blvd., Suite 1553
Miami, Florida 33156
Tel.: (786) 497-7053

*Attorneys for Defendants Rishi Kukreja, Kinwong, LLC, and Circuitronix, LLC*

# PLAINTIFFS' APPENDIX A

1.     Shenzhen Kinwong Electronic Co., Ltd. ("Shenzhen Kinwong") is a corporation formed under the laws of, and with its principal place of business in, the People's Republic of China.

2.     Shenzhen Kinwong has manufactured and sold printed circuit boards ("PCBs") under the KINWONG mark since 1993, the year Shenzhen Kinwong was formed in China.

3.     Before 2013, Shenzhen Kinwong went by the name "Kinwong Electronics (Shenzhen) Co., Ltd."

4.     References to "Shenzhen Kinwong Electronic Co., Ltd."; "Kinwong Electronics (Shenzhen) Co."; and "Kinwong Electronic (Shenzhen) Co. Ltd." are all variations on the name of the single entity—the Plaintiff, Shenzhen Kinwong.

5.     Shenzhen Kinwong manufactures PCBs—devices used to connect electronic components in all but the simplest of electronic machines—in China and sells them around the world.

6.     The other Plaintiff—Kinwong Electronic (Hong Kong) Ltd. ("Kinwong HK")—is a subsidiary of Shenzhen Kinwong based in Hong Kong.

7.     Shenzhen Kinwong has owned the Chinese trademark registration for the KINWONG mark since 1999.

8.     In 1999, Shenzhen Kinwong—using its trademarks—began selling its PCBs to clients in the United States.

9.     Shenzhen Kinwong sold PCBs under the KINWONG mark to its first customer in the U.S., Emerson Network Power, in 1999.

10.     In addition to its Emerson sales, Shenzhen Kinwong also signed a deal in 2002 with Mingyu Enterprise Co., Ltd.—under the terms of which Mingyu would serve as Shenzhen Kinwong's U.S. sales agent.

11.     As Shaobai Liu—Shenzhen Kinwong's CEO and majority shareholder—explained, in the early 2000s, "we at Kinwong thought that if we wanted to expand our business, we had to sell to overseas markets."

12.     In the early 2000s, however, Shenzhen Kinwong "did not have the resources to sell to markets such as Europe and US."

13.     Accordingly, Shenzhen Kinwong's shareholders signed Mingyu up to serve as a "US distributor for Kinwong."

14.     Mingyu "had a team and office or offices in the United States" and sold "Kinwong products to the United States."

15.     CTX's own documents recognize that Mingyu's "[e]nd [c]ustomer[s]" included GM, Ford, and Chrysler.

16.     Since at least 2003, Shenzhen Kinwong has advertised its products on a globally accessible website, www.kinwong.com.

17.     As early as 2004, Shenzhen Kinwong made sales through Yi Fung—a Hong Kong distributor—to a U.S. customer, Neosong USA, and shipped its PCBs to Neosong in Chicago, Illinois.

18.     Shenzhen Kinwong sent documents to Neosong—such as invoices, purchase orders, and packing lists—bearing the Kinwong name and logo.

19.     From the very beginning, the Plaintiffs affixed the KINWONG mark to their packaging and shipping documents.

20.     Cherry He—Shenzhen Kinwong's corporate representative—explained that "[t]here would also be some logos on the boxes," that, "[o]n our document, you would also find Kinwong's logos," and that "[a]ccompanying documents, inspection documents, and packaging documents, they would all contain Kinwong's logo."

21.     The Defendants—Circuitronix LLC ("CTX") and Kinwong LLC—are both Florida-based limited liability companies founded and owned by Rishi Kukreja (another Defendant) in 2002 and 2013, respectively.

22.     Neither CTX nor Kinwong LLC has ever directly manufactured PCBs.

23.     Since its founding in 2013, Kinwong LLC has functioned as a holding company—with Kukreja as its sole member.

24.     Kinwong LLC has never sold any products—not PCBs or anything else.

25.     CTX makes its money by acting as a middleman, purchasing PCBs from Chinese manufacturers—like Shenzhen Kinwong—and reselling them to end customers who use them in their products.

26.     CTX "is a distribution business that buys PCBs from Chinese manufacturers and resells them to end customers."

27.     In 2005, Kukreja—CTX's founder and owner—asked an intermediary to introduce him to some Chinese PCB manufacturers.

28.     In April 2005, Kukreja met Shenzhen Kinwong's COO and partial owner, Mafio Shum.

29.     Mafio Shum was the COO of Shenzhen Kinwong until his death in 2013.

30.     Shortly after their meeting in April 2005, Kukreja emailed Shum.

31.   Kukreja—referring to Shenzhen Kinwong as "Kinwong"—wrote on April 27, 2005: "[I]t is my hope that we can build a strong relationship with Kinwong in the future. Keeping that in mind I would like to bring the following opportunity to Kinwong."

32.   The opportunity consisted of a purchase order for 50,000 estimated annual units of each of six different products manufactured by Shenzhen Kinwong.

33.   Kukreja wrote to Shum at his Kinwong email address: mafio@kinwong.com.

34.   In other words, years before Kukreja formed Kinwong LLC—years before Kukreja applied to register the KINWONG mark in the United States—he was soliciting business from a company with the very same name.

35.   Early on, the relationship between Shenzhen Kinwong and a company called Capital Profit confused Kukreja.

36.   Trying to resolve this perceived discrepancy, Kukreja emailed James Cheung, an intermediary, in April 2005 to ask: "Does Mafio [Shum] work directly for Kinwong or is he from another agency company (What is Capital-Profit)? I would like to work directly with the factories as much as possible."

37.   In his reply, Mr. Cheung copied Shum and explained that "Mafio is the President and owner of Kinwong Electronics (Shenzhen) Co., Ltd. The registered name in HK call [sic] 'Capital Profit Development Ltd.' It is a common thing like Olympic, Tatchun or other[ ] PCB board shops."

38.   Kukreja understood this clarification.

39.   At the time, Capital Profit owned 100% of the shares in Shenzhen Kinwong.

40.     By May 2005, Kukreja (through CTX) and Shum (acting on behalf of Capital Profit) signed a Manufacturer's Agreement, formalizing what they hoped would be a symbiotic relationship.

41.     When Kukreja sent the agreement to Shum for his signature on May 4, 2005, he wrote: "I look forward to building a strong relationship with Kinwong in the near future."

42.     In the draft version Kukreja emailed to Shum on May 4, 2005, the agreement stipulated that it was "by and between circuitronix, llc . . . and Kinwong Electronic (Shenzhen) Co. Ltd. (Manufacturer)."

43.     And it identified Shenzhen Kinwong as "having its principal place of business at Rm 502, 5/f, Block B, Veristrong Industrial Center, 36 Au Pui Wan Street, Fo Tan, HongKong."

44.     The parties later revised the agreement—replacing "Shenzhen Kinwong" with "Capital Profit"—after Shum asked that, "since factory 'Kinwong Electronic (Shenzhen) Co., Ltd.' is 100% held by 'Capital Profit Development Ltd.' with the same director Mafio Shum, and owing to the foreign exchange, tax reason, etc., kindly amend the P.O. by using Capital Profit Development Ltd. instead of Kinwong."

45.     The executed, final version was "by and between circuitronix, llc . . . and Capital Profit Development Ltd. (Manufacturer) having its principal place of business at Rm 502, 5/f, Block B, Veristrong Industrial Center, 36 Au Pui Wan Street, Fo Tan, HongKong."

46.     Capital Profit's address was the same as Shenzhen Kinwong's.

47.     Even though the executed agreement named only CTX and Capital Profit as contracting parties, everyone involved in the negotiations knew that Capital Profit was synonymous with Shenzhen Kinwong.

48.     Under the Manufacturer's Agreement, CTX was buying PCBs from Shenzhen Kinwong through Capital Profit.

49.     From the beginning, CTX operated as if Capital Profit and Shenzhen Kinwong were one and the same.

50.     CTX employees referred to the new manufacturer as "Kinwong."

51.     Employees used the name "Kinwong" when they asked Kukreja questions and Kukreja did the same.

52.     When Kukreja sent a purchase order on June 12, 2005, that identified Capital Profit as the vendor, he asked the recipient: "PLEASE RELEASE THIS PO ON KINWONG."

53.     Even associates outside CTX referred to Capital Profit as "Kinwong" in their conversations with CTX employees.

54.     The certifications Shenzhen Kinwong provided to CTX—and which CTX, in turn, sent its clients—made clear that the two companies were connected, such as the following:



55.     The 2005 Manufacturer's Agreement granted CTX an exclusive relationship with Capital Profit—but only as to those customers (1) whom CTX introduced to Capital Profit and (2) who submitted a purchase order within 12 months of the introduction.

56.     CTX had the "exclusive right to promote and sell" products from Capital Profit (and, in turn, Shenzhen Kinwong), but CTX maintained that exclusive right only with respect to those clients it had introduced.

57.     CTX thus only enjoyed exclusivity when it came to its own customers.

58.     By contrast, Capital Profit (and Shenzhen Kinwong) were free to sell their products to anyone—including in the United States—so long as those customers had not been introduced by CTX.

59.     The Agreement limited itself—geographically—to the Americas, including the United States.

60.     One year after signing the Manufacturer's Agreement—on May 3, 2006—Capital Profit changed its name to Kinwong Group Limited ("Kinwong Group").

61.     A Shenzhen Kinwong employee notified CTX of the formal name change on June 12, 2006, advising that "the accounts and addresses [are] unchanged."

62.     The Shenzhen Kinwong employee attached a note from Capital Profit asking that, beginning June 9, 2006, clients use the new name—Kinwong Group Limited—for remittances.

63.     The 2006 email also included a Certificate of Name Change from the Hong Kong Registrar of Companies.

64.     A CTX employee forwarded this announcement, along with the accompanying documents, to Kukreja.

65.     In light of that name change, Kinwong Group (formerly Capital Profit) continued to do business with CTX under the auspices of the Manufacturer's Agreement.

66.     CTX employees reminded coworkers to refer to the company they were doing business with as "Kinwong," not "Capital Profit," including in an email on January 11, 2007.

67.     CTX employees handled the relationship between Kinwong Group and Shenzhen Kinwong just as they had in the days of Capital Profit—by treating the two companies as one and the same.

68.     Kinwong Group (standing in the same position as Capital Profit) owned 100% of the shares in Shenzhen Kinwong.

69.     In 2010, CTX and Kinwong Group settled a dispute regarding each party's compliance with the 2005 Manufacturer's Agreement by entering into a Settlement Agreement.

70.     The 2010 Settlement Agreement acknowledged that, under the Manufacture's Agreement, "Circuitronix [wa]s to perform global sales and marketing for Kinwong, on an exclusive basis, for certain customers."

71.     The parties stipulated that the Manufacturer's Agreement remained in full force and effect to the extent that it did not conflict with the Settlement Agreement.

72.     In 2011, Shenzhen Kinwong's structure changed.

73.     Kinwong Group sold 100% of its shares in Shenzhen Kinwong to Shenzhen Kinwong—thus consolidating ownership in the manufacturer itself.

74.     That same year, an employee of Shenzhen Kinwong informed clients—including Kukreja—that "Kinwong Group Limited will be changed into Kinwong Electronic (Hong Kong) Limited."

75.     In other words, Shenzhen Kinwong was telling its clients to stop addressing purchase orders to Kinwong Group after June 1, 2011.

76.     Instead, Shenzhen Kinwong instructed customers to submit orders to Kinwong HK.

77.     As before, the company's bank information remained the same.

78.     This time, though, Kinwong HK was a wholly owned subsidiary, rather than the owner, of Shenzhen Kinwong.

79.     Today, Kinwong Group operates as a separate company in Hong Kong.

80.     Throughout the parties' working relationship, CTX conducted sales and marketing for Shenzhen Kinwong through agreements it signed with both Capital Profit and Kinwong Group.

81.     CTX brought customer representatives to personally audit Shenzhen Kinwong's factory in China.

82.     CTX also used Shenzhen Kinwong's materials—complete with Shenzhen Kinwong's name, address, and financial information—in CTX's presentations to potential U.S. customers.

83.     Throughout the thousands of emails the parties exchanged over the course of their lengthy relationship, Kukreja and CTX consistently referred to the company they were doing business with—whatever name appeared on the purchase orders—as "Kinwong."

84.     Both CTX and Shenzhen Kinwong had quality control teams, and both played a role in ensuring the quality of Shenzhen Kinwong's PCBs.

85.     Since 1994, Shenzhen Kinwong has certified its PCBs through Underwriters Laboratories ("UL").

86.     UL is an international organization that develops safety standards for, and conducts product testing of (among many things), PCBs.

87.     UL assigned the applicant (Capital Profit) a file number (E158063).

88.     Like the other companies that registered with UL, Shenzhen Kinwong registered a UL code—the letters "CP" for Capital Profit.

89.     This "CP" code appeared on just about every PCB that Shenzhen Kinwong manufactured except, for example, where "the board is very, very small, like a toothpick."

90.     By 2005, Shenzhen Kinwong had linked the UL code "CP" and the trademark to its own name as well.

91.     Kukreja (and CTX) understood these codes and symbols as referring to Shenzhen Kinwong.

92.     In a 2006 presentation Kukreja himself gave to Margaret Johnson, an employee of a U.S. customer of CTX, CTX included the following slide of Shenzhen Kinwong's UL certification, which identified the manufacturer's UL code as "CP":



93.     While CTX and Shenzhen Kinwong worked closely together, they were clear on who made the PCBs and who distributed them: in 2008, for example, when CTX employees sent parts made by Shenzhen Kinwong to clients, they used shipping labels that identified CTX as the "supplier" and "Kinwong" as the manufacturer as follows:



94.    CTX shared with its U.S. customers "Kinwong presentations"—often at the customers' request—that featured Kinwong's name, logo, factory photographs and address, financial information, customer lists, and quality certifications.

95.    Those presentations indelibly linked Shenzhen Kinwong (not any of the Defendants) with both the KINWONG mark and the Shenzhen Kinwong factory, such as:



96.     In 2009, Shenzhen Kinwong hired another company—Electrotek Corp. based in Wisconsin—to act as its North American sales representative.

97.     Through that agreement, Shenzhen Kinwong engaged Electrotek to serve "as an independent sales representative to offer, promote and sell in the name of Kinwong."

98.     Shenzhen Kinwong's agreement with Electrotek stipulated that "the name 'Kinwong' and the logo type used by Kinwong are service marks and trademarks belonging solely to Kinwong."

99.     Under this arrangement with Electrotek, Shenzhen Kinwong's sales were made under the KINWONG mark, its circuit boards were stamped with *its* UL code ("CP"), and all packaging, shipping labels, invoices, and bills of lading were imprinted with the "Kinwong" name.

100.    The former president of Electrotek, John Johnson, explained that the purpose of this agreement was for Electrotek to "function as Kinwong USA."

101.    The point was to solidify Shenzhen Kinwong's "footprint in the US" and to provide "support" for Shenzhen Kinwong's U.S. customers, including Honeywell—a major U.S. company that used Kinwong PCBs to manufacture (among other things) smoke detectors, and which, as of the time Electrotek signed the Electrotek Agreement, had awarded Kinwong "top vendor" awards for "excellent quality."

102.    In acting as Shenzhen Kinwong's sales representative, Electrotek agreed to "preserve the good will that is presently associated with the name and reputation of [Shenzhen Kinwong]."

103.    To that end, Electrotek "acknowledge[d] and agree[d] the name 'Kinwong' and the Logotype used by Kinwong are service marks and trademarks belonging solely to [Shenzhen Kinwong]."

104.    And, by all accounts, Electrotek was successful in promoting the "Kinwong" brand.

105.    John Johnson, for instance, testified that customers would "reach out to [him] specifically asking for Kinwong products."

106.    And he gave several examples of this: "Electronic Theater Controls in Madison," he said, "specifically wanted to have Kinwong products because they had a specialty printed circuit board[.]"

107.    Since 2009, Shenzhen Kinwong has both sold over $20 million in PCBs to Electrotek and shipped PCBs directly to Electrotek's U.S. customers.

108.    The shipment invoices, packing lists, and certificates of conformance for these deliveries often (if not always) depicted Shenzhen Kinwong's name, stamp, logo, and UL file number.

109.    Electrotek's CFO testified that Shenzhen Kinwong's logo was featured on the certificates of compliance that accompanied each Shenzhen Kinwong shipment.

110.    Plaintiffs paid to promote and market their PCBs through their deal with Electrotek.

111.    By the terms of that deal with Electrotek, Shenzhen Kinwong agreed to pay Electrotek $4,000 a month—or nearly $50,000 each year—to serve as its sales representative in the United States.

112.    Also, after the Electrotek agreement was in place, Shenzhen Kinwong began advertising its parts in English-language trade publications.

113.    By 2013, Shenzhen Kinwong was one of the world's largest PCB manufacturers, with more than $300 million in annual sales.

114.    The following are examples of the KINWONG mark as it appeared on Kinwong's customers' boxes, shipping labels, certificates of compliance, and invoices:





| KINWONG ShenZhen KinWong Electronic Co.,Ltd. | |
|---|---|
| Date Code: | 1942 |
| Part No: | PCR1-630H4W5 |
| Product Code: | |
| Man Part No: | P1633CLSD20/6108A |
| Quantity: | 131pcs |
| N.W/G.W: | 6.262/6.800kg |
| Date: | 2019.10.28 |
| S01B1910282540 | |

| KINWONG 深圳市景旺电子股份有限公司 | |
|---|---|
| 物料编号: | T100103303-LF REV : A |
| 公司料号: | P3003CS110080588A |
| 前　段: | 29PCS |
| 后　段: | 1622 |
| 重　量: | 6.841/7.870 |
| 保质日期: | 2016.11.30 |
| 生产日期: | 2016.05.31 |
| 产　地: | MADE IN CHINA |
| S01B1605318260 | |

| KINWONG 深圳市景旺电子股份有限公司 | | |
|---|---|---|
| 客户料号: | CNECR0023297-PCB | 版本: 4 |
| 客户编号: | | |
| 客户订单号: | MX 70181860 | |
| 生产料号: | P1920YLI08093306B | |
| 数　量: | 91 pcs | |
| 生产周期: | 4219 | |
| 重　量: | 10.038/11.100kg | |
| 2019.10.23 | S01B1910236110 | |



Kinwong Enterprise Group Co.,Ltd
Http://www.kinwong.com

**KINWONG**
景旺电子

Shenzhen Kinwong Electronic co.,LTD
Http://www.kinwong.com

CERTIFICATION OF CONFORMITY

CERTIFICATION OF CONFORMITY

CUST : Electronic Corporation
Kinwong P/N : 30JLE412935A1
Date : 2009-8-10
Part NO. : 4350B6031 REV:B
Quantity Enclosed : 32  PCS
Manufacturer Name : KinWong
UL Flammability Rate : 94V-0
Manufacturing Date Code : 0935
Base Material Type : FR-4

This is to certify that enclosed material have been manufactured and inspected in accordance with customer drawing and specification.

CUST　　　　　　 : HELLA
Kinwong P/N　　 : 280LD0634983C0
Date　　　　　　 : 8/9/2013
Part NO.　　　　 : 934  279-00
Quantity Enclosed : 10024PCS
Manufacturer Name : Kinwong



景旺企業集團有限公司
KINWONG GROUP LIMITED

## INVOICE

TO: Behr Hella Thermocontrol Inc
Inc 50660 Century Ct.
Wixom,MI 48393
USA

DATE: 21-Jun-10
INVOICE NO: SI06514-10

Sender: Kinwong Group Limited
Address: Rm 502,5/F,BlockB,Veristrong Ind.Centre,36Au Pui Wan Street,Fo Tan,Hongkong



Case 0:18-cv-61550-RKA   Document 187-72 *SEALED*   Entered on FLSD Docket 02/19/2020   Page 2 of 2

景 旺 電 子 （ 香 港 ） 有 限 公 司
KINWONG ELECTRONIC (HONG KONG) LIMITED

## INVOICE

Bill To: ICAPE USA, LLC
700E Firmin Street, suite 104 Kokomo,IN 46902 USA

Date : 02-03-2016
Cust NO. : 029F
Invoice NO. : HK15030034



115.    Some of CTX's own customers insisted that CTX only sell them PCBs manufactured by Shenzhen Kinwong.

116.    In one email from August 9, 2010, for example, a General Electric employee explained to CTX that GE would accept PCBs only from Shenzhen Kinwong: "Its [sic] our understanding that the Siga 11 boards are manufactured by Kinwong Electronics. So Kinwong is the approved supplier. This board can not [sic] be moved to another Manufacturer without the permission and approval of UTC Fire & Security."

117.    Other CTX customers from the United States, like Lear Corporation (a Michigan-based company), included Kinwong's name and address in their internal systems and in their purchase orders to CTX—further demonstrating that they knew precisely which entity stood behind the PCBs.

118.    Lear's global director of purchasing explained that he knew exactly who stood behind the PCBs Lear was buying: "Lear Corporation has purchased [PCBs] from [CTX] that were manufactured in China by [Shenzhen Kinwong] ('Kinwong'). Lear specifically audited Kinwong's factories and approved Kinwong as an authorized manufacturer of PCBs before purchasing these PCBs[.]"

119.    CTX's business manager, Animesh Dutta, candidly testified that "the U.S. customers to whom Circuitronix sold Kinwong parts knew that Kinwong was the factory they were coming from."

120.    In its prior breach-of-contract case against Kinwong, CTX affirmatively alleged that, "[w]hen CTX marketed the Products for the Manufacturer's Agreement to its customers, the Products were associated with Kinwong Shenz[h]en's globally-recognized brand 'Kinwong.'"

121.    Shenzhen Kinwong also advertised its brand on its global website, in industry publications, and at international trade shows.

122.    On January 18, 2013—while conducting business with Shenzhen Kinwong—Kukreja formed Kinwong LLC, a Florida limited liability company.

123.    Kukreja is the principal and sole owner of Kinwong, LLC.

124.    Kinwong LLC thus became the world's fourth "Kinwong" company—but the only one owned by the Defendants.

125.    One year later—and while Kukreja was still doing business with Shenzhen Kinwong—Kinwong LLC filed an application with the U.S. Patent and Trademark Office ("USPTO") for the "KINWONG" mark in the circuit-board category.

126.    The USPTO published the Kinwong LLC application "for opposition" in July 2014.

127.    The USPTO asked Kinwong LLC for more information.

128.    In his response—a January 2015 supplement to the Kinwong LLC application—Kukreja swore, under penalty of perjury, that "[t]he mark KINWONG has been used on our website – kinwongllc.com to promote the printed circuit board business."

129.    At the time, the website kinwongllc.com had been in use for only a month.

130.    In his February 2015 supplements to the USPTO application, Kukreja declared—again, under penalty of perjury—that Kinwong LLC "first used" the mark "at least as early as 12/11/2014, and first used in commerce at least as early as 12/11/2014, and is now in use in such commerce."

131.     As proof of Kinwong LLC's use of the KINWONG mark in commerce, Kukreja submitted the following photographs of boxes bearing the label "Kinwong, LLC":

 



132.     Unbeknownst to the USPTO, the labels on these boxes had been ordered on February 5, 2015 at a Fastsigns store and picked up on February 9, 2015—just the day before Kukreja submitted the photographs to the USPTO.

133.     The USPTO granted Kinwong LLC's trademark application on May 12, 2015.

134.     Kinwong LLC has never sold any product.