UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-cv-61550-ALTMAN/Hunt

SHENZHEN KINWONG
ELECTRONIC CO., LTD., *et al.*,

     *Plaintiffs*,

*v.*

RISHI KUKREJA, *et al.*,

     *Defendants.*

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Plaintiffs—Shenzhen Kinwong Electronic Co., Ltd. and Kinwong Electronic (Hong Kong) Ltd. (collectively, "Kinwong")—manufacture printed circuit boards ("PCBs"). The Defendants—Rishi Kukreja, Kinwong LLC, and Circuitronix LLC ("CTX")—are in the business of distributing Chinese-made PCBs to end-users around the globe. For many years, Kinwong and CTX were partners: Customers would approach CTX to place PCB orders, and CTX would submit those purchase orders to Kinwong, which would then manufacture the PCBs to the customers' specifications. Unfortunately, like so many business ventures, this relationship between Kinwong and CTX began to deteriorate and then ruptured completely. As a result, the companies have been in near-constant litigation with each other over the last few years, *see generally Circuitronix, LLC v. Kinwong Elec. (Hong Kong) Co., Ltd.*, 993 F.3d 1299, 1301–03 (11th Cir. 2021), and this case is part of that fallout.

This chapter in the Kinwong-CTX saga implicates the Lanham Act. To make a (very) long story short, Kinwong accused CTX and Kukreja (CTX's owner and president) of fragrantly infringing upon Kinwong's trademark rights. At summary judgment, we found that the Plaintiffs owned the KINWONG mark and that the Defendants did, in fact, infringe on that mark. Having resolved many of the pertinent issues at summary judgment, we proceeded to a bench trial on three discrete issues:

(1) whether the Defendants committed fraud on the U.S. Patent and Trademark Office ("USPTO") when they registered the KINWONG mark in the United States; (2) whether the Defendants schemed to sell counterfeit Kinwong products in violation of the Lanham Act; and (3) whether (and to what extent) the Plaintiffs were entitled to damages and attorneys' fees.

After an exhaustive review of the evidence the parties presented at trial, the parties' arguments, and the relevant law, we now enter **FINAL JUDGMENT** in favor of the Plaintiffs. The overwhelming evidence at trial showed that the Defendants fraudulently attempted to register the KINWONG mark in the United States—*i.e.*, that they did so willfully and with flagrant disregard of Kinwong's indisputable ownership of that mark. The Plaintiffs have also shown that the Defendants "passed off" certain PCBs as having been made by Kinwong when they knew full well that Kinwong hadn't, in fact, made those PCBs (although the practice wasn't as pervasive as Kinwong suggests). Finally, we agree that the Plaintiffs are entitled to both damages and attorneys' fees.

FINDINGS OF FACT

I.      **Factual Background**[1]

A.  **The Parties**

Shenzhen Kinwong Electronic Co., Ltd. (originally known as "Kinwong Electronics (Shenzhen) Co., Ltd.) manufactures PCBs and "other electronic and electrical products" and was established under the laws of the People's Republic of China on March 9, 1993. Pl's Ex. 16 [ECF No. 455-1] at 214–16. In 1999, Kinwong registered the KINWONG mark with the Chinese government and obtained a "Trademark Registration Certificate." *Shenzhen Kinwong Elec. Co, Ltd. v. Kukreja*, 574 F. Supp. 3d 1191, 1196 (S.D. Fla. 2021) (Altman, J.); *see also* Pl's Ex. 149 [ECF No. 455-3] at 339.

---

[1] This Section will be limited to facts that were either: (1) undisputed; (2) not contested at trial; or (3) found to be true in our Omnibus Order granting in part and denying in part summary judgment. *See generally Shenzhen Kinwong Elec. Co, Ltd. v. Kukreja*, 574 F. Supp. 3d 1191, 1196–1207 (S.D. Fla. 2021) (Altman, J.).

Kinwong used the KINWONG mark to "sell[] its PCBs to clients in the United States"—for instance, to Emerson Electric Co. ("Emerson"). *Kukreja*, 574 F. Supp. 3d at 1196. "And, since at least 2003, Shenzhen Kinwong has advertised its products on a globally accessible website, www.kinwong.com." *Ibid.*[2]

Our other Plaintiff, Kinwong Electronic (Hong Kong) Ltd., "is a subsidiary of Shenzhen Kinwong" based in Hong Kong. *Ibid.* Because Chinese law generally forbids Chinese manufacturers from selling its products directly to foreign entities, many Chinese PCB manufacturers (like Shenzhen Kinwong) form Hong Kong-based subsidiaries, which allow them to export their products to customers around the globe. *See* Deposition of Hansen Zhang [ECF No. 461-9] at 21 ("[I]n relation to all overseas export[s] . . . . [The] Kinwong factory would use this method via Kinwong Electronic (Hong Kong) entity to do all the export[s] or most of the export[s]. This is the standard procedure or practice and it is still happening today."); *see also Kukreja*, 574 F. Supp. 3d at 1197 (finding that it's "a common thing [for] PCB board shops" to use Hong Kong-based intermediaries). Kinwong Electronic's name has thus changed over the years. Kinwong Electronic was originally known as "Capital Profit Development Limited." *See* Pl's Ex. 7 [ECF No. 455-1] at 28 ("The registered name in [Hong Kong] [is] call[ed] 'Capital Profit Development Ltd.'"). On May 3, 2006, Capital Profit's name was changed to "Kinwong Group Limited." *See* Pl's Ex. 98 [ECF No. 455-2] at 484. Kinwong Group then changed its name for the last time to Kinwong Electronic (Hong Kong) Ltd., "around 2012." Day 6 Trial Tr. at 206:16–21 ("Q: Now, ultimately, Kinwong Electronic (Hong Kong) Limited, . . .

---

[2] That website, while accessible to everyone in the world, displayed content exclusively in Chinese during the early- and mid-2000s. *See* Day 6 Trial Tr. [ECF No. 474] at 182:16–17 ("[Plaintiff's Counsel]: Anyone in the world could access [www.kinwong.com], right? [Kukreja]: Anybody who spoke Chinese.").

became the successor in interest to Kinwong Group, Limited under the settlement agreement, right? [Kukreja]: They became the successor through a letter[.]").[3]

In October 2002, Defendant Rishi Kukreja formed CTX "as a Florida limited liability company[.]" *Id.* at 152:11–12; *see also Kukreja*, 574 F. Supp. 3d at 1196 ("[CTX] . . . [is a] Florida-based compan[y] founded and owned by Rishi Kukreja . . . in 2002[.]"). Kukreja is "the sole managing member" of CTX, "own[s] 100 percent of the company and always [has]," is "the voice of the company[,]" and "make[s] all the important decisions" for CTX. Day 6 Trial Tr. at 152:14–25. CTX "sells PCBs, but it does not manufacture them." *Kukreja*, 574 F. Supp. 3d at 1196. CTX's business model is to act as a "middleman, purchasing PCBs from Chinese manufacturers—like Shenzhen Kinwong—and reselling them to end customers who use them in their products." *Id.* at 1196–97.

To "facilitate the shipment and delivery process for [CTX's] international customers," Kukreja helped to create "smaller companies under the CTX umbrella," namely Circuitronix Hong Kong ("CTX Hong Kong") and Circuitronix Shenzhen ("CTX Shenzhen"). Day 6 Trial Tr. at 153:9–14.

---

[3] Capital Profit originally "owned 100% of the shares in Shenzhen Kinwong." *Kukreja*, 574 F. Supp. 3d at 1200. But, through a series of complicated purchases and transfers that aren't relevant here, Kinwong Electronic (Hong Kong) eventually became Shenzhen Kinwong's subsidiary. *See id.* at 1203 ("As if that weren't convoluted enough, Kinwong Group—formerly known as Capital Profit—then sold its ownership shares in Shenzhen Kinwong back to Shenzhen Kinwong. And, at around the same time, the Hong Kong facility CTX had initially dealt with—first as Capital Profit, then as Kinwong Group—became Kinwong HK, a subsidiary of Shenzhen Kinwong."). The important point to remember here is that Shenzhen Kinwong is a manufacturing concern based in the People's Republic of China, whereas Kinwong Electronic (formerly known as both Capital Profit and Kinwong Group) is a Hong Kong-based intermediary that allows Shenzhen Kinwong to export its PCBs to foreign customers. These two entities have always been collectively referred to as "Kinwong"—even though the dominant partner in that relationship has changed over time. *See id.* at 1196 n.2 ("Some of the exhibits in this case thus refer variously to 'Shenzhen Kinwong Electronic Co., Ltd.,' 'Kinwong Electronics (Shenzhen) Co.,' and 'Kinwong Electronic (Shenzhen) Co. Ltd.' The parties treat these all as variations on the name of a single entity—the Plaintiff, Shenzhen Kinwong."); *id.* at 1198 ("From the beginning, in fact, CTX operated as if Capital Profit and Shenzhen Kinwong were one and the same. CTX employees referred to the new manufacturer as 'Kinwong.' . . . Even associates outside CTX referred to Capital Profit as 'Kinwong' in their conversations with CTX employees." (cleaned up)).

Unlike CTX, CTX Hong Kong is "owned by [Kukreja's] mother, Promila Kukreja"—not by CTX or Kukreja personally. *Id.* at 156:3–4. And CTX Shenzhen is, in turn, wholly owned by CTX Hong Kong. *See id.* at 156:11–13. But, despite Promila Kukreja's role as sole owner of CTX Hong Kong, Kukreja "personally [has] complete operational control over CTX Hong Kong[.]" *Id.* at 156:14–16. The result of this ownership and operational structure is that Kukreja "operate[s], manage[s], and [has] full and direct control over CTX and all its affiliated companies," including CTX Hong Kong and CTX Shenzhen. *Id.* at 158:16–18.

"On January 18, 2013—while conducting business with Shenzhen Kinwong—Kukreja formed Kinwong, LLC, a Florida limited liability company." *Kukreja*, 574 F. Supp. 3d at 1205. Kukreja testified that he formed Kinwong, LLC, to be "a holding company for [CTX's] trademark rights." Day 7 Trial Tr. [ECF No. 475] at 50:2–3; *see also id.* at 52:3–5 ("Q: You formed [Kinwong, LLC] to act as a holding company for [CTX's] intellectual property. [Kukreja]: As recommended by Ozzie Torres."). Kinwong, LLC had "no employees," used the same business address as CTX, and "never had any revenue[.]" *Id.* at 50:1–6, 51:14–15. The only "asset" Kinwong, LLC possessed was "the mark and name 'Kinwong'"—which CTX assigned to Kinwong, LLC on January 14, 2013. Pl's Ex. 107 [ECF No. 455-3] at 14. Kinwong, LLC attempted to register the KINWONG mark with the USPTO on January 21, 2014—a little over a year after CTX executed its assignment agreement with Kinwong, LLC. *See* Pl's Ex. 26 [ECF No. 455-1] at 260. Although the USPTO eventually registered the mark (Registration No. 4,736,271), we cancelled that trademark registration on December 9, 2021, after concluding that Kinwong—not CTX or Kinwong, LLC—"own[s] the KINWONG mark." *Kukreja*, 574 F. Supp. 3d at 1244.

### B. The Parties' Business Relationship

In late 2004 or early 2005, Kukreja asked two intermediaries—James Cheung and N.K. Lai— "to introduce him to some Chinese manufacturers." *Id.* at 1197. Kukreja met "a gentleman by the

name of Mafio Shum[,]" who was Capital Profit's chairman, COO, and partial owner. Day 6 Trial Tr. at 161:23–25. At the time of this initial meeting, Capital Profit "owned a hundred percent" of Shenzhen Kinwong and its factory in Shenzhen. *Id.* at 163:4–5; *see also* Pl's Ex. 7 [ECF No. 455-1] at 28 ("Mafio is the President and owner of Kinwong Electronics (Shenzhen) Co. Ltd. The registered name in [Hong Kong] call [sic] 'Capital Profit Development Ltd.'"). Kukreja had one goal when looking for a suitable Chinese manufacturing partner: He "wanted to work directly with the company manufacturing the PCBs." Day 6 Trial Tr. at 166:17–18; *see also* Pl's Ex. 7 at 28 (email from Kukreja stating that he "would like to work directly with the factories as much as possible"). Apparently pleased with this initial meeting, Kukreja sent Shum an email expressing his "hope that we can build a strong relationship with Kinwong in the future." *Kukreja*, 574 F. Supp. 3d at 1197 (cleaned up).[4]

On May 4, 2005, Kinwong (under the name Capital Profit) and CTX entered into a "Manufacturer's Agreement." *See* Pl's Ex. 6 [ECF No. 455-1] at 22–25. In this Manufacturer's Agreement, Kinwong granted CTX "the exclusive right to promote and sell its products to all customers/accounts introduced by [CTX]." *Id.* at 22. The Manufacturer's Agreement also provided that Kinwong "may directly sell its Product to certain of its customers [sic] within the Territory,"[5] so long as it did not "enter into any contract with the customer/accounts of [CTX] to promote and/or solicit orders for the sale of Product." *Ibid.*; *see also* Day 6 Trial Tr. at 189:22–190:1 ("Q: In other words, according to the manufacturer's agreement, the manufacturer could sell its PCBs in the territory as

---

[4] Although there was some initial confusion, Kukreja understood that Capital Profit and Kinwong operated as one entity with the same ownership. *See* Day 6 Trial Tr. at 188:6–9 ("Q: From your perspective, when you talk about Kinwong, that incorporates both the distribution company in Hong Kong and the manufacturing company in Shenzhen. [Kukreja]: That—that is correct."). As we discussed in our Omnibus Order: (1) Kukreja (and CTX's employees) "knew that Capital Profit was synonymous with Shenzhen Kinwong" and that "CTX was buying PCBs from Shenzhen Kinwong through Capital Profit"; and (2) CTX and Kukreja "referred to the new manufacturer as 'Kinwong'" because Capital Profit and Kinwong were "one and the same." *Kukreja*, 574 F. Supp. 3d at 1198.
[5] The Manufacturer's Agreement defines "Territory" as "the geographic regions of the United States of America ('USA'), Canada, Mexico, and South America." *Id.* at 22.

long as it wasn't selling them to [CTX's] exclusive customers, that's what that says, right? [Kukreja]: That is right."). CTX was required to "conduct all of its business in its own name[.]" Pl's Ex. 6 at 22; *see also Kukreja*, 574 F. Supp. 3d at 1223 ("In other words, the Agreement—by its plain language— required CTX to do business as CTX, not as Kinwong."). The Manufacturer's Agreement "was silent on branding and trademarks" and "made no reference to an assignment of trademarks to CTX[.]" Day 6 Trial Tr. at 192:13–20. The final paragraph of the Manufacturer's Agreement also included the following provision:

> This Agreement embodies the entire agreement between the parties hereto and with respect to the subject matter hereof and *cancels and supersedes any and all prior or contemporaneous, oral or written understandings, negotiations or communications on behalf of such parties*. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void or otherwise unenforceable, the remaining provisions of this Agreement will nevertheless continue in full force and effect.

Pl's Ex. 6 at 25 (emphasis added).

During the early days of the Kinwong/CTX partnership, CTX made several attempts to convince its customers that the two businesses were part of a joint venture. Kukreja persuaded Mafio Shum to place a "Circuitronix sign . . . outside the [Kinwong] factory" so that CTX could "show a joint venture relationship between the two companies and for . . . every customer to believe that [CTX] was one of the owners of the factory." Day 8 Trial Tr. [ECF No. 476] at 171:16–17, 174:10–13; *see also* Def's Ex. 190 [ECF No. 457-5] at 358 (showing CTX sign outside of Kinwong's factory). In April 2006, Kukreja sent an email to Mafio Shum, "attaching a draft of a letter which we request you to put on a Kinwong letterhead." Pl's Ex. 99 [ECF No. 455-2] at 489. That proposed letter (falsely) declared that "[CTX] is a subsidiary of Capital Profit Development." *Id.* at 492. Indeed, Kukreja admitted that he and other CTX employees sometimes told customers that CTX had an equity share in Kinwong— reasoning that Mafio Shum had given him permission to do so. *See* Day 8 Trial Tr. at 7:10–21 ("[Kukreja]: Mr. Shum and I made [representations] to several customers that we were working as a joint venture. Q: And that is not true, right? [CTX] did not have an equity share in Kinwong, right?

A: Equity ownership is not based upon—equity ownership does not always rely upon money. . . . [T]wo organizations can get together, and they can say that you manage this aspect of the business, and you can represent that you have ownership in the factory. And so I do not believe that it's an untrue statement as long as it's done in agreement with the two owners of the factory."). Kukreja justified these rather misleading acts by insisting that he was "promoting the Kinwong brand in North America[.]" *Id.* at 174:18.

Nevertheless, despite Kukreja's various attempts (intentional or innocent) to blur the lines between Kinwong and CTX, customers understood that Kinwong was the PCB manufacturer and that CTX merely distributed Kinwong's products. *See Kukreja*, 574 F. Supp. 3d at 1198 ("Even associates outside CTX referred to Capital Profit as 'Kinwong' in their conversations with CTX employees."); *id.* at 1233 ("CTX would also share with its U.S. customers 'Kinwong presentations'— often at the customers' request—that featured Kinwong's name, logo, factory photographs and address, financial information, customer lists, and quality certifications."); *id.* at 1235–36 ("CTX's business manager, Animesh Dutta, candidly testified that 'the U.S. customers to whom Circuitronix sold Kinwong parts knew that Kinwong was the factory they were coming from.'"); *see also id.* at 1226 (showing shipping labels that indicate "Circuitronix" as the "supplier" and "Kinwong" as the manufacturer).

The first major fissure in the parties' relationship came in 2010, when "disputes arose regarding pricing, factory visits, information sharing, and [Kinwong's] right to sell its PCBs directly to certain clients." *Id.* at 1202. CTX accused Kinwong "of doing business with Honeywell and TRM in 2008 and 2009," in violation of the Manufacturer's Agreement, which precluded Kinwong from doing business with CTX-exclusive customers. Day 6 Trial Tr. at 201:14–22. To resolve this tension, the parties entered into a Settlement Agreement. *See generally* Pl's Ex. 19 [ECF No. 455-1] at 235–40. This Settlement Agreement was designed to resolve two major disputes. On the one hand, CTX had to pay

Kinwong $314,572.69. *See id.* at 235. On the other, Kinwong agreed to "subordinate and refrain from acting upon any of its desires that may adversely affect [CTX's] interests with the companies [listed] on Schedule A [of the Settlement Agreement]." *Id.* at 236. "Schedule A of the Settlement Agreement identifies these customers as: Lear Corporation, Kimball Electronics, TRW, and GE Industrial and Consumer." *Kukreja*, 574 F. Supp. 3d at 1202 n.10.[6]

Unfortunately, the Settlement Agreement didn't preserve the fragile peace between the parties. On February 7, 2012, a Kinwong employee emailed Kukreja to warn that Kinwong intended to terminate the Settlement Agreement "effective on May 24, 2012[,]" and to advise that "Kinwong will draw up a new contract after [the] expiration of this agreement." Pl's Ex. 241 [ECF No. 455-5] at 375. Kukreja interpreted this email as Kinwong's attempt to "renegotiate a new contract." Day 6 Trial Tr. 212:18–19. So, on April 27, 2012, Kinwong sent CTX a letter through a Hong Kong-based law firm—K.B. Chau & Co.—reiterating its intent to terminate both the Manufacturer's Agreement and the 2010 Settlement Agreement. *See* Pl's Ex. 100 [ECF No. 455-2] at 494–95. On May 7, 2012, CTX's attorney, Osvaldo ("Ozzie") Torres, responded to K.B. Chou's letter by asserting CTX's position that "Kinwong has a continuing obligation that survives the expiration or earlier termination of the Manufacturing Agreement to honor purchase orders from [CTX] Customers" and reiterating CTX's view that the "Settlement Agreement remains in full force in effect" for all CTX customers except TRW. Pl's Ex. 102 [ECF No. 455-3] at 2–3. Torres sent another letter to the K.B. Chou firm on June 25, 2012, arguing that the Manufacturer's Agreement *could not* be terminated because "it must have been sent 90 days before May 3, 2012 (that is, on or before February 3, 2012)." Pl's Ex. 255 [ECF No. 455-6] at 36. Kinwong ultimately acceded to CTX's interpretation of the Manufacturing Agreement,

---

[6] On January 4, 2013, Schedule A of the Settlement Agreement was amended to include one new company: Macom. *See* Def's Ex. 138 [ECF No. 457-4] at 425.

so the parties "operate[d] under that manufacturer's agreement for an additional year[.]" Day 6 Trial Tr. at 223:17–19.

The parties engaged in one final effort to salvage their relationship. Around December 31, 2012, Kukreja met with Mafio Shum in Shenzhen. *See* Day 9 Trial Tr. [ECF No. 477] at 27:7–9 ("[Q]: [D]id you have a meeting with Mr. Shum sometime at the end of 2012 or at the very beginning of 2013? [Kukreja]: We did. I believe it was the end of 2012."). Shum said that he "was extremely happy with the business development [CTX] had done on several of the customers," expressed "optimism in the relationship," and agreed to revise Schedule A of the Settlement Agreement. *Id.* at 27:17–22. Unfortunately, Kukreja "never spoke with Mr. Shum again" after this meeting because Shum became very ill and suddenly passed away. Day 6 Trial Tr. at 211:19–21; *see also* Day 9 Trial Tr. at 31:25–32:3 ("Q: Okay. So at the time that this revised [Schedule] A was signed, did you have any idea that Mr. Shum was, you know, very shortly after not going to be part of the business? A: No, no, absolutely not."). Because of Mr. Shum's illness, Kent Wang—a man Kukreja and CTX had "never dealt with"— "took over responsibilities from Mr. Shum in 2013." Day 8 Trial Tr. at 154:5–12.

Mr. Shum's passing led to a final break in the CTX-Kinwong relationship. On January 28, 2013, Kinwong mailed CTX its official (and effective) letter terminating the Manufacturer's Agreement. *See* Pl's Ex. 101 [ECF No. 455-3] at 1. Despite this termination letter, however, Kinwong continued to manufacture PCBs for CTX until 2018—apparently, so that the two companies could fulfill all CTX's pre-termination purchase orders. *See* Day 9 Trial Tr. at 45:19–46:6 ("[Kukreja]: [CTX] had accepted a bunch of purchase orders prior to the 4th of May, 2015, and they also accepted another group of orders sometime in the June, July 2015 time frame. Those purchase orders were fulfilled all the way into end of 2015, beginning 2016. . . . And finally, [CTX] accepted to put that order [for the CMF1 project] into production sometime after we had—we amended that purchase order in 2017."); Day 4 Trial Tr. [ECF No. 472] at 220:3–6 ("Q: Okay. Do you know whether the final shipment from

Shenzhen Kinwong to [CTX] occurred some point in the middle of 2018? [Wenwu Jiang]: Yes, I recall, yes.").

## II.     Procedural History

Kinwong filed its initial Complaint in this case on July 9, 2018, *see* Complaint [ECF No. 1], and it submitted the now-operative Amended Complaint on May 3, 2019, *see* Amended Complaint [ECF No. 63]. The Amended Complaint asserts six claims against the Defendants. In Count I, Kinwong alleges that the Defendants violated the Lanham Act (15 U.S.C. § 1125(a)) by engaging "in an elaborate, willful scheme to pass off Circuit Board Products that were not manufactured at Shenzhen Kinwong as if they were manufactured at Shenzhen Kinwong." *Id.* ¶ 51. Put another way, Kinwong says that the Defendants used the KINWONG mark without authorization and that their "deceptive counterfeiting practices caused further harm and confusion as to Plaintiffs' KINWONG mark." *Ibid.* Relying on this same conduct, Count IV of the Amended Complaint also alleges "trademark infringement and unfair competition" under Florida common law. *See id.* ¶ 79 ("Defendants have engaged in a willful scheme to counterfeit KINWONG products, resell those counterfeit goods to Plaintiffs' actual and potential customers, and conceal their counterfeiting through fraud, forgery, and deception.").

Counts II and III ask us to cancel Kinwong, LLC's trademark registration of the KINWONG mark in the United States (Trademark Registration No. 4,736,271) for two reasons. *First*, in Count II, Kinwong alleges that Kinwong, LLC didn't have the right to trademark the KINWONG mark "by virtue of Plaintiffs' prior use of the KINWONG mark in United States commerce on and in connection with the Circuit Board Products[.]" *Id.* ¶ 59. Count III, by contrast, urges us to cancel the '271 Registration because the "Defendants committed fraud before the USPTO by knowingly and willfully making false and/or fraudulent declarations or representations to the USPTO" to unlawfully procure the registration. *Id.* ¶ 67.

Finally, Counts V and VI of the Amended Complaint seek alter ego and agency liability under Florida law. Count V alleges that Kukreja "has dominated and controlled his companies [Kinwong, LLC] and CTX to such an extent that their independent existence was in fact non-existent and Kukreja was in fact the alter ego of [Kinwong, LLC] and CTX." *Id.* ¶ 83. Kinwong claims, in other words, that "Kukreja's fraudulent and/or improper use of the corporate form" caused Kinwong to suffer damages. *Id.* ¶ 88. Count VI contends that both CTX and Kinwong, LLC acted as Kukreja's agents *both* "in connection with [Kukreja's] fraudulent application for federal registration of the KINWONG mark" *and* "in connection with his scheme to counterfeit and resell counterfeit KINWONG Circuit Board Products." *Id.* ¶¶ 91–92. In sum, Kinwong's Amended Complaint accuses Kukreja of using his companies—CTX and Kinwong, LLC—to: (1) fraudulently register the KINWONG mark in the United States so that Kukreja could pass the mark off as his own intellectual property (to the detriment of the mark's true owner, Kinwong); and (2) produce counterfeit PCBs featuring Kinwong's marks.

The Defendants answered the Amended Complaint on January 22, 2020, and asserted eight counterclaims against Kinwong: (1) federal trademark infringement and counterfeiting under 15 U.S.C. § 1114, *see* Answer and Counterclaim [ECF No. 163] at 21; (2) unfair competition, in violation of 15 U.S.C. § 1125(a), *id.* at 22; (3) common law trademark infringement, *id.* at 23; (4) disparagement of title, *id.* at 24; (5) tortious interference with business relationships, *id.* at 25; (6) denial of trademark application No. 79/212,641 based on priority of use, *id.* at 26; (7) denial of trademark application No. 79/212,641 based on fraud on the USPTO, *id.* at 27; and (8) a declaration that Kinwong "ha[s] no right to register Trademark Application No. 79/212,641[,]" *id.* at 28. After we dismissed the Defendants' disparagement-of-title counterclaim (Counterclaim IV) with prejudice, *see* July 17, 2020, Order [ECF No. 269] at 1, the Defendants filed their First Amended Counterclaim, asserting the same seven counterclaims—minus the disparagement counterclaim, *see generally* First Amended Counterclaim [ECF No. 280].

On November 12, 2020, we held a hearing on five separate motions: the Defendants' Motion to Dismiss the Amended Complaint [ECF No. 73]; the Defendants' Motion for Summary Judgment [ECF No. 179]; the Plaintiffs' Motion for Partial Summary Judgment [ECF No. 182]; the Defendants' Motion to Strike the Plaintiffs' Reply to Defendants' Objections [ECF No. 226]; and the Plaintiffs' Motion to Dismiss Count IV of the Amended Counterclaim [ECF No. 288]. *See* Nov. 12, 2020, Paperless Minute Entry [ECF No. 330]. At the end of that hearing, we entered an order denying the Defendants' Motion to Strike and granting in part the Defendants' Motion to Dismiss as to Counts V and VI of the Amended Complaint. *See* Nov. 12, 2020, Order [ECF No. 331] at 1. But we took under advisement the fate of Counts I through IV of the Amended Complaint and all seven of the Defendants' counterclaims.

On December 9, 2021, we issued an Omnibus Order disposing of the four remaining motions we had left untouched at the end of the November 12, 2020, hearing. We began with the Defendants' Motion to Dismiss, which argued that Kinwong's "trademark claims constitute compulsory counterclaims" that should have been brought in "the prior breach-of-contract action[.]" *Kukreja*, 574 F. Supp. 3d at 1209. We quickly rejected this argument and denied the Defendants' Motion to Dismiss, explaining that "the Plaintiffs' claims weren't compulsory counterclaims to the 2017 litigation" because "the two cases arise from different facts[.]" *Id.* at 1212. On the other hand, we granted the Plaintiffs' Motion to Dismiss "Count IV of the Defendants' Amended Counterclaim, which allege[d] that the Plaintiffs tortiously interfered with a business relationship." *Ibid.* The Defendants, we reasoned, had failed to show that the Plaintiffs used "improper methods"—such as "physical violence, misrepresentations, illegal conduct, and threats of illegal conduct"—to interfere with the Defendants' business relationships. *Id.* at 1214 (quoting *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1280 n.9 (11th Cir. 2015)).

But the bulk of our Omnibus Order dealt with the parties' cross-motions for summary judgment. Both sides "moved for summary judgment on [Kinwong's] claims for trademark infringement and cancellation (Counts I–IV)," and the Defendants asked for summary judgment "on *some* of their own counterclaims—specifically, Count I (federal trademark infringement and counterfeiting); Count III (common law trademark infringement); Count VI (denial of the Plaintiffs' trademark application because of fraud on the USPTO); and Count VII (a declaration that the Plaintiffs have no legal right to register trademark application No. 79/212,641)." *Id.* at 1216.

We started with the Plaintiffs' "trademark claim—that they are the senior users of the KINWONG mark and that the Defendants' trademark registration for that mark should be cancelled[.]" *Id.* at 1217. In our view, this issue "simply [wasn't] close." *Ibid.* After a lengthy analysis, we held that "ownership of the KINWONG mark plainly rests with the Plaintiffs[,]" reasoning that:

> *First*, the Plaintiffs used their trademark in the United States long before they signed the Manufacturer's Agreement with CTX, and this simple—and dispositive—fact is not subject to genuine dispute. *Second*, even if the Plaintiffs *hadn't* used the mark in the United States before their relationship with CTX and Kukreja commenced, the Manufacturer's Agreement required CTX to "conduct all of its business in its own name"—suggesting that the parties understood that CTX's use of the KINWONG mark would be attributed to the Plaintiffs. *Third*, even if the parties' agreement *didn't* settle the matter, the evidence unambiguously shows that the Plaintiffs' relationship with the Defendants was *non-exclusive*. Thus, the irrebuttable presumption that ownership goes to the manufacturer—Shenzhen Kinwong—applies. *Fourth*, even if CTX *had* served as the Plaintiffs' exclusive American distributor, the Defendants' claim would fail for yet another reason: the Defendants haven't come close to rebutting the presumption that the manufacturer owns the trademark.

*Id.* at 1219. Having found beyond cavil that Kinwong (and not the Defendants) owned the KINWONG mark, we "order[ed] the cancellation of the Defendants' KINWONG registration" and granted summary judgment in favor of Kinwong on Counts I, II, and IV of the Amended Complaint. *Id.* 1244.[7] We couldn't, however, resolve Count III of Kinwong's Amended Complaint, which charged

---

[7] As we separately explained, the Defendants had raised several affirmative defenses that "neither party address[ed]" in their summary-judgment papers. *Kukreja*, 574 F. Supp. 3d at 1240. Relying on the

the Defendants with committing fraud on the USPTO. After all, there was "an open question as to whether Kukreja *knew* that the Plaintiffs had rights to the KINWONG mark in the United States," and Kinwong never "really claim[ed] (or prove[d]) that Kukreja *purposely* or *knowingly* made false statements to the USPTO." *Id.* at 1245. We thus denied the Defendants' Motion for Summary Judgment and granted in part Kinwong's Motion for Summary Judgment on Counts I, II, and IV of the Amended Complaint. *See ibid.*

In the months following our Omnibus Order, we clarified some outstanding issues to help narrow the scope of our eventual bench trial. *First*, the Defendants filed an unobjected-to Motion for Clarification, pointing out that "neither the [Omnibus] Order nor the briefs filed by Plaintiffs in support of their motion for partial summary judgment address the allegations of counterfeiting found in the Amended Complaint at paragraphs 36–40." Motion for Clarification [ECF No. 347] at 3. They therefore asked us to "enter an order clarifying that, although the Court did enter summary judgment as to Counts I and IV of the Amended Complaint, the counterfeiting allegations were not adjudicated or resolved, and remain at issue for trial." *Id.* at 4–5. Without opposition from Kinwong, we agreed. *See* Aug. 2, 2022, Paperless Order [ECF No. 385] ("Our Omnibus Order didn't resolve the Plaintiffs' allegations about the Defendants' Unlawful Counterfeiting Scheme. Those issues will be adjudicated at trial." (cleaned up)). *Second*, after holding a status hearing on December 10, 2021, we determined that "the Defendants' counterclaims in Counts I, II, and III necessarily fail" because we had already ruled in our Omnibus Order "that the Plaintiffs own the KINWONG mark[.]" Dec. 13, 2021, Order

---

Eleventh Circuit's decision in *Johnson v. Board of Regents of University of Georgia*, 263 F.3d 1234 (11th Cir. 2001), we explained that a defendant's failure to argue that its "affirmative defenses preclude[ ] summary judgment" constituted an "abandon[ment] [of] any right they might've had to rely on those never-raised defenses." *Id.* at 1243 (citing *Johnson*, 263 F.3d at 1264). We thus granted summary judgment in favor of Kinwong without considering the viability of these affirmative defenses. *See ibid.* ("[The Defendants] never argued that any of their other affirmative defenses precluded summary judgment. As in *Johnson* and [*Harper v. Del. Valley Broads., Inc.*, 743 F. Supp. 1076 (D. Del. 1990)], then, summary judgment is appropriate.").

[ECF No. 345] at 1. *Finally*, in their pretrial stipulation, the parties realized that "the Court never issued a ruling dismissing Counts V, VI, and VII of [the] Defendants' First Amended Counterclaim," and they agreed that these remaining counterclaims must *also* be dismissed because they "all presume the existence of the trademark registration of the KINWONG mark filed by Kinwong, LLC—which was cancelled based on Plaintiffs' prior use of that mark in the United States pursuant to this Court's Omnibus Order[.]" Pretrial Stipulation [ECF No. 381] at 12. We again agreed with the parties and explicitly granted summary judgment in Kinwong's favor as to Counts V, VI, and VII of the Defendants' First Amended Counterclaim. *See* Apr. 19, 2023, Order [ECF No. 420] at 1.

Even with all that resolved, three major issues remained. The first was whether the Plaintiffs could prove, by clear and convincing evidence, "that Kukreja knowingly, and with the purposeful intent to mislead, made false, material representations of fact to the USPTO in connection with the application to register the KINWONG mark." Pretrial Stipulation at 16. The second (and most substantive) question was whether the Defendants "perpetrated 'an unlawful scheme to counterfeit KINWONG products and resell those counterfeit products under the KINWONG mark to unsuspecting customers' as alleged in paragraphs 36-42 of the Amended Complaint or 'engaged in an elaborate, willful scheme to pass off Circuit Board Products that were not manufactured at Shenzhen Kinwong as if they were manufactured at Shenzhen Kinwong,' as alleged in Count I of the Amended Complaint, or 'engaged in a willful scheme to counterfeit KINWONG products, resell those counterfeit goods to Plaintiffs' actual and potential customers, and conceal their counterfeiting through fraud, forgery, and deception,' as alleged in Count IV of the Amended Complaint." *Ibid.* The final question was whether the Plaintiffs should be entitled to damages and attorneys' fees—and, if so, how much. *See ibid.* To resolve these issues, we began our bench trial on April 24, 2023, and it continued over twelve days until May 23, 2023. *See generally* Docket. This Order follows.

### III.     The Trial Evidence

During our twelve-day trial, we heard from several witnesses—most of them in Kinwong's case-in-chief: Animesh Dutta, CTX's Business Manager; Michael Craven, CTX's Business Development Manager;[8] Wenwu Jiang, CTX's Vice President of Engineering and Chief Engineer; Ying "Cherry" He, Kinwong's Executive Manager of Sales; Defendant Rishi Kukreja, CTX's owner; and Richard Lettiere, Kinwong's damages expert. The Defendants called only one witness: their own damages expert, Barry Mukamal. In addition to these trial witnesses, we also reviewed and considered the deposition testimony of ten additional witnesses: John Johnson, the former president of a company called "Electrotek"; Shaobai Liu, the current CEO of Kinwong; Hansen Zhang, Kinwong's deputy manager for sales; Huazhan Wang, Kinwong's "Administrative Director"; Joe Fu, a Kinwong manager who worked with CTX; Hongqiang "Kent" Wang, Kinwong's Vice President of Sales and Marketing; Jeremy Smith, the Head of Logistics for Hella Electronics Corporation; Mike Swerdlow, the CFO of Electrotek; Vicky Liu, a former CTX employee and current Kinwong employee; and Anderson Yun, a sales manager at Kinwong. *See generally* Joint Notice of Filing Deposition Transcripts [ECF No. 426].[9]

We'll start by assessing the credibility of Dutta, Craven, and Jiang. During the trial, we repeatedly observed that these three witnesses were, for the most part, unreliable and unbelievable. As to Dutta, we found that his "explanation for why [the existence of Kinwong] was [not] disclosed to the USPTO is totally false." Day 2 Trial Tr. [ECF No. 470] at 59:10–11. And we called Mr. Craven's testimony "painful" and explained that both he and Mr. Dutta were "totally nonbelievable[.]" *Id.* at 231:23–24, 233:1–2; *see also id.* at 233:3–9 ("Over and over again, [Kinwong's counsel] had to ask Mr.

---

[8] Mr. Craven didn't testify live at the trial. Instead, Kinwong played a video recording of his deposition testimony.

[9] The parties also provided Cherry He's deposition, which we considered in tandem with her live trial testimony. *See generally* Cherry He Depo. Tr. [ECF No. 426-6].

Craven very simple questions, just to have Mr. Craven say no, just to prove it to Mr. Craven that it's right, then to have Mr. Craven just tell us, [w]ell, I don't remember any of that, but I guess that is michaelcraven@circuitronix.com, so I guess I did send that email. Over and over again.").

But Mr. Jiang's testimony was in a league of its own. We won't rehash *all* the many times in which we found that Jiang's testimony was dishonest, misleading, and blatantly contradicted by the evidence. But, suffice it to say, we found him to be one of the most "obstreperous" witnesses we've ever seen take the stand. *Id.* at 234:5–7; *see also, e.g.*, Day 4 Trial Tr. at 25:1–5 ("I have never seen a witness lie this many times in open court in federal court under oath. I have never seen it—in a criminal case, in a civil case. Is there no consequence for a person who comes into court and makes a complete sham of these proceedings?"); *id.* at 26:3–9 ("[T]he witness will not tell the truth on any matter. On any matter. . . . He will be asked a question, he will lie, then he will be shown a number of emails, and then he will come around to telling the truth, and then just a few minutes later, he will lie again on the same subject.").[10] Given our credibility findings at trial—which we fully incorporate and reiterate here—we conclude that these three witnesses (especially Jiang) weren't in the least bit credible and will discount the vast majority of what they had to say. *Cf. U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1326–27 (11th Cir. 2018) ("Given . . . the numerous conflicts between

---

[10] Counsel for CTX tried to rehabilitate Jiang in two different ways—both ineffective. *First*, CTX's counsel contended that English is "not [Jiang's] first language," and that opposing counsel's questions were "confusing." Day 2 Trial Tr. at 231:6–7. We rejected this argument, finding that Mr. Jiang did not have "a language problem" and that he was "a very smart man" who understood precisely what was going on. *Id.* at 231:11–14; *see also id.* at 238:16–21 ("I don't get the sense that he's having a problem answering any of the questions or understanding any of the questions. To the contrary, I find him to be quite sharp and very much able to assess what's going on. In fact, he's parrying everything. I just think he's just parrying too much. That's my own view."). *Second*, counsel asked Jiang leading questions to induce Jiang to answer a certain way—a tactic we repeatedly reprimanded counsel for. *See* Day 6 Trial Tr. at 88:20–89:6 ("Federal Rule of Evidence 611 specifically says you're not allowed to lead a management employee in your own company or any employee that is basically your own client. They specifically say that. The reason they say that is to prevent us from having this charade that has been the testimony from Mr. Jiang this morning. . . . You think you saying to the witness what the answer is and having him say yes in a bench trial is persuasive to the judge? Just think about that.").

Escobio's testimony and the documentary evidence, the court was entitled to find that Escobio lacked credibility and to discount his testimony accordingly.").

Mr. Kukreja, by contrast, was far more polished and didn't seem as eager as his employees to dispute the most basic of propositions. Notably—and unlike Dutta, Craven, and Jiang—we never found on the record that Kukreja was being dishonest. There was (it's true) some discussion at trial about whether Kukreja had testified credibly in *other* legal proceedings—and about the extent to which that prior testimony should bear on his credibility here. *See* Pl's Ex. 379 [ECF No. 455-8] at 300 (describing Kukreja's testimony as "obviously inconsistent, evasive, or unreliable" in a Hong Kong trademark proceeding). To be clear, though, we won't allow a foreign court's credibility findings to affect our own observations about Mr. Kukreja's credibility. In the end, and after an exhaustive review of all the evidence, we find that Mr. Kukreja was credible about certain things and self-serving (and inconsistent) about other, more critical, issues. So, while we won't discount most of Kukreja's testimony as we have with Dutta, Craven, and Jiang, we'll be sure to identify those parts of Kukreja's testimony we found not believable.

### A. Registration of the KINWONG Mark by Kinwong, LLC

Kinwong, LLC was formed on January 18, 2013, "while [CTX and Kukreja were] conducting business with [Kinwong]." *Kukreja*, 574 F. Supp. 3d at 1205. This was after Kinwong tried to terminate the Manufacturer's Agreement and the Settlement Agreement in early 2012—and only ten days before Kinwong sent its effective termination letter on January 28, 2013. *See* Pl's Ex. 101 [ECF No. 455-3] at 1. Kukreja testified that he created Kinwong, LLC on the advice of CTX's lawyer, Ozzie Torres, to "act as a holding company for [CTX's] intellectual property." Day 7 Trial Tr. at 52:3–5; *see also id.* at 51:14–25 (agreeing that Kinwong, LLC "has never had any revenue," "has never sold a single printed circuit board," and has never "serviced," "assembled," "shipped," or "purchased" a PCB). Kukreja didn't request authorization from (or notify) Kinwong before forming Kinwong, LLC. *See id.* at 49:20–

25 ("Q: When you formed Kinwong, LLC, you did not let anyone at Kinwong know that you had formed it, right? A: I did not. Q: Nobody at Kinwong authorized you to form Kinwong, LLC, right? A: They did not."). Four days before Kinwong, LLC was formed, Ozzie Torres drafted both a trademark assignment and a license agreement, whereby Kukreja—acting on behalf of both CTX and Kinwong, LLC—assigned the "right, title and interest in and to the mark and name 'Kinwong'" and then granted CTX a license to use that mark. *See* Pl's Ex. 107 [ECF No. 455-3] at 14; Pl's Ex. 108 [ECF No. 455-3] at 16–20.[11]

---

[11] Kukreja then executed a "Corrected Assignment of Trademark" in late 2019:

> Q: You did not sign [the Corrected Assignment of Trademark] on January 14th of 2013, right?
>
> A: I cannot recollect, but [it] should have been in that same general time frame.
>
> Q: Actually, you signed it within 60 days of your November 8, 2019, deposition with me, didn't you?
>
> A: I cannot recollect. I—I cannot recollect.
>
> Q: Well, let's look at your November 8, 2019, deposition at page 158, lines 22 to 23. . . . 'Question: When did you receive it? Answer: In the last 60 days. Question: When did you sign it? Answer: In the last 60 days.' Did I ask you those questions and did you give those answers?
>
> A: I did.

Day 7 Trial Tr. at 55:1–20; *see also* Pl's Ex. 108 [ECF No. 455-3] at 15. Kukreja explained that the corrected trademark assignment was necessary because the original assignment lacked consideration— and his lawyers were clear that, after Kinwong brought this case against the Defendants, this defect had to be fixed. *See* Day 7 Trial Tr. at 56:2–7 ("A: Sure. The reason is because they told me that there was—there had to be some consideration given for that assignment. Q: And this was prepared after you were sued by Kinwong for trademark infringement and for fraud on the U.S. Patent and Trademark Office? A: Yes."). Still, Kukreja admitted that neither he nor CTX ever received consideration for the assignment. *See id.* at 56:24–57:1 ("Q: But Kinwong, LLC didn't actually pay you or [CTX] $10 for the assignment of the rights to the trademark, correct? A: I did not get any money.").

In January 2014, a year after Kinwong, LLC was formed, Kukreja decided to "file an application to register the KINWONG trademark" with the USPTO. Day 7 Trial Tr. at 106:3–5.[12] Kukreja "did not let a single person at Kinwong know that [he] was going to file for the trademark rights in the U.S.," nor did he "send an email or written communication to Kinwong reflecting [his] view that [CTX] own[s] the right to the KINWONG trademark in the United States[.]" *Id.* at 107:2–10. Kukreja enlisted Animesh Dutta, who had previously registered CTX's trademark with the USPTO, to file a trademark application on Kinwong, LLC's behalf. *See id.* at 107:20–22 ("Q: Now, Animesh Dutta assisted you with this trademark application, right? A: He did not assist me; he did it."); *see also* Day 1 Trial Tr. at 90:5–7 ("Q: And you also registered the trademark on behalf of Defendant Kinwong, LLC, correct? [Dutta]: Yes."). Although Kukreja didn't "personally enter any of the information into the system to upload it to the [USPTO]," he directed "Dutta to upload information into the system" and told Dutta what to say when the need arose. Day 7 Trial Tr. at 108:2–11. Kinwong, LLC's trademark application was filed with the USPTO on January 21, 2014. *See* Pl's Ex. 26 [ECF No. 455-1] at 260. In this application, Kukreja "swore under oath that no other person, firm, corporation, or association has the right to use the mark in commerce" in the United States, but he failed to disclose that CTX "agreed to perform global sales and [marketing] for Kinwong on a nonexclusive basis" or that there was a Chinese company named Kinwong that manufactured PCBs (and sold them in the United States). Day 1 Trial Tr. at 124:14–125:11; *see also* Day 7 Trial Tr. at 110:14–112:1, 113:20–114:8 (same). Kukreja carefully "followed the progression of the trademark filings closely" and frequently emailed Dutta to request status updates while the application was

---

[12] Kukreja testified that he "decided to register the KINWONG trademark in 2007, 2008, [and] 2009," and that he told Dutta about his intentions. Day 7 Trial Tr. at 106:6–8. But the Defendants haven't provided any evidence to corroborate this point, nor did Kukreja explain why he continued to wait for many more years (and not until *after* CTX's relationship with Kinwong began to deteriorate) before he took concrete steps to register the mark.

pending. Day 7 Trial Tr. at 114:12–17; *see, e.g.*, Pl's Exs. 20–25, 27–28 [ECF No. 455-1] at 246–59, 321–24 (showing emails from Kukreja to Dutta about the trademark application).

The USPTO didn't grant the trademark application right away. On May 1, 2014, an examiner with the USPTO contacted Dutta to seek clarification on: (1) whether the applicant "is an individual" or "a limited liability company"; and (2) "whether 'KINWONG' or 'KIN WONG' in the mark has any meaning in a foreign language[.]" Pl's Ex. 21 at 248. On May 5, 2014, after consulting with Kukreja and Wenwu Jiang, Dutta amended the application to "list[ ] Kinwong, LLC as the sole claimed owner of the mark" and "provided the translation of what 'Kinwong' meant" ("prosperous future in business")—a fact he had "learned from Mr. Jiang." Day 1 Trial Tr. at 129:17–25.

A few months later, on August 26, 2014, the USPTO issued a "Statement of Use," asking Kinwong, LLC to "provide evidence . . . that KINWONG is being used in commerce and also [to] provide the date (approximate) when [Kinwong, LLC] started using it." Pl's Ex. 22 at 251. Kukreja initially wanted to tell the USPTO that Kinwong, LLC first used the KINWONG mark in 2005— eight years before Kinwong, LLC was formed—but Dutta pointed out that they would "have to submit a document (Quotation, Invoice, or Packing List—commercial document)" to corroborate this fact. *Id.* at 250. Kukreja admits that, when he received the Statement of Use, Kinwong, LLC "did not have any commercial documents" showing "use in commerce." Day 7 Trial Tr. at 126:7–8. Kukreja and CTX, of course, had access to many commercial documents showing that the KINWONG mark was being used in commerce, but these documents would have revealed that the mark referred to a Chinese manufacturer whose existence had never been disclosed to the USPTO—and not a mark that Kukreja, CTX, or Kinwong, LLC were using in commerce *independent of* their dealings with Kinwong. *See* Day 1 Trial Tr. at 149:11–150:3 ("Q: And you said that there were at least a hundred commercial documents that you had showing 'Kinwong' in the document at the time you applied for the KINWONG mark, right? [Dutta]: I'm taking a guess, yes, a hundred. Q: But here's the thing. The

documents I just showed you identify 'Kinwong' as its own Chinese company, right? A: That's right. Q: These documents even distinguish CTX as the supplier and Kinwong as the manufacturer or CTX's business associate, right? We've seen that. . . . A: Yes[.]").

Unable to use these preexisting commercial documents to establish Kinwong, LLC's "use" of the KINWONG mark, Kukreja decided to create a website—www.kinwongllc.com—to show "use in commerce." Back in March 2013, Kukreja had told Dutta that "[w]e need to start building the website [for Kinwong, LLC] immediately" and that the website needed "to project that we are a manufacturer and not a broker and focus only on PCBs." Pl's Ex. 183 [ECF No. 455-4] at 167.[13] Dutta agreed to create a website with a "Home page [that] will be designed similar to the Kinwong Home page." *Id.* at 166; *see also* Day 1 Trial Tr. at 153:19–21 ("[Q]: Mr. Kukreja instructed you to use Kinwong's website to build the Kinwong, LLC website, correct? [Dutta]: That's right."). Dutta didn't create the website until December 2014, after Kukreja ordered him to do so in response to the USPTO's Statement of Use. *See* Day 1 Trial Tr. at 157:9–12 ("Q: And the USPTO asking for a statement of first use from Kinwong, LLC provided the impetus for building Kinwong, LLC's website right? A: That's right."); *see also* Pl's Ex. 182 [ECF No. 455-4] at 151–59 (showing www.kinwongllc.com). Dutta "submitted the Kinwong, LLC website to the USPTO as Kinwong LLC's proof of use in commerce on January 19, 2015[.]" Day 1 Trial Tr. at 157:9–11. Neither Kukreja nor Dutta informed the USPTO that www.kinwongllc.com was created *less than a month* before. *See* Day 7 Trial Tr. at 142:21–24 ("Q: You didn't tell the [USPTO] in this statement of use that the website, www.kinwongllc [sic], was just created the previous month, right? [Kukreja]: We did not.").

---

[13] Of course, Kinwong, LLC *was not* (and never was) a PCB manufacturer and instead existed only as a holding company for the KINWONG mark. *See* Day 7 Trial Tr. at 51:14–52:2 (Kukreja agreeing that Kinwong, LLC "never serviced or assembled a PCB" and that it was "just a holding company").

Unfortunately for the Defendants, the USPTO still wasn't convinced. About a week after the Defendants submitted the website to the USPTO, an examiner contacted Dutta and requested that Kinwong, LLC "upload pictures of the goods bearing the mark <KINWONG>." Pl's Ex. 25 at 258; *see also* Day 1 Trial Tr. at 160:20–22 (Q: [The examiner] said the website itself wasn't sufficient unless you had proof of sales, right? [Dutta]: That's right."). In early February 2015, Dutta and Kukreja had an in-person meeting where the following occurred:

> Q: Tell me the substance of the discussions between you and Mr. Kukreja regarding the submission of additional proof. . . . What did he tell you?
>
> [Dutta]: I don't recall. Probably it is to show them that we're using the KINWONG mark on the boxes which we are sending to customers with the Kinwong PCBs, printed circuit boards.
>
> Q: So he told you to take a picture of a Kinwong, LLC box?
>
> [Dutta]: No, upload an image of a box that we are sending with Kinwong printed circuit boards to our customers.
>
> Q: My question was: Did he tell you to take a picture of a box that said "Kinwong, LLC" on the side?
>
> [Dutta]: Yes, that would be the proof of—additional proof—additional proof for you—proof of use of Kinwong as a trademark for promoting the Kinwong brand.

Day 1 Trial Tr. at 162:11–25. Wanting to act quickly, Dutta went to "a company called FASTSIGNS" to pick up "Kinwong, LLC" labels. *Id.* at 168:9–11; *see also* Day 7 Trial Tr. at 153:20–24 ("Q: [CTX] purchased those black on brown vinyl labels at a [FASTSIGNS] shop in Dania Beach the day before, on February 9, 2015, right? [Dutta]: I cannot recollect whether it was February 9th, but it was a short time prior to that date.").[14]

---

[14] According to FASTSIGNS's records, the customer who ordered these boxes was a man named "Willie Aldred." *See* Pl's Ex. 172 [ECF No. 455-4] at 100. Neither Dutta nor any other witness could explain who this "Willie Aldred" is, whether he's even a real person, or if someone used a fake name to order the Kinwong, LLC labels. *See* Day 1 Trial Tr. at 168:18–22 ("[Dutta]: So this is a mystery to me, because there was nobody by that name in Circuitronix. Q: So Willie Aldred is a made up name? [Dutta]: I'm not aware this individual was ever employed in Circuitronix.").

With the labels in hand, Dutta slapped them on three boxes and held a "photoshoot" on February 10, 2015. *See Kukreja*, 574 F. Supp. 3d at 1206 (showing the boxes in question); Pl's Exs. 173–74 [ECF No. 455-4] at 101–02 (same). The boxes "were already shut," no one saw "any PCBs put into these boxes," and there were "no shipping labels on [the] boxes[.]" Day 1 Trial Tr. at 168:1–8. Of course, there would have been no reason for Kinwong, LLC's boxes to have PCBs (or shipping labels) because Kinwong, LLC didn't sell PCBs. *See* Day 7 Trial Tr. at 51:14–52:2. Nevertheless, when Dutta submitted the pictures of the Kinwong, LLC boxes to the USPTO as proof that the mark was being used in commerce, "Kukreja declared—again, under penalty of perjury—that Kinwong LLC 'first used' the mark at least as early as 12/11/2014, and first used in commerce at least as early as 12/11/2014, and is now in use in such commerce." *Kukreja*, 574 F. Supp. 3d at 1205 (cleaned up).

Finally satisfied, the USPTO granted Kinwong, LLC's application and registered the trademark on May 12, 2015. *See* Pl's Ex. 26 at 260. With this registration in hand, Kukreja then tried to stop Kinwong from registering its own mark both in the United States and in Hong Kong. So, for example, when Kinwong tried to register its mark in the United States in 2017, Kinwong, LLC opposed the registration, arguing—among other things—that Kinwong, LLC "actively promoted its goods [PCBs] via a website www.kinwongllc.com and other on-line and print media" years before "the application date of the subject mark[.]" Pl's Ex. 121 [ECF No. 455-3] at 140. Kukreja—through Kinwong, LLC—also tried to oppose the registration of the KINWONG mark by Kinwong in Hong Kong. Kukreja claimed that Kinwong, LLC's "total revenues from around the world for goods sold under the KINWONG mark for the five years from 2010 to 2015 are around US\$ 30–50 million per year," and that allowing Kinwong to register the mark would cause consumers to be "confused that [Kinwong's] goods originate from [Kinwong, LLC] or that there is a business connection between [Kinwong and Kinwong, LLC]." Pl's Ex. 114 [ECF No. 455-3] at 52. The Defendants' efforts to stop Kinwong from registering the KINWONG mark in Hong Kong failed. *See* Day 7 Trial Tr. at 177:25–

178:3 ("Q: At the end of the day, you're aware that Shenzhen Kinwong was able to register the KINWONG trademark in Hong Kong over Kinwong, LLC's objection there, right? [Kukreja]: That is correct."). The Defendants' registration of the KINWONG mark in the United States remained valid until we cancelled the trademark registration in our December 9, 2021, Omnibus Order. *See Kukreja*, 574 F. Supp. 3d at 1244.

### B.  PCB Sales and Production

Much of the trial evidence focused on the various ways in which Kinwong and CTX worked together to manufacture, ship, and sell PCBs to customers around the world. And it's impossible to fully appreciate the parties' dispute without at least a rudimentary understanding of how the industry operates and how Kinwong and CTX worked together. The process would begin when a potential or existing customer contacted CTX. *See* Day 1 Trial Tr. at 101:6–9 ("[Q:] So step 1, Circuitronix will make contact with a customer either through reaching out to that customer or the customer directly contacting Circuitronix, right? [Dutta]: Yes."). When courting a new customer, CTX would send "customers presentations with Kinwong's information and quality certifications[.]" *Id.* at 103:8–9; *see also, e.g.*, Pl's Ex. 9 [ECF No. 455-1] at 37–83 (attaching PowerPoint presentation that was shown to potential customer Itron, Inc.).

One of the most important (if not *the* most important) qualification a PCB manufacturer can have is a "UL code" or "UL logo" from Underwriters Laboratories—"an international organization that develops safety standards for, and conducts product testing of (among many things), PCBs." *Kukreja*, 574 F. Supp. 3d at 1203. Once a factory sends its PCB "to the UL facilities for testing"—and assuming that the PCB passes UL's standards—UL will "assign each PCB manufacturer a very unique number" and a logo that must "be affixed to . . . the products that [the manufacturer] produce[s]." Day 5 Trial Tr. [ECF No. 473] at 10:19–11:2. Kinwong was certified by UL way back in 1994, so it had a unique UL identification number (ULE243951) and a UL logo: the letters "CP" surrounded by

a circle. *See Kukreja*, 574 F. Supp. 3d at 1203; *see also id.* at 1205 ("[Kinwong's] circuit boards were stamped with its UL code ('CP')[.]").[15] Since Kinwong had three factory locations (one in Shenzhen, one in Longchuan, and one in Jiangxi), Kinwong was allowed to "denote[ ] where the manufacturing is happening by adding [a] suffix to the UL code[.]" Day 5 Trial Tr. at 29:5–7. UL codes are extremely important to end-users because that's the mechanism they use to confirm that a PCB is made by a specific manufacturer, and it's how they assure themselves that the product is of an acceptable quality. *See* Day 4 Trial Tr. at 203:2–8 ("Q: Okay. Now, when a customer receives the bare printed circuit board, as I understand your testimony, one of the first things they do is they conduct an inspection, correct? [Jiang]: Yes, correct. Q: Okay. And during that process, they will inspect the UL code and confirm that it's correct, right? A: That's right."). Given the importance of the UL code, CTX's presentations to potential customers were sure to highlight, among other things, that Kinwong was certified by UL. *See* Pl's Ex. 9 at 82; *see also* Day 2 Trial Tr. at 20:13–17 ("Q: Why would you pass a UL number to a customer like Peavey? [Craven]: Primarily to indicate that [Kinwong's] products have been tested, reviewed by Underwriters Laboratory to meet certain safety requirements."). CTX also applied for (and received) its own UL code—separate and apart from Kinwong's UL code. *See* Day 2 Trial Tr. at 216:2–12.

If the customer was swayed by CTX's sales pitch, it would send CTX a "request for quotation" ("RFQ") that would provide "certain manufacturing specifications and quality requirements" to both CTX and the manufacturer (in this case, Kinwong). Day 1 Trial Tr. at 101:16–19, 102:3–4. But, before submitting an RFQ, many customers required an in-person audit of Kinwong's factory. *See* Day 2 Trial Tr. at 52:23–25 ("Q: Okay. Some CTX customers physically went to audit Kinwong's plants, right?

---

[15] Kinwong's UL logo uses the letters "CP" because Capital Profit was the original applicant in 1994. *See Kukreja*, 574 F. Supp. 3d at 1203 ("Like the other companies that registered with UL, Shenzhen Kinwong registered a UL code—the letters "CP" for Capital Profit." (cleaned up)).

[Craven]: Yes."). The purpose of the audits was "to ensure that the factories have good manufacturing standards and will produce quality PCBs[.]" *Id.* at 195:22–24. Cherry He testified that CTX-led audits of Kinwong's factories were particularly unusual because CTX "did not allow any of Kinwong['s] employees to accompany that group [auditing the factory]. And they received the end customer's representatives in a conference room alone without any of Kinwong's employees present. This is very unusual, because normally our employees would accompany that auditing and conference as well." Day 5 Trial Tr. at 12:16–21.

As we've said, Kinwong operated three factories: its original factory in Shenzhen ("Kinwong Shenzhen"); a factory in Longchuan ("Kinwong Longchuan");[16] and a factory in Jiangxi. *See id.* at 28:21–29:4. CTX only sourced its PCBs from Kinwong Shenzhen and Kinwong Longchuan. *See* Day 2 Trial Tr. at 174:16–19. Since Kinwong operated multiple factories, PCBs would be produced *only* in the specific factory that had been audited and approved by the customer. As Kukreja himself explained:

> Q: From time to time over the years, Circuitronix was specifically instructed by some of its customers that Kinwong was to be the only approved manufacturer for their PCBs, right?
>
> [Kukreja]: From time to time, certain customers of ours specified a factory location which they wanted the PCBs to be manufactured at.
>
> [. . . .]
>
> [Q:] From time to time over the years, Circuitronix was specifically instructed by some of its customers that either Shenzhen Kinwong or Kinwong Longchuan was to be the approved factory, correct?

---

[16] Throughout the many exhibits (and even the trial transcript) Longchuan is variously spelled as both "Longchuan" and "Longchaun." We take judicial notice of the fact that the correct spelling of this geographic location is "Longchuan." *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) ("[T]he kinds of things about which courts ordinarily take judicial notice are . . . matters of geography[.]"). To avoid confusion, we've changed all instances in which the factory is misspelled as "Longchaun" to Longchuan.

[Kukreja]: Yes. The factory we took them to and had gotten audited for the printed circuit boards.

Q: And those customers specifically said that those PCBs could not be manufactured by another factory without the permission and approval of that customer, is that right?

[Kukreja]: Something to that effect, yes.

Day 8 Trial Tr. at 4:19–5:13.

There was also testimony that customers would sometimes return to re-audit factories that had already been approved. Additional audits would occur if, for instance, the customer noticed recurring issues with a factory's PCBs or if the factory was using a new "process" to manufacture the customer's product. *See, e.g.,* Day 9 Trial Tr. at 128:23–129:2 ("[Kukreja]: [I]n addition to some of the audits where you had the reopen issue follow up . . . and the process audit . . . for two new processes."); Day 10 Trial Tr. at 95:15–18 ("[Kukreja]: [T]here were a couple of quality issues which had come up on the PQ26. So this audit became a PQ26 audit as well as a C—CMF1 audit."). And, for some customers (particularly those in the automotive industry), specific factories would have to be audited and approved for *each individual part* before manufacturing could begin. *See* Day 11 Trial Tr. at 23:11–19 ("Q: So approval of factories is part specific eventually, right? . . . [Kukreja]: Right and wrong. Q: Why is it wrong? A: You cannot even get to that position without having the first level of approval—the factory approval."); *id.* at 29:22–30:9 ("Q: [CTX] could not just switch factories without the approval of the customer, right? [Kukreja]: As long as—we could switch factories as long as both factories had PPAP approval. Q: Right. You had to get approval first.").

If a customer provided an RFQ to CTX, CTX would submit a purchase order with a factory the customer had previously approved. Once the purchase order was sent to Kinwong, the sales department would "provide a quote back to CTX, and both parties would negotiate and reach an agreement on the price. After that, CTX [would] provide more full [sic] technical document to the Kinwong engineering department, who then, in turn, would contact CTX tech department and

confirm the production details." Day 5 Trial Tr. at 9:7–14. That's when Kinwong would (finally) begin to produce samples of the product, and CTX and Kinwong would generate a Production Part Approval Process document ("PPAP"). *See, e.g.*, Pl's Ex. 420 [ECF No. 455-9] at 416–674 (showing a sample PPAP). The PPAP reflects the sample PCB's specifications and demonstrates that it meets (or doesn't meet) the customer's requirements. *See* Day 5 Trial Tr. at 9:25–10:5 ("[He]: The PPAP report is basically whenever a PCB factory or manufacturer creates a sample, they would test that sample based on what the product specification and requirement. And a supplier must test the actual sample and gather results and compare it with the respect—specification and see if it meets the requirement that's provided by the customer."); *id.* at 73:8–11 ("Q: Okay. And so at what point in the process is the PPAP sent to the customer? [He]: At the same time we [are] building the sample or making the sample."). A new PPAP would be created "every time there's a new opportunity for a new project with any big customer, and there's an opportunity to build samples[.]" *Id.* at 78:11–14 (testimony of Cherry He); *see also id.* at 131:1–4 ("[Q]: [M]y understanding is that when samples are produced at a factory, the customer requires you to submit a PPAP report in connection with that, is that correct? [Jiang]: That's correct."); *id.* at 134:10–13 ("Q: Okay. And with respect to each part number, isn't it true with each project, one of the required steps is to submit a PPAP report? [Jiang]: Yes."). As part of the PPAP, the customer would receive a "part submission warrant" ("PSW") that "summarize[s] the product information" and allows the customer to approve mass production of the PCBs if the customer is satisfied with the samples. Day 3 Trial Tr. [ECF No. 471] at 48:9–12. Because PPAPs are factory- and part-specific, moving production of a part from one factory or another would involve "a lengthy evaluation period by the customer[.]" *Id.* at 34:3–5.

If a customer identifies "a problem or defect with a PCB, they'll send a supplier quality engineer [("SQE")] to visit the factory directly[.]" *Id.* at 41:21–23 (testimony of Wenwu Jiang). To diagnose the problem, SQEs rely on a variety of manufacturing records. The engineer would most

likely start with the "control plan," which contains "the process name, the product features, and how to control each in their feature, and how to measure, and the control method, how to control, if there is any issue . . . what the action need to be taken." *Id.* at 41:1–5 (errors in original testimony). Similarly, a "lot card" "list[s] each and every process and process requirements" and would be attached to every part and project within a factory. *Id.* at 42:9–14. A manufacturing instruction ("MI") "provides information about the factory where a PCB is built[.]" *Id.* at 46:5–6. Work instructions ("WI") list the specific processes a factory "use[s] to control the production" of specific parts. *Id.* at 47:9–10. A certificate of compliance ("COC") lists "all of the customer requirement[s]," so that the manufacturer can confirm that the finished product meets the customer's specific requests. *Id.* at 47:22–24. Finally, a "corrective action report" identifies whether there was a "defect" during the PCB production, the "root cause" of that defect, and what the manufacturer did to try and fix the defect. *Id.* at 48:20–23. All these documents would "convey information about the factory that built [the] PCB[.]" *Id.* at 49:18–20.

### C. The Alleged "Counterfeit" Parts

Of the hundreds of exhibits and thousands of pages of testimony in this case, perhaps the most important piece of evidence is Plaintiff's Exhibit 373. *See* [ECF No. 455-8] at 217. This document—which the Defendants resisted disclosing at every turn (despite being repeatedly ordered to do so)—consists of sales data for "PCB projects and part numbers ('PNs') that CTX and its affiliates misled customers to believe were manufactured by Kinwong when, in fact, they were manufactured at Benlida or other suppliers[.]" Motion to Compel [ECF No. 367] at 5. This chart revealed a total of 23 allegedly counterfeit PCBs, which produced approximately $20,264,814.00 in revenue for the Defendants. *See* Pl's Ex. 373 at 217; *see also* Pl's Ex. 537 [ECF No. 455-13] at 306 (showing "summary of accused revenues in U.S. Dollars by part"). After trial, Kinwong filed an "Amended Request for Relief," indicating that that it was only seeking disgorgement based on 13 of these 23 parts. *See*

Amended Request for Relief [ECF No. 454] at 2. All 13 parts were manufactured for the foreign subsidiaries of three American companies: Kimball, Lear, and Flextronics.[17] *See* Pl's Ex. 373 at 217. Nine of the part numbers were for Kimball: D-8794705NSP01+3_2 ("NSP"), D-8794705RHP1+04 ("RHP"), D-8794705RBP01+03 ("RBP"), 11700060+C, 11122449, 1055449, 8794705PNP01+0 ("PNP"), 23405509+A, and 1075385+8. *See ibid.* Another three were manufactured for Lear: E00808703 ("PQ26"), E01452502 ("JLR"), and 3324690QE ("QE"). And one of the part numbers, 639323-09 ("Rev 9"), was manufactured for Flextronics. We'll take up each of these part numbers in turn.

### 1.  *Kimball Part Numbers NSP, RHP, and RBP*

The NSP, RHP, and RBP PCBs were built for Kimball and, starting in 2014, "were exclusively built at Benlida," not Kinwong. Day 4 Trial Tr. at 50:12–14.[18] Benlida is a Chinese PCB manufacturer based in Jiangmen, and it *also* partnered with CTX. *See* Day 9 Trial Tr. at 9:14 ("[Kukreja]: So Benlida and Shenzhen Kinwong were two factories which I'd approached around the same time. Kinwong Shenzhen I'd approached in April of [2005], and a couple of months later, I'd approached Benlida. And they were similar size factories, similar capabilities. And—so I was working with both the factories."). If these part numbers had been built in a Kinwong factory, they would have carried the Kinwong UL code ("CP"), whereas the parts built at Benlida had the CTX UL code. *See* Day 10 Trial Tr. at 164:9–12. But, because of concerns that these part numbers were being produced by subcontractors, Kimball "requested that the KW-SZ mark [be] put on all boards which ship from [Kinwong Shenzhen]." *Id.* at 161:15–16. On February 26, 2014, Wenwu Jiang emailed two other CTX

---

[17] CTX's original relationship was with a company called Saturn, but that company was later purchased by Flextronics. *See* Day 10 Trial Tr. at 131:20–22 ("Q: All right. And what's the relationship between Saturn and Flextronics? [Kukreja]: Flex acquired—Flex automotive acquired Saturn.").

[18] Before 2014, the NSP part number "was being produced primarily at Kinwong Shenzhen." Day 10 Trial Tr. at 164:3–5.

employees, Yancheng Cai and Xi Su, to "add KW-SZ marking[s]" to the NSP, RHP, and RBP boards that were being manufactured by Benlida. Pl's Ex. 466 [ECF No. 455-11] at 325. The boards produced were marked with both "KW-SZ" and the CTX UL logo. *See id.* at 326–28; *see also* Day 4 Trial Tr. at 51:17–20 ("Q: Right. That was going to be my next question. Even though there's a CTX logo, you're putting 'KW-SZ' on these boards, right? [Jiang]: Yes."). Kukreja admitted that this was a mistake based on a misunderstanding of Kimball's instructions regarding the use of the "KW-SZ" mark. *See* Day 10 Trial Tr. at 162:22–163:5 ("So in this—the KW-SZ mark was supposed to be on the Kinwong PCBs from sometime in 2000—end of 2011. And every so often Kimball China received boards without the KW-SZ mark from them. So around this time frame, the same must have happened on one of these three—on one of these three part numbers. And while following up Kimball China—while following up with us to ensure that the KW-SZ mark was put, somebody in our team gave that same instruction to Benlida to do it on the boards they were producing.").[19]

---

[19] Wenwu Jiang posed an additional theory—that Kimball and Kinwong, in fact, gave CTX *permission* to place the "KW-SZ" mark on PCBs that were manufactured by Benlida. *See* Day 4 Trial Tr. at 53:11–25 ("[Jiang]: [Kinwong] allow[ed] us to build the boards in our other approved factory, but need to do the FQZ control at Kinwong . . . Kinwong allow[ed] us to subcontract the board to our manufacturer as long as we put the [CTX] UL logo. . . . And also, before that, Shenzhen Kinwong even subcontract the board to different manufacturers without customer approval. That was what was in this case happened [sic]. Q: You're telling me Kinwong agreed that you could put a fake KW-SZ logo on boards built by Benlida. A: Kinwong agreed we put 'KW-SZ' on the board. Q: And we're going to see that in writing. A: We have that in writing with our lawyers."); *see also id.* at 57:14–16 ("Q: You're telling me that you had an agreement with Kimball that you could put 'KW-SZ' on Benlida boards? A: Yes. We have that document with our lawyer."). Of course, the Defendants didn't produce *any* documents supporting Jiang's outlandish theory—just another example of Jiang's trouble with the truth. And Kukreja even testified that—while Kinwong allowed CTX to seek out other manufacturers—it *forbade* CTX from using its UL logo unless the PCB was manufactured by Kinwong. *See, e.g.,* Day 9 Trial Tr. at 24:11–15 ("[Kukreja:] And in March of 2011, Mr. Shum had—there are minutes of meeting where Mr. Shum had basically said that any part number where they cannot meet the pricing requirements, we are allowed to subcontract the PCB a hundred percent, as long as we do not use the UL logo."); Day 10 Trial Tr. at 169:23–25 ("[Kukreja:] Because the agreement which Mr. Shum and I—Mr. Shum and I had had was that we could subcontract the PCB as long as we did not use the UL logo."); *see also* Day 5 Trial Tr. at 11:24–12:1 ("Q: Did Kinwong ever authorize [CTX] to put 'KW-SZ' on boards not manufactured at Kinwong? [He]: No."). So, we reject any suggestion that Kinwong would have allowed CTX, Benlida, or anyone else to mark a PCB in a way that would have caused a customer to

A couple months later, a CTX employee named Ryan Spivack instructed Yancheng Cai, another CTX employee, to "remove the KW SZ [mark] for the [NSP] board right away" and to relay the same message to Benlida. Pl's Ex. 470 [ECF No. 455-11] at 338. Puzzlingly, Spivack reiterated to Cai that Benlida "keep the same for now for the other 2 parts" (*i.e.*, Benlida should still put "KW-SZ" on the RHP and RBP boards). *Ibid.* When Kukreja learned that the "KW-SZ" mark had been placed on these Benlida-manufactured boards, he "asked them to stop immediately" because "we should not be putting [the] KW-SZ mark on boards which were being built at Benlida." *Id.* at 165:15–23; *see also* Pl's Ex. 472 [ECF No. 455-11] at 345 ("I need to immediately have a meeting. Who authorized usage of KW-SZ on these boards?"). Although Benlida attempted to fix the issue, thousands of these boards were manufactured and shipped with the "KW-SZ" mark, even though they were manufactured at Benlida. *See* Day 10 Trial Tr. at 168:18–22 ("[Kukreja]: So by the time I asked [Benlida] to stop, 15,000 pieces of the—15,000 pieces of the NSP had already had this logo and 7,000 did not have the logo— 7,000 did not have the KW-SZ mark. And RH had both the logos, because a quantity of 2,200 pieces had shipped to the customer.").

In an email from Sunny Kapoor (CTX's then-COO) to Kukreja, Kapoor agreed that the issue "should have been brought to your attention" but justified the use of the "KW-SZ" because Kimball "will reject boards without this logo[.]" Pl's Ex. 471 [ECF No. 455-11] at 341. To explain the sudden omission of the "KW-SZ" mark, Kapoor lied to Kimball by representing that these three parts were now being built at Kinwong Longchuan—when, as evidenced by Kapoor's own email exchange with Kukreja and Jiang, he (and everyone else at CTX) knew Benlida was the manufacturer. *See ibid.* ("[M]aybe this position changes now that we have told [Kimball] boards are being built in

---

(wrongly) infer that the board was manufactured by Kinwong.

[Longchuan].”); *see also* Day 4 Trial Tr. at 64:25–65:3 (“The Court: Mr. Jiang, answer the question. He asked: ‘That's a false representation that these boards were built in Longchuan, right?’ [Jiang]: Yes.”).

## 2. *Kimball Part Numbers 11700060+C, 11122449, and 1055449*

Part numbers 11700060+C, 11122449, and 1055449 were also manufactured at Benlida and were labeled with the CTX UL code. *See* Day 9 Trial Tr. at 181:9–11, 17–18 (“Q: Okay. And as a matter of fact, where did the production of the part number occur, the mass production? [Kukreja]: In Jiangmen Benlida. . . . Q: Okay. What UL logo was put on those boards? A: CTX UL logo.”); *see also* Day 4 Trial Tr. at 182:12–16 (“Q: So for these three parts, I want to ask you the same question I asked about the PQ26. If Circuitronix told Kimball these parts were made in Kinwong, that would be a false representation, right? [Jiang]: Yes.”). Despite this, CTX *falsely* told Kimball's employees that part number 1055449 was being manufactured at either Kinwong Shenzhen or Kinwong Longchuan. *See, e.g.*, Pl's Ex. 400 [ECF No. 455-8] at 506 (“These parts are built at our Shenzhen plant.”); Pl's Ex. 405 [ECF No. 455-9] at 63 (“1055449: we will say is manufactured in KW LC.”); Pl's Ex. 329 [ECF No. 455-7] at 201 (“Yes, we should [keep] the LC as we told customer the boards of 1105449 [sic] are built by [Longchuan].”); *see also* Day 3 Trial Tr. at 188:24–189:2 (“Q: As we saw with the PQ26, here, again, [CTX] is creating documents to make it look like Benlida parts were made at Kinwong, right? [Jiang]: Right.”).

In contrast, the evidence about part numbers 11700060+C and 11122449 is more mixed. Unlike part number 1055449, the record contains no direct evidence that CTX employees lied to Kimball about the origins of these two parts. Instead, Kinwong asks us to *infer* that Kimball must have been misled about these two parts because an audit discussing certain defects with all three parts took place at Kinwong Shenzhen. *See* Day 3 Trial Tr. at 187:14–18 (“Q: So even though Kimball is coming to Kinwong, Yancheng [Cai] is getting ready to address quality complaints for parts built at Benlida, right? [Jiang]: Yes.” (citing Pl's Ex. 405 at 66)); *see also* Pl's Ex. 328 [ECF No. 455-7] at 196 (“Stephen,

[a]s per discussion, please take the defect samples to Shenzhen tomorrow for those issues [that] happened in Jiangmen factories. So, [w]e can show them if customer want to review."). Wenwu Jiang testified that this was done for the customer's convenience:

> Q: CTX was bringing these defective Benlida boards to Kinwong so Kimball would think they were made at Kinwong, right?
>
> A: Not correct.
>
> Q: What's not correct about that?
>
> A: The reason is, when customer visit China, we have different manufacturer locations. They cannot go to each and every location on one trip. But they do want to discuss about some project was built in other location. That's why we brought those boards to Kinwong Shenzhen factory.

Day 3 Trial Tr. at 199:21–200:4. Kinwong also alleged that the Defendants made "fake" Kinwong manufacturing records to trick Kimball, but the emails discussing these "fake" records only mention part number 1055449. *See, e.g.*, Pl's Ex. 208 [ECF No. 455-5] at 69 ("HIC was brought up due to [b]low hole issue on 1055449+5. We should maintain this boards [sic] were built in [Longchuan] if customer ask for detail and we will documents later on from LC."); Pl's Ex. 416 [ECF No. 455-9] at 390 (ordering CTX employee Steven Ho to "use KW picture instead of Benlida's" in email with the subject line "Quality In process_ Blow hole issue: 1055449+5").

### 3. *The Other Kimball Part Numbers*

There are three other Kimball part numbers Kinwong claims were counterfeited: PNP, 23405509+A, and 1075385+8. Part numbers 23405509+A and 1075385+8 were "both built at Benlida[.]" Day 4 Trial Tr. at 84:25. The only evidence concerning these two parts comes from Plaintiff's Exhibit 477. *See* [ECF No. 455-11] at 364–75. In this email chain, CTX employee Yancheng Cai directs other employees to prepare Kinwong manufacturing instructions, even though both parts were being built at Benlida. *See id.* at 366 ("Another two BLD PN, should prepare KW MI accordingly."); *see also* Day 4 Trial Tr. at 87:24–88:1 ("Q: So for these two Benlida part numbers,

36

Yancheng Cai says prepare Kinwong manufacturing instructions, right? [Jiang]: Yes."); *id.* at 89:14–21 ("Q: And now MIs and lot cards have been created for both the 234 and the 107. Do you see that? A: Yes. Q: Your employees are creating fake records for these two part numbers that were made at Benlida to make it appear like they were made at Kinwong, right? A: No, not correct."). As best we can tell, other than this single email chain, Kinwong didn't present any concrete evidence of "counterfeiting" with respect to these two parts.

The PNP part is unique because the Defendants originally claimed that they didn't earn any revenue from selling it. *See* Pl's Ex. 373 at 217. During trial, however, Kukreja admitted that CTX earned "around $2 million" in sales from this part. Day 11 Trial Tr. at 123:19; *see also* Day 4 Trial Tr. at 94:23–24 ("Q: Circuitronix had revenues for this PNP part number, right? [Jiang]: Correct."). But the Defendants' actual revenue from the PNP part is ultimately irrelevant unless Kinwong can show that the part was counterfeited. The primary evidence for Kinwong's view that the Defendants counterfeited the PNP part is (what Kinwong calls) the "fake lot card email"—in which Yancheng Cai admitted that he prepared a "fake" lot card for the PNP part number that was based on a Kinwong Longchuan lot card. *See* Pl's Ex. 83 [ECF No. 455-2] at 364 ("The other fake lot card [PNP] built at [Benlida] that prepared the evidence at [Longchuan]) is prepared by ourselves. No [Kinwong] involved."). And other emails corroborate Kinwong's position that the Defendants used Kinwong-related documents as the template for *other* manufacturing documents related to the PNP part. *See, e.g.,* Pl's Ex. 206 [ECF No. 455-5] at 46 ("The boards were built in Benlida. Enclosed please find the 8D report and advise if it's ok to send to [Kimball]. It's prepared based on Kinwong factory."); Pl's Ex. 287 [ECF No. 455-6] at 354 ("Please send me the CAR provided by [Benlida] later. Then I will revise it based on [Kinwong]. The 8D report sent to customer should be based on KW, as customer may visit KW and check each corrective action later.").

Kukreja claimed that these fake records were not designed to mislead the client about where the part was manufactured, but he conceded that the practice was deceptive in that it was meant to help factories pass customer audits. *See* Day 11 Trial Tr. at 126:16–21 ("Q: Was it standard practice at Circuitronix to create fake lot cards and other manufacturing records? [Kukreja]: We created missing information so that the factory could be prepared for an audit. Without that— Q: Like the fake lot card? A. It's done by Shenzhen Kinwong during every audit.").

#### 4. *Lear Part Number PQ26*

The saga surrounding the PQ26 part dominated our trial. The PQ26 "went into an electronic body control module for Volkswagen cars" and was a major project between Lear and CTX—resulting in over $9 million in revenue for CTX. Day 3 Trial Tr. at 60:8–25. CTX wanted both Benlida and Kinwong Longchuan to manufacture the PQ26 because Lear "was planning to build [the Volkswagen part] in two of [its] factories[.]" Day 9 Trial Tr. at 188:25–189:2. Benlida would manufacture the PQ26 for Lear's factory in Cebu, the Philippines, and Kinwong Longchuan would do the same for Lear's factory in Rabat, Morocco. *See id.* at 189:2–8.[20] Kinwong Shenzhen and Kinwong Longchuan both made samples for Lear, but CTX's goal was to get the Longchuan factory approved for mass production. *See id.* at 194:11–23 ("[Kukreja]: So there were—there were a hundred boards which were built from Shenzhen and a hundred boards which were built in Longchuan, hundred each. . . . [T]he starting point was to get the Longchuan factory approved."). Unfortunately for CTX, Lear only approved Kinwong Shenzhen for mass production. *See id.* at 196:10–18 ("[Kukreja]: But the batch which got approved were the ones from Shenzhen. The Court: Okay. Approved by Lear. The Witness: By Lear. The Court: To go to mass production. The Witness: Yes. The Court: But not for Longchuan.

---

[20] Lear eventually nixed the Morocco production, obviating the need for CTX to use two factories to fulfill the PQ26 orders. *See id.* at 190:19–21 ("Q: All right. And is it your understanding that the Morocco production actually didn't end up happening at all? [Kukreja]: It did not happen at all.").

The Witness: They didn't get approved to go to Longchuan, yes."). What's worse, Kinwong "didn't want to build the boards in Shenzhen[,]" *id.* at 196:22, because Kinwong would have had to install "an Enthone line" to put the appropriate OSP[21] finish on the boards. *Id.* at 200:6–20.

Although Lear eventually approved Kinwong Longchuan for mass production, *see* Day 11 Trial Tr. at 30:10–12 ("Q: And in Lear's case, it took four to five years for Lear to approve Kinwong as a full-fledge supplier, right? [Kukreja]: Longchuan."); *see also* Pl's Ex. 218 [ECF No. 455-5] at 211–12 ("But all the evidences [sic] in Lear System (Profile and PAM) show Lear only did and approved the production location in Kinwong in Longchuan[.]"), Kinwong needed to find a way to start mass production of the PQ26 part as soon as possible. Lear had already given CTX permission to ship *other* parts back and forth between Kinwong's factories and Benlida because Benlida was the only factory that could apply the appropriate OSP. As Kukreja explained:

> [Kukreja]: So[,] on Jan. 1st, 2013, Benlida also did not have that OSP. [CTX] invested in the line, and we paid for the OSP. We were trying to do the same thing with Kinwong, but they did not agree. They did not agree, so the way we found the solution—the way we proposed the solution to Lear was that the boards which would be built out here would go to Benlida for the OSP finish. And that model did not— was not only applied to the PQ26, . . . it was applied to . . .  Daimler Mercedes Lam, and it was applied to the CMF1, and a couple of other projects.
>
> Q: Okay. Those are other Lear projects where the same process was followed?
>
> A: Yes.
>
> Q: Okay. So basically, if I understand your testimony, at this point in the production, the boards are sent where?
>
> A: They would be sent to [Benlida].
>
> Q: Okay. And then after the OSP is put at [Benlida], what happens here at the end?
>
> A: They would come back to Longchuan for 4-wire test, AVI, final QC, final quality assurance, and packing.

---

[21] "OSP," which stands for "organic solubility protectant," is a "transparent protective chemical" that's placed on the copper surface of a PCB "to prevent [it] from oxidizing." Day 9 Trial Tr. at 199:8–20.

Day 10 Trial Tr. at 17:17–18:11. With this in mind, the Defendants came up with a plan to fulfill the PQ26 order: They would tell Lear that the PQ26 parts were being manufactured by Kinwong and then shipped to Benlida for OSP processing. *See* Day 3 Trial Tr. at 62:15–18 ("[Q]: True or false, [CTX] told Lear that PQ26 parts were built at Kinwong and then sent to Benlida only to apply OSP processing? [Jiang]: That's true.").

The problem with this solution, as the CTX witnesses themselves admitted, was that this was a straight-up lie. Both Kukreja and Jiang testified that CTX falsified records to make it appear as if the PQ26 was being manufactured by Kinwong when, in fact, Benlida was the sole factory handling mass production. *See* Day 3 Trial Tr. at 69:17–70:6 ("Q: Okay. This email reflects that CTX expressly told its customer Lear that the PQ26 board was produced by [the] Longchuan factory of Kinwong, right? [Jiang]: Yes. Q: You instructed—well, let me ask you this. That was a false representation, right? A: Right. But there is a reason. Q: Okay. You instructed your employees to create records to perpetrate that false representation, right? . . . A: Right. But there is a reason." (citing Pl's Ex. 272 [ECF No. 455-6] at 203–04)); *id.* at 121:20–24 ("[Q]: You're creating a MI for these parts using Kinwong's NE [another PCB] information to make it look like the boards were being made at Kinwong, right? [Jiang]: Yes. But that due [sic] to Kinwong not supporting. They supposed to build the boards, but they do not—did not build."); Day 8 Trial Tr. at 96:13–17 ("Q: You wanted your employees to take real manufacturing records for a Kinwong-made part, the NE, and doctor them to make them look like they were manufacturing records for the Benlida-made PQ26, right? [Kukreja]: For the AVI and 4-wire testing, that is correct."). And, as if this testimony wasn't enough, Kinwong also presented several emails confirming that the Defendants and their employees actively tried to mislead Lear into believing that Kinwong was manufacturing the PQ26. *See, e.g.*, Pl's Ex. 209 [ECF No. 455-5] at 90 ("Hide all PQ26 boards in [Benlida]. [The Lear auditor] should not be able to see any boards or records for PQ26 apart from OSP line and packaging."); Pl's Ex. 212 [ECF No. 455-5] at 153 ("I don't think we

should use [Benlida] records. Lear SQE should be a Chinese, she can see this easily and find the problem if we use [Benlida] records as [Kinwong's].”); Pl's Ex. 215 [ECF No. 455-5] at 163 (“Change customer part number of process record to [PQ26]. Change [Kinwong] internal part number in PQ26's traveler and MI to NE's internal part number[.]”).[22]

This charade didn't last forever. Lear eventually flagged some issues with the PQ26 to CTX. *See* Pl's Ex. 399 [ECF No. 455-8] at 493 (identifying a lot of PQ26 boards as “defective”). And Lear scheduled an audit of both Benlida and Kinwong Longchuan for January 2017 to investigate the “poor quality performance” of the PQ26. Pl's Ex. 218 at 211. When Lear arrived to audit Kinwong Longchuan, Kinwong refused to let either CTX or Lear inside the factory. *See* Day 3 Trial Tr. at 168:4–7 (“Q: Well, when CTX arrived with Lear, CTX told Lear, ‘There's a power outage, we can't get inside [Kinwong Longchuan],’ right? [Jiang]: I don't know who talked [to] Lear, but the actual was Kinwong was not supporting, and they refused the customer to go inside.” (errors in original)). It was at this point that the Defendants were forced to admit to Lear that the PQ26 had been manufactured by Benlida, not Kinwong, all along. *See* Day 10 Trial Tr. at 97:20–23 (“Q: All right. I just want to go back to the discussion about the PQ26 manufacturing location on the first day [of the audit]. Where did that discussion actually take place? [Kukreja]: It took place at the conference room in Benlida Jiangmen.”); Pl's Ex. 218 at 212 (“[W]ent back to Jiangmen to continue to discuss the manufacture location of PQ26. CTX insisted that the PQ26 was produced in Benlida in Jiangmen from the beginning.”).[23]

---

[22] Of course, both Jiang and Kukreja attempted to justify this boldface lie in different ways. We'll discuss these excuses (and our view of them) later on.

[23] Kukreja pushed back against this notion, arguing that Lear wanted to visit Kinwong Longchuan to audit the CMF1 part (which was being manufactured by Kinwong)—and not the PQ26. *See* Day 10 Trial Tr. at 97:1–4 (“The reason why [the auditor] travelled to Longchuan was not because she wanted to see PQ26, because that had already been clarified to her, she wanted to travel to Longchuan to see CMF1 from that purchase order which had been released[.]”). In either event, the evidence is conclusive that Lear didn't learn that Benlida was manufacturing the PQ26 until January 2017.

### 5. *Lear Part Numbers JLR and QE*

JLR and QE were Lear parts exclusively manufactured at Benlida. *See* Day 4 Trial Tr. at 42:5–9 ("Q: And [JLR] was produced at Benlida, right? [Jiang]: Yes. Q: And zero dollars in revenue of this part were produced at Kinwong, right? A: Correct."); *id.* at 70:7–10 ("Q: [QE] is one of the Lear boards that was built at Benlida that [CTX] didn't want Lear to see when it came to audit, right? [Jiang]: Correct."). Kinwong's theory of counterfeiting for the JLR part relies on two sources: (1) CTX's internal documents, which prove that the part's manufacturing records (*e.g.*, PPAPs and control plans) were based on the "Kinwong format," *see, e.g.*, Pl's Ex. 439 [ECF No. 455-10] at 186 ("JLR Samples, E01452502—KW LC [PPAP] format used."); Pl's Ex. 442 [ECF No. 455-10] at 191 ("All boards which have CTX logo should have Shenzhen format."); and (2) Lear's own records, indicating that Kinwong was the "supplier" of the JLR part, *see, e.g.*, Pl's Ex. 445 [ECF No. 455-10] at 199 (listing "Ship Point" of JLR part as "Kinwong Electronic (Shenzhen) Co."). As for the QE part, Kinwong relies on this same "format" and "ship point" evidence, but it *also* shows that CTX wanted to "hide" the QE board from both Lear and Kinwong during an audit of Benlida—indicating that CTX was passing off the QE board as being manufactured by Kinwong. *See* Pl's Ex. 220 [ECF No. 455-5] at 220 ("Treat it very carefully, we should not let [Kinwong] know we are building QE board at other factory."); Pl's Ex. 356 [ECF No. 455-8] at 43 ("Only [PQ26] boards can appear in the OSP line or in the packing room, other Lear boards should not be seen by the customer.").

Both Kukreja and Jiang objected to Kinwong's framing of this evidence, insisting that the "Kinwong format" was merely a template of an original Kinwong PPAP, which the Defendants used to create PPAPs for new parts made by different manufacturers—not, as Kinwong suggests, to falsely represent to customers that the part was being manufactured by Kinwong. *See* Day 5 Trial Tr. at 141:8–19 ("[Leading question from CTX's own lawyer]: Okay from time to time, when you have a project that's being developed with another factory, not one that's owned by [Kinwong] but some other

company, let's say Benlida, sometimes do you start with a format [like the Kinwong Longchuan format], and use that as the template to develop the format for the other factory? [Jiang]: Yes. We use the format to develop [the] other company. [Another leading question from CTX's lawyer]: Okay. And when you do that, you make sure to remove any information that specifically refers to Kinwong and try to replace that with the accurate information about whichever factory is actually going to do the production? A: That's correct."); Day 10 Trial Tr. at 118:11–119 ("[Kukreja]: [T]he initial starting point was a format, a Shenzhen format or [Longchuan] format. Like, for this part number . . . [t]he first PPAP which we would put together say it started from LC format. Now, rather than recreating the entire PPAP, we would take it to Benlida and modify from LC format and make the Benlida PPAP. . . . The Court: But if [the customer is] in his office, nothing in the PPAP will ever alert him to the factory that the PPAP is referring to. [Kukreja]: It will not alert him."); *see also* Day 5 Trial Tr. at 88:23–89:9 ("[Q]: Let's say [CTX] took this [PPAP] format, but they removed all references to Shenzhen Kinwong, and they replaced it with accurate information about another factory, including the name of that factory, and then they submitted that to the customer, there's nothing about that that would be misleading to the customer, to confuse the customer into thinking that parts built at another factory were built at Shenzhen Kinwong, isn't that right? [He]: From the end user's perspective, if they got a report without any [of] Kinwong's information and only contained the other factory's information, you're correct, that would not be misleading.").[24]

As for Lear's "ship point" records, the CTX witnesses explained that this was an error in Lear's system, and that both CTX and Lear had flagged the problem before. *See* Day 4 Trial Tr. at 48:14–18

---

[24] Kurkeja also testified that most of a PPAP is "factory agnostic," since it contains information such as "the raw materials which are used . . . to build that part number," "the measurement of all the dimensions" of the specific PCB, and "third-party data sheets" measuring the performance of the board. Day 9 Trial Tr. at 151:5–152:5. The last part of the PPAP (also known as the "control plan") is not factory agnostic because it lays out the specific processes used to manufacture a PCB (such as "drilling, drill speed, [and] drill depth"), which can vary from factory to factory. *Id.* at 155:21–56:7.

("Q: Now, if we go to the underlying email from Lear, you'll see that Lear sends another quality notification in June 2017 identifying a ship point as Kinwong, right? [Jiang]: That's correct. [And] since their system has errors, it always show that way."); Day 10 Trial Tr. at 91:25–92:5 ("Q: All right. Do you know why Lear has been unable to, I guess, correct this address issue? [Kukreja]: So it's—it's a problem which is unique to them, because none of our other customers have this problem. And [Lear] conveyed this to us for the first time in 2013, 2014, and the problem has continued since—since that time."); *see also* Def's Ex. 51 [ECF No. 457-1] at 592 ("This is not correct. Please be advised as follows: The remit to has always been [CTX] . . . [t]he manufacturing location was provided to Lear in the attached email in 2015."); *id.* at 588 ("We acknowledge the system limitations but would like to advise that the Shenzhen address is not where the parts are manufactured or payment remitted to. As long as Lear acknowledges in writing that the POs have some discrepancies we can accept it as is and continue."). To us, the evidence on this point clearly establishes that Lear's asynchronous shipping records are a consequence of Lear's own technical limitations—and not the result of any false statements by the Defendants. We therefore reject Kinwong's "ship point" argument without further discussion.

Finally, Jiang admitted that CTX "hid" the QE part from Lear when it came to audit Benlida *and* that the Defendants tried to hide the fact that Benlida was manufacturing the QE board from both Kinwong and some of CTX's own employees. *See* Day 4 Trial Tr. at 78:6–10 ("Q: So you're hiding the fact that [QE] was built at Benlida from Kinwong, right? [Jiang]: Yes. Q: And you were hiding it from your own employees, right? A: Yes."). Kukreja testified that QE was the new version of a part number that was originally manufactured by Kinwong, but which later had to be moved to Benlida because: (1) Kinwong had transferred production of an earlier version of the part from Shenzhen to Longchuan without permission, *see* Day 10 Trial Tr. at 109:22–110:5 ("So this part number started . . . with a revision called 'ME.' And ME was being produced by Kinwong Shenzhen.

44

Then that went to NE. And NE started in Kinwong Shenzhen. And then Kinwong moved the part to Longchaun without our authorization or Lear's authorization. And the NE became the QE."); and (2) Benlida had a special "OSP" Kinwong lacked, *see id.* at 110:7–9 ("[W]e finally moved the production to—to [Benlida], since this part number also required the special OSP."). He nevertheless insisted that neither he nor anyone else at CTX "misled anyone into believing that the QE parts that were built at Benlida were actually built by [Kinwong]." *Id.* at 112:25–13:1. As with the PQ26 part, Kukreja claimed that the practice of "hiding" the QE parts was done to ensure that the factory audit would be successful—not because the Defendants wanted to hide the parts' origin from Lear. *See* Day 8 Trial Tr. at 74:6–11 ("So what we do is we minimize—there's so many examples of this on the production floor—we minimize it by keeping the bare minimum number of boards on the production floor. And not only us, Shenzhen Kinwong does that today. Every factory in China does that."); Day 10 Trial Tr. at 39:9–17 ("And the main reason behind [hiding parts] is that the more boards which you have on the line, the greater the opportunity for the customer—the customer's definitely going to find a problem somewhere. They'll find a problem with the traveler, they'll find a problem with the in-process quality control of one of those several steps. So what we try to do is that we try to focus the customer on that specific objective for whatever their audit is about.").

### 6.   *The Flextronics Part Number (Rev 9)*

The final part at issue in our case is the "Rev 9," which the Defendants manufactured for Saturn (now Flextronics). Saturn sells the Rev 9 to another company, Macom, which then puts the part into Ford cars. *See* Day 11 Trial Tr. at 85:13–16 ("Q: And then Saturn sells [the Rev 9] to Macom, right? [Kukreja]: Yes. Q: And then Macom puts that into parts for Ford, right? A: Yes."). Although mass production for this part "was done at Benlida," samples for the same part were "produced at Longchuan." Day 10 Trial Tr. at 131:8–10; *see also* Day 4 Trial Tr. at 141:20–142:6 ("[Q]: This confirms that Kinwong was building sample orders of [Rev 9] all the way from 2012 to 2015, correct? [Jiang]:

Correct. Q: Now, as it turned out, . . . [CTX] and Saturn/Flex never actually ended up sending any mass production orders for that specific part number to Kinwong, isn't that correct? A: Correct. Q: All the mass production occurred at Benlida, right? A: Yes." (citing Pl's Ex. 210 [ECF No. 455-5] at 147)).[25] In 2011, Saturn approved both Kinwong Shenzhen and Kinwong Longchuan for production of this part. *See* Pl's Ex. 73 [ECF No. 455-2] at 128 ("[Saturn] has no concern whether we build the board in Shenzhen or Longchuan, this was conveyed to us after the audit.").

An October 12, 2012, email between Wenwu Jiang and Yancheng Cai confirms that Benlida/ROK was "not a registered and approved factory by our customer," but Jiang still ordered CTX employees "to use the Kinwong format" without "copy[ing] [the] Quotation team." Pl's Ex. 348 [ECF No. 455-7] at 376. In 2013, CTX submitted a PPAP and PSW to Saturn for the Rev 9 that was replete with references to Kinwong—not Benlida. *See generally* Pl's Ex. 420 [ECF No. 455-9] at 415–674. CTX's own emails confirm that Flextronics had signed a PSW for Kinwong Shenzhen and Kinwong Longchuan—but not Benlida. *See* Pl's Ex. 431 [ECF No. 455-10] at 85 ("So we have a Signed PSW for Shenzhen dated Jan. 4, 2013, Signed PSW on Longchuan dated 9/19/2013."). When Saturn/Flextronics eventually learned that the Rev 9 was being manufactured by Benlida (not Kinwong) in 2017,[26] CTX employees were flooded with emails questioning why the Rev 9 was being produced at Benlida when Kinwong was the only approved manufacturer. *See, e.g.,* Pl's Ex. 422 [ECF No. 455-10] at 2 ("I got information from Saturn . . . that you [CTX] had PCB own partner Kinwong [S]henzhen . . . and Saturn qualified PCB Kinwong before PCB business, not the PCB manufacturer Benlida Jiangmen we visited."); Pl's Ex. 430 [ECF No. 455-10] at 69 ("The PPAP is showing address [for Kinwong Shenzhen]. Now the production location is at [Benlida]. Have you got authorization

---

[25] Strictly speaking, the Rev 9 "was built by ROK, a Benlida affiliate[.]" Day 4 Trial Tr. at 6:10–11.
[26] Flextronics believed that Kinwong was producing the Rev 9 as late as April 11, 2017. *See* Pl's Ex. 427 [ECF No. 455-10] at 36 ("Toby advised that [he] found that [CTX] does not own Benlida, and they also do not own Kinwong *where the Macom PCBs are produced*." (emphasis added)).

from Flex before production location change?"); Pl's Ex. 432 [ECF No. 455-10] at 126 ("Jiangmen [f]actory's information was not contained in attached PSW.").

Jiang tried to defuse this situation with a half-truth: The Rev 9 project, he wrote Flex, "was started build in Shenzhen and then built in Jiangmen, in some point of time both factory built the parts. Both Shenzhen and Jiangmen factory was approved to build the parts[.]" Pl's Ex. 433 [ECF No. 455-10] at 132 (errors in original). Of course, while Kinwong *did* build some sample Rev 9 parts, only Benlida started mass production. *See* Day 10 Trial Tr. at 131:8–10 ("Q: All right. In addition to the mass production that was done at Benlida, did you have samples produced anywhere else? [Kukreja]: We had the samples produced at Longchuan.").

Kukreja testified at trial that moving production to Benlida without Flextronics's permission was no big deal because Saturn (before the Flextronics buyout) had audited and approved Benlida for mass production many years earlier. *See* Day 11 Trial Tr. at 88:20–22 ("Between 2008 and 2010, a hundred percent of Saturn requirements were being taken—addressed by Benlida."); *see also* Def's Ex. 408 [ECF No. 457-17] at 254 ("When Saturn initiated procurement relationship with [CTX], a Saturn quality auditor visited two manufacturing facilities as requested by [CTX], Kinwong and [Benlida]. . . . All PCBs that have been supplied to Saturn by [CTX] . . . have been supplied by Benlida, not Kinwong."). Saturn (it's true) had audited and approved Benlida for mass production in 2008, but this was for *a separate part* intended for Whirlpool. *See* Def's Ex. 408 at 255 ("Whirlpool needs this information before Sunday night. . . . Where is the plaint in China?"). The Defendants failed to present *any* evidence that Saturn ever audited or approved Benlida for mass production of the Rev 9 before 2017. And we reject the Defendants' suggestion that they mistakenly believed that this 2008 audit and approval meant that Benlida could manufacture the Rev 9 without conducting a new audit. After all, Kukreja admitted that customers—particularly those like Saturn/Flex who were delivering parts to automotive end-users—were extremely careful about *where* the parts were manufactured and often

required audits of factories on a part-by-part basis before approving production. *See* Day 11 Trial Tr. at 23:11–19 ("Q: So approval of factories is part specific eventually, right? . . . [Kukreja]: Right and wrong. Q: Why is it wrong? A: You cannot even get to that position without having the first level of approval—the factory approval."); *id.* at 30:1–9 ("[Kukreja]: As long as—we could switch factories as long as both factories had PPAP approval. . . . Q: Right. Because the automotive industry works that way. You have to submit samples and have a PPAP approved, right? A: Sure."). Indeed, the Defendants' own evidence *confirms* that Flex didn't specifically audit Benlida to produce automotive parts until March 1, 2017—many years *after* Benlida began to manufacture the Rev 9. *See* Def's Ex. 44 [ECF No. 457-1] at 442 ("Overall process audited were P5 to P7, achieved score was 76% and Classification 'C' not quality-capable for Automotive rigid PCB.").

CONCLUSIONS OF LAW

I.        **Fraud on the USPTO**

Our first task is to determine whether Kukreja committed fraud on the USPTO (as pled in Count III of the Plaintiffs' Amended Complaint). Fraud on the USPTO "occurs when an applicant knowingly makes false, material representations of fact in connection with an application for a registered mark." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1209 (11th Cir. 2008). "The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark." *Select Export Corp. v. Richeson*, 2011 WL 13135114, at *7 (S.D. Fla. May 5, 2011) (Dimitrouleas, J.) (quoting *City of N.Y. v. Tavern on the Green, L.P.*, 427 B.R. 233, 242 (S.D.N.Y. 2010)); *see also Angel Flight*, 522 F.3d at 1210 ("Purposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark."). "The party seeking to cancel a mark bears the burden of proving the alleged fraud by clear and convincing evidence." *Angel Flight*, 522 F.3d at 1209.

In our Omnibus Order, we deferred ruling on this question, reasoning that "the best course [was] to reserve this issue for the fact-finder at trial." *Kukreja*, 574 F. Supp. 3d at 1245. We noted that, while "the Plaintiffs argue that Kukreja committed fraud when he 'swore under oath to the USPTO that he knew of no other company with rights to the KINWONG mark in the U.S.[,]'" there remained "open question[s] as to whether Kukreja *knew* that the Plaintiffs had rights to the KINWONG mark in the United States" and whether "Kukreja *purposely* or *knowingly* made false statements to the USPTO." *Ibid.* (quoting Plaintiffs' Motion for Partial Summary Judgment [ECF No. 182] at 9). We therefore concluded that there were "genuine issues of material fact as to whether the Plaintiffs ha[d] proven fraud—a fact-intensive inquiry—by clear and convincing evidence." *Id.* at 1244.

We've now had our trial, and both parties presented evidence on the question of whether Kukreja committed fraud—and, in particular, whether Kukreja *knew* that the Plaintiffs had rights to the KINWONG mark in the United States when he told the USPTO he didn't know of any prior instances of the mark's use in commerce. During the trial, Kukreja took the stand and tried to convince us that he legitimately believed he had the right to use the KINWONG mark in the United States, that forming Kinwong, LLC was based on this good-faith belief, and that he had no intention of defrauding the USPTO because he thought his answers to the USPTO were honest. Having heard extensive argument and testimony on the subject, we now find that the Plaintiffs have established Kukreja's fraud on the USPTO by clear and convincing evidence. Indeed, Kukreja defrauded the USPTO in several glaring ways.

To begin with, Kukreja failed to disclose to the USPTO that Kinwong had rights to the KINWONG mark in the United States. That's textbook fraud. *See Richeson*, 2011 WL 13135114, at *7 ("The deliberate omission in a trademark application of information regarding another's right to use the mark applied for is a material omission justifying cancellation of that mark."); *MPC Franchise, LLC v. Tarntino*, 19 F. Supp. 3d 456, 481 (W.D.N.Y. 2014) (canceling defendant's registration "based on

fraud" because, "even assuming *arguendo* that Tarntino individually had the right to use the mark, he has not produced evidence tending to show how he could have honestly believed that [p]laintiffs, or even his siblings, did not have a right to use the mark that was at least equal to his").

During his testimony, Kukreja admitted that the Manufacturer's Agreement between Circuitronix and Capital Profit was "nonexclusive" in the sense that it allowed Capital Profit (and, therefore, Kinwong) to sell its products to anyone in the United States, so long as those customers hadn't been introduced by Circuitronix:

> Q: And as it relates to the territory, and specifically the United States of America, the manufacturer's agreement was nonexclusive, right?
>
> [Kukreja]: It was—the contract said it was nonexclusive.
>
> [. . . .]
>
> Q: In other words, according to the manufacturer's agreement, the manufacturer could sell its PCBs in the territory as long as it wasn't selling them to Circuitronix's exclusive customers, that's what that says, right?
>
> A: That is right.
>
> Q: But it could sell to any other company in the United States, right?
>
> A: They would have had a little bit of a challenge, because nobody—nobody spoke English or nobody had a U.S. visa, but that's besides the point. But, yes, as—that's what the contract said.
>
> Q: Capital Profit could sell Kinwong PCBs to anyone in the United States except for Circuitronix's exclusive customers, right?
>
> A: That's what the contract says.

Day 6 Trial Tr. at 189:4–190:13; *see also* Pl's Ex. 6 at 22 ("MANUFACTURER grants [CTX] the exclusive right to promote and sell its products to all customers/accounts *introduced by* [*CTX*]." (emphasis added)).

True, Kukreja argued at trial that, while "the contract said one thing," he was "told was another thing," Day 6 Trial Tr. at 189:14–15, and that he had a verbal agreement with Mafio Shum that

supposedly contradicted the explicit terms of the Manufacturer's Agreement, *see id.* at 190:8–13 ("Q: Capital Profit could sell Kinwong PCBs to anyone in the United States except for Circuitronix's exclusive customers, right? [Kukreja]: That's what the contract says. That's not what our agreement was – that was not what the agreement was between Mr. Shum and myself."). But Kukreja conceded that he couldn't produce *even a single piece of evidence* supporting his claim that he had some oral agreement with Mafio Shum that granted Circuitronix exclusivity over the whole American market. *See id.* at 191:12–21 ("Q: And you can't show us a single piece of writing . . . that prevented Capital Profit or Kinwong from selling Kinwong PCBs in the United States so long as it wasn't just to Circuitronix's exclusive customers, right? A: Uhm, I can show certain emails between Cherry and myself where Cherry says that all we're interested in doing is manufacturing PCBs, and we would like you to manage the sales. So stuff like that. I can show emails where the intent can be seen. But I cannot show a contract—the only contract which is there is [the Manufacturer's Agreement]."). This was true even though Kukreja emphasized that "it's important to document anything with the Chinese," and that his practice is to "send emails documenting conversations" and to "prepare meeting minutes of meetings" all of the time. *Id.* at 234:15–24. In the end, despite the critical importance of this alleged oral agreement between Kukreja and Shum—an agreement that would have directly contradicted the terms of the parties' written contract—the Defendants couldn't produce "a single email or meeting minute with a record of the conversation [Kukreja] had with Mr. Shum about the right to use the Kinwong name in the United States[.]" *Id.* at 234:25–235:3. How convenient, in short, that the "only person who could pull a thread out of [Kukreja's] intricately woven tapestry [is] dead." *United States v. Agresti*, 2025 WL 346938, at *1 (S.D. Fla. Jan. 30, 2025) (Ruiz, J.). Having watched Kukreja testify over several days—and having assessed his testimony in light of all the other evidence in the case—we were not persuaded by this all-too-convenient (and wholly unsupported) story.

In any event, and again by Kukreja's own admission, the Manufacturer's Agreement contains an integration clause (also known as a "No Oral Understandings" clause):

> This Agreement embodies the entire agreement between the parties hereto with respect to the subject matter hereof and cancels and supersedes any and all prior or contemporaneous oral or written understandings, negotiations, or communications on behalf of such parties.

Pl's Ex. 6 at 25; *see also* Day 6 Trial Tr. at 192:9–12 ("Q: So to the extent this conversation took place before you entered into this agreement, this provision would bar any agreement you claim you reached by handshake, right? A: I know exactly what the contract means today."). We therefore have no trouble concluding that the Manufacturer's Agreement was nonexclusive, and that Kukreja was aware of its terms. So, we agree with the Plaintiffs that Kukreja "knew Kinwong could market its own name to its own clients outside of Circuitronix in the U.S." Day 12 Trial Tr. [ECF No. 480] at 20:21–23; *see also* Day 7 Trial Tr. at 111:3–8 ("Q: You did not disclose to the U.S. Patent and Trademark Office in your trademark filings that you were telling U.S. customers, in PowerPoint presentations going all the way back to 2005 and 2006, that Kinwong had been doing business with a number of customers in the United States, right? [Kukreja]: I did not.").

And there's plenty of evidence in the record to support this conclusion. For example, on June 1, 2010, CTX and Kinwong signed a Settlement Agreement, memorializing the parties' understanding that CTX owed Kinwong over $300,000. *See* Pl's Ex. 19 at 235; *see also* Day 6 Trial Tr. at 200:23–201:13 ("Q: One of the things that led to the entry of the settlement agreement was that Circuitronix owed Kinwong some money, right? [Kukreja]: One of the minor things. Q: Right. Over $300,000? . . . . A: Actually, we owed them $628,000. And at some point in time, Mr. Shum had committed to sign this agreement, so in good faith I paid $314,000. And then this balance amount was left."). As relevant here, the parties included, as Schedule "A" to the Settlement Agreement, a list of Circuitronix's exclusive customers. *See* Pl's Ex. 19 at 241; *see also* Day 6 Trial Tr. at 202:5–7 ("Q: Those are the lists of exclusive customers that was [sic] attached to this 2010 settlement agreement, right? [Kukreja]: That

is correct."). The Agreement provides that, only as to *these* exclusive customers—the "entit[ies] listed on Schedule 'A'"—Kinwong was obligated to "inform said company that it should contact Circuitronix who is Kinwong's exclusive sales representative, and cease any further dialogue with the company." Pl's Ex. 19 at 237. Importantly, Kukreja admitted that certain American companies CTX had introduced to Kinwong were *left off* this list:

> Q: Honeywell and TRW are two U.S. companies, right?
>
> [Kukreja]: Honeywell and TRW are two U.S. companies which Circuitronix introduced to–to Kinwong Shenzhen.
>
> Q: Right. One of the things that you did through the settlement agreement was to claim TRW as one of Circuitronix's exclusive customers, right?
>
> A: That is correct.
>
> Q: And if you turn to the seventh page, do you see "TRW" listed there?
>
> A: Yes.
>
> Q: Those are the lists of exclusive customers that was attached to this 2010 settlement agreement, right?
>
> A: That is correct.
>
> Q: Honeywell's name is not on that list, correct?
>
> A: Honeywell's name is not on that list.

Day 6 Trial Tr. at 201:19–202:9. By enumerating *some* U.S. companies as exclusive, CTX was conceding that any U.S. company left off the list was *not* one of CTX's exclusive customers—conceding, in other words, that it *knew* Kinwong was doing business with these American companies *separate and apart* from any business it was doing with CTX. *Cf. Circuitronix, LLC v. Kapoor*, 785 F. App'x 678, 681 (11th Cir. 2019) ("The negative-implication canon, also known by its Latin, *expressio unius est exclusio alterius*, suggests that when construing a statute or contract, 'expressing one item of an associated group or series excludes another left unmentioned.'" (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002))). The parties' Settlement Agreement (and Kukreja's testimony) thus provide strong

circumstantial evidence[27] for the Plaintiffs' view that Kukreja *knew* Kinwong was selling to U.S. companies (like Honeywell) from at least 2010 onward—*i.e.*, that Kukreja *knew* Kinwong was using the KINWONG mark in commerce in the United States *long before* he formed Kinwong, LLC. And, again, "[p]urposely failing to disclose other users' rights to use the same or similar marks may qualify as a material omission justifying cancellation of a trademark." *Angel Flight*, 522 F.3d at 1210–11; *see also Richeson*, 2011 WL 13135114, at *2, 9 (finding that the "[d]efendants have demonstrated [the registrant's] fraud by clear and convincing evidence" where the registrant (Moebius) "intentionally failed to disclose [another company's] right to use the TRIDENT mark in commerce in the United States, by virtue of its use of the TRIDENT mark prior to 1988 and its later exportation and distribution through Moebius, of which Moebius was aware"); *cf. Am. Standard Inc. v. Pfizer Inc.*, 722 F. Supp. 86, 141 (D. Del. 1989) ("It is well settled that applicants for patents have an uncompromising duty of candor before the Patent Office. That duty is not an irrelevant legal fiction; the duty of candor is and has long been an essential ingredient in the patent process.").

But this isn't the only evidence the Plaintiffs have adduced of the Defendants' fraud on the USPTO. Perhaps even more brazenly, Kukreja submitted false evidence to the USPTO in the form of a sham website. Specifically, Kukreja and his colleague, Animesh Dutta, submitted a website—www.kinwongllc.com—to the USPTO as evidence of use in commerce. *See* Pl's Ex. 26 at 288 ("The mark KINWONG has been used on our website—www.kinwongllc.com to promote the printed circuit board business. Please visit this site for reference."). This website, which was created just a month-and-a-half before Dutta submitted it to the USPTO, *see* Day 7 Trial Tr. at 142:25–143:2 ("Q: [A]s of December 5th, 2014, about a month and a half earlier, the website hadn't even been built,

---

[27] "Since direct evidence of deceptive intent is rarely available, subjective intent to deceive [the USPTO] can be inferred from indirect and circumstantial evidence." *Tarntino*, 19 F. Supp. 3d at 478 (cleaned up).

right? [Kukreja]: That is correct."), was based off the real Kinwong's website, *see* Day 1 Trial Tr. at 154:19–22 ("Q: So the Kinwong website you submitted to—sorry—the Kinwong, LLC website you submitted to the USPTO was based off my client's pre-existing Kinwong website, right? [Dutta]: That's what I state in the email, yes."). Kukreja, in fact, "instructed" Dutta to "use Kinwong's website to build the Kinwong, LLC website[.]" *Id.* at 153:19–21. And the purpose of this website could not be clearer: The Defendants wanted to deceive the USPTO into believing that Kinwong, LLC was using the mark in commerce to sell PCBs to customers—a blatant lie. *See* Day 7 Trial Tr. at 51:14–52:2.[28]

And, when a USPTO examiner explained that a website wasn't good enough to show use in commerce, Kukreja doubled down on this misrepresentation by ordering Dutta to create boxes emblazoned with "Kinwong, LLC" to give the appearance that Kinwong, LLC was shipping PCBs to customers. *See* Pl's Ex. 28 at 325–27. These boxes had no accompanying shipping labels, and there's no evidence that they ever contained any PCBs or that they were ever shipped to any customer anywhere in the world. *See* Day 1 Trial Tr. at 167:25–168:8; *see also* Pl's Ex. 257 at 44 ("To the best of my knowledge, Lear Corporation has never purchased PCBs from a company named Kinwong, LLC, based here in the United States. Similarly, to the best of my knowledge, Lear Corporation never purchased from Circuitronix, LLC PCBs under a brand by the name of 'Kinwong, LLC.' . . . I have received feedback from the appropriate Managers from every Lear facility in North America and can confirm that no one else recalls seeing [Kinwong, LLC] boxes before."). Indeed, it would have made

---

[28] Of course, by their own admission, the Defendants had access to plenty of documents showing that the KINWONG mark was being used in commerce in the United States many years before www.kinwongllc.com was created, but these documents were useless to the Defendants because they would have revealed to the USPTO that another Kinwong already existed—and that this other Kinwong was using the mark to sell its own PCBs. *See* Day 1 Trial Tr. at 149:11–150:3 ("Q: And you said that there were at least a hundred commercial documents that you had showing 'Kinwong' in the document at the time you applied for the KINWONG mark, right? [Dutta]: I'm taking a guess, yes, a hundred. Q: But here's the thing. The documents I just showed you identify 'Kinwong' as its own Chinese company, right? A: That's right. Q: These documents even distinguish CTX as the supplier and Kinwong as the manufacturer or CTX's business associate, right? We've seen that. . . . A: Yes[.]").

no sense for Kinwong, LLC to ship boxes with PCBs to anybody because Kinwong, LLC didn't manufacture or distribute PCBs. In sum, the evidence is overwhelming that Kukreja—acting on behalf of both CTX and Kinwong, LLC—personally ordered his subordinates to create false evidence to deceive the USPTO into believing that Kinwong, LLC manufactured PCBs and that it used the KINWONG mark in commerce to sell those PCBs to customers around the world. That's plainly sufficient to satisfy the Plaintiffs' burden here. *See Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1361 (M.D. Fla. 2017) (Antoon, J.) ("Conversely, where a trademark owner knows that he has not used a trademark in commerce but nonetheless submits an application based on use of the mark in commerce, the Court may infer a fraudulent intent." (citing *Nationstar Mortg. LLC v. Ahmad*, 112 U.S.P.Q.2d 1361, at *12 (T.T.A.B. Sept. 30, 2014))); *Fuji Med. Instruments Mfg. Co., Ltd. v. Am. Crocodile Int'l Grp., Inc.*, 2021 WL 3286400, at *13 (T.T.A.B. July 28, 2021) ("Shen admitted that his company, ACIGI Relaxation, did not manufacture the FUJIIRYOKI chair as implied by the banner in the photograph. . . . Because the photograph states that Shen's company, ACIGI Relaxation, manufactured FUJIIRYOKI massage chairs—when it did not—this statement on the specimen is both false and material.").

Still resisting, Kukreja apologizes for his "mistaken" belief that Kinwong, LLC could assert the same rights to the mark that (he believed, also mistakenly) had been held by CTX. *See* Day 7 Trial Tr. at 167:15–168:1 ("Q: But Kinwong, LLC was only formed in 2013 and never sold a single PCB, right? [Kukreja]: But Circuitronix was around for 15 years. Q: Right. This is not Circuitronix's website, is it? A: But our—anything which—Kinwong, LLC was formed to—to absorb the rights we had accumulated under [CTX] selling Kinwong. Q: A representation that Kinwong, LLC's presence in the printed circuit board industry is in excess of 15 years was not true, correct? A: Not Kinwong, LLC, that's right. But, yes, its affiliated company Circuitronix, that is a true statement."); *id.* at 174:8–11 ("[Kukreja]: Again, what I was—all this was being filed by attorneys who were perfectly aware of the

fact that Kinwong, LLC—any rights which they accrued was through Circuitronix's usage of the KINWONG mark.").

But this premise suffers from three fatal flaws. *First*, as we've discussed, Kukreja knew that CTX didn't have the right to use the KINWONG mark for its own benefit in the United States, so Kinwong, LLC couldn't have availed itself of this non-existent right. *See ante*, at 19–25. *Second*, even if Kukreja mistakenly believed that CTX had some limited right to use the KINWONG mark in the United States, neither CTX nor Kinwong, LLC ever manufactured its own PCBs, so any representation to the USPTO that the Defendants were in the business of manufacturing PCBs was (standing alone) false. *See* Day 6 Trial Tr. at 161:6–14 ("Q: But Circuitronix does not own a PCB manufacturing facility, right? [Kukreja]: We do not. . . . Q: CTX uses third-party factories to manufacture the PCBs for it. A: That is correct."). *Third*, and most troubling, Kukreja's own actions prove that he didn't believe Kinwong, LLC was deriving its trademark rights from CTX. Kinwong, LLC's application indicated that it first used the KINWONG mark on December 11, 2014. *See* Pl's Ex. 26 at 260. But this date contradicts Kukreja's own theory that CTX (and therefore Kinwong, LLC) received the right to use the KINWONG mark from Mafio Shum in 2005, and that it had been using the mark in commerce by selling Kinwong PCBs for almost a decade before that. *See* Day 7 Trial Tr. at 23:5–10 ("Q: And that's true even though Kinwong had been using the marking in the United States since at least 2005 with [CTX], right? [Kukreja]: They were not using the mark with [CTX]. [CTX] was using the mark as we chose to use the mark. They were not choosing [sic] the mark."); *id.* at 130:24–131:4 ("[Kukreja]: Yes, but Circuitronix started using [the mark] *in 2005*. Q: Right. [CTX] started using it in 2005 when it began selling PCBs manufactured at the Kinwong factory pursuant to the terms of the manufacturing agreement, right? A: Pursuant to a general agreement between Mr. Shum and I that they're not using Kinwong in North America." (emphasis added)). Why didn't Kukreja refer to the earlier date (2005)? Because (again) it didn't want the USPTO to know about the *real* Kinwong—

whose now-deceased president (Shum) had supposedly granted the new (fake) Kinwong, LLC the rights Kukreja was now seeking to trademark.

The evidence, in short, was overwhelming that Kukreja "knowingly [made] false, material representations of fact in connection with an application for a registered mark." *Angel Flight*, 522 F.3d at 1209. To assure the USPTO that Kinwong, LLC had the rights to the KINWONG mark, he ordered his subordinates to produce fraudulent evidence (like a website and labeled boxes) to prove that his company was using the mark in commerce—when it was not. And he withheld material information that Kinwong was the senior user of the mark and that it had used the mark in commerce in the United States for years before Kukreja applied to register the mark with the USPTO. We therefore **ENTER FINAL JUDGMENT** on Count III for the Plaintiffs and against the Defendants.

## II.  The Lanham Act and the Defendants' "Counterfeiting Scheme"

The bulk of the evidence at trial related to what the Plaintiffs have called the "Defendants' Unlawful Counterfeiting Scheme." Amended Complaint ¶¶ 36–40. This alleged counterfeiting is a principal component of Kinwong's Lanham Act[29] and common law trademark-infringement claims as set forth in Counts I and IV. *See id.* ¶ 51 ("[The Defendants] have also engaged in an elaborate, willful scheme to pass off [PCBs] that were not manufactured at Shenzhen Kinwong as if they were manufactured at Shenzhen Kinwong. Defendants' deceptive counterfeiting practices caused further harm and confusion as to Plaintiffs' KINWONG mark."); *id.* ¶ 79 ("Defendants have engaged in a willful scheme to counterfeit KINWONG products, resell those counterfeit goods to Plaintiffs' actual

---

[29] "The Lanham Act provides different types of statutory protection. As relevant here, § 32(a) of the Act, codified at 15 U.S.C. § 1114(1)(a), guards against 'infringement'—the reproduction, counterfeit, copy, or colorable imitation of a registered mark—while § 43(a), codified at 15 U.S.C. § 1125(a), protects against 'false designation of origin,' which we have referred to as a federal cause of action for unfair competition. A claim for infringement under § 1114(1)(a) lies only for federally-registered marks, while a claim under § 1125(a) is broader and may also be based on unregistered (i.e., common-law) marks." *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 872 F.3d 1256, 1261 (11th Cir. 2017) (cleaned up). Count I asserts a claim under § 1125(a), not § 1114. *See* Amended Complaint ¶ 44.

and potential customers, and conceal their counterfeiting through fraud, forgery, and deception.").
We already found in our Omnibus Order that Kinwong was entitled to judgment as a matter of law
on Counts I and IV because there was no dispute of material fact that: (1) Kinwong "had trademark
rights in the mark or name at issue"; and (2) the Defendants "had adopted a mark or name that was
the same, or confusingly similar to its mark, such that consumers were likely to confuse the two."
*Kukreja*, 574 F. Supp. 3d at 1217 (quoting *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1130–31
(11th Cir. 2018)).[30]

      Still, these "counterfeiting" allegations are nevertheless relevant to the measure of damages
Kinwong is entitled to recover. *See* Dec. 10, 2021, Hr'g Tr. [ECF No. 346] at 15:21–16:3 ("[Defense
Counsel]: [A]s Your Honor found, [the] trademark belongs to Shenzhen Kinwong, but they intend to
go further than that and try to prove that actually there was some massive counterfeiting operation
going on, where they were actually going out and having other manufacturers build the boards and
then sell those to customers, and they're going to try to seek millions of dollars in damages based on
that[.]"); Response to Motion for Clarification [ECF No. 348] at 1 ("Kinwong agrees that the
counterfeiting allegations set forth in paragraphs 36 to 40 of the Amended Complaint . . . remain a
live issue for trial and will be part of the evidence Kinwong intends to present to establish the extent
of Defendants' unlawful infringement and the recoveries available to Kinwong under 15 U.S.C. §
1117(a) and Florida law.").

      To complicate matters further, although Kinwong refers to the Defendants' actions as a
"counterfeiting scheme," this description is somewhat of a misnomer. The "scheme" at issue is really

---

[30] Kinwong prevailed on both Count I (the Lanham Act claim) and Count IV (common law trademark
infringement) because the standards are the same. *See Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74
F. Supp. 2d 1261, 1264 n.2 (S.D. Fla. 1999) (Moreno, J.) ("The analysis under the Lanham Act for
trademark infringement also applies to claims of trademark infringement and unfair competition under
Florida common law.").

based on an allegedly false designation of origin—which (like counterfeiting) is forbidden under 15 U.S.C. § 1125(a) and requires proof that the Defendants intended to mislead customers about *who* was manufacturing the PCBs. *See Chanel, Inc. v. Sea Hero*, 234 F. Supp. 3d 1255, 1261 (S.D. Fla. 2016) (Bloom, J.) ("The test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim—i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue. Whether a defendant's use of a plaintiff's trademarks created a likelihood of confusion between the plaintiff's and the defendant's products is also the determining factor in the analysis of unfair competition under Florida common law." (cleaned up) (first citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 780 (1992) (Stevens, J., concurring); and then citing *Rolex Watch U.S.A., Inc. v. Forrester*, 1986 WL 15668, at *3 (S.D. Fla. Dec. 9, 1986) (Paine, J.))).[31]

False designation of origin "has been construed by the courts as creating a federal action for 'passing off[.]'" *Out-Grow, LLC v. Miami Mushroom*, 2021 WL 2823266, at *6 (S.D. Fla. July 7, 2021) (Altman, J.) (quoting *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1248 (11th Cir. 2007)). "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).[32] "[A] passing off claim requires a showing that the defendant falsely

---

[31] "A 'counterfeit' is a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." 15 U.S.C. § 1127. To show counterfeiting, a plaintiff "must demonstrate that [the defendant] infringed a registered trademark . . . and it must prove that [the Defendants] intentionally used such mark, knowing such mark is a counterfeit mark." *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1181 (11th Cir. 1994). With three discrete exceptions (*see post*, at note 33), we don't think Kinwong can prove "counterfeiting," as defined by § 1127, as to any of the parts in question because the Defendants never used a "spurious mark" on Benlida-produced PCBs that was "identical to or substantially indistinguishable from protected [Kinwong] marks." *Bentley Motors Ltd. Corp. v. McEntegart*, 976 F. Supp. 2d 1297, 1312 (M.D. Fla. 2013) (Covington, J.).

[32] Counterfeiting is considered "the most egregious form" of passing off. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:1 (5th ed. 2025).

represented that the plaintiff was the 'source' of the goods when it was not, that is, [the defendant] falsely suggested that the plaintiff was 'the producer of the tangible product sold in the marketplace.'" *Optimum Techs.*, 496 F.3d at 1248 (quoting *Dastar Corp.*, 539 U.S. at 31).

At the end of the day, as with any unauthorized act listed in § 1125(a), Kinwong must "present evidence as to the likelihood of confusion[.]" *Lipscher v. LRP Publ'ns, Inc.*, 266 F.3d 1305, 1313 (11th Cir. 2001); *see also Turner Greenberg Assocs., Inc. v. C&C Imports, Inc.*, 320 F. Supp. 2d 1317, 1330 (S.D. Fla. 2004) (Cohn, J.) ("The legal standard for unfair competition, which includes palming off and false designation of origin, and trademark infringement under both the Lanham Act and common law has been held to be essentially the same. . . . [T]he plaintiff must establish . . . the defendant's use of the mark in commerce creates a likelihood of confusion among consumers as to the origin of the goods."), *aff'd*, 128 F. App'x 755 (11th Cir. 2005). In assessing likelihood of confusion, we consider seven non-exhaustive factors: "(1) type of mark; (2) similarity of mark; (3) similarity of the products the marks represent; (4) similarity of the parties' retail outlets and customers; (5) similarity of advertising media; (6) defendant's intent; and (7) actual confusion." *Lipscher*, 266 F.3d at 1313; *see also Dieter v. B&H Indus. of Sw. Fla.*, 880 F.2d 322, 326 n.3 (11th Cir. 1989) ("There are no hard and fast rules as to how much evidence of confusion is enough. Rather, when looking at the evidence the reviewing court must take into consideration the circumstances surrounding each particular case.").

Kinwong is entitled to a disgorgement of the Defendants' profits if it can show that the Defendants improperly passed off PCBs as manufactured by Kinwong—when they were not. *See* 15 U.S.C. § 1117(a) ("When a violation . . . under section 1125(a) or (d) of this title . . . [has] been established in any civil action arising under this chapter, the plaintiff shall be entitled . . . to recover . . . . [the] defendant's profits[.]"); *see also It's a 10, Inc. v. Beauty Elite Grp., Inc.*, 2013 WL 6834804, at *9 (S.D. Fla. Dec. 23, 2013) (Cohn, J.) (finding that "15 U.S.C. § 1117(a) provides that damages beyond those actually suffered are available on [passing-off] claims"). A profit award is appropriate where:

"(1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 902 (11th Cir. 2007) (citing *Howard Johnson Co., Inc. v. Khimani*, 892 F.2d 1512, 1521 (11th Cir. 1990)). Kinwong need only "prove[ ] the infringer's sales"—it "need not demonstrate actual damage[.]" *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1487–88 (11th Cir. 1987). The burden then "shifts to the defendant" to "prove its expenses and other deductions from gross sales." *Id.* at 1488; *see also Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1290 (S.D. Fla. 2010) (Gold, J.) ("In order to establish the amount of profits to be disgorged, a plaintiff must establish the infringer's gross sales of the product; it is then up to the defendant to refute that amount, and/or to proffer costs that should be deducted from the gross sales.").

So, Kinwong must prove, by a preponderance of the evidence, that each of the thirteen part numbers identified in Plaintiff's Exhibit 373 was passed off. *See Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 192 (1st Cir. 2012) ("The ordinary rule in civil cases is proof by a preponderance of the evidence, and the text of [the Lanham Act] does not prescribe a different burden of proof."); *World Wide Ass'n of Speciality Programs v. Pure, Inc.*, 450 F.3d 1132, 1140 (10th Cir. 2006) ("As the District Court pointed out, in order for World Wide to succeed on [its] claim under the Lanham Act, it was required to demonstrate the following elements by a preponderance of the evidence[.]"). To meet this standard, Kinwong must show "that the existence of a fact is more probable than its nonexistence[.]" *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (cleaned up). Put another way, Kinwong's evidence must be "more convincing than the evidence offered in opposition to it." *United States v. Watkins*, 10 F.4th 1179, 1184 (11th Cir. 2021) (quoting *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997)).

We find that Kinwong has *not* met its burden as to six of the thirteen part numbers: 11122449, 11700060, PNP, JLR, 1075385+8, and 23405509+A. Kinwong, to be sure, has presented *some* evidence

that the Defendants *might* have tried to mislead customers into believing that these parts were manufactured by Kinwong (instead of Benlida). But, after exhaustively reviewing the trial evidence, we cannot say that it's "more likely true than not true" that these parts were passed off as Kinwong PCBs. *United States v. Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000). For part numbers 11122449 and 11700060, Kinwong's evidence certainly demonstrates that the Defendants misled Kimball into believing that *the sister board* for these parts—part number 1055449—was manufactured by Kinwong (more on that below), but this same evidence fails to show that the Defendants made similar misrepresentations about the 11122449 and 11700060 boards. *See, e.g.*, Pl's Ex. 405 at 63 ("1055449: we will say is manufactured in KW LC."); Pl's Ex. 329 at 201 ("Yes, we should [keep] the LC as we told customer the boards of 1105449 [sic] are built by [Longchuan]."). As for part numbers 1075385+8 and 23405509+A, Kinwong's only evidence of counterfeiting is an email indicating that CTX used "Kinwong" manufacturing instructions instead of "Benlida" manufacturing instructions. *See* Pl's Ex. 477 [ECF No. 455-11] at 366 ("Another two BLD PN, should prepare KW MI accordingly."). But Kinwong failed to proffer any evidence that these "Kinwong" MIs were shown to Kimball, or that the Defendants took any other action to pass off these two parts as being manufactured by Kinwong. *See Dastar Corp.*, 539 U.S. at 27 n.1 ("Passing off . . . occurs when a producer misrepresents his own goods or services as someone else's.").

For similar reasons, we're also unconvinced that the PNP and JLR boards were passed off. Kinwong's false-designation theory as to these parts turns mostly on CTX's own records, which show that it used Kinwong-related manufacturing records internally, despite knowing that these parts were manufactured at Benlida. *See, e.g.*, Pl's Ex. 83 at 364 ("The other fake lot card [PNP] built at [Benlida] that prepared the evidence at [Longchuan]) is prepared by ourselves. No [Kinwong] involved."); Pl's Ex. 206 at 46 ("The [PNP was] built in Benlida. Enclosed please find the 8D report and advise if it's ok to send to [Kimball]. It's prepared based on Kinwong factory."); Pl's Ex. 439 at 186 ("JLR Samples,

E01452502—KW LC [PPAP] format used."); Pl's Ex. 460 [ECF No. 455-11] at 274 ("Customer [for QE] requires SZ and LC format[.]"). While this use (or perhaps abuse) of the Kinwong templates is indicative of laziness (at best) or shady business practices (at worst), we still don't think it's more probable than not that these parts were passed off. After all, a false-designation-of-origin claim requires us to consider "the likelihood of confusion in the post-sale context—namely, whether [the Defendants'] potential customers are likely to be confused as to the origin of the extant circuit boards." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 650 (11th Cir. 2007). While the Defendants didn't offer any persuasive excuses for their use of false manufacturing records, Kinwong didn't present any evidence that any customers were misled (or could have been misled) by these purely internal documents. *Cf. id.* at 652 ("Like the proverbial tree falling in a forest, the unauthorized use of a trademark that is never perceived by anyone cannot be said to create a likelihood of consumer confusion."); *Pro Video Instruments, LLC v. Thor Fiber, Inc.*, 2020 WL 11421203, at *8 (M.D. Fla. Apr. 22, 2020) (Presnell, J.) (finding no likelihood of confusion where "Plaintiff fail[ed] to show that the PCB design appeared on the packaging of Defendant's products or anything else that would be seen by the consuming public"). Without evidence that customers like Lear and Kimball were misled into believing that Kinwong manufactured these parts, we remain unconvinced that CTX's own prolific (but internal) use of Kinwong manufacturing templates and records is sufficient evidence of passing off.

On the other hand, we find that Kinwong has easily proven false designation of origin by a preponderance of the evidence as to six other part numbers at issue in this case: PQ26, Rev 9, 1055449, NSP, RHP, and RBP. For each of these parts, Kinwong adduced significant evidence that the Defendants took affirmative steps to assure its customers that these parts were being produced by Kinwong, even though the Defendants knew that each of these parts was being manufactured by Benlida (and by Benlida-affiliated subcontractors). Indeed, the evidence is overwhelming that the

64

Defendants (oftentimes for *years*) told their customers that these parts were being manufactured by Kinwong and then falsified or manipulated manufacturing records to corroborate these misrepresentations. *See, e.g.*, Pl's Ex. 471 at 341 ("[M]aybe this position changes now that we have told [Kimball] [the NSP, RHP, and RBP] boards are being built in [Longchuan]."); Pl's Ex. 405 at 63 ("1055449: we will say is manufactured in KW LC."); Pl's Ex. 430 at 69 ("The PPAP is showing address [for Kinwong Shenzhen]. Now the production location is at [Benlida]. Have you got authorization from Flex before production location change?"); Day 3 Trial Tr. at 62:15–18 ("[Q]: True or false, [CTX] told Lear that PQ26 parts were built at Kinwong and then sent to Benlida only to apply OSP processing? [Jiang]: That's true.").[33] This is textbook passing off. *See Turner Greenberg Assocs.*, 320 F. Supp. 2d at 1334 ("Passing off or palming off can be achieved merely by sending one product in response to an order for another or other methods that misrepresent the source to the buyer." (citing *K-S-H Plastics, Inc. v. Carolite, Inc.*, 408 F.2d 54, 59 (9th Cir. 1969))); *Singer Mfg. Co. v. Golden*, 171 F.2d 266, 268 (7th Cir. 1948) (Minton, J.) ("When one orders parts by name of manufacturer, number, and description, he has a right to have his order filled as given, and if substitutions are made in circumstances calculated to lead the purchaser to believe he is getting what he orders when he is not, it is not only a fraud upon the purchaser but also upon the manufacturer of the goods ordered for which the substitution was made. This was palming off, thinly disguised."); *Syngenta Seeds, Inc. v. Delta*

---

[33] The NSP, RHP, and RBP boards are the only true instances of counterfeiting in this case, because CTX—at least for a period—placed the mark "KW-SZ" on these boards—which confirmed for Kimball that these boards were built at Kinwong Shenzhen when in fact they were manufactured at Benlida. *See, e.g.*, *Babbit Elecs.*, 38 F.3d at 1181 ("Babbit had knowledge that the telephones to which they affixed Dynascan's marks were not Dynascan's telephones[.] . . . Consequently, it is clear that Babbit used Dynascan's trademarks knowing that they were counterfeit."); *see also* Day 10 Trial Tr. at 168:18–22 ("[Kukreja]: So by the time I asked [Benlida] to stop, 15,000 pieces of the—15,000 pieces of the NSP had already had this logo and 7,000 did not have the logo—7,000 did not have the KW-SZ mark. And RH had both the logos, because a quantity of 2,200 pieces had shipped to the customer.").

*Cotton Co-op., Inc.*, 457 F.3d 1269, 1278 (Fed. Cir. 2006) ("[T]he placement of words like 'Delta Co-op Feed' on bags containing Coker 9663 wheat is sufficient to constitute false designation.").

That leaves us with QE—by far the closest call of the thirteen parts at issue in this case. Unlike the preceding six parts (PQ26, Rev 9, 1055449, NSP, RHP, and RBP), Kinwong hasn't proffered any *direct* evidence of the Defendants telling Lear that the QE part was manufactured by Kinwong when, in fact, it was being made by Benlida. Instead, Kinwong points out that CTX hid the QE part from Lear, Kinwong, and even some of its own employees when Lear audited Benlida—a very suspicious practice, to be sure. *See* Pl's Ex. 220 at 220 ("Treat it very carefully, we should not let [Kinwong] know we are building QE board at other factory. You should not even let Meagle [a CTX employee] know."); Pl's Ex. 356 at 43 ("Only [PQ26] boards can appear in the OSP line or in the packing room, other Lear boards [like QE] should not be seen by the customer[.]"); *see also* Day 4 Trial Tr. at 78:6–18 ("Q: So you're hiding the fact that [QE] was built at Benlida from Kinwong, right? [Jiang]: Yes. Q: You were hiding it from your own employees, right? A: Yes. Q: And you were hiding it from Lear, right? A: No, not correct. Q: Well, you told me that this was one of the boards that was included on the spreadsheet where we saw an email: 'Other Lear boards should not be seen when Lear came [sic] to audit Benlida.' Right? A: Yes.").

Citing to this duplicity, Kinwong asks us to draw what we conclude is a logical inference—that the Defendants hid the QE boards manufactured at Benlida from Lear because they didn't want Lear to discover that those boards weren't being made by Kinwong.  Kukreja tried to excuse this game of hide-and-seek by insisting that "[e]very factory in China" keeps "the bare minimum number of boards on the production floor" to ensure that the factory passes a customer's audit. Day 8 Trial Tr. at 74:6–11. But this excuse strikes us as overly convenient and (frankly) absurd given the overwhelming evidence the Plaintiffs adduced of the Defendants frequently misleading—or outright lying—to customers about the origins of PCBs. In short, we find that Kinwong has proven by a preponderance

of the evidence that the QE board was passed off because it "is more likely true than not true" that the Defendants hid the QE board from Lear to obscure its true origin—and not, as Kukreja testified, to ensure that Benlida would pass an audit. *Watkins*, 10 F.4th at 1185 (quoting *Deleveaux*, 205 F.3d at 1296 n.3).

The Defendants parry with several arguments—all unpersuasive. *First*, noting that the Benlida-made PCBs were emblazoned with the CTX UL code (and not the Kinwong UL code), they contend that it would've been impossible for the Defendants to confuse anyone about the origins of the PCBs. *See* Day 12 Trial Tr. at 75:9–14 ("This whole claim makes no sense, Your Honor, in light of the fact that every PCB built by Kinwong has the Kinwong UL code on it. And that every circuit board built by another factory, whether it's Benlida or whether it's Winglung or Million Source, or anybody else, has a completely different identifying mark."). But there's ample evidence in the record that customers were *still* confused about who was manufacturing these PCBs—even though the boards all carried the CTX UL logo. *See* Pl's Ex. 218 at 211–12 ("But all the evidence[ ] in Lear System (Profile and PAM) show Lear only did and approved the production location in Kinwong in Longchuan (besides the surface finishing process is in Benlida in Jiangmen)."); Pl's Ex. 430 at 69 ("The PPAP is showing address [for Kinwong Shenzhen]. Now the production location is at [Benlida]. Have you got authorization from Flex before production location change?"). And we know that CTX added to this confusion when it falsely told some of its customers that it was standardizing all its PCBs to carry the CTX UL logo, rather than a factory-specific logo. *See* Pl's Ex. 339 [ECF No. 455-7] at 334 ("Just telling customer that we are [sic] standardize logo to CTX, no location on this project.").[34] This, of course,

---

[34] Remember, "actual confusion is not necessary to a finding of likelihood of confusion[.]" *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 978 (11th Cir. 1983) (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)). And, for all the reasons we've already discussed, there was certainly a likelihood of confusion about which manufacturer produced the seven PCB parts we're discussing now because of the Defendants' misrepresentations and falsified records.

was false since Kinwong was very protective of its UL code and demanded that all Kinwong-built PCBs be marked with the Kinwong UL code. *See* Day 5 Trial Tr. at 35:18–23 ("Q: And so Kinwong had an agreement from time to time with [CTX] that if the price was too high and Kinwong couldn't build the part for that reason, [the part] could be subcontracted to another manufacturer as long as it didn't have the Kinwong UL logo on the board, right? [He]: That's how it should be interpreted."); *id.* at 104:11–15 ("Q: Right. And so all the [PCBs] that are reflected in your own company's records as having been produced by Shenzhen Kinwong, all of those circuit boards had the Kinwong UL logo on it, right? [He]: Yes."). We're therefore not persuaded by the Defendants' UL-code defense.

*Second*, the Defendants insist that, had their U.S. customers truly been deceived, they would have cut off or rejected CTX shipments—something that apparently never happened. *See* Day 12 Trial Tr. at 72:21–73:2 ("[The customers are] aware of the allegations in this case. Supposedly, in the case of Lear, they caught Circuitronix red-handed when they supposedly came clean about it all in January of 2017. Why would they not start rejecting shipments? Why would they not take their business elsewhere? Why would they not take any kind of remedial steps? Why wouldn't they make a claim? It doesn't make common sense."). But these customers' views are somewhat irrelevant. After all, the victim in a passing-off scheme isn't necessarily the consumer—it's the entity whose goods are passed off (in this case, Kinwong). *Cf. POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107 (2014) ("Though in the end consumers benefit from the [Lanham] Act's proper enforcement, the cause of action is for competitors, not consumers."); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) ("Even a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the [Lanham] Act's aegis."). A person who buys a counterfeit Chanel bag, for example, may be very pleased with her purchase and might even choose to buy *additional* products from the same vendor. But that doesn't preclude Chanel from seeking damages under the Lanham Act. So too here: We don't much care if Kimball, Lear, and Flextronics were pleased,

nonplussed, or aghast at receiving Benlida PCBs that were passed off as Kinwong PCBs. All that matters is whether the Defendants' acts violated the Lanham Act (which they did).[35]

Accordingly, after a careful review of the record and the law, we find that Kinwong has proven by a preponderance of the evidence that the Defendants passed off part numbers PQ26, QE, Rev 9, 1055449, NSP, RHP, and RBP. Conversely, there was insufficient evidence for us to conclude that the Defendants passed off the remaining six parts (11122449, 11700060, PNP, JLR, 1075385+8, and 23405509+A). We'll therefore turn to the measure of damages Kinwong is entitled to.

### III.   The Motion for Judgment as a Matter of Law

Before we get to damages, however, we must address a legal argument the Defendants have advanced in their motion for a partial judgment under FED. R. CIV. P. 52(c). *See* Amended Motion for Judgment as a Matter of Law ("JMOL Motion") [ECF No. 482]. The Defendants believe that the "vast majority of [their] allegedly infringing sales . . . were clearly and indisputably extraterritorial and not domestic." *Id.* at 2. In their view, the Supreme Court held in *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412 (2023), that "extraterritorial sales are outside the scope of § 1125(a) of the Lanham Act, which only applies to domestic use in commerce." *Ibid.* The consequence of this decision, the Defendants say, is that "the sales at issue here cannot be the subject of a Lanham Act claim[.]" *Id.* at 13. Kinwong responds that none of the PCB sales are "foreign sales" because they "were made by an American company . . . to American companies, either directly or indirectly to their foreign subsidiaries." Response in Opposition to Defendants' Amended Motion for Judgment as a Matter of Law ("JMOL Response") [ECF No. 485] at 13. Kinwong adds that, in any event, *Abitron*

---

[35] Although we already concluded at summary judgment that "ownership of the KINWONG mark plainly rests with the Plaintiffs," and that the Defendants infringed upon this mark, *Kukreja*, 574 F. Supp. 3d at 1219, we pause here to note that—if we had declined to reach this decision at summary judgment—the evidence at trial established beyond a shadow of a doubt that the Defendants infringed Kinwong's trademark rights in violation of the Lanham Act and Florida common law.

didn't abrogate the Eleventh Circuit's long line of precedents, holding that the Lanham Act applies to conduct that's "orchestrate[d]" and which "emanate[s]" from the United States. *See id.* at 16–17 ("Because the conduct relevant to the focus of Plaintiffs' Section 1125(a)(1) claim for false designation of origin and passing off—making false representations that the PCBs at issue were made by Kinwong—emanated from Florida, 'the case involves a permissible domestic application of the statute, even if other conduct occurred abroad.'" (quoting *Abitron*, 600 U.S. at 418–19)).

A court may grant a Rule 52(c) motion if, after "a party has been fully heard on an issue during a nonjury trial[,]" it finds that a party's "claim or defense . . . can be maintained or defeated only with a favorable ruling [under the controlling law]." FED. R. CIV. P. 52(c). "In addressing a Rule 52(c) motion, the court does not view the evidence in the light most favorable to the nonmoving party, as it would in passing on a Rule 56 motion for summary judgment or a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as factfinder." *United States v. $242,484.00*, 389 F.3d 1149, 1172 (11th Cir. 2004) (citing *Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1504 (11th Cir. 1993)); *see also JDI Holdings, LLC v. Jet Mgmt., Inc.*, 732 F. Supp. 2d 1205, 1209 (N.D. Fla. 2010) (Rodgers, J.) ("Thus, the court resolves the disputed issues on the basis of the preponderance of the evidence, without drawing any special inferences in favor of the plaintiff.").

### A. The Three *Abitron* Opinions

*Abitron* "concern[ed] a trademark dispute between a United States company (Hetronic International, Inc.) and six foreign parties (five companies and one individual (collectively Abitron))." 600 U.S. at 416. Although Abitron "originally operated as a licensed distributor for Hetronic," it came to believe that "it held the rights to much of Hetronic's intellectual property" and "began to sell Hetronic-branded products that incorporated parts sourced from third parties." *Ibid.* Although "Abitron mostly sold its products in Europe, . . . it also made some direct sales into the United States." *Ibid.* Hetronic brought a Lanham Act claim against Abitron under § 1125(a)(1), and Abitron

(unsuccessfully) argued—before both the district court and the Tenth Circuit—that Hetronic was seeking "an impermissible extraterritorial application of the Lanham Act." *Ibid.*

The Supreme Court unanimously reversed—though it produced three opinions: a five-member majority opinion authored by Justice Alito; a sole concurrence by Justice Jackson; and a four-member opinion (concurring in the judgment) penned by Justice Sotomayor and joined by Chief Justice Roberts, Justice Kagan, and Justice Barrett. The Court's majority opinion explained that, in the usual course, "legislation of Congress . . . is meant to apply only within the territorial jurisdiction of the United States." *Id.* at 417 (quoting *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 251 (2010)). This "presumption against extraterritoriality involves a two-step framework": first, we ask whether Congress "affirmatively and unmistakably instructed that the provision at issue should apply to foreign conduct"; if it didn't, we must "identify the statute's focus and ask whether the *conduct relevant to that focus* occurred in United States territory." *Id.* at 417–18 (cleaned up). The "focus of a statute[,]" the Court explained, "is the object of its solicitude, which can include the conduct it seeks to regulate, as well as the parties and interests it seeks to protect or vindicate." *Id.* at 418 (cleaned up) (quoting *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018)).

All nine members of the Court agreed that the Lanham Act's text doesn't "provide[ ] an express statement of extraterritorial application or any other clear indication that it is one of the 'rare' provisions that nonetheless applies abroad." *Id.* at 420; *see also id.* at 435 (Sotomayor, J., concurring) ("Under this Court's precedents, [the Lanham Act's] language is insufficient to rebut the presumption against extraterritoriality at step one."). In applying step two of the extraterritoriality test, the majority held that "[t]he ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus. And the *conduct* relevant to any focus the parties have proffered is infringing use in commerce, as the [Lanham] Act defines it." *Id.* at 422 (cleaned up). Since § 1125(a)(1) of the Lanham Act "prohibit[s] the unauthorized use 'in commerce' of a protected trademark[,]" the

Court reasoned, "use in commerce" *both* constitutes "the conduct relevant to any potential focus of [§ 1125(a)(1)]" *and* "provides the dividing line between foreign and domestic application" of the Lanham Act. *Id.* at 422–23. The upshot of all this is that the Lanham Act's anti-trademark-infringement provisions "are not extraterritorial and . . . extend only to claims where the *claimed infringing use in commerce is domestic.*" *Id.* at 415 (emphasis added).

Although Justice Jackson joined the majority opinion in full, her concurrence "elaborate[s]" on "what it means to use a trademark in commerce" and "how that meaning guides the permissible-domestic-application question in a particular case." *Id.* at 429 (Jackson, J., concurring); *see also id.* at 428 n.6 ("Justice Jackson has proposed a further elaboration of 'use in commerce,' but we have no occasion to address the precise contours of that phrase here."). According to Justice Jackson, "a 'use in commerce' does not cease at the place the mark is first affixed, or where the item to which it is affixed is first sold. Rather, it can occur wherever the mark serves its source-identifying function. So, even after a trademark begins to be 'used in commerce' (say, when goods on which it is placed are sold), that trademark is also 'used in commerce' wherever and whenever those goods are in commerce, because as long as they are, the trademark 'identifies and distinguishes the source of the goods." *Id.* at 430 (Jackson, J., concurring) (cleaned up) (quoting 15 U.S.C. § 1127. In Justice Jackson's view, then, a foreign company that sells an infringing item in a foreign country can still be liable under the Lanham Act so long as the marked good "is in domestic commerce, and the mark is serving a source-identifying function in the way Congress described [in § 1127]." *Ibid.*[36]

---

[36] To illustrate this concept, Justice Jackson relied on the following hypothetical: "Imagine that a German company begins making and selling handbags in Germany marked 'Coache' (the owner's family name). Next, imagine that American students buy the bags while on spring break overseas, and upon their return home employ those bags to carry personal items." *Id.* at 430–31 (Jackson, J., concurring). Justice Jackson posits that the American company "Coach" could not "sue the German company for Lanham Act infringement" because the "mark affixed to the students' bags is not being 'used in commerce' domestically as the Act understands that phrase: to serve a source-identifying function in the ordinary course of trade[.]" *Id.* at 431 (Jackson, J., concurring) (cleaned up). *However*, if

Although Justice Sotomayor's concurrence didn't carry the day, her opinion helps shed additional light on the majority's holding. Her view (joined by three other justices and the Government as *amicus curiae*) was that the focus of the Lanham Act is "consumer confusion"—and so, she said, the Act must "cover[ ] foreign infringement activities if there is a likelihood of consumer confusion in the United States and all other conditions for liability are established." *Id.* at 437 (Sotomayor, J., concurring). She criticized the majority opinion for creating a *de facto* "third step" for the extraterritoriality framework: "an assessment of whether the 'conduct relevant to the focus' occurred domestically, even when the focus of the statute is not conduct." *Id.* at 439 (Sotomayor, J., concurring). The majority's "conduct"-based test, Justice Sotomayor argued, was based on a "distorted reading of the Court's past decisions" and would serve only to hamstring Congress's ability to regulate "relevant conduct abroad, no matter the true object of the statute's solicitude." *Id.* at 439–40 (Sotomayor, J., concurring).[37]

In sum, the *Abitron* Court splintered over the scope of the Lanham Act *vis-à-vis* certain kinds of extraterritorial conduct. To Justice Sotomayor and the minority, the Lanham Act covers any conduct that *causes* consumer confusion in the United States—even if the conduct itself occurred entirely outside the country. *See id.* at 433 (Sotomayor, J., concurring) ("[T]he Lanham Act extends to

---

those same "American students" were to "resell" the "Coache" bags in the United States, the marked bags would enter "domestic commerce" and could expose the German company to liability under the Lanham Act. *Ibid.* Justice Jackson thus envisioned a scenario in which a foreign company *could* be liable under the Lanham Act *even if* it "never sold [the infringing product] in, or directly into, the United States." *Id.* at 432 (Jackson, J., concurring).

[37] The majority disagreed with the Sotomayor Concurrence on two grounds. *First*, the Court found that Justice Sotomayor's standard "would create headaches for lower courts," since it could allow "almost any claim involving exclusively foreign conduct [to be] repackaged as a 'domestic application'" or "almost any claim under a non-extraterritorial provision [to be] defeated by labeling it a 'foreign application,' even if the conduct at issue was exclusively domestic." *Id.* at 425. *Second*, the majority believed that Justice Sotomayor's focus-based test would be satisfied if there was "merely a likelihood of an effect in this country," and the Court understandably feared that such a nebulous approach would cause "the trademark system [to] collapse" if enough countries took the same view. *Id.* at 426–27.

activities carried out abroad when there is a likelihood of consumer confusion in the United States."). The majority, by contrast, held that the Lanham Act focuses on where the "use in commerce" takes place. If there has been an "infringing use in commerce" in the United States, the Lanham Act's provisions apply; if the "use in commerce" is extraterritorial, the Lanham Act doesn't apply. *See id.* at 422–23 ("The ultimate question regarding permissible domestic application turns on the location of the conduct relevant to the focus. And the *conduct* relevant to any focus the parties have proffered is infringing use in commerce, as the Act defines it. . . . In sum, as this case comes to us, 'use in commerce' is the conduct relevant to any potential focus of § 1114(1)(a) and § 1125(a)(1) because Congress deemed a violation of either provision to occur each time a mark is used in commerce in the way Congress described, with no need for any actual confusion."); *see also LegalForce RAPC Worldwide, PC v. LegalForce, Inc.*, 124 F.4th 1122, 1127 (9th Cir. 2024) ("In sum, if the mark is used 'in connection with' goods and services only outside United States territory, the Lanham Act cannot apply."); *Commodores Ent. Corp. v. McClary*, 2024 WL 4349623, at *2 (M.D. Fla. May 14, 2024) (Dalton, J.) ("In essence, the new gloss from [*Abitron*] is that the location of the infringing conduct is what matters rather than the location where the effects of the infringement are felt. . . . So here, the dispute turns on what constitutes 'use in commerce' and where that conduct took place." (cleaned up)).

### B.  Applying *Abitron* to Our Case

Citing *Abitron*, the Defendants (correctly) explain that "the conduct relevant to the focus of § 1125(a)(1) is 'use in commerce.' Thus, the essential question is whether the allegedly offending 'use in commerce' occurred in the United States. If so, then the statute applies. But, if not, if the allegedly offending 'use in commerce' occurred outside the United States, then the statute does not apply, 'regardless of any other conduct that occurred in U.S. territory.'" JMOL Motion at 9 (quoting *Abitron*, 600 U.S. at 423–24). With this understanding, the Defendants say that the Lanham Act doesn't apply here because (1) Kinwong's "claims related to extraterritorial sales that occurred completely outside

of the United States," and (2) those sales "involved foreign manufactured products sold and shipped between a foreign seller and a foreign buyer, without ever transiting the United States border or otherwise involving United States commerce." *Id.* at 2; *see also ibid.* ("In other words, these sales involved products manufactured outside the United States and sold by a foreign non-party, Circuitronix Hong Kong Limited ('CTX HK'), to foreign customers, with shipment and delivery outside the territory of the United States, for final use in foreign markets."); *id.* at 11 ("The shipping records also confirm that all of the products involved in the extraterritorial sales were shipped from CTX HK in Hong Kong and delivered to foreign shipping locations, such as China, Germany, Philippines, and Thailand.").

Kinwong offers three counterarguments. *First*, it says that "all of the sales at issue . . . were made by an American company (CTX, through its foreign affiliates 'under the CTX umbrella'), to American companies, either directly or indirectly to their foreign subsidiaries." JMOL Response at 13. Kinwong's position, in short, is that the use of foreign "middlemen" doesn't change the fact that the Defendants (all American) sold infringing products to other American companies and their foreign subsidiaries. *See id.* at 15 ("Just as CTX uses its foreign affiliates to facilitate its Chinese PCB orders, Lear, Kimball, and Flex use their foreign affiliates as overseas processing hubs, while overseeing everything—from contracting to audits and factory approval to quality control—from the United States. The trial evidence thus fully confirmed what the Court found to be true at summary judgment—'doing business with an American company through its foreign subsidiary' constitutes use in U.S. commerce." (quoting *Kukreja*, 574 F. Supp. 3d at 1220 n.21)). *Second*, Kinwong contends that *Abitron* didn't abrogate a long line of Eleventh Circuit cases, which held that the Lanham Act applies when an American company "orchestrates . . . unlawful conduct from the [United States]." *Id.* at 16. *Third*, Kinwong argues that, even if *Abitron* undermines its right to collect damages under the Lanham Act, it should still be entitled to relief under Florida law. *See id.* at 17 ("Even if Defendants had properly

addressed Count IV, *Abitron* does not apply to that count. Substantive liability under Florida common law is coextensive with liability under Section 1125(a).").

Before we dive into the parties' substantive arguments, we must clarify a misapprehension that permeates their briefing. The Defendants seem to suggest that, to satisfy *Abitron*, Kinwong's trial evidence *must* show that the infringing products were *sold* to domestic companies for use in the United States. *See* JMOL Motion at 11 ("The evidence in this case conclusively proved that the extraterritorial sales at issue here occurred entirely outside the United States and are thus outside the scope of the Lanham Act, which extends 'only to claims where the claimed infringing use in commerce is domestic.'" (quoting *Abitron*, 600 U.S. at 415)). Kinwong, for its part, doesn't appear to push back against this assertion. *See* JMOL Response at 13 ("It is indisputable that all of the sales at issue in the Motion were made by an American company . . . to American companies, either directly or indirectly to their foreign subsidiaries."). But this assumption—that the Lanham Act only applies to domestic *sales*—is mistaken. The *Abitron* Court never said that. It, instead, held that "§ 1114(1)(a) and § 1125(a)(1) are not extraterritorial and that the infringing 'use in commerce' of a trademark provides the dividing line between foreign and domestic applications of these provisions." 600 U.S. at 428; *see also Sanho Corp. v. Kaijet Tech. Int'l Ltd., Inc.*, 736 F. Supp. 3d 1241, 1273–74 (N.D. Ga. 2024) (Grimberg, J.) ("[T]he Lanham Act permits liability for a foreign defendant's use of its mark '*wherever the mark serves its source-identifying function.*'" (emphasis added) (quoting *Abitron*, 600 U.S. at 430 (Jackson, J., concurring)).

And the term "use in commerce" means a lot more than just selling goods or services. "[T]he 'term "use in commerce" means the bona fide use of a mark in the ordinary course of trade,' where the mark serves to 'identify and distinguish the mark user's goods and to indicate the source of the goods.'" *Abitron*, 600 U.S. at 428 (cleaned up) (quoting 15 U.S.C. § 1127); *see also id.* at 430 (Jackson, J., concurring) ("So, even after a trademark begins to be used in commerce (say, when goods on which

76

it is placed are sold), that trademark is also used in commerce wherever and whenever those goods are in commerce, because as long as they are, the trademark identifies and distinguishes the source of the goods." (cleaned up)). According to the Eleventh Circuit, the "use in commerce" requirement will be satisfied whenever "there [is] an 'effect' on commerce." *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 453 n.1 (11th Cir. 1984). This means that, in addition to selling products, an entity that promotes or advertises its infringing goods in the United States will *also* satisfy the "use in commerce" element of trademark infringement. *See Axiom Worldwide, N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1218 (11th Cir. 2008) ("Axiom briefly argues that placing a competitor's trademarks within meta tags, which consumers never view, does not constitute a 'use' as required to find trademark infringement under the Lanham Act. However, we readily conclude that the facts of the instant case do involve a 'use' as contemplated in the Lanham Act—that is, a use in connection with the sale or advertisement of goods."); *Shatel Corp v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1356 (11th Cir. 1983) ("Advertising that affects interstate commerce and solicitation of sales across state lines or between citizens of the United States and citizens and subjects of a foreign nation is therefore commerce within the meaning of the Lanham Act."); *Itamar Med., Ltd. v. Ectosense NV*, 2021 WL 12095119, at *6 (S.D. Fla. Dec. 29, 2021) (Dimitrouleas, J.) ("[S]everal courts have found the fact that a defendant did not sell any infringing products immaterial, because liability under the Lanham Act can be based on advertising, promotion, or use of a website alone."); *Delta T, LLC v. Kale Fans Am. S.A. de C.V.*, 2021 WL 12092745, at *4 (M.D. Fla. June 10, 2021) (Byron, J.) ("In keeping with this authority, the Court holds that § 1127's definition of 'use in commerce' does not apply to infringement actions under § 1114. Plaintiff is not required to demonstrate that Defendant sold or transported Infringing Products in the United States—simply advertising, displaying, or promoting them is enough." (cleaned up)).

It's true that *Abitron* used § 1127—not § 1114(1)—to define the term "use in commerce," but the definition in § 1127 "does not apply to trademark infringement." *VersaTop Support Sys., LLC v. Ga. Expo, Inc.*, 921 F.3d 1364, 1370 (Fed. Cir. 2019); *see also Axiom Worldwide, Inc.*, 522 F.3d at 1220 n.7 ("However, a leading treatise on trademarks notes that § 1127 'defines the kind of "use" needed to acquire registerable trademark rights—not to infringe them.'" (quoting J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:11.50 (4th ed. 2003)); *BTG Patent Holdings, LLC v. Bag2Go, GmbH*, 193 F. Supp. 3d 1310, 1322 (S.D. Fla. 2016) (Williams, J.) ("The problem with this argument is that § 1127's definition of 'use in commerce' applies only in the trademark qualification context and not in the trademark infringement context."). An act that constitutes a "use in commerce" under § 1127 *also* falls within § 1114(1)'s broader definition of "use in commerce," which includes "all commerce which may be regulated by Congress." *Axiom Worldwide*, 522 F.3d at 1218 n.5; *see also BTG Patent Holdings*, 193 F. Supp. 3d at 1323 (same). *Abitron* didn't abrogate or call into question these precedents. In fact, the majority expressly dodged any attempt to define "use in commerce" beyond "the bona fide use of a mark in the ordinary course of trade[.]" *See* 600 U.S. at 428 & n.6 ("Justice Jackson has proposed a further elaboration of 'use in commerce,' . . . but we have no occasion to address the precise contours of that phrase here."); *see also id.* at 429 (Jackson, J., concurring) ("The Court has no need to elaborate today upon what it means to 'use a trademark in commerce,' nor need it discuss how that meaning guides the permissible-domestic-application question in a particular case." (cleaned up)).[38]

---

[38] To the extent *Abitron* can be read as challenging the use of § 1114(1) to define "use in commerce" in the trademark-infringement context, we remain bound by the Eleventh Circuit's opinion in *Axiom Worldwide* because the Supreme Court did not "demolish and eviscerate" each of the "fundamental props" underpinning the Eleventh Circuit's holding in that case. *Del Castillo v. Sec'y, Fla. Dep't of Health*, 26 F.4th 1214, 1223 (11th Cir. 2022) (cleaned up). Plus, as Professor McCarthy argues in his treatise, "it is very clear from context and the surrounding language that the Supreme Court in *Abitron* did not intend to change the Lanham Act's requirement for infringement" and that the Court's object was not to silently overrule well-settled precedent in several circuits that § 1114(1)'s definition of "use in

According to the Defendants, in short, because the infringing products were sold by CTX's foreign subsidiaries to other foreign entities—and since the products were never shipped to the United States or to any American-based parent companies—all the alleged infringement took place outside the territorial scope of the Lanham Act. *See* JMOL Motion at 11 ("CTX HK's shipping records prove that all of the extraterritorial sales were between a foreign non-party, CTX HK, and foreign buyers such as Lear Philippines, Lear Germany, Kimball China, and Kimball Thailand. . . . Further, Kukreja testified that for all of the extraterritorial sales, the selling entity was CTX HK, that none of the purchasing customers were US corporations, and that none of the parts were shipped to the United States. Kukreja testified further that none of the finished products including the PCBs were for delivery into the American market." (citing Day 10 Trial Tr. at 200:11–201:22)); Reply in Support of Motion for Judgment as a Matter of Law ("JMOL Reply") [ECF No. 486] at 3 ("Shipping records show that all the extraterritorial sales were between a foreign non-party, CTX HK, to foreign buyers such as Lear Philippines, Lear Germany, Kimball China, and Kimball Thailand. These records also confirm that all the products were shipped from Hong Kong and delivered to foreign locations, such as China, Germany, Philippines, and Thailand. [Kinwong] does not dispute this, and there is no evidence to the contrary."). Again, however, "use in commerce" isn't limited to the sale and shipment of infringing goods: It applies to *all* "bona fide use[s] of a mark in the ordinary course of trade, where the mark serves to identify and distinguish the mark user's goods and to indicate the source of goods." *Abitron*, 600 U.S. at 428 (cleaned up); *see also Axiom Worldwide*, 522 F.3d at 1220 ("We conclude that the plain meaning of the statutory language clearly indicates that Axiom's use of NAM's trademarks

---

commerce" applies in trademark-infringement cases. 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 29:57 (5th ed. 2025); *see also Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("The Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*.").

as meta tags constitutes a 'use in commerce in connection with the sale or advertising of any goods' under the facts of this case." (quoting 15 U.S.C. § 1114(1)(a))).

 With our understanding of what constitutes "use in commerce" properly oriented, it's clear to us that *Abitron* doesn't save the Defendants here. The evidence at trial overwhelmingly established that CTX (an American company) contracted with other American companies[39] to sell the foreign subsidiaries of those U.S. companies PCBs that the Defendants passed off as manufactured by Kinwong when, in fact, they were made by Benlida. *See, e.g.*, Day 3 Trial Tr. at 69:17–23 ("Q: Okay. This email [Pl's Ex. 272] reflects that CTX expressly told its customer Lear that the PQ26 board was produced by Longchuan factory of Kinwong, right? [Jiang]: Yes. Q: You instructed—well, let me ask you this. That was a false representation, right? A: Right. But there is a reason." (citing Pl's Ex. 272 [ECF No. 455-6] at 236)); *id.* at 132:17–23 ("[Q]: You took records for a board that was built in Kinwong to try to make it look like a board that wasn't built in Kinwong was built there, right? [Jiang]: Yes. Q: Okay. That's a false representation, correct? A: You can say so, but Kinwong do [sic] the same thing."); Pl's Ex. 413 [ECF No. 455-9] at 361 ("Where is the supplier qualification documents in Benlida? We can use Benlida to do modification. HIC was brought up due to Blow hole issue on [Kimball part] 1055449+5. We should maintain this boards [sic] were built in [Kinwong Longchuan] if customer ask for detail and we will get documents later on from LC.").

 While most of the infringing PCBs were sold by a foreign company (CTX Hong Kong) to foreign subsidiaries of American companies, those sales took place pursuant to supplier agreements between CTX (a U.S. company) and the American parent companies—and occurred only after the

---

[39] The testimony at trial established that Lear, Kimball, and Flextronics are all headquartered in the United States. *See* Day 6 Trial Tr. at 209:7–8 ("[Lear] is headquartered in Southfield, Michigan, right? [Kukreja]: That is correct."); *id.* at 179:10–12 ("[Q]: Jasper is Jasper, Indiana, where Kimball's headquarters is, is that right? [Kukreja]: That is correct."); Day 2 Trial Tr. at 73:16–18 ("Q: Saturn's a U.S. company, right? [Craven]: I don't know their registration, but they were based in Michigan.").

parent companies "approve[d] the factory, set quality standards, and over[saw] audits of [the] sales to foreign affiliates." JMOL Response at 15; *see also* Pl's Ex. 205 [ECF No. 455-5] at 43 ("Longchuan is also [a] Kinwong factory. It has been visited and approved by Kimball global quality team. Actually it has been audited and visited multiple times by Kimball."); Pl's Ex. 257 at 43 (attesting that "the Global Director [of] Purchasing at Lear Corporation based in Southfield, Michigan," is "responsible for all electronic components for Lear Corporation E-Systems *globally*" and that Lear "specifically audited Kinwong's factories and approved Kinwong as an authorized manufacturer of PCBs before purchasing these PCBs, as is its custom and practice" (emphasis added)). To put a finer point on it, the U.S. parent companies approved the purchase of the PCBs by their foreign subsidiaries while operating under the mistaken assumption—an assumption CTX encouraged—that the PCBs had been made by Kinwong. And CTX's use of the Kinwong name and brand to encourage the American parent companies to place purchase orders for their foreign subsidiaries is unequivocally a domestic "use in commerce." *See Axiom Worldwide*, 522 F.3d at 1218 ("[W]e readily conclude that the facts of the instant case do involve a 'use' as contemplated in the Lanham Act—that is, a use in connection with the sale or advertisement of goods."); *McClary*, 2024 WL 4349623, at *2 ("But what McClary ignores is that his New York-based booking agent used the mark to organize, promote, negotiate, finalize, coordinate, plan, market, contract, and publicize those foreign performances—all activity taking place in the U.S. All of this conduct leading up to the performances constitutes an infringing 'use in commerce' of the mark domestically, bringing that conduct within the reach of this Court's territorial jurisdiction." (cleaned up)).[40]

---

[40] Since we've found that the Defendants' promotion of passed-off PCBs constitutes a domestic "use in commerce" under the Lanham Act, we need not (and will not) address Kinwong's alternative arguments that the Defendants (1) orchestrated the unlawful conduct from the United States and (2) should be liable under Florida law. *See generally* JMOL Response at 16–22.

Under the Defendants' reading of *Abitron*, by contrast, an American company could intentionally violate the Lanham Act with impunity so long as it: (1) creates a foreign subsidiary to sell the infringing goods in the marketplace; and then (2) sells those counterfeit goods to the wholly-owned foreign subsidiary of an American company. This would create a gaping chasm in the Lanham Act that would *both* insulate bad-faith American actors from civil penalties *and* fail to protect American companies who have been duped (by fraudulent uses of the mark in the United States) into buying infringing goods for their foreign subsidiaries. That cannot be the law. *See Abitron*, 600 U.S. at 424 ("When a claim involves both domestic and foreign activity, the question is whether the conduct relevant to the statute's focus occurred in the United States. If that conduct occurred in the United States, then the case involves a permissible domestic application of the statute even if other conduct occurred abroad." (cleaned up)); *id.* at 432 n.2 (Jackson, J., concurring) ("I will not attempt to discuss every way in which a marked item might be 'in commerce' such that the trademark is being used 'in the ordinary course of trade' domestically. But, in the internet age, one could imagine a mark serving its critical source-identifying function in domestic commerce even absent the domestic physical presence of the items whose source it identifies.").

For all these reasons, in sum, the Defendants' JMOL Motion is **DENIED**.

## IV.     Kinwong's Damages and Attorneys' Fees

### A.     Additional "Discretionary" Relief

Having determined that Kinwong is entitled to damages for the Defendants' passing-off scheme, we must now decide the proper measure of those damages. In addition to asking for the disgorgement of all profits related to the passed-off PCBs listed in Plaintiffs' Exhibit 373, Kinwong wants us to award it an additional $5,725,112 based on the Defendants: "(1) underreporting the amount of sales for part numbers included on PX-373; and (2) failing to include passed off parts altogether on PX-373." Plaintiffs' Amended Request for Relief [ECF No. 454] at 3. We won't award

these additional damages because Kinwong hasn't proven that it's entitled to them by a preponderance of the evidence.

*First*, we don't think there's sufficient evidence to find that the "underreported" PCBs were ever passed off as being made by Kinwong. To be clear, there *is* evidence that the Defendants failed to report over $2 million in revenues they earned from selling the PNP part number—despite being required to do so by Magistrate Judge Hunt. *See* Day 11 Trial Tr. at 123:8–19 ("Q: That's the 8794705PNP01 part number for which defendants reported zero sales on PX-373? . . . [Kukreja]: Yes. And the same part number we reported a mistake was made. We reported back to GD a mistake was made. Q: Can you tell us how much in revenue at this point in the trial that the defendants earned off of sales of that PNP part number for parts not produced at Kinwong? A: Sure. I have given that spreadsheet to my attorneys. Q: And how much? A: Around $2 million."). We by no means condone this behavior, which is yet another example of the Defendants' repeated attempts to withhold potentially relevant sales data from opposing counsel. All that said, we won't award any damages for passing off the PNP part because, as we've explained, there simply isn't enough evidence that the Defendants falsely designated the PNP part's origins. *See ante*, at 63–64.

*Second*, and relatedly, Kinwong hasn't met its burden of showing that the Defendants failed to report *other* PCBs that were passed off as Kinwong-made. Kinwong's argument here is based on two pieces of evidence: (1) Plaintiff's Ex. 302, [ECF No. 455-7] at 9, which "is a Lear spreadsheet listing 'Kinwong' as the 'FOB' shipping point for over $13 million in sales in 2018 alone for dozens of different part numbers[,]" Amended Request for Relief at 5; and (2) a portion of Wenwu Jiang's trial testimony, in which this admittedly terrible witness purportedly conceded that several undisclosed parts with Kinwong manufacturing records were not, in fact, manufactured by Kinwong, *see* Day 4 Trial Tr. at 86:6–94:13. But this evidence, while eyebrow-raising, isn't convincing enough for us to award millions of dollars more in damages. For one thing, Lear's ship-point data isn't all that useful

because of ample testimony that this data was riddled with errors. *See* Day 10 Trial Tr. at 91:25–92:5 ("Q: All right. Do you know why Lear has been unable to, I guess, correct this address issue? [Kukreja]: So it's—it's a problem which is unique to them, because none of our other customers have this problem. And [Lear] conveyed this to us for the first time in 2013, 2014, and the problem has continued since—since that time."). For another, and as we've already explained, the improper use of Kinwong manufacturing records, standing alone, isn't sufficient evidence of passing off—at least not without *some* proof that customers were *likely* to have been misled about the origins of those PCBs. Having failed to prove any additional damages, we decline to award Kinwong more "discretionary relief" beyond the disgorgement of profits it's shown for the seven passed-off PCBs.

### B.  The Damages Experts

Now, we must calculate the *amount* of the damages Kinwong is entitled to. Both parties hired their own damages experts: Richard Lettiere for Kinwong and Barry Mukamal for the Defendants. Using Plaintiff's Exhibit 373 as their polestar, both Lettiere and Mukamal agreed that CTX earned $20,264,814.00 in sales from the 23 parts listed in that exhibit. *See* Pl's Ex. 537 ("Lettiere Report") [ECF No. 455-13] at 306; Def's Ex. 400 ("Mukamal Report") [ECF No. 457-17] at 191. If we isolate the revenues for the seven PCBs as to which there was sufficient evidence of passing off (PQ26, QE, Rev 9, 1055449, NSP, RHP, and RBP), we get a total revenue of $18,021,581.00. *See* Lettiere Report at 306. Since the revenue amount is undisputed, we look to the Lettiere and Mukamal Reports to help us compute the profits we need to disgorge.

According to Lettiere's methodology, CTX earned $7,036,484 in profits (based on an incremental profit margin of **40.3%** between 2012 and 2016) from selling the seven passed-off PCBs: $3,636,305 for the PQ26; $387,597 for the QE; $1,172,685 for the Rev 9; $1,551,748 for the 1055449; $262,844 for the NSP; $16,034 for the RHP; and $9,271 for the RBP. *See* Lettiere Report at 308. Lettiere arrived at this number by taking the total revenue and then subtracting certain costs that (he

said) were unrelated to the production and sale of the passed-off PCBs. But he limited these deductions *only* to the "cost of goods sold" ("COGS")[41] and "a 1 percent sales commission." Day 11 Trial Tr. at 158:22–24. Lettiere found that "the appropriate salary expense deduction is equivalent to 1 percent of accused sales, because [CTX] actually had to increase its salary expense to pay the [sales] commission by this 1 percent." *Id.* at 148:8–11.

Although Mukamal agreed with much of Lettiere's analysis, he ultimately criticized Lettiere's decision not to deduct *even more* expenses from the profit-margin analysis. *First*, Mukamal argued that Lettiere should have deducted "selling and distribution costs, administrative costs, and business tax[es]" because Lettiere had previously deducted *these same expenses* when he prepared a report computing *Kinwong's* potential liability (as a counter-defendant in this case) for trademark infringement. *See* Mukamal Report at 195; *see also* Day 11 Trial Tr. at 196:23–197:5 ("Mr. Lettiere determined that none of the expenses, except what I just mentioned, direct costs of sales and the 1 percent commission, were—were appropriate deductible expenses. I believe that there are more variable expenses than those. And, in fact, so did he, in 2019, when he issued a report which indicated that a whole host of expenses, when his client was a defendant, are deductible expenses, which he failed to consider in this instance."). *Second*, Mukamal contended that Lettiere should have deducted many *other* operating expenses—such as payroll, travel, warehousing and storage, and insurance (to name just a few)— because these costs can be scaled up predictably with the company's increased sales. *See* Day 11 Trial Tr. at 207:21–208:6 ("[Q]: And so why do you feel that these variable expenses should be included in the analysis versus what Mr. Lettiere did? [Mukamal]: Well, because the expenses for these cat [sic]— particular expenses are fairly consistent as a percentage of sales over the years. Q: And when you say

---

[41] Lettiere defined COGS as "how much [CTX] paid to obtain the circuit boards from their suppliers" and the "costs [that] increase[d] as a result of the accused sales[.]" Day 11 Trial Tr. at 140:20–24, 141:4–5.

that, you're talking about the actual expenses in the financial statements of the company? A. That's correct. And when you distill them to percentages, when you see percentages that are consistent with sales, that suggests very highly—a very high correlation to variability."). Based on these added deductions, Mukamal proposed a lower incremental profit margin of **28.9%**. *See* Mukamal Report at 193.[42]

We find Mukamal's criticisms of the Lettiere Report persuasive. As the Defendants have observed, Lettiere prepared a report in 2019 that calculated the damages *CTX* would be entitled to receive "if Kinwong [were] ultimately found to be liable for the counterclaims [CTX] asserted[.]" Def's Ex. 354 [ECF No. 457-16] at 220. In computing *Kinwong's* profits in that earlier report—contra what he did in his current Report—Lettiere *indeed* deducted businesses taxes, administrative costs, and selling and distribution costs from Kinwong's revenue. These, of course, are the same costs he's now *refused* to deduct when Kinwong is the plaintiff. *See id.* at 223. That's not a good look. What's worse, when pressed on these inconsistencies by defense counsel, Lettiere became defensive and failed to explain—in any credible way—*why* he felt these additional deductions were appropriate for Kinwong (but not for CTX). Here's how that exchange went down:

> [Lettiere]: The facts of—I think you know what I mean, but just to spell it out, thank you—when the facts of Kinwong's business, we're talking in—what I'm talking about today is [CTX's] business. I believe that's what your expert's talking about too. That's the only thing that matters in today's testimony. If you would like to present that we could do a case—the other side of the same case, fine, I don't really have the time to do that, but that's not why I'm here today. I'm here to talk about [CTX's] business, which is what your expert's here to talk about.
>
> Q: Right. And you're using a completely different methodology than the one you used in 2019, when you were performing the same exercise in analyzing Kinwong's costs, right?

---

[42] Mukamal reduced CTX's profits further by erasing any sales that, in the Defendants' view, qualified as "extraterritorial" under *Abitron*. *See* Mukamal Report at 189–91. Since we've rejected the Defendants' argument that these sales fell outside the scope of the Lanham Act, *see ante*, at 74–82, we'll disregard this part of the Mukamal Report.

> A: How's that? I reached different results. I used the same methodology. You gave me different facts, I'll have different results. What do you do when you have different facts?
>
> Q: Well, you didn't deduct from your current calculation any selling or distribution costs or administrative costs, right?
>
> A: This company, Kinwong, is different from [CTX]. We agree with that, right? Today I spoke about [CTX].

Day 11 Trial Tr. at 167:12–168:7.

Lettiere may well be right that the two businesses are meaningfully different—and that their differences somehow led him to deduct certain costs from the one that should have been included for the other. But rather than tell us why this was so—or to show us, with evidence, what he meant—he simply criticized defense counsel for raising a straw man and said little else on the matter. That's not good enough—especially since, when presented with an opportunity to clarify Lettiere's methodology, Kinwong's attorneys (stunningly) declined to conduct a redirect examination. *See id.* at 187:14–15. We also agree with Mukamal's broader point that the operating expenses endemic to running a business— things like payroll expenses, warehousing, supplies, and insurance, *see* Mukamal Report at 192—should be deducted from CTX's total revenues because they're "consistent as a percentage of sales over the years," Day 11 Trial Tr. at 207:25–208:1. Lettiere and his Report, by contrast, are strangely silent on this issue. *See generally* Lettiere Report. And Kinwong unquestionably bears "the burden of proving damages in a definite amount." *Taylor Rental Corp. v. J.I. Case Co.*, 749 F.2d 1526, 1530 (11th Cir. 1985). We therefore exercise our substantial discretion in the computation of damages, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Rule 706 allows the court at its discretion to procure the assistance of an expert of its own choosing."), and adopt Mukamal's incremental profit margin of **28.9%**, *see* Mukamal Report at 193.

When we apply this percentage to the total revenue the Defendants earned from the seven passed-off PCBs, *see* Lettiere Report at 306; Mukamal Report at 191, we get the following profits:

$2,699,959 for the PQ26; $287,329 for the QE; $863,649 for the Rev 9; $1,147,100 for the 1055449; $191,750 for the NSP; $11,687 for the RHP; and $6,763 for the RBP—totaling $5,208,237. We'll therefore order the disgorgement of **$5,208,237** of the Defendants' profits as damages for the Defendants' illicit trademark-infringement and passing off.

### C. Attorneys' Fees in an "Exceptional Case"

The final issue we must resolve is whether Kinwong is entitled to attorneys' fees under 15 U.S.C. § 1117. That provision of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). An "exceptional case" is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014); *accord Tobinick v. Novella*, 884 F.3d 1110, 1118 (11th Cir. 2018) ("We conclude that to be an 'exceptional case' under the Lanham Act requires only that a 'case stands out from others,' either based on the strength of the litigating positions or the manner in which the case was litigated.").[43] Nevertheless, even if a case qualifies as "exceptional," "the ultimate decision whether or not to award attorney's fees remains within the discretion of the trial court." *Tobinick*, 884 F.3d at 1117 (cleaned up); *see also FCOA, LLC v. Foremost Title & Escrow Servs., LLC*, 2019 WL 7790856, at *3 (S.D. Fla. Oct. 17, 2019) (Torres, Mag. J.) ("There is no precise rule or formula for determining whether a Lanham Act case is

---

[43] The Eleventh Circuit had previously defined an "exceptional case" as "one that can be characterized as malicious, fraudulent, deliberate and willful, or one in which evidence of fraud or bad faith exists." *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 253 F.3d 1332, 1335 (11th Cir. 2001) (cleaned up). The Supreme Court's decision in *Octane Fitness* abrogated this definition by adopting "a far less stringent standard defining 'exceptional' consistent with its ordinary dictionary meaning: uncommon, rare, not ordinary, out of the ordinary course, unusual, or special." *Domond v. PeopleNetwork APS*, 2017 WL 5642463, at *2 (S.D. Fla. Nov. 14, 2017) (Moreno, J.) (citing *Octane Fitness*, 572 U.S. at 554).

'exceptional' based on its lack of substantive strength. Instead, as with the other *Octane Fitness* factors, courts must use their discretion in considering the totality of the circumstances.").

During closing arguments, counsel for Kinwong argued that this case is exceptional because of the Defendants' "weak Lanham Act claim," their "fraud on the USPTO," their "deliberate counterfeiting or passing off," and their "frivolous litigation positions." Day 12 Trial Tr. at 188:13–16. If this case were just about the passing-off allegations, we'd agree with the Defendants that their positions were not necessarily frivolous or unreasonable—and, therefore, that the case itself isn't "exceptional." *See Stream, Inc. v. CIJ Enters., Inc.*, 2020 WL 1033351, at *4 (S.D. Fla. Mar. 3, 2020) (Reinhart, Mag. J.) ("[T]he court's conclusion in *Smokers Edge* [was] that Plaintiffs acted unreasonably and that their lawsuit was frivolous, which in turn resulted in a finding that the case was an exceptional one that warranted an award of attorney's fees. None of these factors were present in the instant case. Their absence leads me to conclude that this was not an exceptional case." (citing Order Awarding Attorney's Fees, *Stream, Inc. v. The Smokers Edge, LLC*, No. 18-cv-80545 (S.D. Fla. Feb. 4, 2020) (Middlebrooks, J.), ECF No. 77 at 6)).

But this case isn't just about passing off. The most egregious conduct in this case, after all—the conduct that makes this case truly exceptional—is the Defendants' blatant trademark infringement and the brazen fraud they perpetrated on the USPTO to secure registration of the KINWONG mark. As we explained in our Omnibus Order, "ownership of the KINWONG mark plainly rests with the Plaintiffs," and the Defendants' arguments to the contrary "fail[ed] at every turn[.]" *Kukreja*, 574 F. Supp. 3d at 1219. As we've seen, despite knowing that CTX had no credible claim to the KINWONG mark, Kukreja formed Kinwong, LLC, and then intentionally lied to the USPTO about that entity's use of the KINWONG mark in the United States. We've also found, on numerous occasions, that the Defendants' attempts to defend or justify this conduct were frivolous. *See* Aug. 5, 2022, Hr'g Tr. [ECF No. 391] at 27:20–23 ("You're repeatedly walking into federal court and making frivolous arguments.

You've done this, [sir], throughout the pendency of this litigation. Magistrate Judge Hunt was tired of it, and I'm tired of it."); Nov. 12, 2020, Hr'g Tr. [ECF No. 335] at 54:17–55:4 ("Now, we're going to the point that I think is frivolous, the point that Mr. Kukreja wasn't aware that he was actually doing business with Mr. Shum at Kinwong.com or that Mr. Kukreja just, for example, came up with the name 'Kinwong' because it meant . . . prosperous future. Ridiculous claims. I mean I don't have to give any credence to those claims. That's not a genuine issue of material fact. He didn't just invent the name 'Kinwong' because it had a nice ring to it. He stole it from the company that he was doing business with. That's clear.").

In the pre-*Octane Fitness* world, this sort of fraudulent conduct (coupled with frivolous legal arguments) was more than enough to justify an award of attorneys' fees under § 1117. *See Tire Kingdom*, 253 F.3d at 1335 ("We have previously said that an 'exceptional case' is one that can be characterized as malicious, fraudulent, deliberate and willful, or one in which evidence of fraud or bad faith exists." (cleaned up)); *Select Export Corp. v. Richeson*, 2011 WL 13136505, at *3 (S.D. Fla. May 25, 2011) (Snow, Mag. J.) ("The Court found that the clear and convincing evidence overwhelmingly demonstrated that the plaintiff's principal, Herbert Moebius, made repeated misrepresentations to the United States Patent and Trademark Office, and canceled the plaintiff's trademark. The undersigned concludes that the Court's finding supports a conclusion that the entire lawsuit, including the claim against defendant Richeson, was brought in bad faith, and entitling defendant Richeson to an award of fees."); *Volkswagen Grp. of Am., Inc. v. Varona*, 2021 WL 1997573, at *17 (S.D. Fla. May 18, 2021) (Goodman, Mag. J.) ("Finally, Defendants took frivolous and/or questionable positions . . . causing Plaintiffs to expend unnecessary costs in relation to this litigation. Plaintiffs are therefore entitled to recover their attorney's fees for Defendants' willful infringement and counterfeiting."). Given that "the standard in *Octane Fitness* is broader than the previous Eleventh Circuit requirement that a case be 'malicious, fraudulent, deliberate and willful, or one in which evidence of fraud or bad faith exists[,]'" *Donut Joe's,*

*Inc. v. Interveston Food Servs., LLC*, 116 F. Supp. 3d 1290, 1293 (N.D. Ala. 2015) (Hopkins, J.) (quoting *Tire Kingdom*, 253 F.3d at 1335), we easily conclude that this case is "exceptional" because the "substantive strength" of the Defendants' litigating position (as to the trademark-infringement and fraud claims) was exceptionally weak and because the Defendants advanced unreasonable and frivolous positions to sustain that position, *see Octane Fitness*, 572 U.S. at 554 ("[A]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position . . . or the unreasonable manner in which the case was litigated."). The Plaintiffs are thus entitled to attorneys' fees under 15 U.S.C. § 1117.

## CONCLUSION

After a careful review of all the evidence, we hereby **ORDER and ADJUDGE** as follows:

1. As to Count III of the Amended Complaint, Final Judgment is **ENTERED** in favor of the Plaintiffs and against the Defendants.

2. As to Counts I and IV of the Amended Complaint, the Plaintiffs are awarded **$5,208,237.00** in damages.

3. The Plaintiffs are also entitled to attorneys' fees under 15 U.S.C. § 1117 because this is an "exceptional case." The Court will retain jurisdiction over this action to adjudicate any post-judgment motions for fees and/or costs.

4. The Defendants' Amended Motion for Judgment as a Matter of Law [ECF No. 482] is **DENIED**.

5. Pursuant to Federal Rule of Civil Procedure 58, the Court will enter final judgment separately.

6. The Clerk shall **CLOSE** this case. All deadlines and hearings are **TERMINATED**, and any other pending motions are **DENIED as moot**.

**DONE AND ORDERED** in the Southern District of Florida on April 4, 2025.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record