# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:18-CV-61550-ALTMAN/HUNT

SHENZHEN KINWONG ELECTRONIC
CO., LTD., a Chinese Limited Company,
and KINWONG ELECTRONIC (HONG
KONG) LIMITED, a Hong Kong Limited
Company,

      Plaintiff,

v.

RISHI KUKREJA, an Individual;
KINWONG, LLC, a Florida
Limited Liability Company; and
CIRCUITRONIX, LLC, a Florida Limited
Liability Company,

      Defendants.

_____ /

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND NON-TAXABLE COSTS

**GREENBERG TRAURIG, P.A.**
Mark A. Salky (Florida Bar No. 058221)
James E. Gillenwater (Florida Bar No. 1013518)
Emiley Pagrabs (Florida Bar No. 1030834)
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

Dated: May 30, 2025

*Attorneys for Plaintiffs Shenzhen Kinwong
Electronic Co., Ltd. and Kinwong Electronic
(HongKong) Limited*

Plaintiffs Shenzhen Kinwong Electronic Co., Ltd. and Kinwong Electronic (HongKong) Limited ("Plaintiffs" or "Kinwong"), pursuant to Local Rule 7.3, move for their reasonable attorneys' fees and non-taxable costs. In support of this Motion, Plaintiffs state as follows:

## **INTRODUCTION**

On April 7, 2025, after a month-long bench trial in April and May 2023, the Court entered Final Judgment in Kinwong's favor against Defendants Rishi Kukreja, Kinwong LLC, and Circuitronix LLC ("CTX," together with Kukreja and Kinwong, LLC, "Defendants"). [D.E. 488]. In its Final Judgment, the Court found that Defendants committed fraud on the USPTO and trademark infringement by passing off Kinwong's printed circuit boards ("PCBs"), and awarded Kinwong a total of $5,208,237 in disgorgement for its Lanham Act and common law infringement claims. *Id.* The Court also found that Plaintiffs were "entitled to attorneys' fees under 15 U.S.C. § 1117" because this is an "exceptional case." [D.E. 487] at 91.[1]

The Court should award Kinwong its attorneys' fees in the amount of $ 4,508,374.70, together with all non-taxable costs in the amount of $1,507,265.79. As demonstrated below, and in the supporting Declaration of James Gillenwater, attached hereto as **Exhibit 1**, these attorneys' fees are imminently reasonable in light of the attorneys' hourly rates and the number of hours worked over the course of this seven-year complex international case, which Defendants over-

---

[1] On May 2, 2025, Plaintiffs filed their Partially Unopposed Motion to Alter or Amend the Judgment, seeking to (1) reduce the total judgment amount to $4,474,786; and (2) award Plaintiffs prejudgment interest on that reduced judgment amount. *See* [D.E. 492]. Defendants agree both to a reduction of the Final Judgment and Plaintiffs' entitlement to prejudgment interest, but disagree regarding the specific amount to be reduced and the interest calculations. *See* [D.E. 493]. In Plaintiffs' Response in Partial Opposition to Defendants' Motion to Alter or Amend the Judgment, Plaintiffs acknowledged that a further reduction to the Final Judgment amount was warranted for the Rev 9 Part Number for the year 2017, such that the amount of disgorged profits that should be awarded in the amended final judgment is $4,438,722. *See* [D.E. 497] at 2-4. However, Plaintiffs disagreed on Defendants' other proposed reductions. *Id.* at 2-4. Regardless, the parties' requested amendments to the Final Judgment do not impact the Court's award of attorneys' fees and costs.

complicated at every turn by, *inter alia*, hiding the ball in discovery and repeatedly advancing what the Court found to be "unreasonable and frivolous positions." [D.E. 487] at 91; *see also* [D.E. 391] at 27:20-23 ("You're repeatedly walking into federal court and making frivolous arguments. You've done this, [sir], throughout the pendency of this litigation. Magistrate Judge Hunt was tired of it, and I'm tired of it.").

## FACTUAL BACKGROUND

As the Court described it, the Parties "have chased each other in and out of court rooms these past few years" including this "protracted—and, sometimes, acrimonious—litigation." [D.E. 341] at 1. Plaintiffs manufacture PCBs under the name KINWONG—which they registered in China in 1999—and Defendants distribute Chinese-made PCBs to various end-users. *Id.* at 1-2. Beginning in 2005, CTX began distributing PCBs for Kinwong, including to end-users in the United States, pursuant to a non-exclusive Manufacturer's Agreement that did not give CTX the right to use the KINWONG name. *Id.* at 2, 50. However, around 2013, the Parties' relationship "began to deteriorate and then ruptured completely," resulting in extensive litigation. [D.E. 487] at 1. Relevant here, Kinwong discovered that Kukreja had stolen the KINWONG mark and registered it as his own in the United States through a company he created exclusively for that purpose, Kinwong, LLC—falsely swearing that he knew of no one else with rights to the mark despite distributing PCBs for Kinwong for nearly a decade. [D.E. 1]. As a result, Kinwong filed its original trademark infringement Complaint in this Court approximately seven years ago, on July 9, 2018. *Id.* Thereafter, the Parties engaged in nearly five years of extensive discovery and motion practice, which culminated in a month-long bench trial in April and May 2023. A summary of the relevant events leading up to trial follows.

On August 20, 2018, Defendants filed an answer and counterclaim, asserting claims of

federal and common law trademark infringement, counterfeiting, and unfair competition, all premised on Defendants' fraudulent registration of the KINWONG mark. [D.E. 17]. Defendants subsequently amended to add counterclaims for disparagement of title and tortious interference. [D.E. 163]. Defendants sought over $40 million pursuant to these counterclaims based on the open and continuous PCB sales Kinwong had been making in the United States under its own name. *Id.* ¶¶ 53-116; *see also* [D.E. 211]. So from the outset of this litigation, Plaintiffs and their attorneys were tasked not only with unmasking Defendants' fraud and sophisticated multi-million dollar passing off scheme, but also with beating back Defendants' frivolous counterclaims.

Plaintiffs, of course, were not privy to Defendants' passing off scheme, because it happened without their knowledge, and Defendants engaged in elaborate ruses to cover it up— along with their attorneys—as the Court subsequently found. *See, e.g.*, [D.E. 487] at 18, 31. But in late 2018, Plaintiffs first got a glimpse at the cover of the puzzle box and a picture of what the scheme looked like when they were able to make contact with Kukreja's former right-hand-man and CTX's CEO in training—Sunny Kapoor. Plaintiffs contacted Mr. Kapoor because he had filed a lawsuit against CTX in which he alleged that CTX retaliated against him for blowing the whistle on CTX's unlawful practices with their suppliers (like Kinwong) and customers. *See Kapoor v. Circuitronix, LLC*, Case No. 15-CV-61446-BB (S.D. Fla.), [D.E. 5] ¶ 13 ("Mr. Kapoor voiced his disapproval of these unethical and unlawful practices, which included . . . making material misrepresentations to customers and vendors."). On the call with Plaintiffs' counsel, Mr. Kapoor indicated that Plaintiffs' allegations in their original complaint were only the "tip of the iceberg" of Defendants' unlawful practices that he had observed. *See* [D.E. 57]; [D.E. 211] at 17. Mr. Kapoor then walked Plaintiffs' counsel through Defendants' passing off scheme that ultimately formed the basis for the claims that Plaintiffs were able to prove at trial. [D.E. 211] at 17. He

indicated he had helpful documents but then, when Plaintiffs attempted to subpoena those documents—which revealed to Defendants that Plaintiffs had spoken with Mr. Kapoor—he suddenly went radio silent and his counsel represented that no responsive documents existed. *Id.*

Notwithstanding Mr. Kapoor's self-explanatory vanishing act, the damage to Defendants had been done, and Plaintiffs now knew, at the least, what puzzle pieces they needed to look for in discovery. On May 3, 2019, Plaintiffs filed the operative Amended Complaint to add allegations of counterfeiting/passing off against the Defendants that tracked the information Mr. Kapoor provided to them and which they had been able to independently corroborate—albeit to a limited degree at that stage—by searching in the documents that they had already obtained from Defendants. The Amended Complaint, [D.E. 63], asserted six claims. In Count I, Plaintiffs brought a Lanham Act infringement claim against Defendants for, *inter alia*, engaging "in an elaborate, willful scheme to pass off [PCBs] that were not manufactured at Shenzhen Kinwong as if they were manufactured at Shenzhen Kinwong." *Id.* ¶ 51. Count IV asserted a Florida common law infringement and unfair competition claim based on the same conduct. *Id.* ¶ 79. Count II sought to cancel Defendants' KINWONG registration based on "Plaintiffs' prior use of the KINWONG mark in United States commerce." *Id.* ¶ 59. Count III likewise asked the Court to cancel Defendants' trademark registration due to their fraud on the USPTO. *Id.* ¶ 67. Finally, Counts V and VI sought alter ego and agency liability for Kukreja under Florida law. *Id.* ¶¶ 83, 91-92.

Defendants moved to dismiss the Amended Complaint, advancing the unsupported argument that Plaintiffs' trademark infringement claims were compulsory counterclaims to the Parties' prior breach of contract action, which was tried in 2019 in *Circuitronix, LLC v. Shenzhen Kinwong Elec. Co. Ltd., et al.*, No. 17-CV- 2462 (S.D. Fla.). *See* [D.E. 73]. The Court held argument on Defendants' motion to dismiss on June 25, 2019, and ultimately denied it. *See* [D.E.

94]; [D.E. 160]. In connection with that motion, Kukreja submitted a sworn declaration setting out what would become the basis of Defendants' "Capital Profit Defense"—a patently frivolous, bad-faith litigation position that the Court found to be "ridiculous" at summary judgment, [D.E. 335] at 54:17-25, and will look even more so to the Court now that it has heard all the evidence at trial:

> 10.   Upon beginning sale of Capital Profit products in the Territory, I decided that Circuitronix should adopt the name KINWONG as a trademark for its Chinese sourced PCBs. KINWONG means "prosperous future in business" in Chinese. This was also the business name in China of one of the factories from which Capital Profit obtained products.
>
> 11.   Specifically, it was Circuitronix which proposed using the Kinwong name and Capital Profit insisted on using the Capital Profit name.

[D.E. 73-1].

The parties then engaged in contentious international discovery, producing hundreds of thousands of documents and taking numerous depositions across the United States and in multiple foreign countries—including in Hong Kong and Germany (through a foreign court proceeding)— throughout 2019. Over the course of those depositions, Defendants engaged in "obstreperous" conduct on both sides of the table. *See* [D.E. 487] at 18. When it came to Defendants' witnesses, they were "painful to watch." *Id.* at 17-18; *see also, e.g.*, *id.* ("Over and over again, [Kinwong's counsel] had to ask Mr. Craven very simple questions, just to have Mr. Craven say no, just to prove it to Mr. Craven that it's right, then to have Mr. Craven just tell us, [w]ell, I don't remember any of that, but I guess that is michaelcraven@circuitronix.com, so I guess I did send that email. Over and over again."). And when it came to Defendants' attorneys' questioning of Kinwong's witnesses, it was equally painful, as Plaintiffs and their attorneys had to sit through hours of repetitive grandstanding as Defendants' attorneys belabored the "Capital Profit Defense" and other frivolous arguments. For example, Defendants spent a full day in a Hong Kong conference room

peppering Shaobai Liu, the CEO of a multi-billion dollar company, with inane questions like:

> Q. Yes. Isn't it a fact Mr. Shum wanted to go with the name Capital Profit, not Kinwong, in the United States? . . .
> A. It is impossible for Mr. [Shum] to think in such a manner, and it is even more unlikely that he would actually do such things. I don't know where you got that idea from. As I mentioned earlier, we do have strategies for branding, development directions, and marketing. Our strategy is to make the brand Kinwong stronger, bigger, and international.

[D.E. 186-7] at 99:19-100:4; *see also id.* at 100:19-101:5 ("Q. Alright. Mr. Liu, in 2005, Mr. Shum wanted to use the name Capital Profit and not the name Kinwong in the United States of America. . . . A. In relation to this question, I feel that I have already explained very clearly.").

On top of the frivolous Capital Profit Defense, following these Hong Kong depositions in the fall of 2019, Defendants also ginned up an equally frivolous spoliation argument that wasted a significant amount of the parties', Magistrate Judge Hunt's, and this Court's time. *See* [D.E. 128]. According to Defendants, Mafio Shum—who died in 2013 as the relationship between Kinwong and CTX began to sour—would have had documents supporting their Capital Profit Defense such that Kinwong's routine deletion of his emails following Mr. Shum's death warranted "dismissal of this action." *Id.* at 19. Both Magistrate Judge Hunt and this Court gave Defendants' spoliation argument the back of the hand. *See* [D.E. 262] at 4 ("Defendants should have access to any emails Shum sent to Defendants, as well as all the emails received by Plaintiffs' employees."); [D.E. 289] at 44:4-54:2 ("I don't think the question is all that close. . . . I don't think that Circuitronix has come anywhere near satisfying its burden.").

In tandem with launching these frivolous and distracting arguments to tie up Plaintiffs' litigation resources, Defendants were also engaged in actively obfuscating the evidence that Plaintiffs needed to prove their affirmative case of passing off. Following Mr. Kapoor's revelations, Plaintiffs had served targeted document requests on Defendants designed to ferret out the evidence of Defendants' passing off scheme. But as the eve of discovery approached, Kinwong

discovered that Defendants had failed to produce any responsive documents from key custodians that Kinwong had identified as being critical to their passing off theory: Wenwu Jiang, Yangcheng Cai, and Mr. Kapoor himself. *See* [D.E. 150]. Defendants' withholding necessitated several meritorious motions to compel, *id.*, and it was only months after the close of discovery—and after Defendants' witnesses had already been deposed—that Defendants dumped 140,000 documents from these custodians on Kinwong on the eve of summary judgment. [D.E. 211] at 17-20.

Defendants then sought to profit from their own sandbagging by moving for summary judgment, arguing that Plaintiffs' "claim of counterfeiting . . . is totally unsubstantiated." [D.E. 179] at 19. But even in the limited time Plaintiffs had to review Defendants' belated production before filing their opposition, Plaintiffs were able to crack Defendants' code using the information gleaned from Mr. Kapoor and discovered a treasure trove of evidence of Defendants' passing off scheme. [D.E. 211] at 17-20 (detailing some of the "hide," "fake" and "create . . . records" exhibits ultimately used at trial). Plaintiffs used that evidence to defeat Defendants' summary judgment motion, which the Court summarily denied. *See* [D.E. 335] at 15:20-24 ("Let's be frank. Their motion for summary judgment is going to be denied. It's not even close. . . . They know that.").[2]

In February 2020, Kinwong filed its own summary judgment motion on its claims of ownership, infringement, and cancellation, [D.E. 182], and moved to dismiss Defendants' counterclaims, [D.E. 170].[3] In July 2020, the Court granted the motion to dismiss. [D.E. 269]. Defendants amended their counterclaims, and Plaintiffs again moved to dismiss. [D.E. 280, 288].

---

[2] The Court did grant Defendants' motion in part as to Counts V-VI of the Amended Complaint—Plaintiffs' stand alone claims for alter ego and agency—but allowed Plaintiffs to seek relief under those theories of liability on their remaining claims, so this was only a formality. [D.E. 331].

[3] Prior to these filings, on January 2, 2020, the Parties moved to stay all deadlines to allow settlement discussions to proceed, [D.E. 155], which the Court granted, [D.E. 160]. The settlement discussions were unsuccessful, however, and the case was reopened on February 18, 2020, [D.E. 177], "just as the COVID-19 pandemic swept across the country," [D.E. 341] at 20.

After hearing argument on the motions for summary judgment and to dismiss on November

12, 2020, [D.E. 335], the Court entered an Omnibus Order on December 9, 2021. [D.E. 341]

("Omnibus Order"). In the 78-page Omnibus Order, the Court: (1) granted Plaintiffs' Motion to

Dismiss Defendants' Amended Counterclaim; (2) granted Plaintiffs' Partial Motion for Summary

Judgment; and (3) cancelled Defendants' KINWONG trademark, Registration No. 4,736,271. *Id.*

at 77-78. The Court found that Kinwong was the rightful owner of the KINWONG trademark and

that Defendants had infringed on that trademark under federal and common law, noting:

> The Plaintiffs' trademark claim—that they are the senior users of the KINWONG
> mark and that the Defendants' trademark registration for that mark should be
> cancelled—simply isn't close.

*Id.* at 35. The Court rejected the "Capital Profit Defense" as "frivolous," "silly," and "ridiculous":

> THE COURT: Now, we're going to the point that I think is frivolous, the point that
> Mr. Kukreja wasn't aware that he was actually doing business with Mr. Shum at
> Kinwong.com or that Mr. Kukreja just, for example, came up with the name
> "Kinwong" because it meant, what was it, creativity in Chinese --
> MR. GILLENWATER: A prosperous future in business.
> THE COURT: -- prosperous future. Ridiculous claims.

[D.E. 335] at 54:17-25; *see also id.* at 45:16-23 ("I don't want to have argument about things that

are silly in my view."). The Court did, however, find that fact issues remained as to whether

Kukreja committed fraud on the USPTO, given the clear and convincing evidence standard

required to prevail on that claim. [D.E. 341] at 76-77. Thus, the remaining issues for trial were:

> (1) whether the Defendants committed fraud on the U.S. Patent and Trademark
> Office ("USPTO") when they registered the KINWONG mark in the United States;
> (2) whether the Defendants schemed to sell counterfeit Kinwong products in
> violation of the Lanham Act; and (3) whether (and to what extent) the Plaintiffs
> were entitled to damages and attorneys' fees.

[D.E. 487] at 1-2.

As to the first two issues, given that Kinwong itself was not privy to Defendants' fraud or

passing off scheme, Plaintiffs had to prove those issues through Defendants' own documents and

witnesses. But in the build up to trial, Defendants continued to obfuscate evidence that was critical to Plaintiffs' ability to do so. The most egregious example is with "PX-373"—a chart listing Defendants' sales revenue for parts not made by Kinwong but passed off as if they came from Kinwong—which the Court ultimately found was "perhaps the most important piece of evidence" in the case. [D.E. 487] at 31. The reason this document was so important is that while Plaintiffs were able to piece together evidence of Defendants' passing off scheme on a part number by part number basis—which required painstaking searches through a data set of over 200,000 documents (many of which were hyper-technical engineering and manufacturing records) after deciphering code language and abbreviations Defendants used when referring to their illicit conduct—Plaintiffs were unable to quantify the disgorgement to which they were entitled because of Defendants' withholding of all revenues for the passed-off part numbers. *See id.* Plaintiffs had to seek Court intervention to get this clearly-relevant information not once, not twice, but three times: through two motions to compel, *see* [D.E. 237]; [D.E. 367], and then at the final pre-trial hearing on Defendants' *Daubert* motion, [D.E. 391], after Defendants continued to flout the two prior orders from Magistrate Judge Hunt compelling the production of Defendants' passed-off sales revenue. *See* [D.E. 262]; [D.E. 387]. This Court's colloquy with counsel for Defendants regarding their argument for why they did not need to produce the sales revenue despite Magistrate Judge Hunt's orders illustrates the extent of Defendants' discovery obstructionism:

> THE COURT: Are you arguing again with whether you should turn over the sales data?
> MR. COLE: No, Your Honor. But this is outside the scope of Judge Hunt's order. This is not what he ordered us to produce. He was very specific -- Your Honor, if you look at DE 262, he was very specific. He said what they're asking us to produce is defendants' sales revenue for products that had the Kinwong logo that were produced by third parties other than the plaintiffs. That's not what he's asking for now. Now he's asking us to produce information about other sales we did with other suppliers that he's going to now argue are counterfeit, I suppose, at trial. . . .
> THE COURT: . . . He's saying that this product, that he has evidence that it's counterfeit, and you're saying, well, it's not counterfeit.

MR. COLE: He doesn't have evidence that it's counterfeit.

THE COURT: It doesn't matter. It's not for you to decide. It's already been decided. It's responsive. It's for me to say whether it's counterfeit. I hereby order you to produce it. Am I clear about that?

MR. COLE: Yes, Your Honor. May I --

THE COURT: Do not ask me again. I'm ordering you to produce it. If you do not produce it, I will sanction you. Do you hear me?

MR. COLE: Yes, Your Honor. May I --

THE COURT: You're trying to read that paragraph as if I misread it, and that he sided with you on this question. It's absurd. You're repeatedly walking into federal court and making frivolous arguments. You've done this, Mr. Cole, throughout the pendency of this litigation. Magistrate Judge Hunt was tired of it, and I'm tired of it. I'm ordering you now to produce it. Are you listening to me? . . .

THE COURT: But it's not like you can decide without ever letting the information see the light of day. And that's what his frustration was at that hearing. It's his frustration I think in this order, where he gives you one sentence as to analysis. . . . That's a signal to you that this was frivolous. Do you see that? That's a signal by Magistrate Judge Hunt that this  is a frivolous position that you have taken. Now, he didn't sanction you, because he's nice, and he doesn't want to get appealed. But listen to what the judges are saying to you. It's not your job to decide the ultimate merits question. So you have 30 days to turn it over.

[D.E. 391] at 23:11-31:6.

The importance and clear relevance of PX-373 became clear at trial after just one day of

questioning Defendants' second live witness, Wenwu Jiang:

THE COURT: All right. These documents that we're seeing now that I sustained the objection about the production, are those part of the documents that we had a whole hearing about, and Magistrate Judge Hunt had ordered their production, and then you told me they weren't relevant at all, and I ordered you to produce them? Was that this?

MR. COLE: I believe only the spreadsheet that had all the sales data.

THE COURT: The ones that we've just been looking at?

MR. COLE: It's Exhibit 373. . . .

THE COURT: Right. . . . [M]y question was about the documents that we had a discussion about in court after Judge Hunt had ordered their production, and you told me there was nothing relevant in there. And now we see that there was something very relevant in there. Don't we agree with that?

MR. COLE: No, Your Honor. I think – that's what I'm trying --

THE COURT: You don't think 373 was relevant at all?

MR. COLE: No, no, 373 is what we produced.

THE COURT: 373 was what you produced after that hearing, correct?

MR. COLE: Yeah. It's a spreadsheet that shows the sales data.

THE COURT: Okay. Am I missing it? . . . 373 was produced after the hearing here in my courtroom?

MR. COLE: Yeah, it was produced as a result of that, pursuant to that order. . . .

THE COURT: In other words, 373 is something that came out of both Magistrate Judge Hunt and I instructing you to turn over something that you told me, sitting in this courtroom, that there was nothing relevant in there. And now we find something that we can all – I mean whether you agree what it shows or whatever is – I'm excited about your cross-examination – but it's very relevant. Don't we agree with that?

MR. COLE: Well, it's only relevant if there's counterfeiting for those parts.

THE COURT: The witness just admitted, after a whole torturous sequence of events, that those parts were not manufactured by Kinwong. And then we saw a number of emails that showed that he was instructing his employees to make them look as if they were manufactured in Kinwong, and he admitted that Lear was told they were manufactured at Kinwong, right? Now, you may have a perfectly logical explanation for all that, but that's not the standard at discovery. The standard is whether it's relevant. And so what I'm coming up with here is not the proposition that you have no defense to this. Again, you're going to have an opportunity to defend it. But can we deny that 373 is relevant?

MR. COLE: Your Honor, again, I think it's only relevant if they prove counterfeiting as to those parts. . . .

THE COURT: Okay. Well, that is what he said. You know what? Never mind, Mr. Cole. You're just going to continue to insist that 373, which came after that hearing, is not relevant, should never have been produced. That's your view as an officer of this Court?

MR. COLE: No, Your Honor.

THE COURT: You agree that it should have been produced, correct? And that we shouldn't have had two federal judges order you to produce it, correct?

MR. COLE: Your Honor, it was produced pursuant to your order.

THE COURT: It was produced after we had a whole hearing, where I had to raise my voice at you, because you were claiming that Magistrate Judge Hunt's order directing you to produce it did not say what it clearly said, which was that you had to produce it, after you had objected to producing it, because you claimed it was not relevant, and after Magistrate Judge Hunt found that it was relevant and ordered you to produce it, you came into my courtroom and told me that you did not have to produce it. And we had a whole back and forth. Have we forgotten that whole charade in this courtroom?

MR. COLE: Your Honor, I --

THE COURT: And I had to raise my voice at you and order you within whatever it was, 30 days, to produce it over your objection to the fact that it wasn't relevant at all, and I said, "You will produce it." And now we have a document that you may continue to deny, if you wish, but that is clear beyond peradventure is discoverable information that you were sitting on. Do you not agree with that?

MR. COLE: I don't agree with that, Your Honor.

[D.E. 471] at 662:5- 668:7. Suffice it to say, the Court found that "Defendants resisted disclosing [PX-373] at every turn (despite being repeatedly ordered to do so)." [D.E. 487] at 31.

Defendants' obstructionism did not stop there. Even without full impeachment evidence, by using the sandbagged documents Defendants produced after discovery on which Plaintiffs were

unable to question Defendants' witnesses at deposition, Plaintiffs were able to establish at trial that Defendants' witnesses perjured themselves again and again under oath on the stand. *See id.* at 17-18 (finding Animish Dutta's testimony to be "totally false"; Michael Craven's testimony to be "totally nonbelievable" and Wenwu Jiang to be "one of the most 'obstreperous' witnesses we've ever seen take the stand"). As the Court noted during Mr. Jiang's testimony:

> I have never seen a witness lie this many times in open court in federal court under oath. I have never seen it—in a criminal case, in a civil case. Is there no consequence for a person who comes into court and makes a complete sham of these proceedings?. . .
>
> [T]he witness will not tell the truth on any matter. . . . He will be asked a question, he will lie, then he will be shown a number of emails, and then he will come around to telling the truth, and then just a few minutes later, he will lie again on the same subject.

*Id.*

The obstructionism continued when counsel for Defendants attempted to rehabilitate Mr. Jiang over the course of several days using obviously improper leading questions:

> THE COURT: How many times are you going to do it?
> MR. COLE: I apologize, Your Honor.
> THE COURT: It's not right. I'm letting you do it because he's not objecting and he's being a real friendly colleague, but it's not right. . . .
> THE COURT: . . . [Y]ou just come with a leading question with the answer and then he gets it and then he says, oh, yeah yeah. I noticed that, I see it and you're just doing it over and over again. So, he's objecting to one out of every 50 of them. You know it I know it. You're not allowed to do it. . . .
>
> THE COURT: Here we go.
> MR. COLE: Well.
> THE COURT: He was getting ready but I saved him the trouble. You see that? That was inappropriate and I've told you that now I don't know how many times.
> MR. COLE: Your Honor --
> THE COURT: And I just have to say, I was a federal practitioner just not that long ago if I had a judge in this building telling me it was leading inappropriate I would not have been able to sleep that night and I have now told you several times and you just ignore it. . . .
>
> MR. GILLENWATER: Objection. Leading.
> THE COURT: I have never seen anything like it, Mr. Cole, I really haven't. My law clerks can correct me if I'm wrong. I've just never seen it. You just don't care. You just don't care. Even the prior question, isn't it true that you filled in all the correct information and took out all the Kinwong? Objection. Leading. Sustained. . . .

THE COURT: You just did it again.

MR. COLE: Your Honor.

THE COURT: You just did it again. You would be sanctioned in any other courtroom in this building. You just would. You know it, he knows it. . . . I don't know what else to do. I've warned you so many times. And I have never seen it. I have never seen it, Mr. Cole. I don't know what your reputation is outside of this courtroom. I don't care. I haven't asked. I don't know what you think you are doing. . . .

THE COURT: No I'm telling you now. What you just did was inappropriate again. You're trying to prove something, okay, that's not in the document. . . . He didn't give you the answer that you wanted. . . . [E]specially having had, I don't know how many admonitions from me, you . . . gave him the answer. It's totally inappropriate.

MR. COLE: Your Honor, I will try not to give him the give him the answers but --

THE COURT: You've told me that now -- we could go back in the transcript -- five or six times. We're wasting time here. I want to get this trial moving. And it doesn't move because you're not following the rules. You're not playing according to the rules. . . .

THE COURT: You continue to play this game that I find totally inappropriate. And I will sanction you. Do you understand me?

MR. COLE: I do understand.

THE COURT: I've never, I've never threatened a lawyer with a sanction I have never sanctioned a lawyer I don't want to ever sanction a lawyer in my life. But I have never in all the years of practice, and in all the years of being a judge had a lawyer do what you were doing now. And even standing here now, right, in front of me, after I've admonished you I don't know how many times today, you are claiming and in my opinion in a totally disingenuous way that you were doing what I wanted, and you thought you were doing what was appropriate. And that to me is totally disingenuous. . . .

THE COURT: Let me tell you now we're going to take a break, fix it I don't want to see it again I never talked with a lawyer like this I never had an issue with a lawyer like this. I think you can ask Ms. Espinoza, I'm a friendly guy in court, I love this job. You are making it miserable in here. And you're doing it, because like you said, just now, you think you are entitled to fix things by feeding answers when you're client gives you answers you don't like. And that is wrong. It's unethical and it's impermissible and I have told you that many times. Do you hear me? . . .

THE COURT: . . . And when I see you repeatedly and flagrantly violating my admonition not to feed the client the answers you want him to give, okay? I have told you repeatedly that that's inappropriate, and impermissible and you even, you even now don't understand. . . . And I'm concerned that we're going to come back and you're going to do it again, because you just think you can do what you want. . . .

THE COURT: Federal Rule of Evidence 611 specifically says you're not allowed to lead in management employee in your own company or any employee that is basically your own client. They specifically say that. The reason they say that is to prevent us from having

13

this charade that has been the testimony from Mr. Jiang this morning. . . . You think you saying to the witness what the answer is and having him say yes in a bench trial is persuasive to the judge? Just think about that. It's like you've never tried a case before.

[D.E. 474] at 1308:23-1335:7.

The point of excerpting these colloquies is to emphasize that the obstructionism that the Court witnessed at trial—*i.e.*, that "it doesn't move because [Defendants are] not following the rules"—was par for the course throughout the life of this "exceptional" litigation, and helps explain its lengthy history, over 500 docket entries, and the resultingly high, yet entirely reasonable, attorneys' fees Plaintiffs were forced to incur to prove their case.

And prove it they did, notwithstanding Defendants' obstructionism. On April 4, 2025, the Court issued its 92-page Findings of Fact and Conclusions of Law entering Final Judgment in favor of the Plaintiffs. [D.E. 487]. Specifically, the Court found: (1) "[t]he evidence . . . was overwhelming that Kukreja knowingly made false, material representations of fact in connection with an application for a registered mark," and committed fraud on the USPTO, *id.* at 58; (2) "Kinwong has proven by a preponderance of the evidence that the Defendants passed off part numbers PQ26, QE, Rev 9, 1055449, NSP, RHP, and RBP," *id.* at 69; (3) "Kinwong is entitled to damages for the Defendants' passing-off scheme," *id.* at 82; and (4) "Plaintiffs are . . . entitled to attorneys' fees under 15 U.S.C. § 1117," *id.* at 91.

Regarding Kinwong's entitlement to attorneys' fees, the Court then analyzed whether this case constituted an "exceptional case" under the Lanham Act. *Id.* at 88 (citing 15 U.S.C. § 1117(a)). An "exceptional case" is "'one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.'" *Id.* (citing *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). The Court noted that although the

14

passing-off allegations standing alone may not render this case "exceptional," the case was about more than passing off. *Id.* at 89.  In fact, "[t]he most egregious conduct in this case, after all—the conduct that makes this case truly exceptional—is the Defendants' blatant trademark infringement and the brazen fraud they perpetrated on the USPTO to secure registration of the KINWONG mark." *Id.* Although Defendant Kukreja knew "CTX had no credible claim to the KINWONG mark, Kukreja formed Kinwong, LLC, and then intentionally lied to the USPTO about that entity's use of the KINWONG mark in the United States." *Id.* Further, "on numerous occasions," "Defendants' attempts to defend or justify this conduct were frivolous." *Id.* (citing Defendants' arguments before the Court). The "fraudulent conduct (coupled with frivolous legal arguments) was more than enough to justify an award of attorneys' fees under § 1117." *Id.* at 90.

## **ARGUMENT**

### I.   **The Court Should Award Kinwong $ 4,508,374.70 in Reasonable Attorneys' Fees.**

The Court already determined that Kinwong is entitled to attorneys' fees under 15 U.S.C. § 1117, allowing the Court to award "reasonable attorney fees to the prevailing party" in an "exceptional case." [D.E. 487] at 88-89. Thus, all that remains is for the Court to determine whether Kinwong's requested attorneys' fees are reasonable.

Courts use the lodestar method to calculate reasonable attorneys' fees, multiplying a reasonable hourly rate by the number of hours reasonably expended. *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1299 (11th Cir. 1988). A reasonable hourly rate for attorneys' fees is determined by evaluating "the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Id.* (*citing Blum v. Stenson*, 465 U.S. 886, 895 (1984)). "A court . . . is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value." *Id.* at 1303

(quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)). Applying the lodestar method here, Kinwong is entitled to an attorneys' fees award of $ 4,508,374.70.

Consistent with Local Rule 7.3(a), the attached Declaration of James E. Gillenwater provides the names, experience, and qualifications of the attorneys and other professionals for whom fees are sought, as well as the number of hours expended by each timekeeper, a description of the tasks performed, and the claimed hourly rate of each attorney and other professional. Kinwong and its counsel at Greenberg Traurig, P.A. agreed that Kinwong would receive roughly a twenty percent discount on the base rate of each timekeeper, and the timekeeper rates were locked in at the time the timekeeper began working on the matter.[4] In other words, if a timekeeper began working on this case in 2017, such as lead counsel Mark Salky, the base rate never increased through trial, and Kinwong received a twenty percent discount on top of that base rate.

As detailed in the Declaration, Kinwong's fees are reasonable. Kinwong's attorneys' discounted hourly rates ranged from approximately $660.00 per hour to $120.00 per hour, representing roughly a 20% discount on base rates, many of which were fixed back in 2017 and 2018, despite significant subsequent rate increases in the Miami legal market through the present. Courts in this district have found comparable rates reasonable. *See Trump v. Clinton*, 653 F. Supp. 3d 1198, 1236 (S.D. Fla. 2023) (Middlebrooks, J.) (finding J. Gillenwater's rate of $700.00/hr to be reasonable); *Celsius Holdings, Inc. v. A SHOC Beverage, LLC*, No. 21-CV-80740, 2022 WL 3568042, at *3 (S.D. Fla. July 19, 2022) (similar); *Circuitronix, LLC v. Shenzhen Kinwong Elec. Co.*, No. 17-CV-22462, 2019 WL 12265725, at *4 (S.D. Fla. Dec. 20, 2019) (similar).

The amount of 9,954.9 total hours is similarly reasonable. Kinwong is not seeking to

---

[4] The only timekeeper with a hourly rate increase is James E. Gillenwater. Mr. Gillenwater's rate increased from $420.00 to $492.00, which is still a steep discount from his standard rate.

recover any time that is excessive or duplicative, and Kinwong's attorneys worked efficiently throughout this litigation. *See* Gillenwater Decl. Without more, Plaintiffs' attorneys' fees would be reasonable given that this case spanned seven years, involved extensive international discovery, required substantial briefing on the merits and various discovery issues, and culminated in a twelve-day bench trial spanning a month.[5] But Plaintiffs' fees are even more reasonable in light of Defendants' obstructionism and the "frivolous," "silly," and "ridiculous" positions they took throughout this litigation, [D.E. 335] at 45:16-23, 54:17-25, including Defendants': (i) Bad-faith Capital Profit Defense; (ii) meritless counterclaims through which Defendants sought over $40 million; (iii) frivolous spoliation motion; (iv) wasting time at depositions; (v) extensive document sandbagging until after the close of discovery; (vi) repeated flouting of discovery orders, including as to the "most important piece of evidence" in the case, [D.E. 487] at 31; (vii) witness perjury at trial, which significantly extended the length of trial, *id.* at 17-18; and (viii) attorney misconduct, *see, e.g.*, [D.E. 474] at 1308:23-1335:7, which likewise extended the length of the case and trial. *See supra*, at 3-15. Courts have granted similar fee awards on similar facts. *See, e.g.*, *Apotex, Inc. v. UCB, Inc.*, No. 12-CV-60706, 2015 WL 11622480, at *2 (S.D. Fla. Dec. 4, 2015) (awarding $5,336,391.52 in attorneys' fees in a three-year "case involv[ing] an orchestrated scheme to deceptively obtain a patent" that also "involved egregious misconduct throughout").

## II.  The Court Should Award Kinwong Their Non-Taxable Costs.

Kinwong is likewise entitled to an award of non-taxable costs.  On May 21, 2025, Kinwong filed its Bill of Costs, along with a supporting affidavit and memorandum of law, seeking an award of its taxable costs. *See* [D.E. 498-500]. Kinwong now seeks its non-taxable costs pursuant to the Lanham Act or, alternatively, the Court's inherent authority.

---

[5] For additional context, when broken down further, Kinwong's attorneys spent an average of 1,422.1 hours per year on this litigation.

A.  *Kinwong Is Entitled to Its Non-Taxable Costs*.

Having found that this matter constitutes an "exceptional case" under the Lanham Act, the Court should award Kinwong its taxable and non-taxable costs.  *See* 15 U.S.C. § 1117(a) (allowing the plaintiff to recover the "costs of the action"). Although some courts have found that the Lanham Act does not authorize an award of non-taxable costs,[6] other courts, including a recent decision in this district, have found that parties are entitled to non-taxable costs under the Lanham Act.  *See, e.g.*, *Carnival Corp. v. McCall*, No. 18-CV-24588, 2020 WL 6788102, at *13 (S.D. Fla. Sept. 8, 2020) (granting motion for attorneys' fees and non-taxable costs under the Lanham Act); *Purple Innovation, LLC v. Responsive Surface Tech., LLC*, No. 2:20-CV-00708-RJS, 2025 WL 590309, at *8 (D. Utah Feb. 24, 2025) ("As part of an award of attorney fees [under the Lanham Act], the court may award "incidental and necessary expenses incurred in furnishing effective and competent representation" such as non-taxable costs).

Regardless, the Court should award Kinwong its non-taxable costs under the Court's inherent authority. *See Wachovia Bank v. Tien*, 406 F. App'x 378, 383 (11th Cir. 2010) (affirming award of non-taxable costs as within the court's inherent power); *Blanco GmbH±Co. KG v. Vlanco Indus., LLC*, 992 F. Supp. 2d 1225, 1257–59 (S.D. Fla. 2014). "A court may award attorney's fees

---

[6] In 2019, the Supreme Court determined that non-taxable costs could not be awarded under the Copyright Act, which allows a court "in its discretion [to] allow the recovery of full costs . . . to the prevailing party." *Rimini St., Inc. v. Oracle USA, Inc*., 586 U.S. 334, 336 (2019); 17 U.S.C. § 505. The Supreme Court held that under the Copyright Act, "full costs" referred only to a "full" numeric quantity of the six categories specified in the general costs statute. *Id.* at 336-37. Some district courts have applied the same reasoning to the Lanham Act.

However, the Lanham Act authorizes an award of "costs of the action" to a prevailing plaintiff, as well as attorneys' fees to the prevailing party in exceptional cases. 15 U.S.C. § 1117(a). Congress's reference to "costs of the action" in the Lanham Act is more expansive then the "full costs" language in the Copyright Act, and the Court should find that non-taxable costs are included in the "costs of the action."  This is further supported by the fact that an award of attorneys' fees is rarer under the Lanham Act—requiring a finding of an exceptional case—as opposed to the Copyright Act which allows the court to discretionarily award attorneys' fees.

and costs as a sanction for bad-faith litigation pursuant to the court's inherent authority," which "serves the dual purpose of (1) vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and (2) making the prevailing party whole for expenses caused by his opponent's obstinacy." *Id.* at 1257-58. A bad-faith finding unlocks the Court's inherent authority, "demonstrated by a party's knowing or reckless raising of a frivolous argument, by a party's harassment of an opponent, by a party's delay or disruption of a proceeding, or by a party's hampering of the enforcement of a court order." *Id.* at 1258. This inquiry focuses "primarily on the conduct and motive of a party." *Id.*

As already detailed, the Court found this case was exceptional, in part, because of Defendants' "brazen fraud" and frivolous arguments. [D.E. 487]. And Defendants' delay and disruption, discovery sandbagging, and flouting of multiple court orders is well-document above. *Supra*, at 5-14. Such misconduct greatly increased Plaintiffs' costs to litigate this matter, particularly discovery and deposition travel costs. Thus, the Court should exercise its inherent authority and award Kinwong its non-taxable costs. *See Landfall 2, Inc. v. Datascore-AI, LLC*, No. 22-CV-80801, 2024 WL 693088, at *5 (S.D. Fla. Jan. 30, 2024) (awarding non-taxable costs in Lanham Act case under Court's inherent authority).

B. *Kinwong's Non-Taxable Costs Are Reasonable and Supported by Law.*

Kinwong seeks $1,507,265.79 in non-taxable costs. As described fully in the Declaration, the following costs are recoverable:

- $15,956.25 in mediation costs, *see Brown Jordan Int'l, Inc. v. Carmicle*, No. 14-60629-CV, 2017 WL 5633312, at *10 (S.D. Fla. Aug. 7, 2017);

- $15,056.84 in document translation costs, *see Altair S.R.L. v. His Wind, LLC*, No. 5:15-CV-329-OC-30PRL, 2016 WL 1728931, at *5 (M.D. Fla. Apr. 29, 2016);

- $163,669.76 in expert costs, *see Kapila, Tr. of SMF Energy Liquidating Tr. v. Davis, Graham & Stubbs LLP*, No. 15-CV-61016-RNS, 2018 WL 4810248, at *4 (S.D. Fla. June 6, 2018);

- $7,946.98 for meals related to attendance of depositions, hearings, and trial, *see Dais Analytic Corp. v. Soex (Hong Kong) Indus. & Inv. Co.*, No. 8:15-CV-2362, 2021 WL 9949847, at *6 (M.D. Fla. Aug. 23, 2021);

- $3,871.02 in shipping and courier costs, *see Carmicle*, 2017 WL 5633312, at *10;

- $33,248.92 in research costs, *id.*;

- $110,901.09 in travel costs related to attending depositions, hearings, and trial, *see Dais Analytic Corp.*, 2021 WL 9949847, at *6;

- $1,194.07 in additional travel and meal expenses for hearings, depositions, and trial;

- $996,712.52 in discovery ESI vendor costs, *Carmicle*, 2017 WL 5633312, at *10;

- $92,519.52 for trial support (a trial tech and graphics support), *id.*;

- $66,188.82 for hiring a document review team to review Chinese documents, *id.*

In addition to these costs, Kinwong requests that the Court award it any costs deemed to be non-taxable in its Bill of Costs. *Id.* at *9 (Because plaintiffs were entitled to non-taxable costs, such costs associates with taxable costs were recoverable, and plaintiffs were "entitled to full compensation for bringing this lawsuit").

Thus, as fully established herein and in the attached Declaration and supporting documentation, Plaintiffs are entitled to all non-taxable costs incurred in litigating this matter.

## **CONCLUSION**

For the foregoing reasons, Kinwong requests that the Court award Kinwong $ 4,508,374.70 in its reasonable attorneys' fees under 15 U.S.C. § 1117(a) and its non-taxable costs in the amount of $1,507,265.79.

<u>**CERTIFICATE OF CONFERRAL PURSUANT TO L.R. 7.3**</u>

Pursuant to Local Rule 7.3(b), on May 7, 2025, Plaintiffs served on Defendants (1) a draft motion for attorneys' fees and non-taxable costs, (2) a draft declaration in support of that motion, and (3) backup documentation in support of that motion. Plaintiffs' counsel noted that additional backup documentation regarding Kinwong's costs was forthcoming. The same day, Plaintiffs' counsel noted that the deadline to confer was Wednesday, May 28 and requested times to meet and confer. On May 9, 2025, Plaintiffs sent Defendants the backup support for its costs request.

On May 13, 2025, Plaintiffs' counsel followed up, requesting a time to confer on the Motion for Attorneys' Fees and Non-Taxable Costs. Defendants' counsel responded that he was available to confer after May 21. The next day, Plaintiffs' counsel requested times on May 22, May 23, and May 27 to confer.

On May 19, 2025, Defendants' counsel objected to any costs that were non-taxable as not recoverable. Although Defendants' counsel indicated that certain costs fell outside of the costs provided for in 28 U.S.C. § 1920, he did not otherwise indicate why he objected to Plaintiffs' request for non-taxable costs, nor did he provide a line by line specification of the objections.

On May 21, 2025, Defendants' counsel emailed Plaintiffs' counsel, stating that Defendants had reviewed the Motion for Attorneys' Fees and had objections. Defendants' counsel then generally outlined boilerplate objections with caselaw citations. However, Defendants' counsel did not provide line by line objections, stating "[w]e will provide a spreadsheet with notes on each time entry. Given the massive volume of time entries (6449 according to the spreadsheet) we require some additional time to get through them all, but hope to have that to you shortly."

Defendants' counsel did not provide the promised line by line objections. On May 27, 2025, Plaintiffs' counsel followed up on a date and time to confer, noting that the deadline to do

so was May 28. On May 29, 2025, Defendants' counsel responded that he was able to confer on June 3 or June 4. Plaintiffs' counsel responded that afternoon, stating "the deadline to confer was yesterday, and, although you mentioned providing line by line objections, we have not received them. Do you plan to send them to us today?" As of the time of filing, Defendants' counsel has not responded to this inquiry, and Plaintiffs have not received the line by line objections required by the local rules. See L.R. 7.3(b) ("The respondent shall describe in writing and with reasonable particularity each time entry or nontaxable expense to which it objects, both as to issues of entitlement and as to amount, and shall provide supporting legal authority.").

Dated:  May 30, 2025

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
*Counsel for Plaintiffs Shenzhen Kinwong Electronic Co., Ltd. and Kinwong Electronic (HongKong) Ltd.*
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717

By:  ___/s/ *James E. Gillenwater*___
    MARK A. SALKY
    Florida Bar No. 058221
    Email: salkym@gtlaw.com
    JAMES GILLENWATER
    Florida Bar No. 1013518
    Email:  gillenwaterj@gtlaw.com
    EMILEY PAGRABS
    Florida Bar No. 1030834
    Email: pagrabse@gtlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 30th day of May 2025, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ James E. Gillenwater*
James E. Gillenwater

### SERVICE LIST
*Shenzhen Kinwong Electronic Co., Ltd et al. v. Rishi Kukreja et al.*
**Case No. 0:18-cv-61550 ALTMAN/HUNT**

**GRAY ROBINSON, P.A.**
Counsel for Defendants Rishi Kukreja,
Circuitronix, LLC, and Kinwong, LLC
333 S.E. 2nd Ave., Suite 3200
Miami, FL 33131
Tel: (305) 416-6800
Fax: (305) 416-6887

Jorge Espinosa, Esq.
Florida Bar No: 779032
jorge.espinosa@gray-robinson.com
Francesca Russo, Esq.
Florida Bar No: 174912
francesca.russo@gray-robinson.com

**CHAUNCEY D. COLE, P.A.**
Chauncey D. Cole, Esq.
9100 South Dadeland Blvd., Suite 1553
Miami, Florida 33156
Tel: (305) 372-1800
E-mail: chauncey.cole@coletrial.com