**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-cv-61550-ALTMAN/Hunt**

**SHENZHEN KINWONG**
**ELECTRONIC CO., LTD.,** *et al.,*

      *Plaintiffs,*

*v.*

**RISHI KUKREJA,** *et al.,*

      *Defendants.*

_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**RENEWED MOTION TO PARTIALLY ALTER OR AMEND JUDGMENT**

After conducting a multi-day bench trial, we entered final judgment for the Plaintiffs and awarded them $5,208,237.00 in disgorgement damages. *See* Final Judgment [ECF No. 488] at 1. Both sides promptly filed motions to alter the judgment under FED. R. CIV. P. 59(e), each arguing that: (1) the total amount of disgorgement damages should be reduced; and (2) the Plaintiffs were *also* entitled to prejudgment interest. *See* Plaintiffs' Motion to Alter or Amend the Judgment [ECF No. 492] at 1 ("[The Plaintiffs] hereby move the Court to alter or amend the Final Judgment to (1) reduce the total judgment amount . . .; and (2) award Plaintiffs prejudgment interest on the disgorged profits awarded. Defendants agree to both (i) a reduction in the amount of the Final Judgment, and (ii) Plaintiffs' entitlement to prejudgment interest[.]"); Defendants' Motion to Partially Alter or Amend the Judgment [ECF No. 493] at 1 (same).

On June 2, 2025, we granted in part both Rule 59(e) motions and agreed to issue "an amended judgment that: (1) reduces the amount of disgorgement damages awarded to the Plaintiff; and (2) awards the Plaintiff prejudgment interest." June 2, 2025, Order [ECF No. 509] at 1. To aid our decision-making, we ordered the Defendants to "file a renewed motion to alter or amend the

judgment" that "precisely set[s] forth the amount of disgorgement damages and prejudgment interest the Defendants believe the Plaintiffs are entitled to." *Ibid.* The Defendants filed their renewed Rule 59(e) motion on June 17, 2025, *see* Renewed Motion to Partially Alter or Amend Judgment ("Motion") [ECF No. 514], and the matter is now fully briefed and ripe for adjudication, *see* Plaintiffs' Response in Opposition ("Response") [ECF No. 515]; Defendants' Reply in Support of Renewed Motion ("Reply") [ECF No. 519]. After careful review, we now **GRANT in part** and **DENY in part** the Defendants' Motion as follows.

## THE LAW

A party may file "[a] motion to alter or amend a judgment . . . no later than 28 days after the entry of the judgment." FED. R. CIV. P. 59(e). "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (cleaned up); *see also Eveillard v. Nationstar Mortg. LLC*, 2015 WL 1191170, at *5 (S.D. Fla. Mar. 16, 2015) (Bloom, J.) (noting that "an intervening change in controlling law" may serve as a basis for Rule 59 relief). As a result, parties "cannot use a Rule 59(e) motion to relitigate old matters, raise argument[s] or present evidence that could have been raised prior to the entry of judgment." *Michael Linet, Inc. v. Vill. of Wellington*, 408 F.3d 757, 763 (11th Cir. 2005); *see also Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) ("The purpose of a Rule 59(e) motion is not to raise an argument that was previously available, but not pressed.").

## ANALYSIS

The parties agree that we must "reduce the amount of disgorgement damages awarded in favor of [the Plaintiffs] and . . . award prejudgment interest[.]" Motion at 1. What we must resolve here is what this new total award will be. The Defendants request that the Plaintiffs' "award of disgorgement damages be reduced to $3,973,167.63," and they ask us to calculate a "prejudgment interest of $209,377.77" under 28 U.S.C. § 1961 "for a total revised final judgment of $4,182,545.40." *Ibid.* The

Plaintiffs, on the other hand, want us to "reduce the [disgorgement damages] to $4,438,722 based on Kinwong's voluntary concessions as to the PQ26, QE, 1055449, and Rev-9 part numbers," Response at 4, and award "$2,535,740 in prejudgment interest" under the interest rate Florida's Chief Financial Officer set pursuant to FLA. STAT. § 55.03, *id.* at 15. Under the Plaintiffs' calculations, then, we would enter an amended final judgment in the amount of $6,974,462.00. *See id.* at 16.

Before we get to the merits of the Motion, we'll clarify a lingering jurisdictional issue. On July 2, 2025, the Defendants appealed the final judgment we entered on April 7, 2025. *See* Notice of Appeal [ECF No. 516]. That's over a month *after* we granted the parties' original Rule 59(e) motions and two weeks *after* the Defendants filed *this* Motion. The Defendants explained that they were appealing "to avoid missing a jurisdictional deadline" (despite "the court's announced intention to enter an amended final judgment"). *Id.* at 1 n.1. Fortunately, that appeal hasn't deprived us of jurisdiction to adjudicate the Motion. *Cf. Doe 1–13 ex rel. Doe Sr. 1–13 v. Bush*, 261 F.3d 1037, 1064 (11th Cir. 2001) ("[A]s a general rule, the filing of a notice of appeal divests the district court of jurisdiction over those aspects of the case that are the subject of the appeal."). Rule 4(a)(4) of the Federal Rules of Appellate Procedure "provides that a notice of appeal filed during the pendency of a Rule 59 motion is simply suspended." *Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 745–46 (11th Cir. 2014); *see also Locke v. Warren*, 2020 WL 2129243, at *3 (S.D. Fla. May 5, 2020) (Altman, J.) ("Indeed, once a party files a Rule 59(e) motion, that party may not appeal the underlying judgment until the district court rules on the motion." (citing *Osterneck v. Ernst & Whinney*, 489 U.S. 169, 177 (1989))).[1] Since the Notice of Appeal was filed while a Rule 59(e) motion was pending, we've retained jurisdiction to rule on the Motion.

---

[1] That's probably why the Eleventh Circuit recently issued a jurisdictional question to the Defendants, ordering them to "address whether the notice of appeal is effective and, if so, whether the appeal is taken from a final, appealable order." Jurisdictional Question, *Shenzhen Kinwong Elec. Co. Ltd. v. Kukreja*, No. 25-12273 (11th Cir July 29, 2025), ECF No. 13-1 at 1.

# I.     Disgorgement Damages

In our Findings of Fact and Conclusions of Law, we found that the Plaintiffs were entitled to the "disgorgement of $5,208,237 of the Defendants' profits as damages for the Defendants' illicit trademark-infringement and passing off." *Shenzhen Kinwong Elec. Co., Ltd. v. Kukreja*, 2025 WL 1009008, at *41 (S.D. Fla. Apr. 4, 2025) (Altman, J.). Here's how we got to that number. *First*, we determined that the Plaintiffs had "proven by a preponderance of the evidence that the Defendants passed off part numbers PQ26, QE, Rev 9, 1055449, NSP, RHP, and RBP." *Id.* at *33. *Second*, we found that the Defendants earned a "total revenue of $18,021,581.00" from the sale of those seven parts. *Id.* at *40. *Third*, we adopted the expert report of Barry Mukamal (the Defendants' expert)—who calculated the Defendants' profits using an "incremental profit margin of 28.9%." *Id.* at *41 (citing Mukamal Report [ECF No. 457-17] at 193). *Fourth*, we applied Mukamal's incremental profit margin to the Defendants' revenues to compute the following profits: "$2,699,959 for the PQ26; $287,329 for the QE; $863,649 for the Rev 9; $1,147,100 for the 1055449; $191,750 for the NSP; $11,687 for the RHP; and $6,763 for the RBP—totaling $5,208,237." *Ibid.*

Both sides agree that we erred during this process by considering sales that took place *after* the relevant wrongful conduct—thus overinflating the total revenue we used to calculate the Defendants' profits. *See* Motion at 2 ("[T]he Final Judgment appears to have awarded damages for the entire ten-year time period (2012 to 2022) contained in the expert report of [the Plaintiffs'] damages expert, Richard Lettiere, that are not supported by the evidence. In many cases, this includes damages for time periods where even [the Plaintiffs have] previously admitted that no damages are warranted based on the evidence."); *see also* Plaintiffs' Amended Request for Relief [ECF No. 454] at 2 (showing "the part numbers and years for which Plaintiffs are not seeking disgorgement"). To correct this error, the parties have jointly asked that: (1) "sales [of the PQ26] be reduced to eliminate any damages for the years 2017 and 2018," Motion at 3; (2) "damages for [the QE] be reduced to eliminate any damages

after 2016," *id.* at 4; (3) "[f]or [the Rev 9], a 50% reduction should be applied to damages from 2017, and no damages should be awarded for any later years[,]" *ibid.*; and (4) "[for the 1055449] all damages for 2017 and 2018 be eliminated[,]" *id.* at 5; *see also* Response at 4 ("Kinwong agrees with Defendants that a reduction is warranted for part numbers PQ26, QE, and Rev-9, and 1055449 (as to 2017-2018 revenues only)[.]"). Taking these agreed reductions into account, we find that the Plaintiffs are entitled to *no more* than $4,438,722 in disgorgement damages. *See* Response at 4 ("Based on these agreements, the judgment should be reduced by $769,515 from $5,208,237 to $4,438,722.").

The Defendants, however, would have us reduce this award even further. As for part number 1055449, the Defendants request that "no damages [be] awarded for 2013" and that "a reduction of 50% should be applied to 2016 [sales]." Motion at 5. In the Defendants' view, the evidence at trial established that "the 'passing off' of this part number began in 2014" and that "the customer was clearly aware of the correct manufacturing location by July 2016." *Ibid.* As for part numbers NSP, RHP, and RBP, the Defendants ask us to limit our award *solely* to 2014 sales. *See id.* at 7 ("Thus, while damages are appropriate for these sales in 2014 based on the Court's findings, no damages should be awarded for any other years, long before and after these events, such as damages for 2012, 2013, 2015 and 2016."). Finally, the Defendants contend that we should "use the variable yearly rates identified for Mr. Mukamal for each of the relevant years, rather than a flat rate of 28.9% for all years." *Id.* at 8. We agree with some (but not all) of the Defendants' arguments.

*First*, the Defendants say there's no evidence that the 1055449 part was passed off before August 2014 *and* after July 2016. *See* Motion at 6 ("Given the undisputed fact that the customer was aware of the correct manufacturing location by July 2016, a 50% reduction for that year is appropriate . . . . Further, all 2013 damages for this part number should be eliminated because all of the evidence relied upon by [the Plaintiffs] at trial . . . indicates that the alleged 'passing off' of this part number began some time in August, 2014."). We agree with the second part. As the Plaintiffs admitted,

Kimball learned that the 1055449 wasn't manufactured by Kinwong when Kimball audited Benlida in July 2016, and there's no evidence that the Defendants continued to pass off that part *after* the audit. *See* Plaintiffs' Amended Request for Relief at 3 (requesting damages for the 1055449 "based on Defendants bringing Kimball to audit Benlida for the first time in connection with these part numbers in July 2016"); *see also* Def's Ex. 323 [ECF No. 457-12] at 7–8 (indicating that "Kimball will audit [Benlida]" to see the 1055449 part). The Plaintiffs push back, saying that it "charitably agreed to forego disgorgement for 2017 and 2018 for part number 1055449 based on the assumption that a corrective disclosure eventually occurred at some point following the July 2016 Benlida audit, but there is no basis in the record that such a disclosure occurred in 2016, and thus there is no basis to amend the Court's judgment that disgorgement should be awarded on CTX's full 2016 revenues for part number 1055449." Response at 5. But we aren't going to award the Plaintiffs damages based on an *absence* of evidence. *See Kukreja*, 2025 WL 1009008, at *30 ("Kinwong must prove, by a preponderance of the evidence, that each of the [seven] part numbers . . . was passed off." (citing *Fishman Transducers, Inc. v. Paul*, 684 F.2d 187, 192 (1st Cir. 2012))).

That said, we won't exclude the pre-August 2014 damages. The Defendants say that "all of the evidence relied upon" by the Plaintiffs indicates that the 1055449 part wasn't passed off until August 2014. Motion at 6. That's not quite right. The 1055449 was exclusively manufactured by Benlida. *See Kukreja*, 2025 WL 1009008, at *16 ("1055449 [was] also manufactured at Benlida and were labeled with the CTX UL code."); *see also* Day 4 Trial Tr. [ECF No. 472] at 182:13–16 ("[Q]: If Circuitronix told Kimball [that 1055449 was] made in Kinwong, that would be a false representation, right? [Jiang]: Yes."). And the unrebutted evidence at trial established that the Defendants began selling the 1055449 part in 2013. *See* Pl's Ex. 373 [ECF No. 455-8] at 217 (showing $391,776.90 in revenue from the 1055449 part in 2013). The Plaintiffs therefore proved that: (1) the 1055449 part was first sold in 2013; (2) the part was exclusively manufactured by Benlida; and (3) Kimball didn't

know Benlida manufactured the part until the July 2016 audit. The logical inference we draw from this evidence is that Kimball falsely believed that the 1055449 part was being manufactured by the Plaintiffs until July 2016 because the Defendants were improperly passing off that part until the July 2016 audit. *Cf. Ojeda-Sanchez v. Bland Farms, LLC*, 499 F. App'x 897, 901 (11th Cir. 2012) ("[T]he finder of fact [must] weigh the evidence, assess the credibility of the witnesses, and evaluate the reasonableness of the permissible inferences.").[2] We thus conclude that the Plaintiffs are entitled to pre-2014 damages—but not post-July 2016 damages—for the 1055449 part.

*Second*, we'll partially reduce the Plaintiffs' damages for the NSP, RHP, and RBP parts by excluding sales that took place before 2014. As the Defendants explain, these parts "were produced by [the Defendants] in 2014 with an erroneous 'KW-SZ' mark," which was "removed approximately six weeks later, also in 2014." Motion at 6. As a result, the Defendants argue, "damages are appropriate for these sales in 2014 based on the Court's findings, [and] no other damages should be awarded for any other years[.]" *Id.* at 7. The Plaintiffs counter that the Defendants "continued lying to Kimball well after the KW-SZ mark was removed from the boards." Response at 7.

Both sides are partly correct. The Defendants are right that—before 2014—these parts were at least partially manufactured by the Plaintiffs. *See Kukreja*, 2025 WL 1009008, at *15 & n.18 ("The NSP, RHP, and RBP PCBs were built for Kimball and, starting in 2014, were exclusively built at

---

[2] The Defendants say there's "no evidence at all of misrepresentations or passing off before 2014." Reply at 5. It's true that the earliest example of the Defendants *admitting in writing* that they "falsely told Kimball's employees that part number 1055449 was being manufactured at either Kinwong Shenzhen or Kinwong Longchuan" was from around August 2014. *Kukreja*, 2025 WL 1009008, at *16; *see also* Response at 6 ("According to Defendants, their passing off as to this part number began in August 2014. But this is just the date of the earliest email where Defendants were explicit as to the misrepresentations they had been making to Kimball about this part number."). But we won't limit the Plaintiffs' damages to the first day on which the Defendants *memorialized* their bad acts. At the end of the day, the Plaintiffs' evidence showed that Kimball didn't realize Kinwong wasn't manufacturing the 1055449 part from 2013 to July 2016 and that, during this time, the Defendants took affirmative steps to mislead Kimball about the origin of that part. That's enough to establish passing off.

Benlida, not Kinwong. Before 2014, the NSP part number was being produced primarily at Kinwong Shenzhen." (cleaned up)). While the Defendants may have passed off *some* of these pre-2014 boards as manufactured by the Plaintiffs (when they were really made by Benlida), the Plaintiffs didn't produce any evidence of pre-2014 passing off at trial. *See* Reply at 8 ("[T]he offending conduct clearly occurred in 2014 and not in any earlier years."). And, since all the RBP sales took place before 2014, we find that the Plaintiffs aren't entitled to *any* disgorgement damages for this part. *See* Pl's Ex. 373 at 217; *see also* Motion at 7 ("Accordingly, no damages should be awarded for the RBP part number[.]").

On the other hand, the Plaintiffs are right that the Defendants continued to pass off the NSP and RHP parts *after* the "KW-SZ" mark was removed. The trial evidence was clear that Sunny Kapoor continued to lie to Kimball about the origin of these parts to cover up the sudden removal of the offending mark. *See Kukreja*, 2025 WL 1009008, at *16 ("To explain the sudden omission of the 'KW-SZ' mark, Kapoor lied to Kimball by representing that these three parts were now being built at Kinwong Longchuan—when, as evidenced by Kapoor's own email exchange with Kukreja and Jiang, he (and everyone else at CTX) knew Benlida was the manufacturer." (citing Pl's Ex. 471 [ECF No. 455-11] at 341)). The Plaintiffs are therefore entitled to disgorgement damages for NSP and RHP part sales the Defendants made in 2014, 2015, and 2016—though they aren't entitled to disgorgement damages for the NSP, RHP, and RBP parts the Defendants sold in 2012 and 2013.

*Third*, we agree with the Defendants that using "variable yearly profit margins"—instead of "a flat rate of 28.9% for all years"—is the more appropriate way to calculate the damages in this case. Motion at 8. In our prior order, we adopted Barry Mukamal's expert report after finding his methodology more persuasive than the Plaintiffs'. *See Kukreja*, 2025 WL 1009008, at *41 ("We also agree with Mukamal's broader point that the operating expenses endemic to running a business—things like payroll expenses, warehousing, supplies, and insurance—should be deducted from CTX's total revenues because they're consistent as a percentage of sales over the years. Lettiere and his

Report, by contrast, are strangely silent on this issue." (cleaned up)). The Mukamal Report also calculated an average "incremental profit margin of 28.9%." *Id.* at *40 (citing Mukamal Report at 193). As the Defendants point out, however, *both experts* "opined that variable yearly profit margins should be applied to determine the accurate measure of damages." Reply at 4; *see also, e.g.*, Mukamal Report at 194 (using variable yearly profit margins); Day 11 Trial Tr. [ECF No. 479] at 155:4–8 ("Q: So do I understand you to say that the incremental profit margins reflected in the bottom line for each of those years would be the appropriate percentage to apply to the accused revenues for each of those years? [The Plaintiff's Damages Expert]: Yes."). We'll therefore recalculate the Plaintiffs' disgorgement damages using Mukamal's variable yearly profit margins (rather than his average flat rate).

*      *      *

We must now recalculate the proper amount of the Plaintiffs' disgorgement damages. After considering the parties' respective arguments, we find that the Plaintiffs have proven damages for the following six parts: the PQ26 (from 2013 to 2016); the QE (from 2014 to 2016); the Rev 9 (from 2013 to July 2017); the 1055449 (from 2013 to July 2016); the NSP (from 2014 to 2016); and the RHP (from 2014 to 2015). We thus calculate the relevant revenue as follows:

| Part Number | 2013 | 2014 | 2015 | 2016 | 2017 |
|---|---|---|---|---|---|
| PQ26 | $185,270.28 | $1,471,121.00 | $2,893,587.30 | $2,700,374.20 | $0 |
| QE | $0 | $318,993.04 | $965,485.84 | $352,333.32 | $0 |
| Rev 9 | $408,958.81 | $1,051,317.30 | $871,548.32 | $407,000.00 | $124,790.09 |
| 1055449 | $391,776.90 | $994,482.18 | $1,186,755.60 | $476,459.08 | $0 |
| NSP | $0 | $151,831.85 | $135,105.88 | $54,591.28 | $0 |
| RHP | $0 | $10,710.00 | $1,425.96 | $0 | $0 |
| **Total Revenue:** | **$986,005.99** | **$3,998,455.37** | **$6,053,908.90** | **$3,990,757.88** | **$124,790.09** |

*See* Pl's Ex. 373 at 217.

The next (and final) step is to apply Mukamal's variable yearly profit margin to each year's revenue to calculate the disgorgement damages for that year. The variable yearly profit margins are as follows: 29.6% for 2013; 31.5% for 2014; 27.1% for 2015; 28.5% for 2016; and 28.9% for 2017. *See* Mukamal Report at 194. By multiplying the total revenue for each year by these profit rates, we end up with the following profits: $291,857.77 for 2013; $1,259,513.44 for 2014; $1,640,609.31 for 2015; $1,137,366.00; and $36,064.34. Adding these sums together, we arrive at an amended disgorgement award of **$4,365,410.86**, which we'll award to the Plaintiffs "as damages for the Defendants' illicit trademark-infringement and passing off." *Kukreja*, 2025 WL 1009008, at *41.

## II.    Prejudgment Interest

The parties also agree that the Plaintiffs are entitled to an award of prejudgment interest. *See* Motion at 9; Response at 8. As the Defendants explain in their Motion, "it appears that the current law of the Eleventh Circuit is similar to that of the Second Circuit, which authorizes an award of prejudgment interest in 'exceptional cases.'" Motion at 10; *see also PayCargo, LLC v. CargoSprint LLC*, 2022 WL 20810293, at *10 (S.D. Fla. Sept. 30, 2022) (Louis, Mag. J.) ("In Lanham Act cases, prejudgment interest is available in the Court's discretion to successful plaintiffs."), *aff'd*, 2024 WL 1697923 (11th Cir. Apr. 19, 2024).[3] Since we've "already determined that this is an 'exceptional case'

---

[3] Judge Totenberg of the Northern District of Georgia cogently explained the current state of the law in the Eleventh Circuit as it applies to prejudgment interest in Lanham Act cases:

> There exists a circuit split on whether the explicit availability of pre-judgment interest in one part of the statute but not in another bars a claim for pre-judgment interest under Section 1117(a).

> The Fourth Circuit prohibits pre-judgment interest in non-counterfeiting cases, because Section 1117 "explicitly authorizes prejudgment interest in some circumstances but not others." *Georgia-Pac. Consumer Products LP v. von Drehle Corp.*, 781 F.3d 710, 722 (4th Cir. 2015), as amended (Apr. 15, 2015). The Second Circuit, on the other hand, has allowed pre-judgment interest in Section 1117(a) cases, in "exceptional

within the meaning of 15 U.S.C. § 1117(a)[,]" the Defendants concede that we have the "discretion to award [the Plaintiffs] prejudgment interest." Motion at 11; *see also Kukreja*, 2025 WL 1009008, at *43 ("[W]e easily conclude that this case is 'exceptional' because the substantive strength of the Defendants' litigating position (as to the trademark-infringement and fraud claims) was exceptionally weak and because the Defendants advanced unreasonable and frivolous positions to sustain that position[.]" (cleaned up)).

Unfortunately, that's pretty much where the agreement ends. The Defendants ask us to "exercise [our] discretion to award prejudgment interest that is compensatory, rather than punitive, by applying the federal statutory rate set forth in 28 U.S.C. § 1961." Motion at 9. The Plaintiffs counter that, since "damages [were] awarded on a claim governed by Florida law, the interest rates set annually

---

cases." *Am. Honda Motor Co., Inc. v. Two Wheel Corp.*, 918 F.2d 1060, 1064 (2d Cir. 1990) (citing *Champion Spark Plug Co. v. Sanders*, 108 F.Supp. 674 (E.D.N.Y. 1952), *aff'd*, 204 F.2d 125 (2d Cir. 1953)). The Seventh Circuit arguably went further, announcing "a rule that prejudgment interest should be presumptively available to victims of federal law violations . . . [and] is particularly appropriate in a [trademark infringement] case . . . where the violation was intentional, and indeed outrageous. *Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989).

The Eleventh Circuit has not squarely addressed the availability of pre-judgment interest in a non-counterfeiting case, though it did somewhat summarily determine that such an award was not an abuse of discretion. *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1568 (11th Cir. 1986) ("We have examined the partners' other contentions of error and find them meritless. We also conclude that the district court did not abuse its discretion in trebling the damages, awarding prelitigation interest, and awarding Ramada Inns $20,000 in attorney's fees. For the foregoing reasons, the judgment of the district court is affirmed.").

[. . . .]

While the Eleventh Circuit's decision in *Ramada Inns* does not shed light on whether pre-judgment interest is presumptively available or reserved for "exceptional cases," it is at least clear from that opinion that awarding such damages is not a *per se* abuse of discretion, and thus the Fourth Circuit's approach of total exclusion cannot be the law in this circuit.

*Glock, Inc. v. Wuster*, 2020 WL 11025586, at *9–10 (N.D. Ga. Sept. 15, 2020).

by Florida's Chief Financial Officer apply." Response at 9 (citing FLA. STAT. § 55.03). The Plaintiffs

also propose, in the alternative, that we apply "the rate set by 26 U.S.C. § 6621(a)(2)[.]" *Id.* at 12 n.2.

Although the Defendants argue that we shouldn't apply Florida's interest rate, they don't discuss the

§ 6621(a)(2) rate anywhere in their briefing. *See generally* Motion; Reply.

The Eleventh Circuit has given us the discretion to choose "a rate at which to set the amount

of prejudgment interest," so long as there's an "absence of a controlling statute[.]" *Werner Enters., Inc.*

*v. Westwind Mar. Int'l, Inc.*, 554 F.3d 1319, 1328 (11th Cir. 2009) (cleaned up); *see also, e.g., Chanel, Inc. v.*

*Villalobos*, 2011 WL 13217003, at *5 (S.D. Fla. June 20, 2011) (Gold, J.) ("[T]he Lanham Act does not

specifically authorize prejudgment interest on an award of statutory damages. . . . In the absence of a

controlling statute, the prejudgment interest rate for an award based on federal law is within the court's

discretion."). Our "choice of a rate at which to determine the amount of prejudgment interest" is

"usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant

fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in

awarding post-judgment interest." *Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d

1434, 1447 (11th Cir. 1998). After careful review, we decline to award prejudgment interest under

either 28 U.S.C. § 1961 or FLA. STAT. § 55.03 and will instead award prejudgment interest at the rate

established by 26 U.S.C. § 6621(a)(2).

In assessing which prejudgment-interest rate to apply in Lanham Act cases, courts have taken

different approaches. Some courts *outside our Circuit* have adopted the Defendants' approach and have

assessed prejudgment interest under 28 U.S.C. § 1961. *See, e.g., Hudson Furniture, Inc. v. Mizrahi*, 2024

WL 565095, at *14 (S.D.N.Y. Feb. 7, 2024) ("While not uniformly so, many courts assessing pre-

judgment interest in copyright and other intellectual property cases under federal law have applied the

federal post-judgment interest rate set forth in 28 U.S.C. § 1961(a)."); *N.V.E., Inc. v. Day*, 2009 WL

2526744, at *5 (D.N.J. Aug. 18, 2009) ("With regard to prejudgment interest, because this Court's

jurisdiction arises from NVE's federal Lanham Act claims, this Court has discretion to set the applicable interest rate. In exercising this discretion, the Third Circuit has recommended that this Court be guided by the interest rate provided by 28 U.S.C. § 1961(a)." (citing *Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir. 1986))); *Electrology Lab., Inc. v. Kunze*, 169 F. Supp. 3d 1119, 1160–61 (D. Colo. 2016) ("The Court finds the post-judgment interest rate under § 1961 would reasonably compensate ELI for the loss of use of money for the applicable time period.").

Even so, as the Plaintiffs point out, there isn't a "single Lanham Act case out of this Circuit in which a court applied the Federal Postjudgment Interest Rate to calculate prejudgment interest." Response at 12; *see also Smith v. Am. Int'l Life Assurance Co. of N.Y.*, 50 F.3d 956, 958 (11th Cir. 1995) ("We recognize that some circuit courts have approved the use of the section 1961(a) post-judgment rate to compute pre-judgment interest. . . . Because district courts have discretion in determining pre-judgment interest rates, we hold that district courts are not required to use section 1961(a) in computing such interest."). Indeed, the prevailing view in our Circuit is that § 1961 *doesn't* properly compensate plaintiffs for *prejudgment* harm. *See, e.g.*, *Glock*, 2020 WL 11025586, at *10 ("As the average federal post-judgment rate of interest for the calendar week preceding the hearing in this matter was 0.17%, in large part due a recession that long post-dated the filing of the complaint, the Court finds that the post-judgment rate would be inadequate under the circumstances."); *Eventus Mktg., Inc. v. Sunset Transp. Co.*, 2011 WL 13220271, at *4 (S.D. Fla. Oct. 25, 2011) (Williams, J.) ("The Court has considered the interest rate specified in 28 U.S.C. § 1961, which deals with post-judgment interest, but finds that amount insufficient to compensate Plaintiff.").

Many other courts have adopted the Plaintiffs' position and used the relevant state-law interest rate—so long as the Lanham Acts claims were brought together with state-law claims. *See, e.g.*, *Bumble & Bumble, LLC v. Pro's Choice Beauty Care, Inc.*, 2016 WL 658310, at *12 (S.D.N.Y. Feb. 17, 2016) ("[T]he Court finds that an award of prejudgment interest on the statutory damages is appropriate to

serve these purposes. This interest should be applied at the 9% statutory rate under New York Civil Practice Law and Rules § 5004, compounded annually."); *Vanwyk Textile Sys., B.V. v. Zimmer Mach. Am., Inc.*, 994 F. Supp. 350, 390–91 (W.D.N.C. 1997) ("Under the circumstances of this case, . . . the undersigned concludes that the most faithful application of the law would be to award prejudgment interest for the Lanham Act violation, beginning with the date of sale to Springs. Further, the prejudgment interest rate should be that provided by the South Carolina Code § 34–31–20 (8.75%) and applicable to the other substantive claims in this case."); *see also Chiquita Brands Int'l, S.A.R.L. v. Zamhern S.A.*, 2023 WL 12058625, at *2 (S.D. Fla. Oct. 13, 2023) (Altman, J.) (finding that "the Petitioner's request for prejudgment interest using the statutory rates under Florida law (which provides more guidance that § 1961(a) on multi-year computations) is reasonable and warranted" in a case brought under 9 U.S.C. § 203).

We certainly *could* award prejudgment interest under Florida law because we found for the Plaintiffs on their state-law claims. *See Kukreja*, 2025 WL 1009008, at *28 n.30 ("Kinwong prevailed on both Count I (the Lanham Act claim) and Count IV (common law trademark infringement) because the standards are the same."). But we take the Defendants' point that this case is "almost entirely as a question of the application of the Lanham Act on the parties' trademark rights." Motion at 14; *see also* Reply at 10 ("[F]ederal claims and federal law substantially predominated over this litigation."). And we're reluctant to impose a state-law interest rate in a case that almost exclusively "implicates the Lanham Act." *Kukreja*, 2025 WL 1009008, at *1; *see also Abbott Labs. V. H&H Wholesale Servs., Inc.*, 2022 WL 17977495, at *12 (E.D.N.Y. Dec. 28, 2022) (declining to award "the New York state rate of nine percent annum, compounded annually" in favor of the rate in 26 U.S.C. § 6621(a)(2)).

So, we'll take a third option: "'[the] adjusted prime rate, established periodically by the Secretary of the Treasury and codified in 26 U.S.C. § 6621[(a)(2)],'" which is "'used regularly by district courts to calculate prejudgment interest' in other types of cases." *Glock*, 2020 WL 11025586, at *10

(quoting *Taxman v. Bd. of Educ. of Twp. of Piscataway*, 91 F.3d 1547, 1566 (3d Cir. 1996)).[4] And, indeed, many courts in our Circuit have used this rate to calculate prejudgment interest in Lanham Act cases. *See Glock*, 2020 WL 11025586, at *10 ("The Court agrees with Mr. Cenatempo's conclusions, and adopts the [rate codified in 26 U.S.C. § 6621]."); *Villalobos*, 2011 WL 13217003, at *5 ("Prejudgment interest on statutory damages awards shall be calculated at the same rate provided for under the Lanham Act for calculating prejudgment interest on an award of actual damages—the rate set by 26 U.S.C. § 6621(a)(2)."); *Louis Vuitton Malletier, S.A. v. Guodong*, 2011 WL 13213938, at *7 (S.D. Fla. Feb. 18, 2011) (McAliley, Mag. J.) ("I recommend that the court calculate prejudgment interest on the statutory damages awards at the same rate provided for under the Lanham Act for calculating prejudgment interest on an award of actual damages—the rate set by 26 U.S.C. § 6621(a)(2)."), *report and recommendation adopted*, 2011 WL 13213951 (S.D. Fla. July 14, 2011) (Gold, J.); *see also Melodrama Publ'g, LLC v. Santiago*, 2015 WL 2380521, at *6–7 (S.D.N.Y. May 19, 2015) ("Although 15 U.S.C. § 1117(a) does not provide for prejudgment interest, such an award is within the discretion of the trial court and is normally reserved for 'exceptional' cases. . . . Melodrama's prejudgment interest should be capped at the rate set forth in Section 1117(b). That section incorporates by reference the rate established under 26 U.S.C. § 6621(a)[.]"). In our view, using the prejudgment interest rate under 26 U.S.C. § 6621(a)(2) gives us the best of both worlds: It adequately compensates the Plaintiffs (unlike the § 1961(a) rate) *and* is consistently deployed in cases under the Lanham Act and other federal statutes.[5]

---

[4] The Lanham Act itself says that district courts can "award prejudgment interest . . . at an annual interest rate established under [26 U.S.C. § 6621(a)(2)]" *if* the court awards treble damages in "a case involving use of a counterfeit mark[.]" 15 U.S.C. § 1117(b).

[5] Since the Defendants have never argued that the § 6621(a)(2) prejudgment interest rate is improper, *see generally* Motion; Reply, they've arguably waived their right to challenge our decision on this point, *see United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d

The parties agree that we should "measur[e] the date of loss from January 1 of the following year (e.g. 1/1/14 as the date of loss for 2013 profits)," and that any interest should be "computed daily and compounded annually." Motion at 17 (cleaned up). Unfortunately, neither side has had an opportunity to calculate the appropriate amount of prejudgment interest in accordance with the rulings we've made in this Order—namely, that (1) the Plaintiffs are entitled to $4,365,410.86 in damages; and (2) the prejudgment interest rate set by 26 U.S.C. § 6621(a)(2) applies to those damages. Rather than try to resolve this issues ourselves without input from the parties, we'll order both sides to jointly compute the appropriate amount of prejudgment interest in a way that's consistent with this Order. Once the parties have filed that joint notice on the docket, we'll promptly issue an amended judgment awarding the appropriate amount of damages.

## CONCLUSION

For all these reasons, we **ORDER and ADJUDGE** as follows:

1.  The Defendants' Renewed Motion to Partially Alter or Amend Judgment [ECF No. 514] is **GRANTED in PART** and **DENIED in PART**.

2.  The Plaintiff shall be awarded **$4,365,410.86** in damages, plus an appropriate amount of prejudgment interest at the rate set forth in 26 U.S.C. § 6621(a)(2).

3.  The parties shall file a joint notice on the docket calculating the appropriate amount of prejudgment interest by **August 26, 2025**.

4.  Our April 7, 2025, Final Judgment [ECF No. 488] is **VACATED**. We'll enter an amended final judgment once the parties have filed their joint notice on prejudgment interest.

---

678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("'[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented . . . are deemed waived.").

**DONE AND ORDERED** in the Southern District of Florida on August 13, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record